**DYKEMA GOSSETT LLP**
ASHLEY R. FICKEL, State Bar No. 237111
   *AFickel@dykema.com*
444 South Flower Street, Suite 2200
Los Angeles, California 90071
Telephone: (213) 457-1800
Facsimile: (213) 457-1850

Attorneys for Respondent Anthem Holdings (USA), Inc.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| William H. Hawkins, as Trustee of the William H. Hawkins Revocable Trust,<br><br>Petitioner,<br><br>v.<br><br>Anthem Holdings (USA), Inc., a Delaware corporation, and DOES 1-10, inclusive,<br><br>Respondents. | Case No.:<br><br>**RESPONDENT ANTHEM HOLDINGS (USA), INC.'s NOTICE OF REMOVAL** |

Respondent Anthem Holdings (USA), Inc. ("Anthem"), pursuant to 28 U.S.C. § 1441, hereby removes to this Court the case styled *William H. Hawkins v. Anthem Holdings (USA), Inc.*, Case No. 24STCP03132, from the Superior Court of the State of California for the County of Los Angeles, based on the following grounds:

1.     On or after September 30, 2024, Petitioner filed a Petition to Compel Arbitration in the Superior Court of the State of California for the County of Los Angeles (the "Petition").

2.     The Petition names Anthem as the sole respondent in that case.

3.     Anthem was served by personal service through its registered agent on October 11, 2024.  True and correct copies of the letter with the summons, petition and other case initiating documents are attached as Exhibit A.

DYKEMA GOSSETT LLP
444 SOUTH FLOWER STREET
SUITE 2200
LOS ANGELES, CALIFORNIA 90071

4.      This Notice of Removal is filed within thirty (30) days of Anthem's receipt of the Petition, making removal of this action timely under 28 U.S.C. § 1446(b).

5.      This case is a civil action for which this Court has original jurisdiction under 28 U.S.C. § 1332(a).  This civil action is between citizens of different states and, based on the allegations in the Complaint, the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

6.      Specifically, Petitioner is a California resident and his trust is organized in California. Pet. Para 1.

7.      Petitioner alleges that defendant Anthem is a corporation organized under the laws of the state of Delaware with its principal place of business in Texas. Pet. Para 2.

8.      The amount in controversy requirement is satisfied.  Petitioner expressly alleges that he is entitled to damages in excess of $1.4 million. Pet. Para 10.

9.      Pursuant to 28 U.S.C. § 1446(d), Anthem will promptly give notice, upon filing this Notice of Removal, to all parties of record and to the Clerk of the Superior Court of the State of California for the County of Los Angeles.

10.      The summons, Petition and other case initiating documents are attached to this Notice of Removal as Exhibit A.

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

DYKEMA GOSSETT LLP
444 SOUTH FLOWER STREET
SUITE 2200
LOS ANGELES, CALIFORNIA 90071

2

1    Therefore, having met all the requirements for removal under 28 U.S.C. §

2    1441 and 1446, including all jurisdictional requirements established by 28 U.S.C. §

3    1332, Anthem gives notice that it removes the captioned case to the United States

4    District Court for the Central District of California.

5

6    DATED:  October 21, 2024         DYKEMA GOSSETT LLP

7

8

9    By: _____

10        ASHLEY R. FICKEL
         Attorneys for Respondent Anthem
11        Holdings (USA), Inc.

12   121265.000008  4886-4488-2162.2

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT "A"

Electronically FILED by
Superior Court of California,
County of Los Angeles
9/30/2024 4:50 PM
David W. Slayton,
Executive Officer/Clerk of Court,
By S. Ruiz, Deputy Clerk

1    TROYGOULD PC
     Russell I. Glazer (SBN 166198)
2    Email:    rglazer@troygould.com
     Sara Watar (SBN 341770)
3    Email:    swatar@troygould.com
     1801 Century Park East, 16th Floor
4    Los Angeles, CA 90067-2367
     Telephone:    (310) 553-4441
5    Facsimile:    (310) 201-4746

6    Attorneys for Petitioner
     William H. Hawkins, as Trustee of the William H. Hawkins
7    Revocable Trust

8            SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                      COUNTY OF LOS ANGELES

10

11

12   William H. Hawkins, as Trustee of the        Case No.  24STCP03132
     William H. Hawkins Revocable Trust,
13                                                 WILLIAM H. HAWKINS, AS TRUSTEE OF
                   Petitioner,                     THE WILLIAM H. HAWKINS REVOCABLE
14                                                 TRUST'S NOTICE OF PETITION AND
            v.                                     PETITION TO COMPEL ARBITRATION
15                                                 AND APPOINT NEUTRAL ARBITRATOR;
     Anthem Holdings (USA), Inc., a Delaware       SUPPORTING DECLARATIONS OF
16   corporation, and DOES 1-10, inclusive         WILLIAM H. HAWKINS AND SARA
                                                   WATAR
17                 Respondents.

18

19

20

21

22

23

24

25

26

27

28

**TroyGould PC**

**PETITION TO COMPEL ARBITRATION AND APPOINT NEUTRAL ARBITRATOR**

Pursuant to California Code of Civil Procedure §§ 1281.2 and 1281.6, Petitioner William H. Hawkins, as Trustee of the William H. Hawkins Revocable Trust (the "Trust"), hereby alleges:

1.     William H. Hawkins is an individual residing in Northridge, California.  At all times mentioned in this Petition, William H. Hawkins was and is the co-trustee of the William H. Hawkins Revocable Trust, which was created in Los Angeles, California on or around February 3, 2016.  (Declaration of William H. Hawkins ("Hawkins Decl."), ¶¶ 2-3).

2.     Respondent, Anthem Holdings (USA), Inc. ("Anthem"), is a Delaware corporation organized under the laws of Delaware with its principal place of business located at 3001 Dallas Parkway, Suite 201, Frisco, Texas 75034.  (Declaration of Sara Watar ("Watar Decl."), ¶ 2.).

3.     On March 29, 2022, Anthem entered into a written stock purchase agreement with the Trust, whereby the Trust was to sell, and Anthem was to buy, all outstanding shares of Angeleno Mortuaries, Inc. ("Stock Purchase Agreement").  (Hawkins Decl., ¶ 4, Ex. A.).

4.     That same day, Anthem and the Trust executed a side letter modifying the Stock Purchase Agreement (the "Side Letter").  (The Stock Purchase Agreement as modified by the Side Letter is referred to herein as the "SPA.")

5.     The SPA was executed in Los Angeles, California.  (Hawkins Decl., ¶ 6.).

6.     Among other things, in the Side Letter, the Trust agreed to forego immediate payment of $8,000,000 of the purchase price – an amount later increased to $9,000,000 – in exchange for a promissory note in that amount, plus interest (the "Promissory Note").  (Hawkins Decl., ¶¶ 5, 7, Exs. B-C.).

7.     The Promissory Note came due on June 27, 2022.  Anthem failed to pay the Trust any principal due under the Promissory Note, just as it has failed to honor its other obligations to the Trust.  (Hawkins Decl., ¶¶ 4-5, 8-9, 11-17, Exs. A-D.).

8.     On August 17, 2022, Anthem, the Trust and the Canadian Imperial Bank of Commerce ("CIBC") entered into a subordination and postponement agreement, whereby Anthem and the Trust agreed that the Promissory Note would be deferred, postponed and subordinated to the prior repayment in full by Anthem of its debt to CIBC ("Subordination and Postponement

Agreement"). (Hawkins Decl., ¶ 10.). As a result, the Trust does not presently seek arbitration of its entitlement to payment pursuant to the Promissory Note. Instead, the Trust brings this Petition to compel arbitration and appoint a neutral arbitrator to seek redress for Anthem's breaches of the SPA that are not encompassed by the Promissory Note or barred by the Subordination and Postponement Agreement.

9.      Pursuant to § 12.1(a) of the SPA, Anthem and the Trust agreed to arbitrate any dispute arising under the agreement in Los Angeles, California. (Hawkins Decl., ¶¶ 4-5, Exs. A-B.).

10.     A dispute has arisen regarding Anthem's beaches of the SPA including (1) Anthem's failure to deposit and pay an escrow fund of $1.4 million; (2) Anthem's failure to pay the Trust the amount by which the closing working capital was greater than the target working capital of $750,000; and (3) Anthem's failure to reimburse the Trust for paying Anthem's attorney's fees incurred in retaining the services of Dykema Gossett PLLC to represent it during Anthem's purchase of Angeleno Mortuaries, Inc. (Hawkins Decl., ¶¶ 4-5, 11-17, Exs. A-B, D.).

11.     Accordingly, all of the Trust's claims arise under the SPA. (Hawkins Decl., ¶¶ 4-5, Exs. A-B.).

12.     Moreover, Pursuant to § 12.1(c) of the SPA, Anthem and the Trust agreed that:

> [A]ny claim they may have against the other arising out of or related to the transaction contemplated by this Agreement and/or the terms, interpretation and/or enforcement (including any dispute regarding the interpretation of this arbitration clause) shall be submitted to and finally resolved by binding arbitration in accordance with the California Arbitration Act (Code of Civil Procedure § 1280 et seq.)

(Hawkins Decl., ¶¶ 4-5, Exs. A-B.).

13.     Code of Civil Procedure § 1281.6 provides:

> If the arbitration agreement does not provide a method for appointing an arbitrator, the parties to the agreement who seek arbitration and against whom arbitration is sought may agree on a method of appointing an arbitrator and that method shall be followed. In the absence of an agreed method, or if the agreed method fails or for any reason cannot be followed, or when an arbitrator appointed fails to act and his or her successor has not been appointed, the court, on petition of a party to the arbitration agreement, shall appoint the arbitrator.

**TroyGould PC**

3

04639-0002 4876-5939-6067.3

When a petition is made to the court to appoint a neutral arbitrator, the court shall nominate five persons from lists of persons supplied jointly by the parties to the arbitration or obtained from a governmental agency concerned with arbitration or private disinterested association concerned with arbitration. The parties to the agreement who seek arbitration and against whom arbitration is sought may within five days of receipt of notice of the nominees from the court jointly select the arbitrator whether or not the arbitrator is among the nominees. If the parties fail to select an arbitrator within the five-day period, the court shall appoint the arbitrator from the nominees.

14.    On August 7, 2024, counsel for the Trust sent a letter to Anthem attaching a draft demand for arbitration (the "Demand for Arbitration"). In the letter and pursuant to the SPA and Code of Civil Procedure § 1281.6, *et seq.*, counsel for the Trust proposed to arbitrate the matter before JAMS and requested that Anthem provide the Trust a list of recommended arbitrators. Anthem did not respond. (Declaration of Sara Watar ("Watar Decl."), ¶¶ 3-5, Ex. E.).

15.    On August 14, 2024, counsel for the Trust sent correspondence to Anthem, following up on the Trust's Demand for Arbitration and its request for recommended arbitrators. Counsel for the Trust notified Anthem that if it did not receive a response by August 19, 2024, regarding the Trust's Demand for Arbitration, the Trust would move to petition the Court to appoint an arbitrator pursuant to Code of Civil Procedure § 1281.6. (Watar Decl., ¶ 6, Ex. F.).

16.    On August 16, 2024, counsel for Anthem sent correspondence to counsel for the Trust, proposing mediation. In his email, counsel for Anthem did not agree to arbitration. (Watar Decl., ¶ 7, Ex. G.).

17.    The parties did not agree to mediation. (Watar Decl., ¶ 8.).

18.    On September 3, 2024, counsel for the Trust again asked whether Anthem would arbitrate the matter before JAMS. (Watar Decl., ¶ 9, Ex. H.).

19.    On September 4, 2024, counsel for Anthem sent correspondence to counsel for the Trust, refusing to arbitrate before JAMS. Counsel for Anthem failed to propose an alternative arbitration provider. (Watar Decl., ¶ 10, Ex. I.).

**TroyGould PC**

4

g

20.    On September 4, 2024, counsel for the Trust sent correspondence to counsel for Anthem, inquiring as to Anthem's basis for objecting to JAMS and proposing Alternative Resolution Centers as an alternative arbitration provider.  (Watar Decl., ¶ 11, Ex. J.).

21.    To date, Anthem's counsel has yet to respond to counsel for the Trust's September 4, 2024, correspondence and has yet to agree to arbitration. (Watar Decl., ¶ 12.).

22.    On September 27, 2024, counsel for the Trust obtained a list of arbitrators from a private disinterested association concerned with arbitration, namely, Alternative Resolution Centers.  (Watar Decl., ¶¶ 13-14, Ex. K.); C.C.P. § 1281.6.

19.    The Trust has not at any time waived its right to arbitration.  (Watar Decl., ¶ 15.).

WHEREFORE, the Trust prays as follows:

1.    For an order by the Court compelling Anthem to submit this dispute to arbitration pursuant to the parties' arbitration agreement;

2.    That the Court nominate five persons contained on the list of arbitrators supplied by Alternative Resolution Centers and attached as Exhibit K to the Declaration of Sara Watar;

3.    That the Court select an arbitrator from among the Nominees if the parties fail to select an arbitrator within five days after receipt of notice of the nominees;

4.    For attorneys' fees and costs; and

5.    For such further relief as the Court may deem proper.


                                        TROYGOULD PC



                                        By: _____
                                            Russell I. Glazer
                                            Sara Watar
                                        Attorneys for Petitioner
                                        William H. Hawkins as Trustee of the William H.
                                        Hawkins Revocable Trust

04639-0002  4876-5939-6067.3

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Respondent Anthem Holdings (USA), Inc. ("Anthem") has breached its obligations to Petitioner William H. Hawkins, as Trustee of the William H. Hawkins Revocable Trust (the "Trust") pursuant to the stock purchase agreement and side letter entered into between the parties on March 29, 2022.  Because each and every claim the Trust brings against Anthem arises under the stock purchase agreement and the side letter modifying the stock purchase agreement, the Trust's claims are subject to the arbitration agreement contained therein.  Despite the Trust's repeated efforts to engage with Anthem in appointing a neutral arbitrator, Anthem has failed to agree to arbitration or to a neutral arbitrator.  The Trust therefore respectfully requests that the Court (1) grant this petition and compel Anthem to arbitrate the claims against it and (2) nominate five persons from the list of arbitrators supplied by Alternative Resolution Centers, attached as Exhibit K to the Declaration of Sara Watar, in accordance with California Code of Civil Procedure §§ 1281.2 and 1281.6.

## II.    STATEMENT OF FACTS

### A.    The SPA Contains an Agreement to Arbitrate

On or around March 29, 2022, Anthem and the Trust executed a stock purchase agreement and side letter modifying the stock purchase agreement, whereby the Trust was to sell and Anthem was to buy all 100 outstanding shares of Angeleno Mortuaries, Inc. ("Angeleno Mortuaries") (the stock purchase agreement and side letter modifying the stock purchase agreement are referred to herein as the "SPA".)  (Declaration of William H. Hawkins ("Hawkins Decl."), ¶¶ 4-5, Exs. A-B.).  Pursuant to § 2.2 of the SPA, the estimated purchase price for the 100 outstanding shares in Angeleno Mortuaries was to be calculated as: (a) $28,000,000, plus or minus (b) the Working Capital Adjustment[1], minus (c) minus existing indebtedness, minus (d) seller transaction expenses.  (*Id*.)

---

[1]    Pursuant to § 2.2(b) of the SPA, the working capital adjustment is defined as the amount by which the closing working capital is greater than or less than the target working capital ("Working Capital Adjustment"). § 1.1 defines the closing working capital as the amount

(Continued...)

1      Pursuant to § 12.1(a) of the SPA, the parties agreed to arbitrate "[a]ny dispute arising under

2   [the SPA]." (*Id.*).

3      **B.**     **The Trust's Claims Arise Under the SPA**

4          *1.*    *The Escrow Fund*

5      Section 3.3(b) of the SPA provides that Anthem was to deposit an escrow fund of $1.4

6   million ("Escrow Fund") into a segregated escrow account ("Escrow Account") by June 27, 2022.

7   (*Id.*).  The escrow agent was to disburse the Escrow Fund to the Trust upon the expiration of the

8   escrow period on February 18, 2023 ("Escrow Period").  (*Id.*)  Anthem never deposited the Escrow

9   Fund on behalf of the Trust prior to or since June 27, 2022.  (Hawkins Decl., ¶¶ 4-5, 11, Exs. A-

10   B.).  Accordingly, the escrow agent has been unable to disburse the Escrow Fund pursuant to the

11   terms of the SPA.  (*Id.*).

12          *2.*    *The Working Capital Adjustment*

13      Section 2.4 of the SPA provided that on or before the 60th day following the Closing Date,

14   Anthem was to provide the Trust with a written statement setting forth Anthem's calculation of the

15   purchase price for the 100 outstanding shares of Angeleno Mortuaries, including among other

16   things, the Closing Working Capital.  (Hawkins Decl., ¶¶ 4-5, Exs. A-B.).  Pursuant to the terms of

17   the SPA, if the Closing Working Capital was less than the Target Working Capital, Anthem and the

18   Trust were to execute a joint written discretion directing the escrow agent to immediately release

19   the full amount of that difference from the Escrow Fund to Anthem, plus interest on any unpaid

20   amount until paid in full.  (*Id.*)  The SPA also requires that if the Closing Working Capital was

21   greater than the Target Working Capital, Anthem was to pay that difference to the Trust, plus

22   interest on any unpaid amount until paid in full.  (*Id.*)

23      Anthem did not provide the Trust its written statement setting forth a calculation of the

24   purchase price or the Closing Working Capital on or before the 60th day after Closing, and has

25

26               calculated by subtracting the current liabilities of Angeleno Mortuaries from the current assets

27   of Angeleno Mortuaries (excluding inventory) as of the closing date (Closing Working Capital").  The SPA lists the target working capital at $750,000 ("Target Working Capital").

28   The closing date is defined in § 3.1 of the SPA (the "Closing Date" or "Closing").  (Hawkins Decl., ¶¶ 4-5, Exs. A-B.).

**TroyGould PC**

04639-0002 4876-5939-6067.3

1    failed to do so since.  (Hawkins Decl., ¶¶ 4-5, 12, Exs. A-B.).  On information and belief, the

2    Closing Working Capital exceeded the Target Working Capital by approximately $300,000.

3    (Hawkins Decl., ¶ 13.).  Anthem has yet to transfer that difference to the Trust in violation of the

4    SPA.  (Hawkins Decl., ¶¶ 4-5, 13, Exs. A-B.).

5                    3.      *Anthem's Dykema Fees*

6            Section 12.9 of the SPA provides that each party shall pay its own costs and expenses,

7    including legal fees, incurred in connection with the agreement.  (Hawkins Decl., ¶¶ 4-5, Exs. A-

8    B.).  Anthem retained the legal services of Dykema Gossett PLLC ("Dykema") in connection with

9    its purchase of Angeleno Mortuaries.  (Hawkins Decl., ¶ 14.).

10          On or about March 29, 2022, a final settlement statement was prepared by First American

11   Title Insurance Company, which listed the charges to Anthem and the Trust relating to the purchase

12   and sale of Angeleno Mortuaries ("Final Settlement Statement").  (Hawkins Decl., ¶ 15, Ex. D.).

13   The Final Settlement Statement erroneously listed Anthem's Dykema fees of $95,000 as charges to

14   be paid by the Trust rather than Anthem.  (*Id*.).  At Anthem's request and in the interest of time, the

15   Trust paid Dykema's fees on Anthem's behalf and in reliance on Anthem's promise to reimburse

16   the Trust for those fees.  (Hawkins Decl., ¶ 16.).  Anthem failed to reimburse the Trust for paying

17   Anthem's Dykema fees in violation of the SPA.  (Hawkins Decl., ¶¶ 4-5, 17, Exs. A-B.).

18       **C.      The Trust's Attempts to Engage Anthem in Appointing a Neutral Arbitrator**

19                **Pursuant to the SPA**

20          Pursuant to § 12.1(c) of the SPA, Anthem and the Trust agreed that:

21                  [A]ny claim they may have against the other arising out of or related to
                    the transaction contemplated by this Agreement and/or the terms,
22                  interpretation and/or enforcement (including any dispute regarding the
                    interpretation of this arbitration clause) shall be submitted to and finally
23                  resolved by binding arbitration in accordance with the California
                    Arbitration Act (Code of Civil Procedure § 1280 et seq.)
24

25   (Hawkins Decl., ¶¶ 4-5, Exs. A-B.)

26
     Code of Civil Procedure § 1281.6 provides:
27
                    If the arbitration agreement does not provide a method for appointing an
28                  arbitrator, the parties to the agreement who seek arbitration and against

**TroyGould
PC**

g

04639-0002  4876-5939-6067.3

whom arbitration is sought may agree on a method of appointing an arbitrator and that method shall be followed. In the absence of an agreed method, or if the agreed method fails or for any reason cannot be followed, or when an arbitrator appointed fails to act and his or her successor has not been appointed, the court, on petition of a party to the arbitration agreement, shall appoint the arbitrator.

When a petition is made to the court to appoint a neutral arbitrator, the court shall nominate five persons from lists of persons supplied jointly by the parties to the arbitration or obtained from a governmental agency concerned with arbitration or private disinterested association concerned with arbitration. The parties to the agreement who seek arbitration and against whom arbitration is sought may within five days of receipt of notice of the nominees from the court jointly select the arbitrator whether or not the arbitrator is among the nominees. If the parties fail to select an arbitrator within the five-day period, the court shall appoint the arbitrator from the nominees.

On August 7, 2024, counsel for the Trust sent for the Trust sent a letter to Anthem attaching a draft demand for arbitration (the "Demand for Arbitration"). (Declaration of Sara Watar ("Watar Decl."), ¶ 3, Ex. E).  In the letter, and pursuant to the SPA and Code of Civil Procedure § 1281.6, *et seq.*, counsel for the Trust proposed to arbitrate the matter before JAMS and requested that Anthem provide the Trust a list of recommended arbitrators.  (Watar Decl., ¶¶ 3-4, Ex. E).  Anthem did not respond.  (Watar Decl., ¶ 5.).

On August 14, 2024, counsel for the Trust sent correspondence to Anthem, following up on the Trust's Demand for Arbitration and its request for recommended arbitrators.  (Watar Decl., ¶ 6, Ex. F.).  Counsel for the Trust notified Anthem that if she did not receive a response by August 19, 2024, regarding the Trust's Demand for Arbitration, the Trust would move to petition the Court to appoint an arbitrator pursuant to Code of Civil Procedure § 1281.6.  (*Id.*)

On August 16, 2024, counsel for Anthem sent correspondence to counsel for the Trust, proposing mediation.  In his email, counsel for Anthem did not agree to arbitration.  (Watar Decl., ¶ 7, Ex. G.).  The parties did not agree to mediation. (Watar Decl., ¶ 8.).

On September 3, 2024, counsel for the Trust again asked whether Anthem would arbitrate the matter before JAMS.  (Watar Decl., ¶ 9, Ex. H.).  On September 4, 2024, counsel for Anthem sent correspondence to counsel for the Trust, refusing to arbitrate before JAMS.  (Watar Decl.,

¶ 10, Ex. I.).  Counsel for Anthem failed to propose an alternative arbitration provider. (*Id*.).  On September 4, 2024, counsel for the Trust sent correspondence to counsel for Anthem, inquiring as to Anthem's basis for objecting to JAMS and proposing Alternative Resolution Centers as an alternative arbitration provider.  (Watar Decl., ¶ 11, Ex. J.).  To date, Anthem's counsel has yet to respond to counsel for the Trust's correspondence regarding appointment of a neutral arbitrator and has yet to even agree to arbitrate this matter.  (Watar Decl., ¶ 12.).

On September 27, 2024, counsel for the Trust obtained a list of arbitrators from a private disinterested association concerned with arbitration, namely, Alternative Resolution Centers. (Watar Decl., ¶¶ 13-14, Ex. K.); C.C.P. § 1281.6.  Due to Anthem's failure to cooperate with the Trust regarding appointment of a neutral arbitrator, the Trust was forced to file this Petition requesting that the Court compel arbitration of the Trust's claims against Anthem and nominate five arbitrators from the list of arbitrators provided by the Alterative Resolution Centers.

## III.    THE COURT SHOULD COMPEL ANTHEM TO ARBITRATE THE TRUST'S CLAIMS

Code of Civil Procedure section 1280 *et seq*. mandate**s** that courts grant motions to compel arbitration when there is a valid agreement to arbitrate.  **"**On petition of a party to an arbitration agreement alleging the existence of a written agreement to arbitrate a controversy and that a party to the agreement refuses to arbitrate that controversy, the court shall order the controversy to arbitration if it determines that an agreement to arbitrate exists . . . "  C.C.P. § 1281.2.

"California has a strong public policy in favor of arbitration and any doubts regarding the arbitrability of dispute are resolved in favor of arbitration.  This strong policy has resulted in the general rule that arbitration should be upheld unless it can be said with assurance that an arbitration clause is not susceptible to an interpretation covering the asserted dispute.  The party opposing arbitration has the burden of demonstrating that an arbitration clause cannot be interpreted to require arbitration of the dispute."  *Rice v. Downs* (2016) 248 Cal.App.4th 175, 185; *see also Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1, 9 (1992) (California "has expressed a strong public policy in favor of arbitration as a speedy and relatively inexpensive means of dispute resolution.")

Once the party in favor of arbitration has sufficiently alleged the existence of an arbitration agreement, "the burden must fall upon the party opposing arbitration to demonstrate that an arbitration clause cannot be interpreted to require arbitration of the dispute." *Coast Plaza Drs. Hosp. v. Blue Cross of California* (2000) 83 Cal.App.4th 677, 686-87. Moreover, because of the strong public policy in favor of arbitration, the scope of arbitration agreements must be liberally construed: "Doubts as to whether an arbitration clause applies to a particular dispute are to be resolved in favor of sending the parties to arbitration." *Cione v. Foresters Equity Servs.* (1997) 58 Cal.App.4th 625, 642.

On March 29, 2022, Anthem and the Trust entered into the SPA. (Hawkins Decl., ¶¶ 4-5, Exs. A-B.). § 12.1(c) of the SPA contained an arbitration provision, providing that:

> [A]ny claim they may have against the other arising out of or related to the transaction contemplated by this Agreement and/or the terms, interpretation and/or enforcement (including any dispute regarding the interpretation of this arbitration clause) shall be submitted to and finally resolved by binding arbitration in accordance with the California Arbitration Act (Code of Civil Procedure § 1280 et seq.)

(*Id.*).

As set forth in the Demand for Arbitration, the Trust's claims arise out of or relate to the transaction contemplated by the SPA. (Hawkins Decl., ¶¶ 4-5, Exs. A-B; Watar Decl., ¶ 3, Ex. E.).

**First**, the Demand for Arbitration alleges that the SPA required Anthem to deposit the Escrow Fund of $1.4 million on June 27, 2022, to be held in the Escrow Account and disbursed to the Trust at the end of the Escrow Period. (Watar Decl., ¶ 3, Ex. E, Ex. A, ¶¶ 21-22). At the end of the Escrow Period, the Escrow Fund of $1.4 million should have been deposited to the Trust because no claims for Working Capital Adjustment or indemnification were made by Anthem. (*Id.*, Ex. A, ¶ 24.). The Demand for Arbitration alleges that the Trust never received the Escrow Fund because Anthem failed to deposit it in the first instance in violation of the SPA. (*Id.*, Ex. A, ¶ 25.).

**Second**, the Demand for Arbitration alleges that, per the SPA, if the Closing Working Capital was greater than the Target Working Capital, Anthem was required wire transfer the full amount of that difference to the Trust. (*Id.*, Ex. A, ¶ 28.). The Demand for Arbitration alleges that

**TroyGould PC**

04639-0002  4876-5939-6067.3

the Closing Working Capital was greater than the Target Working Capital of $750,000 and as such, Anthem should have wire transferred the full amount of that difference to the Trust but failed to do so in violation of the SPA. (*Id.*, Ex. A, ¶ 30.)

**Third**, the Demand for Arbitration alleges that the SPA provides that each party shall pay its own costs and expenses, including legal fees, incurred in connection with the agreement. (*Id.*, Ex. A, ¶ 33.) Although the Final Settlement Statement erroneously listed Anthem's Dykema fees of $95,000 as charges to be paid by the Trust rather than Anthem, the Trust paid Anthem's Dykema fees as an accommodation to Anthem, relying on Anthem's promise to reimburse the Trust for those fees. (*Id.*, Ex. A, ¶ 36.) The Demand for Arbitration alleges that Anthem failed to reimburse the Trust for paying Anthem's Dykema fees in violation of the SPA. (*Id.*).

In short, the Demand for Arbitration alleges that Anthem materially breached its obligations to the Trust in violation of the SPA. (Watar Decl., ¶ 3, Ex. E, Ex. A.) As a result, the Trust seeks to assert claims against Anthem for (1) breach of written contract and (2) an accounting. (*Id.*). These claims must be arbitrated pursuant to the arbitration agreement contained within the SPA. (Hawkins Decl., ¶¶ 4-5, Exs. A-B.)

## IV.    THE COURT SHOULD NOMINATE A LIST OF FIVE PERSONS FROM THE LIST PROVIDED BY ARC

Section 12.1(c) of the SPA provides:

> [A]ny claim they may have against the other arising out of or related to the transaction contemplated by this Agreement and/or the terms, interpretation and/or enforcement (including any dispute regarding the interpretation of this arbitration clause) shall be submitted to and finally resolved by binding arbitration in accordance with the California Arbitration Act (Code of Civil Procedure § 1280 et seq.)

(*Id.*). Moreover, Code of Civil Procedure § 1281.6 provides:

> If the arbitration agreement does not provide a method for appointing an arbitrator, the parties to the agreement who seek arbitration and against whom arbitration is sought may agree on a method of appointing an arbitrator and that method shall be followed. In the absence of an agreed method, or if the agreed method fails or for any reason cannot be followed, or when an arbitrator appointed fails to act and his or her successor has not been appointed, the court, on petition of a party to the arbitration agreement, shall appoint the arbitrator.

**TroyGould PC**

04639-0002 4876-5939-6067.3

> ***When a petition is made to the court to appoint a neutral arbitrator, the court shall nominate five persons from lists of persons supplied jointly by the parties to the arbitration or obtained from a governmental agency concerned with arbitration or private disinterested association concerned with arbitration***. The parties to the agreement who seek arbitration and against whom arbitration is sought may within five days of receipt of notice of the nominees from the court jointly select the arbitrator whether or not the arbitrator is among the nominees. If the parties fail to select an arbitrator within the five-day period, the court shall appoint the arbitrator from the nominees.  (Emphasis added.)

Anthem has continuously ignored the Trust's repeated attempts to appoint an arbitrator pursuant to the SPA and Code of Civil Procedure § 1281.6.  (Watar Decl., ¶¶ 3-12, Exs. E-J.).  As a result, counsel for the Trust obtained a list of arbitrators from Alternative Resolution Centers.  (Watar Decl., ¶ 14, Ex. K.).  Based in Los Angeles, Alternative Resolution Centers is a private disinterested association that provides arbitration and mediation services.  (Watar Decl., ¶ 13); C.C.P. § 1281.6.  Pursuant to the SPA and Code of Civil Procedure § 1281.6, the Court should nominate the five persons from the list of arbitrators provided by Alternative Resolution Centers and appoint an arbitrator from the nominees if the parties do not select an arbitrator within five days of the Court's order.  (Watar Decl., ¶¶ 14, Ex. K).

## V.    **CONCLUSION**

For the foregoing reasons, the Trust respectfully requests that the Court (a) order Anthem to arbitrate the Trust's claims as contained in the Demand for Arbitration, (b) nominate five persons from the list of arbitrators provided by Alternative Resolution Centers, and (c) select an arbitrator from the list if the parties do not agree on an arbitrator within five days after the parties receive notice of the nominees from the Court.

TROYGOULD PC


By: _____
     Russell I. Glazer
     Sara Watar
Attorneys for Petitioner
William H. Hawkins as Trustee of the William H. Hawkins Revocable Trust

04639-0002  4876-5939-6067.3

## DECLARATION OF WILLIAM H. HAWKINS

I, William H. Hawkins, declare as follows:

1.      I am the petitioner in this proceeding.  I have personal knowledge of the facts set forth in this declaration and, if called as a witness, could and would testify competently to such facts under oath.

2.      I reside in Northridge, California.

3.      At all relevant times, I was the co-trustee of the Williams H. Revocable Trust (the "Trust"), which was created in Los Angeles, California on or around February 3, 2016.

4.      On March 29, 2022, the Trust and Anthem Holdings (USA), Inc. ("Anthem") entered into a written stock purchase agreement, whereby the Trust was to sell, and Anthem was to buy, all 100 outstanding shares of Angeleno Mortuaries, Inc. ("Stock Purchase Agreement").  A true and correct copy of the Stock Purchase Agreement is attached hereto as **Exhibit A**.

5.      On March 29, 2022, the Trust and Anthem executed a side letter modifying the Stock Purchase Agreement (the "Side Letter").  A true and correct copy of the Side Letter is attached hereto as **Exhibit B**.  (The Stock Purchase Agreement as modified by the Side Letter is referred to herein as the "SPA.")

6.      The SPA was executed in Los Angeles, California.

7.      In the Side Letter, the Trust agreed to forego immediate payment of $8,000,000 of the purchase price for the 100 outstanding shares of Angeleno Mortuaries, Inc. ("Angeleno Mortuaries") – an amount later increased to $9,000,000 – in exchange for a promissory note in that amount, plus interest (the "Promissory Note").  A true and correct copy of the Promissory Note is attached hereto as **Exhibit C**.

8.      The Promissory Note came due on June 27, 2022.

9.      To date, Anthem failed to pay the Trust any principal due under the Promissory Note.

10.     On August 17, 2022, Anthem, the Trust and the Canadian Imperial Bank of Commerce ("CIBC") entered into a subordination and postponement agreement, whereby Anthem

**TroyGould PC**

04639-0002 4876-5939-6067.3

1  and the Trust agreed that the Promissory Note would be deferred, postponed and subordinated to

2  the prior repayment in full by Anthem of its debt to CIBC ("Subordination and Postponement

3  Agreement").

4       11.    Anthem never deposited the escrow fund of $1.4 million on behalf of the Trust prior

5  to or since June 27, 2022.  The escrow agent has therefore been unable to disburse the escrow fund

6  pursuant to the terms of the SPA.  *See* **Exhibits. A-B**.

7       12.    Anthem never provided the Trust its written statement setting forth a calculation of

8  the purchase price or the closing working capital on or before the 60th day after closing, and has

9  failed to do so since.  *See* **Exhibits. A-B**.

10       13.    On information and belief, the closing working capital exceeded the target working

11  capital by approximately $300,000.  Anthem has yet to transfer that difference to the Trust.

12       14.    Anthem retained the legal services of Dykema Gossett PLLC ("Dykema") in

13  connection with its purchase of Angeleno Mortuaries.

14       15.    On or about March 29, 2022, a final settlement statement was prepared by First

15  American Title Insurance Company, which listed the charges to Anthem and the Trust relating to

16  the purchase and sale of Angeleno Mortuaries ("Final Settlement Statement").  The Final

17  Settlement Statement erroneously listed Anthem's Dykema fees of $95,000 as charges to be paid

18  by the Trust rather than Anthem.  A true and correct copy of the Final Settlement Statement is

19  attached hereto as **Exhibit D**.

20       16.    At Anthem's request and in the interest of time, the Trust paid Dykema's fees on

21  Anthem's behalf and in reliance on Anthem's promise to reimburse the Trust for those fees.

22       17.    Anthem failed to reimburse the Trust for paying Anthem's Dykema fees.

23       I declare under penalty of perjury under the laws of the State of California that the

24  foregoing is true and correct, and that this declaration is executed on September 2&#770;, 2024, at Los

25  Angeles, California.

26

27

28                     William H. Hawkins

# EXHIBIT A

*Execution Version*

**STOCK PURCHASE AGREEMENT**

**BY**

**ANTHEM HOLDINGS (USA), INC.,
A DELAWARE CORPORATION**

**AND**

**THE WILLIAM H. HAWKINS REVOCABLE TRUST, BY WILLIAM H. HAWKINS
AND GLENN GOMEZ, CO-TRUSTEES**

**FEBRUARY 18, 2022**

# TABLE OF CONTENTS

Page

I. DEFINITIONS ..................................................................................................1

    1.1    **Definitions.**.............................................................................1
    1.2    **Construction.**......................................................................11

II. PURCHASE AND SALE OF SHARES ..............................................12

    2.1    **Purchase and Sale.**...........................................................12
    2.2    **Purchase Price.**.................................................................12
    2.3    **Payment of Purchase Price.**............................................12
    2.4    **Calculation of Final Purchase Price.**.............................13
    2.5    **Rollover.**............................................................................14
    2.6    **Excluded Assets.**...............................................................15
    2.7    **Permitted Liens on Company's Assets.**..........................15

III. CLOSING ................................................................................................15

    3.1    **Closing Date.**.....................................................................15
    3.2    **Seller Deliveries at the Closing.**....................................16
    3.3    **Buyer Deliveries at the Closing.**....................................16

IV. REPRESENTATIONS AND WARRANTIES CONCERNING SELLER ...........................17

    4.1    **Authority and Enforceability.**........................................17
    4.2    **No Conflict or Violation.**..................................................17
    4.3    **Third-Party Consents and Approvals.**...........................18
    4.4    **Ownership of Shares.**.......................................................18

V. REPRESENTATIONS AND WARRANTIES CONCERNING THE COMPANY...............18

    5.1    **Organization.**....................................................................18
    5.2    **Qualification; Location of Business and Assets.**..........18
    5.3    **No Subsidiaries.**...............................................................18
    5.4    **Third-Party Consents and Approvals.**...........................19
    5.5    **No Conflict or Violation.**..................................................19
    5.6    **Capitalization.**..................................................................19
    5.7    **Financial Condition and Liabilities.**.............................19
    5.8    **No Undisclosed Liabilities.**.............................................20
    5.9    **Absence of Certain Changes.**..........................................20
    5.10    **Accounts Receivable.**.......................................................22
    5.11    **Inventories.**.......................................................................22
    5.12    **Title; Business Assets.**......................................................22
    5.13    **Condition of Assets.**.........................................................22
    5.14    **Real Property.**...................................................................22

-i-

Page

5.15    Leased Personal Property. ...........................................................24
5.16    Employment Matters. ...................................................................24
5.17    Employee Benefit Plans ...............................................................28
5.18    Material Contracts. ......................................................................30
5.19    Suppliers. .....................................................................................31
5.20    Tax Returns and Taxes. ...............................................................31
5.21    Permits. ........................................................................................34
5.22    Intellectual Property Rights. ........................................................34
5.23    No Pending Proceedings. .............................................................35
5.24    Compliance with Laws. ...............................................................35
5.25    OSHA. ..........................................................................................36
5.26    Environmental/Health Safety Matters. ........................................36
5.27    Investments. .................................................................................37
5.28    Preneed Trusts. ............................................................................38
5.29    Preneed Insurance. .......................................................................38
5.30    Other Insurance Coverage. ..........................................................38
5.31    Warranty Claims. .........................................................................38
5.32    Relationships with Affiliates and Related Persons. .....................38
5.33    Privacy Laws ...............................................................................39
5.34    Rollover Equity ...........................................................................39
5.35    Brokers and Finders. ....................................................................40
5.36    Disclosure. ...................................................................................40
5.37    No Other Seller Representation or Warranties. ...........................40

VI. REPRESENTATIONS AND WARRANTIES OF BUYER ....................................40

6.1    Organization. ...............................................................................40
6.2    Authority and Enforceability. ......................................................40
6.3    Third-Party Consents. ..................................................................41
6.4    No Conflict or Violation. .............................................................41
6.5    Investment Intent. ........................................................................41
6.6    Brokers and Finders .....................................................................41
6.7    Limitation on Warranties. ............................................................41

VII. COVENANTS ....................................................................................................41

7.1    Access and Investigation. ............................................................41
7.2    Conduct of Business. ...................................................................42
7.3    Consents and Approvals. ..............................................................43
7.4    Update Schedules. ........................................................................43
7.5    Exclusivity. ..................................................................................44
7.6    Confidentiality. ............................................................................44
7.7    Noncompetition/Nonsolicitation. ................................................44
7.8    Termination of Pension Plans. .....................................................45
7.9    Assistance in Proceedings. ..........................................................46
7.10    Retention of and Access to Books and Records. .........................46
7.11    Further Assurances. .....................................................................46

-ii-

Page

7.12  **Press Releases.** ...................................................................................46
7.13  **Buyer Objections.** ...............................................................................46
7.14  **Transfer of Excluded Assets.** ..............................................................47

VIII. TAX MATTERS ........................................................................................47

8.1  **Apportionment of Taxes** .....................................................................47
8.2  **Filing of Tax Returns** ..........................................................................48
8.3  **Refunds and Credits.** ...........................................................................49
8.4  **Transfer Taxes.** ...................................................................................49
8.5  **Cooperation on Tax Matters** ...............................................................49
8.6  **Tax Proceedings.** .................................................................................50
8.7  **Tax Actions.** .......................................................................................50
8.8  **Tax Consequences of Transaction.** ......................................................50

IX. CONDITIONS TO CLOSING ......................................................................51

9.1  **Conditions to Obligations of Buyer.** ...................................................51
9.2  **Conditions to Obligations of Seller.** ...................................................52

X. INDEMNIFICATION ...................................................................................53

10.1  **Indemnification by Seller.** ..................................................................53
10.2  **Indemnification by Buyer.** ..................................................................53
10.3  **Defense of Third-Party Claims.** ..........................................................54
10.4  **Other Claims.** .....................................................................................55
10.5  **Survival.** .............................................................................................55
10.6  **Indemnification Limitations.** ..............................................................56
10.7  **Exclusive Remedy.** .............................................................................57
10.8  **Limitation of Damages.** ......................................................................57

XI. TERMINATION ..........................................................................................57

11.1  **Termination.** .......................................................................................57
11.2  **Effect of Termination.** ........................................................................58

XII. OTHER PROVISIONS ...............................................................................58

12.1  **Dispute Resolution.** ............................................................................58
12.2  **Appendices, Exhibits and Schedules.** .................................................59
12.3  **Amendment.** .......................................................................................59
12.4  **No Waiver.** .........................................................................................59
12.5  **Entire Agreement.** ..............................................................................59
12.6  **Governing Law.** ..................................................................................59
12.7  **Notices.** ..............................................................................................59
12.8  **Execution of Agreement.** ....................................................................60
12.9  **Expenses.** ...........................................................................................61

Stock Purchase Agreement
121265.000008  4851-0140-2367.9

Page

**12.10  Successors and Assigns; No Third Party Beneficiaries.** ....................................61

**12.11  Enforcement by Injunction**. ...............................................................................61

Page

EXHIBITS

A    Escrow Agreement                                              A-1
B    Consulting Agreement                                          B-1
C    Form of Resignation and Release                               C-1

DISCLOSURE SCHEDULES

Schedule 1.1          Preneed Trusts
Schedule 2.2(a)       Closing Working Capital Calculation
Schedule 2.3(a)       Estimated Purchase Price
Schedule 2.3(b)       Seller's Wire Transfer Instructions
Schedule 3.3(d)       Seller's Transaction Costs
Schedule 5.2          Qualification; Location of Business and Assets
Schedule 5.4          Third-Party Seller Consents
Schedule 5.8          Company Liabilities
Schedule 5.9          Absence of Certain Changes
Schedule 5.10         Accounts Receivable
Schedule 5.14(a)      Owned Real Property and their Preliminary Title Reports
Schedule 5.14(b)      Leased Real Property
Schedule 5.15         Leased Personal Property
Schedule 5.16(a)      Current Employees
Schedule 5.16(b)      Independent Contractors
Schedule 5.16(c)      Terminated Employees
Schedule 5.16(e)      Collective Bargaining Agreements
Schedule 5.17         Employee Benefit Plans
Schedule 5.18         Material Contracts
Schedule 5.19         Suppliers
Schedule 5.20         Tax Returns
Schedule 5.21         Permits
Schedule 5.22         Intellectual Property Rights
Schedule 5.23         Pending Proceedings
Schedule 5.24         Compliance with Laws
Schedule 5.25         OSHA
Schedule 5.26         Environmental Matters
Schedule 5.27         Investments
Schedule 5.29         Preneed Insurance
Schedule 5.30         Other Insurance Coverage
Schedule 5.31         Warranty Claims
Schedule 5.32         Affiliates and Related Persons
Schedule 6.3          Third-Party Buyer Consents

-v-

## STOCK PURCHASE AGREEMENT

THIS STOCK PURCHASE AGREEMENT (the "Agreement") is made as of February 18, 2022 (the "Effective Date"), by and between Anthem Holdings (USA), Inc., a Delaware corporation ("Buyer"), and the William H. Hawkins Revocable Trust, by William Hawkins and Glenn Gomez, as Co-Trustees ("Seller"). Buyer and Seller are also referred to from time to time in this Agreement individually as a "Party" and together as the "Parties."

## RECITALS

A.    Seller owns all of the outstanding shares of capital stock (the "Shares") of Angeleno Mortuaries, Inc. a California corporation (the "Company").

B.    The Company is engaged in the business of operating funeral homes and a crematory at its facilities located in Los Angeles San Bernardino, and Ventura Counties in California (the "Business").

C.    Seller desires to sell to Buyer, and Buyer desires to purchase from Seller, all of the Shares, upon the terms and subject to the conditions of this Agreement.

## AGREEMENTS

The Parties, intending to be legally bound, agree as follows:

## I. DEFINITIONS

**1.1    Definitions.**  For purposes of this Agreement, the following terms shall have the meanings specified or referred to in this Section 1.1:

"Affiliate" means, with respect to any specified Person, any other Person directly or indirectly controlling, controlled by or under common control with such specified Person. For the purposes of this definition, "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise. For purposes of the Employee Plans, the term "Affiliate" shall have the meaning ascribed under Code Section 414(b), (c) or (m) and ERISA Section 4001.

"Agreement" has the meaning specified in the Preamble.

"Arbitration Rules" is defined in Section 12.1(c).

"Anthem GP" has the meaning specified in Section 2.5.

"Basket Amount" has the meaning specified in Section 10.6.

"Bureau" means the California Cemetery and Funeral Bureau.

"Business" has the meaning specified in the Recitals.

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks in New York, New York are required or authorized by law to be closed.

"Buyer" has the meaning specified in the Preamble.

"Buyer Closing Certificate" has the meaning specified in Section 9.2.

"Buyer Documents" has the meaning specified in Section 6.2.

"Buyer Group" has the meaning specified in Section 7.1.

"Buyer Indemnified Persons" has the meaning specified in Section 10.1.

"CARES Act" means the Coronavirus Aid, Relief, and Economic Security Act, as in effect as of the date of this Agreement (or any amended or successor version that is substantively comparable) and any current or future regulations or official interpretations thereof.

"Cash" has the meaning specified in Section 2.5(a).

"Closing" has the meaning specified in Section 3.1.

"Closing Cash" has the meaning specified in Section 2.3(c).

"Closing Date" has the meaning specified in Section 3.1.

"Closing Financial Information" has the meaning specified in Section 2.4.

"Closing Payment" has the meaning specified in Section 2.3.

"Closing Working Capital" means the amount calculated by subtracting the current liabilities of the Company from the current assets of the Company (excluding Inventory) as of the Closing Date. The calculation of Closing Working Capital shall be prepared and presented consistent with the principles applying the same accounting methods, policies, practices, procedures and principles as were used to prepare the Pre-Closing Balance Sheet.

"COBRA" means the Consolidated Omnibus Budget Reconciliation Act.

"Code" means the Internal Revenue Code of 1986, as amended.

"Company" has the meaning specified in the Recitals.

"Company Software" means any Software (including related documentation) that is material to the Company and that is owned by or licensed to the Company other than commercially available, off-the-shelf, non-customized Software.

"Company Systems" has the meaning specified in Section 5.22.

"Consulting Agreement" has the meaning specified in Section 3.2.

2

"Consent" means any consent, approval, authorization, permission, ratification or waiver from, notice to, or registration or filing with, any Person.

"Contract" means any agreement, contract, subcontract, lease, instrument, note, option, purchase order, work order, customer order, license or sublicense or other commitment or undertaking of any nature (whether written or oral), in each case that is legally binding.

"Copyrights" means all registered and unregistered copyrights in both published works and unpublished works and all rights in mask works.

"Deferred CARES Act Taxes" means any amount payable by the Company after the Closing Date which would have been payable by the Company on or prior to the Closing Date but for the deferral of such Taxes pursuant to the CARES Act and any administrative or other guidance published with respect thereto by any Governmental Authority.

"Due Diligence" means the Buyer's representatives and advisors investigation, inspection, review and/or analysis of the Business and Company's Assets, contracts, documents, financial statements, books, records, tax returns, accounts, ledgers, insurance policies, preneed trusts, appraisals, employee files, and all other similar and related documents and information, including but not limited to those deposited in the due diligence Data Site, and those made available to Buyer and its representatives during their visits to each of Seller's Real Properties, and/or any information provided or disclosed in any Real Property Preliminary Title Reports, appraisals, Phase I or II reports, environmental reports, and any other reports regarding the Company, Business and the Company's Assets.

"Effective Date" has the meaning specified in the Preamble.

"Employee Plans" means employment related plans, including but not limited to, employment or consulting agreements, collective bargaining and supplemental agreements, pension, profit sharing, incentive, bonus, deferred compensation, retirement, stock option, stock purchase, severance, medical, hospitalization, dental, prescription, life insurance, disability, vacation, salary continuation, sick pay, welfare, fringe benefit and other employee benefit plans, contracts, programs, policies and arrangements, whether written or oral.

"Environmental Claim" means any and all administrative, regulatory or judicial actions, suits, orders, demands, claims, notices of violation, investigations or proceedings or requests for information involving any Person alleging liability arising out of or resulting from (A) alleged noncompliance with any Environmental Laws or Environmental Permits or (B) the alleged presence, migration or Release of, or exposure to, any Hazardous Substances at any location;

"Environmental Laws" means all Laws, Environmental Permits, Governmental Orders, or legally binding agreements relating to the use, management or disposal of Hazardous Substances, or to pollution, or protection of endangered species, natural resources, human health or the environment;

"Environmental Permits" means Permits which are or have been required under or are or have been issued pursuant to Environmental Laws;

3

"ERISA" means the Employee Retirement Income Security Act of 1974.

"Escrow Agent" has the meaning specified in Section 3.3(b).

"Escrow Agreement" has the meaning specified in Section 3.2(c).

"Escrow Fund" has the meaning specified in Section 3.3(b).

"Estimated Purchase Price" has the meaning specified in Section 2.3.

"Existing Indebtedness" means the Indebtedness of the Company outstanding on the Closing Date.

"Filed Tax Returns" has the meaning specified in Section 5.20(a).

"Final Purchase Price" has the meaning specified in Section 2.4.

"Final Termination Date" has the meaning specified in Section 11.1.

"Financial Statements" has the meaning specified in Section 5.7.

"FIRPTA" – has the meaning specified in Section 5.20.

"Fundamental Representations" has the meaning specified in Section 10.5.

"Governmental Authority" means the government of the United States, or of any state, local, county or political subdivision thereof, and any federal, state, local or county entity, agency, body or authority exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"Governmental Order" means any legally binding order, writ, judgment, injunction, decree, stipulation, award or determination of any Governmental Authority.

"Hazardous Substance" means any and all substances or wastes which have been defined or classified as hazardous, toxic or harmful pursuant to any Environmental Laws, or which are regulated pursuant to such Environmental Laws, including Medical Waste, petroleum and each of its chemical constituents and by-products, urea formaldehyde foam insulation, polychlorinated biphenyls, and asbestos in any form;

"HIPAA" means the Health Insurance Portability and Accountability Act of 1996, as amended, and the privacy and security regulations promulgated thereunder, the Health Information Technology and Clinical Health Act, enacted as part of the American Recovery and Reinvestment Act of 2009 and the regulations promulgated thereunder, and the Breach Notification Rule, codified at 45 CFR 164.400 et seq.

"Indebtedness" means (i) the principal of and/or interest accrued on (A) indebtedness for money borrowed and (B) indebtedness evidenced by notes, debentures, bonds or other similar instruments; (ii) all obligations issued or assumed as the deferred purchase price of property (but excluding accounts payable); (iii) all obligations for the reimbursement of any obligor on any letter

4

of credit or similar credit transaction servicing obligations of a Person or of a type described in clauses (i) and (ii) above and (iv) and (v) below; (iv) all obligations to pay rent or other amounts under any lease of real property or personal property which obligations are required to be classified and accounted for as capital leases, and the amount of such obligations shall be the capitalized amount thereof; and (v) all guarantees of obligations of the type referred to in clauses (i) through (iv) of other Persons, in each case including the aggregate amount of all pre-payment, termination or redemption charges, premiums, penalties, fees, costs, expenses, breakage costs, make-whole payments or other payments required to be paid in respect of any of the obligations of the type referred in clauses (i) through (v) on prepayment or otherwise.

"Indemnified Party" has the meaning specified in Section 10.3.

"Indemnifying Party" has the meaning specified in Section 10.3.

"Intellectual Property Rights" means all intellectual property owned or licensed (as licensor or licensee) by the Company, including (i) Marks; (ii) Patents and Invention Disclosures; (iii) Copyrights; (iv) all rights in mask works (as defined in Section 901 of the Copyright Act of 1976); (v) Software; (vi) Trade Secrets; (vii) Net Names; (viii) other applications, certificates, filings, registrations or other documents issued by, filed with, or recorded by, any private, state, government or other public or quasi-public legal authority for protection of any technology; and (ix) all rights to sue or recover and retain damages and costs and attorneys' fees for past, present and future infringement or misappropriation.

"Invention Disclosures" means invention disclosures relating to inventions conceived or reduced to practice by one or more officers, employees, independent contractors, or other parties with whom the Company may have collaborated in connection with developments on behalf of the Business.

"Inventory" means all inventories including inventory of unsold and available funeral goods, and all other materials and supplies used or consumed by the Company in its business (including inventories held at any location controlled by the Company and inventories previously purchased and in transit to such locations).

"IRCA" has the meaning specified in Section 5.16.

"Seller's Knowledge", "known to Seller" and words of similar import means, with respect to any matter in question, the actual knowledge of Seller and of each of Glenn Gomez and William Hawkins as a layperson, after making due and reasonable inquiry of such matter, which shall include due inquiry of any Person having primary responsibility for such matter. This term is not intended to connote that the persons in this term are expressing any legal opinions.

"Law" means any law, ordinance, code, statute, rule, regulation, order, judgment, injunction, award, or decree of any court, arbitrator, administrative agency, regulatory body or authority and governmental body or authority, whether federal, state, local or foreign.

"Leased Real Property" has the meaning specified in Section 5.14.

"<u>Legal Expenses</u>" means reasonable attorney's, accountants', investigators', and experts' fees, and expenses reasonably sustained or incurred in connection with the defense or investigation of any Losses or the enforcement of this Agreement.

"<u>Liabilities</u>" means any and all debts (secured and unsecured), liabilities, guarantees, commitments and obligations, whether fixed, contingent or absolute, asserted or unasserted, matured or unmatured, liquidated or unliquidated, accrued or not accrued, known or unknown, due or to become due, whenever or however arising (including whether arising out of any contract or any tort based on negligence or strict liability).

"<u>Lien</u>" means any pledge, lien (including without limitation any tax lien), charge, claim, encumbrance, security interest, mortgage, option, restriction on use, voting or transfer (including without limitation any buy-sell agreement or right of first refusal or offer), community property interest, forfeiture, penalty, license, equity or other right of another Person of every nature and description whatsoever.

"<u>Losses</u>" has the meaning specified in <u>Section 10.1</u>.

"<u>Marks</u>" means Company's name, all assumed fictional business names, trade names, registered and unregistered trademarks, service marks and applications.

"<u>Material Adverse Effect</u>" means any fact, event, change, development or effect that, individually or together with any one or more other facts, events, changes, developments or effects, has resulted in, or would reasonably be expected to: (a) result in a material adverse effect on the Business, assets, liabilities, operations, capitalization, results of operations or financial condition of the Company, or (b) prevent or materially delay or materially impair the ability of Seller to consummate the transactions contemplated by this Agreement.

"<u>Material Contracts</u>" has the meaning specified in <u>Section 5.18</u>.

"<u>Medical Waste</u>" means medical waste items, including, but not limited to, cultures and stocks of infectious agents, human body fluids, pathological waste, radioactive isotopes, pacemakers, and similar materials, including as defined in the applicable Laws regulating medical waste in the applicable jurisdiction.

"<u>Net Names</u>" means all rights in internet web sites and internet domain names presently used by the Company.

"<u>Notice of Disagreement</u>" has the meaning specified in <u>Section 2.4</u>.

"<u>Ordinary Course of Business</u>" means the usual and ordinary course of business consistent with past custom and practice (including with respect to quantity and frequency) of the Company.

"<u>Organizational Documents</u>" means, with respect to any Person, (i) the bylaws, (ii) certificate of incorporation or certificate of formation, (iii) limited liability company agreement, operating agreement or similar agreement, (iv) similar corporate or limited liability company documents, (v) any charter or agreement or similar document adopted or filed in connection with

6

the creation, formation, or organization of a Person, and (vi) any amendment to or restatement of any of the foregoing.

"OSHA" means the Occupational Safety and Health Act of 1970.

"Owned Real Property" has the meaning specified in Section 5.14.

"Party" or "Parties" has the meaning specified in the Preamble.

"Patents" means all patents, patent applications and inventions and discoveries that may be patentable.

"Payoff Letters" has the meaning specified in Section 3.3(c).

"Pension Plan" has the meaning specified in Section 7.8.

"Permits" means all permits, approvals, consents, registrations, licenses, certificates, variances or other authorizations granted by or obtained from any Governmental Authority.

"Permitted Lien" means (i) statutory Liens for Taxes not yet due and payable, (ii) statutory Liens of landlords, carriers, warehousemen, mechanics and materialmen incurred in the Ordinary Course of Business for sums not yet due, (iii) in the case of any Real Property, in addition to items (i) and (ii), zoning, building, or other restrictions, variances, covenants, rights of way, encumbrances, easements and other minor irregularities in title, none of which, individually or in the aggregate, interfere in any material respect with the present use of or occupancy of the affected Real Property by the Company, and (iv) Liens securing the Existing Indebtedness (which Liens shall be terminated on the Closing Date upon payment in full of such Existing Indebtedness).

"Permitted Purposes" means the "Allowable Uses of Covered Loans" set forth in Section 7(a)(36)(F) of the Small Business Act, as in effect on the Effective Date.

"Person" or "person" means an individual, a partnership, limited partnership, a corporation, a limited liability company, proprietorship, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, union, any other business entity, or a Governmental Authority (or any department, agency, or political subdivision thereof).

"Personal Property" means all tangible personal property and interests therein, including all machinery, equipment, tools, dies, jigs, patterns, molds, trade fixtures, furniture, furnishings, vehicles, computer hardware, drawings, designs and blue prints

"Post-Closing Tax Period" means any Tax period or portion of a period that begins after the Closing Date.

"PPACA" means the Patient Protection and Affordable Care Act of 2010, as amended by the Health Care and Education Reconciliation Act of 2010 and any subsequent amendments thereto.

"PPP Loan" means all Indebtedness of the Company pursuant to Paycheck Protection Program loan documents, including any such funds received from IncredibleBank as lender, in accordance with the CARES Act.

"Pre-Closing Balance Sheet" has the meaning specified in Section 5.7.

"Pre-Closing Tax Period" means any Tax period ending on or before the Closing Date and that portion of any Straddle Period ending on the Closing Date.

"Pre-Closing Tax Returns" has the meaning specified in Section 8.2(a).

"Preneed Agreements" means any funeral preneed Contract for undelivered funeral merchandise or services.

"Preneed Trusts" means the trusts listed on Schedule 1.1(d).

"Proceeding" means any claim, action, charge, demand, allegation, complaint, suit, litigation, arbitration, grievance, inquiry, proceeding, hearing, examination or investigation of any nature, civil, criminal, administrative, regulatory or otherwise, whether at law or in equity.

"Property Taxes" has the meaning specified in Section 8.1.

"Purchase Price" has the meaning specified in Section 2.2.

"Real Property" means any real property owned, used, leased, occupied, managed or operated by the Company, in each case together with the Company's right, title and interest in all buildings, structures, improvements, and fixtures located thereon, and all easements and other rights and interests appurtenant thereto.

"Real Property Leases" has the meaning specified in Section 5.14.

"Real Property Preliminary Title Reports" means the real property preliminary title report for each parcel of Real Property that were obtained by Buyer in connection with the transactions contemplated by this Agreement.

"Receivables" means all accounts receivable, notes receivable and other amounts receivable from third parties.

"Registered Intellectual Property" means all Intellectual Property Rights that are subject to any issuance registration, application or other filing by, to or with any Governmental Authority or authorized private registrar in any jurisdiction, including registered Trademarks, Net Names and Copyrights, issued and reissued Patents and pending applications for any of the foregoing.

"Related Person" means (i) with respect to a particular individual, each other member of such individual's family, including the individual's spouse, any other natural person who is related to the individual or the individual's spouse within the second degree, and any other natural person who resides with such individual, and (ii) with respect to a specified Person other than an individual, each shareholder, partner, member or employee of such specified Person and each

Person that serves as a director, officer, or manager of such specified Person (or in a similar capacity) of such specified Person.

"<u>Release</u>" means any actual or threatened release, spill, emission, leaking, dumping, injection, pouring, deposit, disposal, discharge, dispersal, leaching or migration into or through the environment (including ambient air, surface water, groundwater, land surface or subsurface strata) or within any building, structure, facility or fixture.

"<u>Remedial Action</u>" means any action required under any Environmental Laws to (x) clean up, remove, treat, or in any other way address any Hazardous Substance or other substance in the environment, (y) prevent the Release or threat of Release, or minimize the further Release of any Hazardous Substance or other substance so it does not migrate or endanger or threaten to endanger public health or welfare or the environment, or (z) perform pre-remedial studies and investigations and post-remedial monitoring and care.

"<u>Representative</u>" means with respect to a particular Person, any director, officer, manager, employee, agent, consultant, advisor, accountant, financial advisor, legal counsel or other representative of that Person.

"<u>Reviewing Accountant</u>" has the meaning specified in <u>Section 2.4</u>.

"<u>Rollover Equity</u>" has the meaning specified in <u>Section 2.5</u>.

"<u>SBA</u>" means the U.S. Small Business Administration.

"<u>SBA Notice</u>" means SBA Procedural Notice Control No. 5000-20057, dated effective as of October 2, 2020.

"<u>Securities Act</u>" means the Securities Act of 1933, as amended.

"<u>Seller</u>" has the meaning specified in the Preamble.

"<u>Seller Documents</u>" has the meaning specified in <u>Section 4.2</u>.

"<u>Seller Indemnified Persons</u>" has the meaning specified in <u>Section 10.2</u>.

"<u>Seller Tax Liabilities</u>" means all Taxes (A) imposed on or for which the Company is liable for any Pre-Closing Tax Period, (B) for which the Company is liable pursuant to Treasury Regulation Section 1.1502-6 or similar provisions of state, local or non-U.S. law, (C) of any other Person imposed on the Company as a transferee or successor, by contract, Law or otherwise, with respect to an event or transaction occurring before the Closing, (D) allocated to Seller pursuant to <u>Section 8.1</u>, and (E) Deferred CARES Act Taxes.

"<u>Seller Transaction Expenses</u>" means all out-of-pocket costs and expenses incurred by the Company on its own behalf or on behalf of any of its Affiliates or Seller prior to the Closing (whether paid or payable on, prior or after the Closing Date and whether or not then invoiced), in connection with, related to or arising from the transactions contemplated by this Agreement and the agreements and documents referenced herein, including any legal, accounting, investment

9

banking, brokerage or advisory fees and expenses and including any sale, change of control, transaction or similar bonuses or compensation payable to any employee of the Company in connection with the consummation of the transactions contemplated hereby.

"Seller's Closing Certificate" has the meaning specified in Section 9.1.

"Shares" has the meaning specified in the Recitals.

"Significant Supplier" has the meaning specified in Section 5.19.

"Software" means all computer software and subsequent versions thereof, including source code, object, executable or binary code, objects, comments, screens, user interfaces, report formats, templates, menus, buttons and icons and all files, data, materials, manuals, design notes and other items and documentation related thereto or associated therewith.

"Straddle Period" has the meaning specified in Section 8.1.

"Straddle Tax Returns" has the meaning specified in Section 8.2(b).

"Subsidiary" means, with respect to any Person, any corporation, partnership, limited liability company, joint venture or other legal entity of any kind of which such Person (either alone or through or together with one or more of its other Subsidiaries) owns, directly or indirectly, at least a majority of the outstanding capital stock (or other shares of beneficial interest) entitled to vote generally or otherwise have the power to elect a majority of the board of directors or similar governing body or the legal power to direct the business or policies of such Person.  The term Subsidiary shall include all Subsidiaries of such Subsidiary.

"Target Working Capital" means $750,000.

"Tax" or "Taxes" means any assessment of any kind or nature imposed by any Governmental Authority, any federal, state, local, or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under Code §59A), duties including customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, whether computed on a separate or consolidated, unitary or combined basis or in any other manner, including any interest, penalty, deficiency, or addition thereto, whether disputed or not and including any obligation to indemnify or otherwise assume or succeed to the liability for Taxes of any other Person.

"Tax Proceeding" has the meaning specified in Section 8.6.

"Tax Return" means any report, return, declaration, statement or other information required to be supplied to a taxing authority in connection with Taxes.

"Trade Secrets" means all know-how, trade secrets, confidential or proprietary information, customer and supplier lists, Software, technical information, manufacturing

processes, business practices, customer and supplier relationships, data, process technology, and plans.

"Transfer Taxes" has the meaning specified in Section 8.4.

"Treasury Regulations" means regulations promulgated under the Code.

"WARN" means the Workers Adjustment and Retraining Notification Act of 1988, as amended.

"Working Capital Adjustment" has the meaning specified in Section 2.2.

**1.2    Construction.**

(a)    Unless the context of this Agreement otherwise clearly requires, (i) references to the plural include the singular, and references to the singular include the plural, (ii) references to one gender include the other gender, (iii) references to "or" shall be construed in the inclusive sense of "and/or", (iv) the words "include", "includes" and "including" do not limit the preceding terms or words and shall be deemed to be followed by the words "without limitation", (v) the terms "hereof", "herein", "hereunder", "hereto" and similar terms in this Agreement refer to this Agreement as a whole and not to any particular provision of this Agreement, (vi) the terms "day" and "days" mean and refer to calendar day(s), (vii) the terms "year" and "years" mean and refer to calendar year(s), and (viii) where a word or phrase is defined herein, each of its other grammatical forms shall have a corresponding meaning. When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the first day in calculating such period shall be excluded, and the last day included. If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

(b)    Unless otherwise set forth in this Agreement, references in this Agreement to (i) any document, instrument or agreement (including this Agreement) (A) includes and incorporates all exhibits, schedules and other attachments thereto, (B) includes all documents, instruments or agreements issued or executed in replacement thereof and (C) means such document, instrument or agreement, or replacement or predecessor thereto, as amended, modified or supplemented from time to time in accordance with its terms and in effect at any given time, and (ii) a particular Law means such Law, as amended, modified, supplemented or succeeded from time to time and in effect on the date hereof. All Article, Section, Exhibit and Schedule references herein are to Articles, Sections, Exhibits and Schedules of this Agreement, unless otherwise specified. The headings of the several Articles and Sections herein are inserted for convenience of reference only and are not intended to be part of or to affect the meaning or interpretation of this Agreement.

(c)    Any reference in this Agreement to "made available" means a document or other item of information that was, not less than one (1) day prior to the Effective Date, provided or made available for review by Buyer and its Representatives in the electronic data site established for "Angeleno Mortuaries" by Johnson Consulting Group on behalf of the Company to which Buyer and its Representatives have been given access ("Data Site").

(d)     The Parties have participated jointly in the negotiation and drafting of this Agreement, and any rule of construction or interpretation otherwise requiring this Agreement to be construed or interpreted against either Party by virtue of the authorship of this Agreement shall not apply to the construction and interpretation hereof.  The Parties agree that any drafts of this Agreement prior to the final fully executed drafts shall not be used for purposes of interpreting any provision thereof, and each Party agrees that no Party or any Affiliate thereof shall make any claim, assert any defense or otherwise take any position inconsistent with the foregoing in connection with any Proceeding among any of the foregoing.

## II.  PURCHASE AND SALE OF SHARES

**2.1     Purchase and Sale.**  Upon the terms and subject to the conditions of this Agreement, at the Closing, Seller shall sell and transfer to Buyer, and Buyer shall purchase and accept from Seller, all of the outstanding Shares free and clear of all Liens.

**2.2     Purchase Price.**  Buyer shall pay Seller for purchasing the Shares from Seller an amount (the "Purchase Price") equal to:

(a)     $28,000,000;

(b)     plus or minus, as the case may be, the amount by which Closing Working Capital is greater than or less than, respectively, the Target Working Capital (the "Working Capital Adjustment").  Closing Working Capital shall be determined in accordance with the calculation shown on Schedule 2.2(a);

(c)     minus Existing Indebtedness; and

(d)     minus Seller Transaction Expenses.

**2.3     Payment of Purchase Price.**  The Purchase Price shall be paid as follows:

(a)     No later than the third Business Day immediately preceding the Closing Date, Seller shall deliver to Buyer a written closing statement certified by an appropriate executive officer of the Company (which shall be in the form attached to this Agreement as Schedule 2.3(a)), setting forth in detail Seller's good faith estimate of the Working Capital Adjustment, Existing Indebtedness and Seller Transaction Expenses as of the Closing Date and the Purchase Price based thereon calculated in accordance with Section 2.2(a) (the "Estimated Purchase Price").  If Buyer reasonably believes the Estimated Purchase Price delivered by Seller is unreasonable, Buyer and Seller shall cooperate in good faith to resolve such dispute.  If any disputed matter cannot be resolved, the Estimated Purchase Price will be calculated based upon Seller's position concerning such disputed matter without prejudice to the right of Buyer to raise such disputed matter again in accordance with the determination of the Final Purchase Price pursuant to Section 2.4.

(b)     At the Closing, Buyer shall pay to Seller a cash closing payment (the "Closing Payment") in an amount equal to (A) the Estimated Purchase Price (in accordance with Section 2.3(a)), minus (B) the amount of the Escrow Fund.  The Closing Payment

shall be made to Seller on the Closing Date, by wire transfer of immediately available funds to the account or accounts as specified in Schedule 2.3(b).

(c)    In connection with the transactions contemplated by this Agreement, the existing bank accounts used by the Company shall remain in place under the Company's control as of the Closing Date.  Seller shall leave an amount of cash equal to $120,000 (the "Closing Cash") in such accounts as of the Closing Date; Buyer agrees to transfer an amount equal to the Closing Cash to an account or accounts designated in writing by Seller within ten (10) Business Days following the Closing Date.  From and after the Closing, Seller shall assist the Company as reasonably necessary in ensuring that income and expenses are handled from such accounts in the Ordinary Course of Business, and in adding additional or different signatories to such accounts.

(d)    Within five (5) Business Days after the calculation of the Final Purchase Price becomes final and binding on the Parties pursuant to Section 2.4, Buyer or Seller, as the case may be, shall make the following payment:

(i)    If the Final Purchase Price is greater than the Estimated Purchase Price, Buyer shall pay to Seller, the full amount of the difference between the Final Purchase Price and the Estimated Purchase Price, by wire transfer of immediately available funds to the accounts specified in Schedule 2.3(b); or

(ii)    If the Final Purchase Price is less than the Estimated Purchase Price, then Seller shall pay to Buyer the full amount of the difference between the Final Purchase Price and the Estimated Purchase Price, by wire transfer of immediately available funds to an account specified by Buyer.

(iii)    If Buyer or Seller, as the case may be, shall fail to pay the amount due and owing in accordance with this Section 2.3(d), such unpaid amount shall bear interest at the rate of eight percent (8%) per annum from the due date of such payment until paid in full.

**2.4    Calculation of Final Purchase Price.**

(a)    On or before the sixtieth (60th) day following the Closing Date, Buyer shall deliver to Seller a written statement setting forth a calculation of the Closing Working Capital, Existing Indebtedness, Seller Transaction Expenses and the Purchase Price based thereon (collectively, the "Closing Financial Information").  The Closing Financial Information shall be consistent with Section 2.2(a) and Schedule 2.2(a).

(b)    During the thirty (30) day period following delivery of the Closing Financial Information to Seller, Seller shall be permitted to review the books, records, accounting records and accounting work papers used in the preparation of the Closing Financial Information.  The Purchase Price as calculated by Buyer shall become final, binding and conclusive upon the Parties on the thirtieth (30th) day following delivery of the Closing Financial Information, unless Seller gives written notice of his disagreement (the "Notice of Disagreement") with the calculation of the Purchase Price to Buyer prior to such date.  The Notice of Disagreement shall (i) specify in reasonable detail the nature and basis

of any disagreement so asserted and (ii) only include disagreements based on the Purchase Price not being calculated in accordance with Section 2.2 or mathematical or factual errors.

(c)    If Seller duly and timely delivers to Buyer the Notice of Disagreement, then the calculation of the Purchase Price shall become final, binding and conclusive upon the Parties on the earlier of (i) the date the Parties resolve in writing all differences they have with respect to the matters specified in the Notice of Disagreement or (ii) the date all disputed matters are finally resolved in writing by the Reviewing Accountant (as defined below).  If the Parties fail to resolve the issues outstanding with respect to the Notice of Disagreement and the calculation of the Purchase Price within 30 days after Buyer's receipt of the Notice of Disagreement, the Parties shall submit the issues remaining in dispute to a partner having relevant expertise and practicing at Jones & Perry Inc. in Sacramento or Napa, or, if such firm is unable or unwilling to act, a partner having relevant expertise at such other independent public accounting firm as shall be agreed upon by the Parties in writing (the "Reviewing Accountant").  Seller and Buyer shall jointly instruct the Reviewing Accountant that it (A) shall act as an expert and not as an arbitrator, (B) shall review only the matters that were properly included in the Notice of Disagreement, (C) shall make its determination based upon the terms and conditions set forth in this Section 2.4(c) and within the range of (1) the amount of Purchase Price set forth in the Closing Financial Information and (2) the amount of Purchase Price set forth in the Notice of Disagreement and (D) shall render its decision within 60 days after the referral of the dispute to the Reviewing Accountant for a decision pursuant hereto.  The determination by the Reviewing Accountant shall be final, binding and conclusive on the Parties.  The fees and expenses of the Reviewing Accountant incurred in rendering any judgment pursuant to this Section 2.4 shall be borne one-half by Seller and one-half by Buyer.  The fees and expenses of Seller and his advisors incurred in connection with their review of the Closing Financial Information and, if applicable, the Notice of Disagreement, shall be borne by Seller, and the fees and expenses of Buyer's advisors incurred in connection with its preparation of the Closing Financial Information, and, if applicable, the Notice of Disagreement, shall be borne by Buyer.  Judgment may be entered upon the determination of the Reviewing Accountant in any court in California having jurisdiction over the Party against which such determination is to be enforced.  The Purchase Price, once finally resolved and/or agreed to in accordance with this Section 2.4 shall become the "Final Purchase Price".

**2.5    Rollover.**

(a)    At the Closing, effective as of the Closing Date, Seller shall contribute $1,400,000 of the Purchase Price to Anthem GP Ltd., an indirect parent company of Buyer ("Anthem GP"), which shall be evidenced by Seller's execution and delivery to Anthem GP of a Subscription Agreement, and such other instruments of assignment, transfer and conveyance as Anthem GP may reasonably request.  In exchange for such amount, Seller shall receive approximately 180,000 Class A Preferred Shares in Anthem GP (the "Rollover Equity"), at a share price of ten Canadian dollars, based on the applicable US-Canadian exchange rate on the Closing Date, subject to the applicable provisions of Anthem GP's bylaws and other governing documents.

(b)      The granting of the Rollover Equity is conditioned on the recipient of the Rollover Equity entering into a Subscription Agreement with Anthem GP, and the rights of Seller as a holder of Rollover Equity will be subject to all restrictions stated in the Subscription Agreement and the applicable Anthem GP governance documents.

**2.6      Excluded Assets.**  The Parties agree that the following assets are not included in this sale transaction:

(a)      All of the Company's cash and cash equivalents deposited in any of its bank accounts, money market accounts, certificates of deposit, bonds, stock portfolio, and similar deposits and investments ("Cash") as reflected in its books and records at the Closing Date, all of which the Company shall pay to Seller at the Closing Date, subject to Section 2.3(c);

(b)      All personal items and property not owned by the Seller or Company, but located on the Real Property and/or used in the Business, none of which is material to the Business.

(c)      William Hawkins' 2020 Lincoln Continental provided by the Company;

(d)      William Hawkins' mobile phone and telephone number of 818-257-1865, provided by the Company prior to Closing; and

(e)      Glenn Gomez's mobile phone and phone numbers of 626-688-1304 and 818-798-4461, provided by the Company prior to Closing.

**2.7      Permitted Liens on Company's Assets.**  Except for the Existing Indebtedness, which will be paid in full at Closing, Buyer agrees that it is acquiring ownership of the Company whose Company's Assets are subject to any and all Permitted Liens, including without limitation all those set forth in the Real Property Preliminary Title Reports, or any other inspection or similar reports, obtained by Buyer regarding this transaction, in each case which are defined as Permitted Liens as agreed to by the Parties pursuant to this Agreement and the corresponding Disclosure Schedules.

## III.  CLOSING

**3.1      Closing Date.**  The closing of the transactions contemplated by this Agreement (the "Closing") shall take place remotely via the exchange of documents and signatures, commencing at 10:00 a.m., on the first Business Day after the satisfaction (or, to the extent permitted, waived by the Party entitled to the benefit thereof) of the conditions set forth in Article IX except those conditions relating to the delivery of documents to be delivered at Closing pursuant to the terms hereof (the day on which the Closing takes place being referred to herein as the "Closing Date"). All documents delivered and actions taken at Closing shall be deemed to have been delivered or taken simultaneously, and no such delivery or action shall be considered effective or complete unless or until all other such deliveries or actions are completed or waived in writing by the Party against whom such waiver is sought to be enforced.  For financial and accounting purposes, the Closing shall be effective as of 11:59 p.m. on the Closing Date.

**3.2**    **Seller Deliveries at the Closing**.  At the Closing, Seller shall deliver to Buyer:

(a)    executed assignments (or other instruments of transfer) representing all of the Shares, duly endorsed in blank and otherwise in the proper form for transfer;

(b)    executed Seller's Closing Certificate;

(c)    the Escrow Agreement, substantially in the form of that attached hereto as Exhibit A (the "Escrow Agreement"), executed by Seller;

(d)    a Consulting Agreement, substantially in the form of that attached hereto as Exhibit B (the "Consulting Agreement") executed by Seller;

(e)    resignations and releases executed by such of the directors and officers of the Company as are designated by Buyer, substantially in the form of that attached hereto as Exhibit C;

(f)    a new lease agreement for the Real Property owned by Seller and used in the Business, on terms acceptable to Buyer, executed by Seller as landlord;

(g)    duly executed termination statements or discharges by creditors terminating any and all Liens with respect to the Existing Indebtedness on the Company's Assets;

(h)    a certification from Seller pursuant to Treasury Regulation Section 1.1445-2(b), in form and substance satisfactory to Buyer, that Seller is not a foreign person within the meaning of Code Section 1445;

(i)    evidence of payment of the Transfer Taxes due and payable (if any) by Seller to the appropriate taxing authority; and

(j)    such other documents as Buyer or its counsel may reasonably request to demonstrate satisfaction of the conditions and compliance with the agreements set forth in this Agreement.

**3.3**    **Buyer Deliveries at the Closing.**  At the Closing, Buyer shall deliver to Seller, the Escrow Agent, and other designated Persons, as the case may be:

(a)    payment to Seller of the Closing Payment by wire transfers in immediately available funds as provided in Section 2.3(b);

(b)    deposit with U.S. Bank, National Association (the "Escrow Agent") $1,400,000 (the "Escrow Fund") into escrow to be held and distributed by the Escrow Agent for the 12 month Escrow Period (as defined in the Escrow Agreement) in accordance with the terms of the Escrow Agreement;

(c)    payment, on behalf of the Company and Seller, of the Existing Indebtedness, by wire transfers of immediately available funds pursuant to payoff and lien release letters, in form and substance satisfactory to Buyer (the "Payoff Letters"), which

16

were provided not later than five (5) Business Days prior to the Closing by the following, except to the extent the Parties agree to leave applicable arrangements in place as of the Closing Date: (i) Bank of the West, (ii) FC Marketplace, LLC, (iii) U.S. Bank Equipment Finance, (iv) IncredibleBank, (v) Antelope Valley Mortuaries, Inc., (vi) Social Construct, (vii) Los Angeles County tax authority, (viii) Great Western Insurance Company, and (ix) Ingold Chapel, Incorporated;

(d)    payment, on behalf of the Company and Seller, of the aggregate Seller Transaction Expenses, as identified on Schedule 3.3(d). The Company shall withhold from the Seller's Transaction Expenses payable to an employee of the Company all applicable federal, state and local income Tax, social security Tax, Medicare Tax, state disability Tax, unemployment Tax and other Tax required to be withheld;

(e)    executed Buyer's Closing Certificate;

(f)    to Seller a duly executed counterpart to the Escrow Agreement;

(g)    to Seller, a duly executed counterpart to the Consulting Agreement; and

(h)    evidence of payment of the Transfer Taxes due and payable (if any) by Buyer to the appropriate taxing authority;

(i)    and such other documents as Seller or their counsel may reasonably request to demonstrate satisfaction of the conditions and compliance with the agreements set forth in this Agreement.

## IV.  REPRESENTATIONS AND WARRANTIES CONCERNING SELLER

Seller represents and warrants to Buyer as of the Effective Date and as of the Closing Date, as follows:

**4.1    Authority and Enforceability.**  Seller has full power, authority and legal right and capacity to execute and deliver this Agreement and to perform his obligations hereunder and to consummate the sale of the Shares and the other transactions contemplated hereby. The execution, delivery and performance of this Agreement, the Escrow Agreement, the Consulting Agreement, and the other agreements and documents to be executed and delivered by Seller pursuant to the provisions of this Agreement (the "Seller Documents") and the consummation by Seller of the transactions contemplated hereby and thereby have been duly and validly authorized by all necessary action on the part of Seller and the Company and no other proceedings on the part of Seller or the Company are necessary to authorize this Agreement or the Seller Documents or to consummate the transactions contemplated hereby. This Agreement has been, and at the Closing the Seller Documents shall be, duly and validly executed and delivered by Seller and constitute, or shall constitute, the legal, valid and binding obligation of Seller, enforceable against Seller in accordance with their respective terms.

**4.2    No Conflict or Violation.**  Neither the execution and delivery of this Agreement or the Seller Documents by Seller nor the consummation by Seller of any of the transactions contemplated hereby do or will (with or without notice or lapse of time or both) (a) contravene,

conflict with or result in a violation of any Law or any Governmental Order to which Seller is subject (provided any and all Consents required for the transfer and issuance of the funeral establishment, crematory and any other licenses are obtained as set forth herein); (b) contravene or conflict with, result in any breach of, constitute a default under, or give to others any rights of payment, termination, amendment, modification, acceleration, suspension, revocation or cancellation of, or result in the creation of any Lien on any of the assets of Seller pursuant to, any Contract to which Seller is a party (provided any and all Consents required by those contracts are obtained as set forth herein); or (c) result in the creation of any Lien on any of the Shares.

**4.3    Third-Party Consents and Approvals.**  No Consent is required for the execution, delivery and performance of this Agreement and the Seller Documents by Seller and the consummation of the transactions contemplated hereby and thereby, except those set forth in Schedule 5.4.

**4.4    Ownership of Shares.**  Seller is the sole record and beneficial owners of, and has good and valid title to, all of the Shares, free and clear of any and all Liens.  Except for this Agreement, none of such Shares is subject to (a) any option, warrant, purchase right or other Contract that requires Seller to sell, transfer or otherwise dispose of any of such Shares or (b) any voting trust, proxy or other Contract or understanding with respect to the voting, dividend rights, preferences, sale, acquisition or other disposition of any of such Shares.  Upon delivery of such Shares to Buyer and full payment therefore as contemplated hereby, Buyer shall acquire good and valid title to all such Shares, free and clear of all Liens.

## V.  REPRESENTATIONS AND WARRANTIES CONCERNING THE COMPANY

Seller represents and warrants to Buyer as of the Effective Date and as of the Closing Date, as follows:

**5.1    Organization.**  Company is a corporation incorporated, validly existing and in good standing under the laws of California.  Company has all requisite corporate power and authority to own, lease and operate its properties and assets and to carry on the Business as and where now being conducted.  The entity record books (including the stock records) of Company are correct and complete and contain accurate resolutions or other consent action adopted by the Board of Directors and shareholder of the Company since its date of formation.  Seller has made available to Buyer complete and correct copies of all the Company's record books and Operating Agreements, as currently in effect.

**5.2    Qualification; Location of Business and Assets.**  Company is duly licensed or qualified to do business only in California.  There has not been any claim by any jurisdiction to the effect that the Company is required to qualify or otherwise to be authorized to do business as a foreign corporation in any jurisdiction in which the Company has not qualified or obtained such authorization.  Set forth in Schedule 5.2 is each location where the Company (a) has a place of business, or (b) owns or leases property.

**5.3    No Subsidiaries.**  The Company owns no Subsidiaries, nor does it have any right to acquire, directly or indirectly, any capital stock of, or other equity interests in, any Person.

**5.4**     **Third-Party Consents and Approvals.**  Except as set forth in <u>Schedule 5.4</u>, no Consent is required for the consummation of the transactions contemplated by this Agreement by Seller.  Seller and the Company have complied with the requirements of the SBA Notice, except as set forth in <u>Schedule 5.4</u>.

**5.5**     **No Conflict or Violation.**  Neither the execution and delivery of this Agreement nor the consummation of any of the transactions contemplated hereby do or will (with or without notice or lapse of time or both) (a) contravene, conflict with or result in a violation of any provision of the Organizational Documents of the Company; (b) contravene or conflict with or result in a violation of any Law or any Governmental Order to which the Company is subject; (c) contravene, conflict with or result in a violation of any of the terms or requirements of any Permit applicable to the Company; or (d) as of the Closing Date, contravene or conflict with, result in any breach of, constitute a default under, or give to others any rights of payment, termination, amendment, modification, acceleration, suspension, revocation or cancellation of, or result in the creation of any Lien on any of the assets of the Company pursuant to, any Material Contract to which the Company is a party.

**5.6**     **Capitalization.**  The Shares constitute all of the Company's outstanding equity securities.  All of the Shares are duly authorized, validly issued, fully paid and nonassessable, and none of the Shares has been issued in violation of any preemptive rights or applicable Law.  There are no outstanding (a) securities of the Company convertible into, or exchangeable or exercisable for, Shares, (b) options, warrants to purchase or subscribe, or other rights to acquire from the Company any Shares or other equity securities or securities convertible into or exchangeable or exercisable for Shares or other equity securities of the Company, or rights of first refusal or first offer relating to any Shares or other equity securities of the Company, or (c) bonds, debentures, notes or other Indebtedness or securities of the Company having the right to vote (or convertible into, or exchangeable for, securities having the right to vote) on any matters on which equity holders of the Company may vote.  There are no voting trusts, proxies or other agreements or understanding with respect to the voting of the Shares, except as may be set forth in the Company's Bylaws.

**5.7**     **Financial Condition and Liabilities.**

(a)     Seller has made available to Buyer correct and complete copies of (a) trial balances of the Company as of December 31, 2019 and 2020, and year to date September 30, 2021, and internally prepared consolidated financial statements for December 31, 2019 and 2020, and year to date September 30, 2021 (collectively, the "<u>Financial Statements</u>"), and (b) the unaudited balance sheet of the Company as of December 31, 2021 (the "<u>Pre-closing Balance Sheet</u>"), and related consolidated statements of income and cash flow for the period then ended, all of which are correct and complete and in accordance with the books and records of the Company, and have been prepared in accordance with the company's historical accounting practices, consistently applied.  Such balance sheets present fairly in all material respects the financial condition, assets and liabilities of the Company as of the dates indicated, and such statements of income, cash flow and members equity present fairly in all material respects the results of operations, cash flows and members equity of the Company for the periods indicated.

(b)    The Company properly applied for the PPP Loan in accordance with the terms of the Small Business Act and the CARES Act.  To Seller's Knowledge, the Company satisfied all of the criteria for the PPP Loan set forth in the Small Business Act (including, without limitation, Sections 7(a)(36)(D) and 7(a)(36)(G) of the Small Business Act) and the CARES Act. The Company has used all of the proceeds of the PPP Loan first for Permitted Purposes that qualify the PPP Loan for forgiveness under Section 1106 of the CARES Act, and second, for other Permitted Purposes.  At least sixty percent (60%) of the proceeds of the PPP Loan were used by the Company to fund "payroll costs" (as defined in the CARES Act) of the Company.  The PPP Loan has been forgiven in full as of the Effective Date.

**5.8    No Undisclosed Liabilities.**  Except as set forth on <u>Schedule 5.8</u>, the Company has no Liabilities, except (a) Liabilities fully reflected or reserved against on the Pre-closing Balance Sheet, (b) Liabilities for costs and expenses incurred in connection with the transactions contemplated by this Agreement, and (c) current Liabilities incurred in the Ordinary Course of Business since the date of the Pre-closing Balance Sheet.

**5.9    Absence of Certain Changes.**  Since the date of the Pre-closing Balance Sheet, except as set forth on <u>Schedule 5.9</u> or in accordance with the terms of this Agreement, the Company has conducted the Business in the Ordinary Course of Business and the Company has not:

(a)    amended any of its Organizational Documents;

(b)    made any change in its authorized stock or other securities, issued any stock or other securities of any class or become party to any subscriptions, warrants, rights, options, convertible or exchangeable securities or other agreements or commitments of any character relating to its issued and unissued equity or other securities, or granted any equity appreciation or similar rights;

(c)    declared, set aside or paid any dividend or made or agreed to make any other distribution or payment in respect of its stock or other securities, or redeemed, purchased or otherwise acquired or agreed to redeem, purchase or acquire any of its stock or other securities;

(d)    suffered any material casualty, damage, destruction or loss, or any material interruption in use, of any material assets or properties, whether or not covered by insurance, or suffered any repeated, recurring or prolonged shortage, cessation or interruption of supplies or utilities or other services required to conduct its business and operations;

(e)    made any payment of or increase in any bonuses, salaries, or other compensation to any member, manager, shareholder, director, officer, or (except in the Ordinary Course of Business and in accordance with plans existing as of the date of the Pre-Closing Balance Sheet) employee or entry into any employment, severance, or similar Contract with any member, manager, shareholder, director, officer or employee, except that, on or before the Closing Date, the Company shall pay Glenn Gomez a bonus as

20

described on Schedule 5.9, to compensate him for the extraordinary amount of time and work he has spent regarding this transactions that has been in additional to his usual and regular duties;

(f)     adopted, or increased the payments to or benefits under, any Employee Plan for or with any of its employees;

(g)     mortgaged, pledged or subjected any of its assets to any Lien;

(h)     accelerated, amended, terminated, or cancelled or had terminated or cancelled any Material Contract, or canceled, modified or waived any material debts or claims held by it or waived any rights material to the Business;

(i)     sold or in any way transferred or otherwise disposed of any of its material assets or properties except for sales of Inventory and other transfers and dispositions in the Ordinary Course of Business;

(j)     made or committed to make any capital expenditures or capital additions or betterments exceeding in the aggregate $10,000;

(k)     encountered any labor union organization activity, had any actual or overtly threatened employee strikes, work stoppages, slow-downs or lock outs, or had any material adverse change in its relationship with any of its employees, salesmen, distributors, or independent contractors;

(l)     changed any of the accounting principles followed by it or the methods of applying such principles or revalued any of its assets;

(m)     instituted, settled, or agreed to settle any Proceeding related to its assets or the Business;

(n)     failed to replenish its inventories or supplies in a normal and customary manner consistent with the Company's prior practices or made any purchase commitment other than in the Ordinary Course of Business;

(o)     prepaid any of its obligations or any other obligations relating to the Business;

(p)     accelerated the collection of Receivables or extended the payment of accounts payable;

(q)     except for the execution of this Agreement, entered into any transaction other than in the Ordinary Course of Business;

(r)     experienced a Material Adverse Effect or any event, change, development or effect which, individually or together with other such events, changes, developments or effects, could reasonably be expected to have a Material Adverse Effect; or

(s)    committed to do any of the foregoing.

**5.10    Accounts Receivable.**  The Receivables of the Company as set forth in the Pre-closing Balance Sheet or arising since the date thereof are reflected properly on the books and records of the Company; are valid and genuine; have arisen solely out of bona fide sales and deliveries of goods, performance of services and other business transactions in the Ordinary Course of Business; are not subject to valid defenses, set-offs or counterclaims; and, to Seller's Knowledge, are collectible in the Ordinary Course of Business within a reasonable period of time, except as to the VA Affairs Receivables described on <u>Schedule 5.10</u>.  Notwithstanding the preceding, Seller is not providing any guarantee of collectability of any Receivables.

**5.11    Inventories.**  All Inventory reflected on the Pre-closing Balance Sheet or acquired since the date thereof was acquired and has been maintained in the Ordinary Course of Business; is merchantable and fit for the purpose for which it was produced or manufactured; is valued at the lower of cost or market value;  is not subject to any write-down or write-off; and the quantities of all lines of Inventory are reasonable and appropriate in the present circumstances of the Business.  Except as specifically reserved on the Pre-closing Balance Sheet, none of the Inventory is obsolete, damaged, defective or slow moving to Seller's Knowledge.  To Seller's Knowledge, the Company is not under any liability or obligation with respect to the return of Inventory in the possession of wholesalers, retailers or other customers.

**5.12    Title; Business Assets.**  The Company has good and marketable title to, or a valid leasehold interest in, all of the properties and assets used by the Company, free and clear of all Liens, except Permitted Liens.  The properties and assets owned or leased by the Company constitute all the assets and properties that are used or held for use by the Company and that are reasonably necessary to conduct the Business as presently conducted, and to reasonably perform all of the Contracts of the Company.

**5.13    Condition of Assets.**  All of the buildings, structures and fixtures owned or leased by the Company are in good operating condition and repair in all material respects, subject only to ordinary wear and maintenance, and are usable in the regular and Ordinary Course of Business.  All of the Personal Property owned or leased by the Company material to the business, operations or financial condition of the Company is in good operating condition and repair in all material respects, subject only to ordinary wear and maintenance, and are usable in the Ordinary Course of Business and have been maintained in accordance with normal industry practice.

**5.14    Real Property.**

(a)    <u>Schedule 5.14(a)</u> lists all Real Property owned by the Company ("<u>Owned Real Property</u>"), including a correct legal description, street address and tax parcel identification number of each property, as well as their Real Property Preliminary Title Reports obtained as part of this transaction.  Correct and complete copies of all deeds, existing title insurance policies and surveys of or pertaining to each of the Owned Real Properties have been made available to Buyer to the extent they are in the Seller's possession.  With respect to each parcel of Owned Real Property, except as set forth in <u>Schedule 5.14(a)</u>: (i) the Company has good and marketable, indefeasible, fee simple title (and holds a valid and effective policy of title insurance), free and clear of all Liens, except

Permitted Liens; (ii) the Company has not leased or otherwise granted to any Person the right to use or occupy such Owned Real Property or any portion thereof; and (iii) there are no outstanding options, rights of first offer or rights of first refusal to purchase such Owned Real Property or any portion thereof or interest therein.

(b)    Schedule 5.14(b) lists all Real Property leased, subleased or occupied by the Company ("Leased Real Property"), including the name of the landlord (or sublandlord, as applicable) under the applicable Lease, the name of the entity holding such leasehold interest, the street address and unit number of each Leased Real Property.  Correct and complete copies of all leases, subleases or occupancy agreement and all amendments, extensions, renewals, guaranties and other agreements with respect thereto (collectively, the "Real Property Leases"), and in the case of any oral Real Property Lease, a written summary of the material terms thereof, have been made available to Buyer.  With respect to each Real Property Lease (i) each such Lease is legal, valid, binding, enforceable and in full force and effect, and the Company enjoys peaceful possession of such leased property in accordance with the respective Real Property Lease, (ii) the Company nor, to Seller's Knowledge, any other party to such Lease is in breach or default under such Lease in any material respect, and no event has occurred or circumstance exists which, with the delivery of notice, the passage of time or both, would constitute such a breach or default, or permit the termination, modification or acceleration of rent under such Lease, and (iii) the Company has subleased, licensed or otherwise granted anyone the right to use or occupy such Leased Real Property or any portion thereof.  To Seller's Knowledge, all work required to be done by the Company as a tenant in accordance with the applicable Real Property Lease has been duly performed.  No party to any Real Property Lease has provided written notice to the Company of its intent to cancel or terminate such Real Property Lease, and the Company has not waived or failed to enforce any right or benefit under any Real Property Lease in a manner that would be reasonably likely to materially affect such party's rights under such Real Property Lease following the Closing.  Except as set forth in Schedule 5.14(b), the consummation of the transactions contemplated by this Agreement will not result in a breach of, or default under, or require any Consent under, any Real Property Lease.

(c)    The Owned Real Property and the Leased Real Property constitutes all of the Real Property used, held for use or intended to be used in, otherwise related to, the Business.  There is no condemnation, expropriation or other proceeding in eminent domain, pending or, to Seller's Knowledge, threatened, affecting any parcel of the Owned Real Property or the Leased Real Property or any portion thereof or interest therein.  To Seller's Knowledge, all utility services or systems for the Leased Real Property have been installed and are operational and sufficient for the operation of the Business as currently conducted thereon.  To Seller's Knowledge, the classification of each parcel of Owned Real Property and Leased Real Property under applicable zoning laws, ordinances and regulations permits the use and occupancy of such parcel and the operation of the Business as currently conducted thereon, and permits the improvements located thereon as currently constructed, used and occupied.  To Seller's Knowledge, there are sufficient parking spaces, loading docks and other facilities at such parcel to comply with such zoning laws, ordinances and regulations.  The Owned Real Property and the Leased Real Property, or any easement affecting the Owned Real Property or the Leased Real Property, does not violate any

23

building lines or set-back lines, and there are no encroachments onto the Owned Real Property or the Leased Real Property or any portion thereof.

(d)     Notwithstanding the preceding, Seller makes no representation or warranty, and expressly disclaims any warranty, whatsoever with respect to any future use or suitability of the Owned Real Property and the Leased Real Property by Buyer that changes, increases, adds and/or expands in any materially different manner or respect beyond their present use and suitability.

**5.15     Leased Personal Property.**  Schedule 5.15 contains a correct and complete list of all leases and other agreements under which the Company leases, holds or operates any Personal Property owned by any other Person.  Seller has made available to Buyer correct and complete copies of all such leases and agreements.  All of such leases and agreements are valid, binding, enforceable and in full force and effect, there is no default by the Company thereunder and no event has occurred that, with notice or lapse of time or both, would constitute a default or permit termination, modification or acceleration thereunder.  To Seller's Knowledge, there is no default by any other party under any such leases or agreements.

**5.16     Employment Matters.**

(a)     Schedule 5.16(a) lists the name, date of hire and/or appointment of the Company's currently employed employees, and their current annual salary, commissions, allowances or wage rates, along with any arrangement to increase such annual salary, commissions, allowances or wage rates, of each present manager, director, officer, and employee of the Company, together with a statement of the nature of the services rendered. Copies of the following documents, information and data, to the extent that they exist, have been made available to Buyer and are listed in Schedule 5.16(a):

(i)     (A) whether each employee is a family member of Seller, (B) whether each employee qualifies as exempt or non-exempt and Seller's basis for any such exempt classification, (C) any agreement (whether written or oral) with any employee regarding any shift rate differences or shift rate premiums, or regarding overtime payment rates in excess of what is required by applicable Law, (D) the amount of vacation time that each employee is currently entitled to (and including any amounts that have been carried over from prior years), and the amount of vacation time that each employee has taken year to date, (E) the amount of paid sick time that each employee is currently entitled to on an annual basis and how much paid sick time remains accrued and unused to date, and (F) any change in compensation since January 1, 2020, insurance benefits, and all other benefits.

(ii)     a complete and accurate list of all Contracts between the Company and any of the Company's employees, a complete and accurate copy of which have been provided to Buyer.

(iii)     a list of current Employee Handbooks and Employee Policies issued by the Company to any of the Company's employees, a complete and accurate copy of which has been provided to Buyer.

24

(iv)    a list of any Contract of which Seller has Knowledge between any of the Company's Employees and a third party applicable to the operation of the Business, a complete and accurate copy of which have been provided to Buyer.

(b)    Schedule 5.16(b) contains a complete and accurate list of all:

(i)    the names of all service providers (both individuals and business entities) who are currently and/or were retained and/or classified as independent contractors/non-employees ("ICs") and issued a Form 1099 for "Nonemployee Compensation" during any of the years between 2017 and 2021 and/or are currently retained and will be issued a Form 1099 for "Nonemployee Compensation" for 2021 (year to date), and indicating in each case (A) such IC's date of retention, (B) a description of the services provided by each such IC, (C) such IC's rate and method of compensation (meaning whether payment is or was made by project, or by the hour, the day, the week, the month or some other period of time), (D) whether such IC is or was retained on an at-will basis or is subject to contractual limitations on the Company's ability to terminate the engagement of such IC, including severance obligations in the event of certain occurrences, (E) whether such IC is or was retained on an exclusive basis, (F) whether such IC has or had a written or oral agreement providing for retention, (G) whether the applicable Company was or is not able to control or direct what such IC does, either by contract or in actual practice; and (H) whether such IC performed or performs tasks outside of the Company's usual business (i.e. is or was engaged in an independently-established trade, occupation, or business).

(ii)    the names of all service providers (both individuals and business entities) who were retained and/or classified as independent contractors/non-employees during any of the years between 2017 and 2021 and were reclassified as employees by the Company.

(iii)    a list of all independent contractor or consultant agreements between the Company and any of its contractors or consultants, a complete and accurate copy of which have been provided to Buyer.

(c)    Schedule 5.16(c) contains a list of:

(i)    the names of all employees that were terminated or resigned from the Company on or after January 1, 2017, including but not limited to the names of the former employees, if any, identified as ineligible to work in the United States by the United States Immigration and Customs Enforcement Agency ("ICE"), indicating in each case whether such former employee resigned or was terminated.

(ii)    the terms of any termination and/or severance agreement or arrangement with each former employee identified on Schedule 4.16.

(iii)    the employee numbers and positions of any and all employees who were furloughed from January 1, 2020 to the present and the dates such furloughs took place.

(iv)    the employee numbers and positions of all employees who received emergency paid sick leave under the Families First Coronavirus Response Act (FFCRA) and the dates and amounts of paid sick leave received.

(v)    the employee numbers and positions of all employees who received emergency extended family leave under the Families First Coronavirus Response Act (FFCRA) and the dates and amounts of Extended family leave received.

(d)    The Company has been in compliance for the previous four (4) years and currently is in compliance in all material respects with all applicable Laws respecting employment and employment practices, terms and conditions of employment laws and regulations (including without limitation those relating to overtime, meal periods and rest breaks), wages and hours, and the classification of employees and independent contractors, and has not engaged in any unfair labor practice.  This includes without limitation:  (i) keeping accurate time records for nonexempt employees, (ii) paying for all "on-the-clock" or other worktime of employees, paying at least minimum wage for all hours worked, not merely by averaging the amount paid over the month or year, (iii) paying any overtime at 1.5 times the normal hourly rate and 2.0 times the normal hourly rate when applicable, (iv) classifying employees properly as exempt or nonexempt, (v) classifying workers properly as employees or independent contractors, (vi) maintaining a code-compliant policy for permitting uninterrupted meal periods and rest and recovery breaks, (vii) providing paycheck stubs that comply with the nine requirements of Labor Code Section 226(a), (viii) eliminating commission-only compensation, unless sales employees are properly classified as exempt, and (ix) eliminating all piece-rate compensation (including payment by-the-mile of drivers) unless minimum wage and overtime are properly accounted for and paid.

(e)    Except as disclosed on <u>Schedule 5.16(e)</u>:

(i)    the Company is not a party to any collective bargaining agreement or other contract or agreement with any labor organization or other representative of any of its employees nor is any such contract or agreement presently being negotiated;

(ii)    there is no unfair labor practice or discrimination charge or complaint pending or, to Seller's Knowledge, threatened against or otherwise affecting the employees of the Company;

(iii)    there is no labor strike, slowdown, work stoppage, dispute, lockout or other labor controversy in effect, or, to Seller's Knowledge, threatened against or otherwise affecting the Company, and the Company has not experienced any such labor controversy within the past five (5) years;

(iv)    no grievance is pending or, to Seller's Knowledge, threatened from any employee of the Company;

(v)    the Company is not a party to any employment agreement, independent contractor agreement or consulting agreement with any Person or entity, nor is any such contract or agreement presently being negotiated;

(vi)    no Proceeding by or before any Governmental Authority brought by or on behalf of any employee, prospective employee, former employee, retiree, labor organization or other representative of the employees of the Company is pending or, to Seller's Knowledge, threatened;

(vii)    the Company is not a party to or otherwise bound by, any consent decree with, or citation by, any Governmental Authority relating to employees or employment practices, wages, hours, and terms and conditions of employment with respect to its business;

(viii)    the Company has paid in full, or accrued in their financial books and records, to all employees of the Company, all wages, salaries, commissions, bonuses, benefits and other compensation due to such employees or otherwise arising under any policy, practice, agreement, plan, program, statute or other law;

(ix)    the Company is not liable for any severance pay or other payments to any employee or former employee arising from the termination of employment, and the Company will not have any liability under any benefit or severance policy, practice, agreement, plan, or program which exists or arises, or may be deemed to exist or arise, under any applicable Law or otherwise, as a result of or in connection with the transactions contemplated by this Agreement or as a result of the termination by the Company of any Persons employed by the Company on or prior to the Closing Date;

(x)    the Company has not closed any plant or facility, effectuated any layoffs of employees or implemented any early retirement or separation program within the past five (5) years, nor has the Company planned or announced any such action or program for the future;

(xi)    the Company is not subject to Federal WARN 29 USCS § 2101 or the California Plant Closing Act, Lab Code § 1400 et seq. ("WARN Acts");

(xii)    the services of all essential employees of the Company will continue to be available on the same terms and at the same locations for the continuation of the Business of the Company after consummation of the transactions contemplated hereby;

(xiii)    to Seller's Knowledge, all current employees of the Company who work in the United States are, and all former employees of the Company who worked in the United States whose employment terminated, voluntarily or involuntarily, within the three years prior to the date of this Agreement, were legally authorized to work in the United States. The Company has completed and retained the necessary employment verification paperwork under the Immigration Reform and Control Act of 1986 ("IRCA") for the employees hired prior to the date of this Agreement, and the Company has complied with anti-discrimination provisions of the IRCA. Further, at all times prior to the date of this Agreement, the Company is in material compliance with both the employment verification provisions

27

(including the paperwork and documentation requirements) and the anti-discrimination provisions of IRCA;

(xiv)    no Company employee is employed with the Company for any specified period of time or provided any benefits (other than health, life and disability insurance), profit sharing, equity incentives or other rights that are not generally made available to other employees of the Company; and

(xv)    no Company employee is on leave of absence for any reason, including but not limited to military service, because of disability or pursuant to the Family and Medical Leave Act of 1993/or the California Family Rights Act (CFRA) and the Families First Coronavirus Response Act (FFCRA).

(f)    Seller makes no representation or warranty that any Company employee currently employed will continue their employment with the Company either before or after the Closing Date.

**5.17    Employee Benefit Plans**.

(a)    Schedule 5.17 contains a correct and complete list of all Employee Plans which the Company maintains or maintained, or under which the Company has or had any obligations, with respect to any employee or former employee, officer or former officer, director or former director, manager or former manager, now or at any time during the past five (5) years.

(b)    Except as disclosed on Schedule 5.17: (i) all accrued contributions, claims and other payments required to be made by the Company to any Employee Plan through the Closing Date have been made or reserves adequate for such purposes as of the Closing Date have been set aside therefore and reflected on the Pre-Closing Balance Sheet; (ii) the Company is not in default in any material respect in performing any of its contractual obligations under any of the Employee Plans or any related trust agreement or insurance contract, and there are no outstanding or unfunded liabilities of any Employee Plan other than liabilities for benefits to be paid to participants in such Employee Plan; and (iii) all such contributions are fully deductible under the Code as employer contributions.

(c)    The only qualified retirement plan that the Company maintains or has maintained during the past five (5) years is a defined contribution profit sharing plan (with a 401(k) feature).  The Company during the past five (5) years has not maintained, established, sponsored, participated in or contributed to any qualified defined contribution money purchase pension plan, qualified defined benefit pension plan (that is subject to ERISA Title IV and Code Section 412), a "multiemployer pension plan" (as defined in ERISA §3(37)), or a "multiple employer plan" as defined under ERISA and the Code.

(d)    The Company has not ever maintained, established, sponsored, participated in, contributed to or promised to establish (i) any "employee welfare benefit plan" (as defined in ERISA Section 3(1)) that provides benefits to or on behalf of any Person following retirement or other termination of employment (other than to the extent required by Code Section 4980B), (ii) any multiemployer or multiple employer welfare

arrangement, fund or plan (as defined under ERISA), or (iii) any "funded welfare plan" within the meaning of Code Section 419.

(e)    The Company has not maintained or entered into any Employee Plan or other document, plan or agreement that is considered a non-qualified deferred compensation arrangement (as defined under Code Section 409(A)), or that contains any change in control provisions which would cause an increase or acceleration of benefits or vesting or contains any benefit entitlements (including severance pay, unemployment compensation, or any other type of payment) to employees or former employees of the Company or other provisions, which would cause an increase in liability of the Company or to Buyer as a result of the transactions contemplated by this Agreement or any related action thereafter.

(f)    Except as set forth in Schedule 5.17, with respect to each of the Employee Plans:

(i)    each Employee Plan has been established, maintained, funded and administered in all material respects in accordance and compliance with its governing documents, and all applicable Law, including but not limited to the provisions of ERISA, the Code, COBRA, PPACA and HIPAA, and all regulations or rules promulgated thereunder; and the Company has no unsatisfied obligations to any employees or qualified beneficiaries pursuant to COBRA, HIPAA or any state Law governing health care coverage or extension;

(ii)    all disclosures to employees and all filings and other reports relating to each such Employee Plan and required (under ERISA, the Code, other applicable Law, including federal and state securities laws, and all regulations thereunder) to have been made or filed on or before the Closing Date have been or will be duly and timely made or filed by that date;

(iii)    there is no Proceeding (other than routine claims for benefits), pending or, to Seller's Knowledge, threatened or anticipated with respect to any such Employee Plan, its related assets or trusts, or any fiduciary, administrator or sponsor of such Employee Plan, including, but not limited to, any liability or penalty under Code Sections 4975 through 4980H;

(iv)    the Company has delivered to Buyer correct and complete copies of the following: the current Employee Plan document (including a written description of all oral Employee Plans), any amendments thereto, and the related summary plan description or summary annual reports, if any; each trust or custodial agreement and each deposit administration, group annuity, insurance or other funding agreement associated with each such Employee Plan; for the last three Employee Plan years, the financial information or reports (including any FASB required reports, if applicable), relating to each such Employee Plan; all Internal Revenue Service and other governmental agency rulings relating thereto, and all applications for such rulings; and all filing and reports (including the Annual Report Form 5500 series, if applicable) filed with any governmental agency at any time during the

29

three year period ending on the Closing Date, along with all schedules and reports filed therewith; and

(v)     neither any such Employee Plan nor any other Person or entity has engaged in a "prohibited transaction" (as defined in ERISA Section 406 or Code Section 4975) with respect to such Employee Plan, for which no individual or class exemption exists.

(g)     Except as set forth in Schedule 5.17, with respect to each Employee Plan which is an "employee pension benefit plan" (as defined in ERISA Section 3(2)):

(i)     each such Employee Plan which is intended to qualify as a tax qualified retirement plan under Code Section 401(a) has received a favorable determination letter(s) from the Internal Revenue Service (copies of which have been delivered to Buyer), or is subject to an opinion letter on a pre-approved plan on which the Employee Plan can rely, as to qualification of such Employee Plan covering the period from its adoption through the Closing Date; all amendments required to maintain such qualification have been timely adopted; nothing has occurred, whether by action or failure to act, which has resulted in or could reasonably be expected to cause the loss of such qualification (whether or not eligible for review under the Internal Revenue Service's Closing Agreement Program, Voluntary Compliance Resolution program or any similar governmental agency program); and

(ii)     Any trust maintained in connection with an Employee Plan (and from its establishment) has been exempt from federal income taxation under Code Section 501 and has not, at any time, had any "unrelated business taxable income" (as defined under the Code Section 512) and, to Seller's Knowledge, nothing has occurred with respect to the operation of any such Employee Plan that could cause the loss of such qualification of exemption or the imposition of any liability, penalty or tax under Law.

**5.18    Material Contracts.**

(a)     Schedule 5.18 contains a correct and complete list of the Contracts which are material to the Company's operations, to which the Company is a party or any of its assets are currently bound or subject (collectively, the "Material Contracts"), which includes:

(i)     each Contract, if any, that involves annual payments to or from the Company in excess of $25,000, in the aggregate, except for Contracts with customers or suppliers and Contracts relating to the Leased Real Property;

(ii)     each Contract, if any, relating to Indebtedness of the Company;

(iii)     each Contract, if any, for capital expenditures in excess of $10,000;

30

(iv)    each Contract, if any, with independent contractors, or consultants (or similar arrangements) in excess of $10,000;

(v)    each Contract, if any, in excess of $10,000 that limits the ability of the Company (or any manager, director or officer thereof) to compete in any line of business or with any Person or in any geographic area or during any period of time, or otherwise to conduct the Business as presently conducted or planned to be conducted, or to use or disclose any information in the possession of the Company; and

(vi)    each Contract, other than the lease with Seller to be executed pursuant to this Agreement, if any, in excess of $10,000 with any shareholder or any Affiliate or Related Person of the Company;

(vii)    each material license agreement, other than for off-the-shelf, commercially available, non-customized third-party Software; and

(viii)    each Preneed Agreement for undelivered funeral merchandise or services that have not been performed as of the Closing Date.

(b)    Except as set forth on Schedule 5.18(b), each Material Contract (i) is valid and in full force and effect and constitutes a legal, valid and binding obligation of the Company, and, to Seller's Knowledge, the other parties thereto, (ii) is enforceable in accordance with its terms, and (iii) will remain valid and in full force and effect after the Closing Date as a result of the transactions contemplated hereby, without any change or modification.  Correct and complete copies of each of the Material Contracts, including all amendments and supplements as of the date hereof, have been made available to Buyer.

(c)    The Company is not (with or without the lapse of time or the giving of notice, or both) in breach of or in default under any of the Material Contracts, and to Seller's Knowledge, no other party to any of the Material Contracts is (with or without the lapse of time or the giving of notice, or both) in breach of or in default under any of the Material Contracts.  There are no Contracts granting third parties a power of attorney on behalf of the Company.

**5.19    Suppliers.**  Except as set forth in Schedule 5.19, Seller does not have any Knowledge of any intention of or indication by a "Significant Supplier" to terminate its business relationship with the Company or to limit or alter its business relationship with them in any material respect.  The term "Significant Supplier" means any of the present ten (10) largest suppliers, by dollar volume, as set for in Schedule 5.19., of the Company during the three calendar year period 2019-2021.  Schedule 5.19 contains a true and correct list of the Significant Suppliers and the dollar volume of business with each Significant Supplier during the three calendar year period 2019-2021.

**5.20    Tax Returns and Taxes.**  Except as set forth on Schedule 5.20:

(a)    the Company has made copies of the Company's filed federal and state income Tax Returns for the past (4) years ("Filed Tax Returns") available to Buyer, and

has (i) timely filed all Tax Returns which are required to be filed by the Company with respect to any Taxes, and (ii) paid all Taxes due or assessed pursuant to the Filed Tax Returns;

(b)    all such Tax Returns were correct and complete and were prepared in compliance with all applicable Laws;

(c)    all such Tax Returns properly reflect the liabilities of the Company for Taxes for the periods, properties or events covered thereby;

(d)    there are not now any extensions of time in effect with respect to the dates on which any Tax Returns of the Company were or are due to be filed;

(e)    no waiver of any statute of limitations relating to Taxes for the Company is in effect;

(f)    any deficiencies, if any, asserted as a result of any examination by a Governmental Authority of any of the Tax Returns of the Company have been paid in full or finally settled;

(g)    no claims have been asserted and no proposals or deficiencies for any Taxes of the Company are being asserted, proposed or, to Seller's Knowledge, threatened, and no audit or investigation of any Tax Returns of the Company is currently underway, pending or, to Seller's Knowledge, threatened;

(h)    the Company has not received any notice of assessment of additional Taxes or executed or filed with any Governmental Authority any agreement or waiver extending the period of assessment for any Taxes or any deficiency thereof;

(i)    no claim has ever been made by a Governmental Authority in a jurisdiction where the Company conducts the Business that it did or does not file Tax Returns that the Company is or may be subject to taxation by that jurisdiction;

(j)    there are presently no Liens for Taxes (other than Taxes not yet due and payable) upon any of the assets of the Company;

(k)    the Company has withheld and paid all Taxes required to have been withheld and paid in connection with any amounts paid or owing to any employee, independent contractor, creditor, stockholder, or other third party;

(l)    all Taxes for periods beginning four (4) years before the Closing Date, have been paid or are adequately reserved against on the books of the Company;

(m)    the Company has not been audited by the Internal Revenue Service, the California Franchise Tax Board or any other applicable Tax Governmental Authority within the past five (5) years;

32

(n)    the Company is presently not a party to any Tax allocation agreement, Tax indemnity agreement, Tax sharing agreement or other similar Contract;

(o)    the Company (i) has not been a member of an affiliated group within the meaning of Code Section 1504(a) (or any similar group defined under a similar provision of state, local or foreign law) and (ii) has liability for Taxes of any person (other than the Company) under Treas. Reg. sect. 1.1502-6 (or any similar provision of state, local or foreign law), as a transferee or successor by contract or otherwise;

(p)    the Company will not be required to include or accelerate the recognition of any item in income, or exclude or defer any deduction or other tax benefit, in each case in any taxable period (or portion thereof) after Closing, as a result of any change in method of accounting, closing agreement, intercompany transaction, instalment sale, or the receipt of any prepaid amount, in each case prior to Closing;

(q)    the Company has not participated in any reportable transaction as defined in Section 6707A of the Code or Treasury Regulation Section 1.6011-4(b) and (c)(3);

(r)    no transaction contemplated by this Agreement is subject to withholding under Section 1445 of the Code (relating to "FIRPTA");

(s)    there is no Contract, plan or arrangement covering any present, former or retired employee, director, independent contractor or consultant that, individually or collectively, provides for, or provided for, nor will anything in this Agreement result in, the payment of any amount or the provision of any benefit that is or could be treated as an "excess parachute payment" pursuant to Section 280G of the Code and the regulations thereunder;

(t)    The Company has not entered into a gain recognition agreement pursuant to Treasury Regulations Section 1.367(a)-8. The Company has not transferred an intangible the transfer of which would be subject to the rules of Section 367(d) of the Code;

(u)    None of the assets of the Company: (i) constitute Tax-exempt use property or Tax-exempt bond financed property within the meaning of Section 168 of the Code; or (ii) are subject to a lease, safe harbor lease, or other arrangement as a result of which such assets are required for federal income Tax purposes to be treated as owned by a Person other than the Company;

(v)    The Company has been for all applicable time periods prior to the Closing Date and as of the Closing Date, taxed for federal income tax purposes as an "S-Corporation" under and pursuant to Subchapter S of the Code. Neither the Company nor any owner, officer or, to Seller's Knowledge, employee of the Company has received any notices, warning letters or other statements asserting or otherwise indicating the commencement or intention to conduct an investigation, audit, or review regarding the termination or revocation of such "S-Corporation" election or status. No proceeding or inquiry is pending or, to Seller's Knowledge, has been or is threatened, regarding the termination or revocation of such "S-Corporation" election or status;

(w)    during the three (3) years prior to the Effective Date, the Company has not been a party to any transaction treated by the parties thereto as one to which Section 355 of the Code applied;

(x)    the Company has not engaged in any "reportable transaction" for purposes of Treasury Regulations Sections 1.6011-4(b) or Code Section 6111 or any analogous provision of state or local Law for which reporting to the Internal Revenue Service or other Governmental Authority is required (taking into account published guidance thereunder); and

(y)    each Tax election made by or with respect to the Company was timely and properly made.

**5.21    Permits.**  Schedule 5.21 contains a complete and accurate list of all Permits (other than Environmental Permits) used by the Company in the operation or conduct of the Business or that relate to the Company's assets.  The Permits of the Company constitute all Permits that are necessary for the lawful operation or conduct of the Business as presently conducted and are required for the lawful use, lease, occupancy and ownership of the assets of the Company.  The Company is in compliance with each of the Permits, and no event, to Seller's Knowledge, has occurred which constitutes or, after notice or lapse of time or both, would constitute a breach or default under any of the Permits or would permit revocation or termination of any of the Permits.  Except to the extent described on Schedule 5.21 (including with respect to the cremation license for the Company that the Seller is acquiring for Antelope Valley), the Permits are in full force and effect and should be renewable based upon paying the annual renewal filing fees and performing other legal requirements in the Ordinary Course of Business.  To Seller's Knowledge, none of the Permits should be adversely affected by consummation of the transactions contemplated by this Agreement, so long as Buyer timely and completely performs all of its obligations set forth in this Agreement to obtain the applicable Consents from the applicable Government Authorities, and file all required notices and other documents with them regarding this transaction, including those required to be filed with the Bureau regarding the assignment of the Company's funeral establishment licenses and the issuance of its crematory license.  Notwithstanding the foregoing, Seller provides no guarantee that the Government Authorities, including the Bureau, will issue the required licenses to Buyer to lawfully operate the Business.

**5.22    Intellectual Property Rights.**

(a)    Schedule 5.22 contains a list of all Intellectual Property Rights owned or licensed by the Company other than off-the-shelf commercially available software.  The Company is the owner of all right, title and interest in and to each of the Intellectual Property Rights that are listed as owned on Schedule 5.22, free and clear of all Liens except for any Permitted Liens, and, except as indicated on Schedule 5.22, has the right to use without payment to a third party all of the Intellectual Property Rights listed as licensed on Schedule 5.22.  Except as indicated on Schedule 5.22, the Company has no, nor does it pay or receive any royalties on, any licenses and other agreements relating to the Intellectual Property Rights.  To Seller's Knowledge, there is no material conflicting use, infringement or misappropriation of any such Intellectual Property Rights within the United States.  Except as set forth on Schedule 5.22, to Seller's Knowledge, (i) no products made, sold or

34

distributed by the Company or service provided by the Company violate any license or infringes any intellectual property rights of any third party, and (ii) there are no pending claims or demands by

(b)     Any Net Names have been registered in the name of the Company. No Net Name, if any, has been or is now involved in any dispute, opposition, invalidation or cancellation Proceeding and, to Seller's Knowledge, no such action is threatened with respect to any Net Name.

(c)     To Seller's Knowledge, except for commonly available off-the-shelf computer and workstation software programs, no Person (other than the Company) holds, manages or controls the Company Software or other software used in the operation of the Business of the Company in any manner without the Company's right and ability to maintain unhindered and continuous useful operation of such software. To Seller's Knowledge, the Company has taken commercially reasonable steps and implemented commercially reasonable procedures, each consistent with industry practices and standards to ensure that the Company Software and internal computer systems (consisting of hardware, software, databases or embedded control systems, collectively with the Company Software, the "Company Systems") are free from all disabling codes or instructions, and all malware, viruses or other intentionally created (by any Person) undocumented contaminants. The Company Systems have in place disaster recovery plans, procedures and facilities and have taken commercially reasonable steps consistent with industry practices and standards to safeguard the Company.

(d)

(e)     The Company has taken commercially reasonable efforts consistent with industry practices and standards to safeguard the security, confidentiality and integrity of the Company Systems, transactions and data, and protect against unauthorized access to the Company Systems or data. To Seller's Knowledge, the Company has not suffered a security breach with respect to any of the Company Systems or data. To Seller's Knowledge, there has been no unauthorized or illegal use of or access to the Company Systems or to any data. The Company has not notified, or been required to notify, any Person of any information security breach involving user or customer data.

**5.23    No Pending Proceedings.**  Except as set forth in Schedule 5.23, there is no Proceeding pending or, to Seller's Knowledge, threatened against or affecting the Company or any of their respective properties or assets, at law or in equity, nor does Seller know of any reasonably likely basis for any such Proceeding. There are presently no outstanding Governmental Orders of any Governmental Authority or any arbitrator against or affecting the Company or any of its properties or assets. None of the pending or threatened Proceedings listed in Schedule 5.23, individually or in the aggregate, will or could reasonably be expected to have a Material Adverse Effect.

**5.24    Compliance with Laws.**

(a)     Except as set forth in Schedule 5.24, the current Business of the Company has been conducted in compliance in all material respects with all applicable Laws.  No notice, citation, summons or order has been assessed and no investigation or review is pending or, to Seller's Knowledge, threatened by any Governmental Authority with respect to any alleged violation by the Company of any Law.  To Seller's Knowledge, no event has occurred or circumstance exists that (with or without notice or lapse of time), could reasonably be expected to constitute or result in a violation by the Company of, or a failure on the part of the Company to comply with, any Law in any material respect.

(b)     The Company has at all times operated in reasonable compliance with applicable executive orders, quarantines, or similar guidelines from any governmental or administrative body with authority with respect to mitigation of the spread of COVID-19, including those requiring modifications of the operation of the workplace in response to the COVID-19 pandemic.  The Company has not experienced any material number of employees testing positive for COVID-19 to the extent that its employees have provided such information to the Company.

**5.25     OSHA.**  The facilities of the Company are maintained and operated in compliance with OSHA and any similar state statute and the rules and regulations promulgated thereunder in all material respects.  Except as set forth in Schedule 5.25, the Company has not been subject to an investigation by the U. S. Department of Labor, litigation over compliance with such rules and regulations or any fine, penalty or citation relating to or arising out of a violation or alleged violation of OSHA and any similar state statute and such rules and regulations.

**5.26     Environmental/Health Safety Matters.**  Except as set forth in Schedule 5.26:

(a)     The Company (including its assets, operations and Business) is not now, nor has previously been, in violation of or noncompliant with any applicable and required Environmental Laws or Environmental Permits.

(b)     To the extent required by Law, the Company currently holds and at all times has held all Environmental Permits that are or have been required for the operation of the Business of the Company as currently and formerly conducted.  Schedule 5.26 contains (i) a description of all Environmental Permits currently held by the Company in connection with the operation of its Business, properties and assets, and identifies the, nature, duration and renewal dates of and the issuing governmental entity with respect to each Environmental Permit, and (ii) a complete list of all solid waste and hazardous waste disposal, treatment, and storage facilities which are presently or were used by the Company at any time in the operation of its Business for disposal of solid waste and Hazardous Materials.  Each current Environmental Permit is valid and in good standing, and the Company has not been advised by any Governmental Authority of any actual or potential change in the status or terms and conditions of any Environmental Permit.  To Seller's Knowledge, all applications for renewal, extension, reissuance or modification of Environmental Permits, or related submissions to any Governmental Authority, have been made in a complete and timely manner and the Company has no reason to believe that such application(s) will be denied, in whole or in part.

(c)    The generation, usage, Release, transportation, treatment, storage or disposal of any Hazardous Substance that may have been used in the operation of the Business have been (i) in compliance with Environmental Laws, and (ii) in a manner that would not give rise to any Environmental Claim or to any other liability or obligations under Environmental Laws.; no underground storage tanks, surface impoundments, landfills, asbestos containing materials or polychlorinated biphenyls are located at, on or under any property currently or formerly owned, leased or used by the Company.

(d)    To Seller's Knowledge, there has been no Release of any Hazardous Substance at, on or under any property or facility currently or formerly owned, operated or leased by the Company, or at any adjacent or off-site location, that has formed or could reasonably be expected to form the basis of any Environmental Claim against the Company or any obligation to perform Remedial Action by the Company.

(e)    To seller's Knowledge, there are no Environmental Claims pending or, to Seller's Knowledge, threatened against the Company.  The Company has not retained or assumed, either contractually or by operation of law, any liabilities or obligations that have formed or could reasonably be expected to form the basis of any Environmental Claim against the Company or any obligation to perform Remedial Action by the Company.

(f)    The Company has delivered to Buyer true and complete copies and results of any environmental reports, studies, analyses, tests or monitoring possessed or initiated by the Company, if any, pertaining to any Hazardous Substance in, on or under any property currently or formerly owned, leased or used by the Company in the operation of the Business, or concerning compliance by the Company or the Business with Environmental Laws.

## 5.27    Investments.

(a)    All funds received by the Company in connection with Preneed Agreements have been deposited on a timely basis in appropriate accounts and administered and reported in all material respects (i) in accordance with the terms of agreements with the purchasers and (ii) as required by applicable Law. On an aggregate basis, to Seller's Knowledge, the principal and interest earnings of the accounts, trusts or other deposits held pursuant to Preneed Agreements are equal to or greater than the cost of performing such Preneed Agreements.

(b)    The Company, and any preneed funeral trust or similar entity established by the Company, have good and marketable title to all securities and other investments (collectively, the "Investments") owned by the Company and any such trust or similar entity established by the Company.

(c)    As of the date of this Agreement, (i) none of the Investments is in default in any material respect, (ii) all Investments held in any trust or similar entity are in compliance with industry regulatory standards in all material respects and are owned and administered in accordance with standards such that the Investments, collectively, are prudent taking into account the needs of the Investments' beneficiaries, the need to preserve the corpus of

37

such trust or similar entity and the amount and regularity of income produced by the Investments, and (iii) Schedule 5.27 sets forth a list, by category, of the amount of each type of Investment owned by the Company.

**5.28    Preneed Trusts.**  Schedule 1.1 is a correct and complete list of all Preneed Trusts maintained by the Company.  Each Preneed Trust is duly established and validly existing under the Laws of the state of its creation and has the requisite power and authority to hold the property held in such trust, and to carry on the affairs of such trust as now being conducted.  To Seller's Knowledge, the trustee of each Preneed Trust has administered each such Trust in compliance with all applicable Laws.  Seller has made available to Buyer correct and complete copies of all documents governing each Preneed Trust.

**5.29    Preneed Insurance.**  To Seller's Knowledge, since January 1, 2017, the Company has exclusively used the insurance companies set forth in Schedule 5.29 to provide insurance products sold in connection with Preneed Agreements The Company owns no insurance subsidiaries or captive insurance company.

**5.30    Other Insurance Coverage.**  To Seller's Knowledge, the Company presently maintains, and has at all times prior to the date hereof maintained, liability, casualty, property loss and other insurance coverages upon its properties and with respect to the conduct of its Business in such amounts, of such kinds and with such insurance carriers as are generally deemed appropriate and sufficient for companies of a similar size engaged in similar types of business and operations.  Schedule 5.30 sets forth a complete and correct list of all current insurance policies maintained by the Company and indicating for each policy the insurance company, type of coverage, annual premium and whether the terms of such policy provide for retrospective premium adjustments.  Schedule 5.30 also sets forth all claims made under any such policy in the past five (5) years.  Each of such policies are valid, outstanding and enforceable and there is no default with respect to any provision contained in any such policy, nor has there been any failure to give any notice or present any claim under any such policy in a timely fashion or in the manner or detail required by the policy.  The Company has paid all premiums due, and, to Seller's Knowledge, has otherwise performed all of its obligations, under each policy of insurance to which it is a party or that provides coverage to the Company.  No written notice of cancellation or non-renewal with respect to, or disallowance of any claim under, any such policy has been received by the Company.  The Company has not been refused any insurance, nor has its coverage been limited by any insurance carrier to which it has applied for insurance or with which it has carried insurance during the last five (5) years.

**5.31    Warranty Claims**.  To Seller's Knowledge, except as set forth in Schedule 5.31, (a) the Company has made no oral or written warranties with respect to the quality or absence of defects of its products or services which are in force as of the date of this Agreement, and (b) there are no liabilities of or claims against the Company and no liabilities or claims are threatened against the Company, with respect to any product liability or product warranty (or similar claim) of the Company that relates to any product manufactured, shipped or sold or any service provided by the Company.

**5.32    Relationships with Affiliates and Related Persons.**  To Seller's Knowledge, neither the Company, nor Seller nor any Affiliate or Related Person of any of them has, or during

38

the past three years, has had, any interest in any property (whether real, personal or mixed and whether tangible or intangible) used in or pertaining to the Business, except for the Seller's lease to the Company of one of the Leased Real Properties.  To Seller's Knowledge, except as set forth in Schedule 5.32, the Company nor Seller nor any Affiliate or Related Person of any of them is a party to any Contract with, or has any claim or right against, the Company.

**5.33    Privacy Laws.**  The Company has complied in all material respects with all applicable Laws relating to privacy, data protection, and the collection and use of personal information.  To Seller's Knowledge, the Company has complied with any internal privacy policies and guidelines relating to privacy, data protection, and the collection and use of personal information.  To Seller's Knowledge, the Company takes reasonable measures to ensure that such information is protected against unauthorized access, use, modification, or other misuse.  To Seller's Knowledge, the Company has not experienced any incident in which personal information or other sensitive data was or may have been stolen or improperly accessed, and the Company is not aware of any facts suggesting the likelihood of the foregoing, including, any breach of security or receipt of any notices or complaints from any Person regarding personal information or other data.  True copies of the Company's privacy policies and guidelines, if any, have been made available to Buyer.

**5.34    Rollover Equity.**

(a)    Seller acknowledges that Seller is acquiring the Rollover Equity for investment for Seller's own account and not with a view to, or intention of, a sale in connection with, any distribution of any part thereof.  Seller acknowledges that the Rollover Units may not be sold, transferred, offered for sale, assigned, pledged, hypothecated or otherwise disposed of unless (i) such transfer, sale, assignment, pledge, hypothecation or other disposition is pursuant to the terms of an effective registration statement under the Securities Act, and the Rollover Equity is registered under any applicable state or foreign securities Laws or (ii) the Rollover Equity is sold pursuant to an exemption from registration under the Securities Act and any applicable state or foreign (including Canadian) securities Laws.  Seller acknowledges that the Rollover Equity and the issuance or transfer thereof have not been registered under the Securities Act or the securities Laws of any state or jurisdiction.

(b)    Seller is an "accredited investor" as defined in Canada's National Instrument 45-106 – Prospectus Exemptions.  Seller acknowledges that it is informed as to the risks of acquiring and ownership of the Rollover Equity.  Seller is an informed and sophisticated investor, and has engaged advisors, experienced in transactions of the type of the transactions contemplated by this Agreement and any documentation related to the Rollover Equity ("Rollover Documentation").  Seller has been given the opportunity to ask questions of and receive answers from Buyer and Anthem GP concerning the Rollover Equity, the Rollover Documentation and related matters.  Seller further represents that it has been furnished with, and has evaluated, all information it deems necessary, desirable and appropriate to evaluate the merits and risks of the acquisition of the Rollover Equity and the Rollover Documentation and has received such legal, financial, and other advice as deemed by it to be necessary, desirable and appropriate to enable it to make an informed and intelligent decision with respect to the execution, delivery and performance of this

Agreement, the Rollover Documentation and the other agreements and documents to be executed and delivered by it in connection herewith and therewith. In evaluating the suitability of the transactions contemplated by this Agreement and the Rollover Documentation, Seller has not relied upon any other representations, whether oral or written provided by or made on behalf of Buyer or any of its Affiliates, and is not relying on any implied representations or warranties as to the prospects or the likelihood of success of the business of Buyer or any of its Affiliates contained in any information whether oral or written provided by or on behalf of Buyer or any of its Affiliates.

**5.35    Brokers and Finders.** Neither Seller nor the Company has employed any broker or finder or incurred any liability for any financial advisory fees, brokerage fees, commissions or finders' fees, and no broker or finder has acted directly or indirectly for Seller or the Company in connection with this Agreement or the transactions contemplated herein, except for Johnson Consulting Group, whose fees shall be paid by Seller and are included among the Transaction Expenses.

**5.36    Disclosure.** No representation or warranty of Seller contained in this Agreement, and no statement contained in any certificate or Schedule furnished to Buyer pursuant hereto, contains any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements contained herein or therein, in light of the circumstances under which such statements are made, not misleading.

**5.37    No Other Seller Representation or Warranties.** Except as expressly set forth in Articles IV and V, Seller and the Company have not made any other representations or warranties whatsoever (implied, express or otherwise) to the Buyer.

## VI.    REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Seller as of the Effective Date and as of the Closing Date, as follows:

**6.1    Organization.** Buyer is a corporation duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation. Buyer has all requisite corporate or other entity power and authority to own, lease and operate its properties and assets and to carry out its business as and where now being conducted.

**6.2    Authority and Enforceability.** Buyer has full corporate or other entity power and authority to execute and deliver this Agreement and to perform its obligations hereunder and to consummate the transactions contemplated hereby. The execution, delivery and performance of this Agreement, the Escrow Agreement, the Consulting Agreement and all other agreements and documents to be executed and delivered by Buyer pursuant to the provisions of this Agreement (the "Buyer Documents") and the consummation by Buyer of the transactions contemplated hereby and thereby have been duly authorized by all necessary corporate or other entity action on the part of Buyer and no other proceedings on the part of Buyer are necessary to authorize this Agreement or the Buyer Documents or to consummate the transactions contemplated hereby. This Agreement has been, and at the Closing the Buyer Documents shall be, duly and validly executed and delivered

40

by Buyer and constitute, or shall constitute, the legal, valid and binding obligation of Buyer enforceable against Buyer in accordance with their respective terms.

**6.3    Third-Party Consents.**  Except as set forth in <u>Schedule 6.3</u>, no Consent is required for the execution, delivery and performance of this Agreement and the Buyer Documents by Buyer and the consummation of the transactions contemplated hereby and thereby.

**6.4    No Conflict or Violation.**  Neither the execution and delivery of this Agreement or the Buyer Documents by Buyer nor the consummation by Buyer of any of the transactions contemplated hereby do or will (with or without notice or lapse of time or both) (a) contravene, conflict with or result in a violation of any provision of the Organizational Documents of Buyer; (b) contravene, conflict with or result in a violation of any Law or any Governmental Order to which Buyer is subject; or (c) contravene or conflict with, result in any breach of, constitute a default under, any Contract to which Buyer is a party.

**6.5    Investment Intent.**  Buyer is acquiring the Shares for its own account for investment and not with a view to their distribution within the meaning of Section 2(11) of the Securities Act.  Buyer understands that the Shares have not been registered under the Securities Act or any state securities laws and are being transferred to Buyer, in part, in reliance on the foregoing representation.

**6.6    Brokers and Finders.**  Buyer has not employed any broker or finder or incurred any liability for any financial advisory fees, brokerage fees, commissions or finders' fees, and no broker or finder has acted directly or indirectly for Buyer in connection with this Agreement or the transactions contemplated herein.

**6.7    Limitation on Warranties.**  Buyer hereby acknowledges and agrees that, except as expressly set forth in Articles IV and V or as and to the extent set forth in the Disclosure Schedules, Seller makes no, and Buyer is not relying upon any, representation or warranty, express or implied, with respect to the Company or the Shares.  Buyer acknowledges and agrees that in entering into this Agreement, it has relied and will rely on such representations and warranties and its own investigation and analysis pursuant to Buyer's Due Diligence.  With respect to any Company assets not otherwise addressed pursuant to Section 7.13 below, Buyer has not identified, including through its Due Diligence, any material unacceptable conditions in Company assets, except for any such conditions as are identified to Seller at least three (3) Business Days prior to Closing.

## VII.  COVENANTS

**7.1    Access and Investigation.**  Between the date of this Agreement and the Closing Date, and upon reasonable notice, Seller will, and shall cause the Company and its Representatives to (a) afford Buyer and its Representatives and prospective lenders and their Representatives (collectively, "<u>Buyer Group</u>") full and free access, during regular business hours, to the Company's personnel, properties (including subsurface testing), Contracts, Permits, books and records and other documents and data, such rights of access to be exercised in a manner that does not unreasonably interfere with the operations of the Company; (b) furnish Buyer Group with copies of all such Contracts, Permits, books and records and other existing documents and data as

41

Buyer may reasonably request; (c) furnish Buyer Group with such additional financial, operating and other relevant data and information as Buyer may reasonably request; (d) reasonable access to the Significant Suppliers of the Company in a manner as shall be mutually agreeable between Buyer and Seller, and (e) otherwise cooperate and assist, to the extent reasonably requested by Buyer, with Buyer's investigation of the properties, assets and financial condition related to the Company. In addition, Buyer shall have the right to have the Real Property and Personal Property inspected by Buyer Group, at Buyer's expense, for purposes of determining the physical condition and legal characteristics of the Real Property and Personal Property, including subsurface or other destructive testing. Buyer Group shall have access to the Real Estate and facilities thereon for the purpose of conducting appropriate environmental tests, inspections or investigations, including without limitation, Phase I and II environmental investigations or other intrusive testing or sampling of soil and groundwater, all at Buyer's expense.

**7.2    Conduct of Business.**

(a)    Except as otherwise contemplated by this Agreement, during the period from the date of this Agreement and continuing until the Closing Date, Seller will, and shall cause the Company to, operate the Business in the Ordinary Course of Business and to use all commercially reasonable efforts to:

(i)    preserve the Business intact and conserve the goodwill related thereto;

(ii)    preserve intact the present business organization of the Company, keep available the services of officers, employees and agents; and

(iii)    preserve present relationships with suppliers, customers, lenders and others having business dealings with them.

(b)    In connection with the foregoing, and without limiting the generality of the this Section 7.2, Seller will and shall cause the Company to:

(i)    maintain supplies and other materials included in the Inventories at levels that are in the Ordinary Course of Business;

(ii)    maintain its assets (including buildings, offices, properties and equipment) in the Ordinary Course of Business in good operating order and condition, reasonable wear and tear excepted;

(iii)    continue to extend customers credit, collect Receivables and pay accounts payable and similar obligations and otherwise handle short-term assets and liabilities in the Ordinary Course of Business;

(iv)    maintain in full force and effect and in the same amounts policies of insurance comparable in amount and scope of coverage to that now maintained by or on behalf of the Company;

(v)     continue to maintain its books and records in accordance with its historical practices;

(vi)     continue its cash management practices in the Ordinary Course of Business;

(vii)     confer with Buyer prior to implementing operational decisions of a material nature; and

(viii)     otherwise report periodically to Buyer concerning the status of its Business, operations and finances.

(c)     Without the prior written consent of Buyer, and without limiting the generality of any other provision of this Agreement, Seller will not, and shall cause the Company not to, take any affirmative action, or fail to take any reasonable action within its control, as a result of which any of the changes or events listed in Section 5.9 would be likely to occur.

**7.3     Consents and Approvals.**  Each of the Parties shall cooperate with each other, and use their respective commercially reasonable efforts to take, or cause to be taken, all action, and to do, or cause to be done, all things necessary under applicable Laws to consummate the transactions contemplated by this Agreement as promptly as practicable after the date hereof, including obtaining all Consents of Governmental Authorities and other third parties necessary to consummate the transactions contemplated by this Agreement.

(a)     Without limiting the forgoing, the Buyer shall, at its sole expense, secure any and all Consents of Governmental Authorities necessary to consummate the transactions contemplated by this Agreement, including but not limited to those required by the Bureau, that must be timely completed in order that the Buyer and Company may properly and legally operate the Business from and after the Closing Date.  This includes, but is not limited to Buyer complying with all conditions imposed by the Bureau for such approvals, filing all applications for assignment of funeral establishment and issuance of crematory licenses, filing all Notifications of change of the Company's ownership, officers, managing funeral director, and preneed trustees, filing related Certification Affidavits, and any providing any other documents and taking any other actions as may be required for such approval by the Bureau.  Seller shall provide such information and assistance as is reasonably requested for Buyer to complete the requirements of the Bureau.

(b)     The Parties hereby acknowledge and agree that the risk of delay and/or unanticipated additional terms or conditions being imposed by the Governmental Authorities entities, including the Bureau, and other third parties necessary to consummate the transactions and obtain their consent and approvals as contemplated by this Agreement is beyond the control of the Parties.

**7.4     Update Schedules.**  Seller shall promptly disclose to Buyer any information contained in its representations and warranties or the Schedules which, because of an event occurring after the date hereof, is incomplete or is no longer correct as of all times after the date hereof until the Closing Date.  Such disclosures shall be deemed to modify, amend or supplement

43

the representations and warranties of Seller and the Schedules hereto for the purpose of <u>Articles IV and V</u> hereof if they are provided to Buyer at least three (3) Business days prior to the Closing Date and Buyer has consented thereto in writing.  If Buyer has any objections to the updated Schedules, Buyer will provide such objections writing prior to the Closing Date.

      **7.5**     **Exclusivity.**  Seller grants to Buyer the exclusive right to acquire the Shares until the Final Termination Date.  Seller will not, and shall cause the Company not to, directly or indirectly (a) solicit, initiate or encourage the submission of any proposal or offer from any Person relating to the acquisition of the Shares or any other equity or voting securities, or any substantial portion of the assets of, the Company (including any acquisition structured as a merger, consolidation or share exchange) or (b) participate in any discussions or negotiations regarding, furnishing any information with respect to, assist or participate in, or facilitate in any other manner any effort or attempt by any Person to do or seek any of the foregoing.

      **7.6**     **Confidentiality.**

      (a)     Unless and until the Closing has been consummated, Buyer will hold, and shall cause its Representatives to hold, in confidence any confidential data or information made available to Buyer in connection with this Agreement with respect to the Company and its Business using the same standard of care to protect such confidential data or information as is used to protect Buyer's confidential information.  If the transactions contemplated by this Agreement are not consummated, Buyer shall return or cause to be returned to Seller all written materials and all copies thereof that were supplied to Buyer by Seller or the Company that contain any such confidential data or information, provided that Buyer may retain one copy of such confidential data and information in secure storage for use in any dispute related to this Agreement.

      (b)     From and after the Closing Date, Seller shall hold, and shall cause their respective Representatives to hold, in confidence all confidential data or information with respect to the Company and the Business and all terms and conditions of this Agreement using the same standard of care to protect such confidential data or information or terms and conditions as it used to protect such confidential information prior to the Closing Date.

      **7.7**     **Noncompetition/Nonsolicitation**.

      (a)     The Parties acknowledge that Seller has owned and operated the Company in the state of California and has developed the goodwill of the Company.  To induce Buyer to purchase the Shares, and as consideration for Seller transferring all of his equity interests in the Business along with all good will attendant thereto to the Buyer, Seller agrees that for a period lasting until the third (3rd) anniversary of the Closing Date (the "**Restricted Period**") within the limits of Los Angeles County, San Bernardino County, or Ventura County, California (the "**Restricted Territory**"), Seller shall not, directly or indirectly, alone or for the account of any other Person:

      (i)     either as employee, employer, consultant, agent, principal, partner, trustee, advisor, officer, director, manager, shareholder, member or in any other individual or representative capacity, own, manage, control, advise, support,

44

finance, operate, engage or participate in the ownership, management, operation or control of or be connected in any manner with any business, partnership, joint venture, corporation, trust or other organization or entity which is or may be in competition with the funeral home, mortuary, crematory, cemetery, burial or pre-need marketing business of the Company or Buyer; notwithstanding the above, Seller may own up to one percent (1%) of the stock of any publicly traded corporation, provided that no public acknowledgement of such stock ownership is made by any Person in any way which could reasonably constitute an endorsement of such publicly-traded company by Seller;

      (ii)    interfere with, solicit, disrupt or attempt to disrupt any past, present or prospective relationship, contractual or otherwise, between Company or Buyer and any former, existing or prospective customer, client, supplier, employee or agent or request or advise any such Person to withdraw, curtail or cancel their business with Company or Buyer or induce or attempt to induce any such Person to breach their agreements with Company or Buyer; or

      (iii)    divulge, transmit or otherwise disclose or cause to be disclosed, or use personally, any Confidential Information, other than as may be required by Law or legal process.

      (b)    Seller agrees that the terms and conditions of the restrictive covenants in this Section 7.7 are reasonable and necessary for the protection of the Company and Buyer and to prevent damage or loss to Company or Buyer as a result of actions taken by Seller. Seller further agrees that the consideration provided to Seller in this Agreement is sufficient to compensate Seller fully and adequately for agreeing to the restrictions contained in this Section 7.7. It is agreed by the Parties that if any portion of the restrictive covenants set forth above is held to be unreasonable, arbitrary or against public policy, then each such covenant shall be considered divisible both as to time and geographical area, with each month of a specified period being deemed a separate period of time and each city being deemed a separate geographical area, it being the intention of the Parties that a lesser period of time or geographical area shall be enforced so long as the same is not unreasonable, arbitrary or against public policy.

      **7.8**    **Termination of Pension Plans**. At least one day before Closing, Seller shall cause the Company to cease any sponsorship of, participation in, obligation to contribute to and otherwise terminate the Company's existing 401(k) plan and any other Company-sponsored pension plan (as defined in ERISA Section 3(2)) (collectively referred to as the "Pension Plan"). Seller shall cause to be taken all further actions as may be necessary to implement Pension Plan termination and/or discontinuance of sponsorship or contribution by the Company of the Pension Plan in a manner that complies with all applicable Law, including, but not limited to, timely adoption (at least one day before Closing) of resolutions of the Company's governing bodies approving plan termination and of a plan termination amendment; preparation, submission and dissemination of annual reports (form 5500); timely provision of any required notices to participants, trustees and administrators; and processing the final distribution of plan assets and final wind-up of the Plan.

45

7.9    **Assistance in Proceedings**.  In the event and for so long as any Party is actively contesting or defending against any Proceeding brought by a third party in connection with any action, activity, circumstance, condition, conduct, event, fact, failure to act, incident, occurrence, plan, practice, situation, status or transaction involving the Business, the other Party shall reasonably cooperate with the contesting or defending Party and its Representatives in the contest or defense, make available its personnel and provide any testimony and access to its books and records as may be reasonably requested in connection with the contest or defense, at the sole cost and expense of the contesting or defending Party (unless such contesting or defending Party is entitled to indemnification therefor under Article X, in which case, the costs and expense shall be borne by the Parties in accordance with Article X).

7.10    **Retention of and Access to Books and Records.**  After the Closing Date, Buyer shall retain for a period consistent with Buyer's record-retention policies and practices the books and records of the Company, but in no event less than seven (7) years after the Closing Date. Buyer shall provide Seller and its Representatives reasonable access thereto, during normal business hours and on at least three days' prior written notice, to enable them to prepare financial statements or tax returns or deal with tax audits.

7.11    **Further Assurances.**  Seller, after the Closing, without further consideration, shall execute, acknowledge, and deliver any further deeds, assignments, conveyances, and other assurances, documents, and instruments of transfer, reasonably requested by Buyer, and shall take any other action consistent with the terms of this Agreement that may reasonably be requested by Buyer for the purpose of assigning, transferring and delivering the Shares to Buyer or to better enable Buyer to complete, perform or discharge any of the liabilities or obligations assumed by Buyer.  Each of the Parties hereto will, without further consideration unless otherwise agreed, cooperate with the other and execute and deliver to the other Parties hereto such other instruments and documents and take such other actions as may be reasonably requested from time to time by any other Party hereto as necessary to carry out, evidence and confirm the intended purposes of this Agreement.

7.12    **Press Releases.**  Except as required by applicable Law, no Party to this Agreement shall give notice to third parties or otherwise make any public statement or releases concerning this Agreement or the transactions contemplated hereby except for such written information as shall have been approved in writing as to form and content by the other Parties, which approval shall not be unreasonably withheld.

7.13    **Buyer Objections.**

(a)    Buyer shall notify Seller in writing of all title objections uncovered pursuant to Buyer's Due Diligence no less than five (5) business days prior to Closing.  No later than five (5) business days after receipt of the Buyer's title objections, Seller shall notify Buyer either that (i) Seller will correct such title objections or cause the Title Company to insure over any such title objections (in which case Seller shall state with specificity as to how such correction will be accomplished), or (ii) Seller will not correct such title objections.  If Seller elects to correct such title objections, then Seller will do so in a manner reasonably satisfactory to Buyer at or prior to Closing.  Notwithstanding anything contained herein to the contrary, Seller shall be obligated to satisfy all Mandatory Removal

46

Liens by no later than the Closing Date. As used herein, the term "Mandatory Removal Liens" means: (i) amounts secured by liens, deeds to secure debt, security deeds, deeds of trust, mortgages, security agreements, security interests, UCC financing statements or other similar liens which can be discharged by a sum certain of money, (ii) real estate taxes and assessments that are due and payable (subject to proration adjustments as provided herein), (iii) liens against the Real Property whether voluntarily or involuntarily created by the acts or omissions of Seller, or any other party acting by or through Seller which can be discharged by a sum certain of money, and (iv) any mechanics liens affecting all or any portion of the Real Property.

(b)    If Seller elects not to correct any title objections with respect to the Real Property, then Buyer may, (i) as its sole and exclusive remedy (except to the extent that the title objection is a result of a default by Seller hereunder), terminate this Agreement no later than 5:00 p.m. Eastern time on the date which is five (5) business days after receipt of Seller's election not to correct any title objections (other than Mandatory Removal Liens), (ii) purchase the Real Property and consummate the transaction without any reduction in the Purchase Price, except that in the event of any failure by Seller to cure any Mandatory Removal Liens on or prior to the Closing Date, Buyer may proceed to Closing with title to the Real Property as it then exists, with the right to deduct from the Purchase Price a sum equal to the aggregate amount necessary to cure or remove (by endorsement or otherwise, in form and substance reasonably acceptable to Buyer) the Mandatory Removal Liens that Seller has failed to cure and remove, or (iii) agree with Seller to proceed to Closing, but for any exceptions set forth in the Title Policy as of Closing other than Permitted Encumbrances or other title objections outstanding as of Closing, including Post-Closing Exceptions, if any, Seller shall correct such matters withing thirty (30) days post-Closing.

**7.14    Transfer of Excluded Assets.**  Immediately upon Closing Date, the Company shall transfer title and possession to all of the Excluded Assets, including but not limited to its Cash, to Seller, subject to Section 2.3(c).  The Parties shall cooperate with each other regarding the transfer of the Cash from the Company's accounts to Seller to mitigate any disruption to the Company and its Business operations.

## VIII.   TAX MATTERS

**8.1    Apportionment of Taxes**.  Any Taxes of the Company for a taxable period beginning on or before and ending after the Closing Date ("Straddle Period") shall be apportioned between the Pre-Closing Tax Period and Post-Closing Tax Period based, (i) in the case of property Taxes and similar ad valorem obligations ("Property Taxes"), the amount of such Property Taxes for the entire Straddle Period multiplied by a fraction, the numerator of which is the number of days in the portion of the Straddle Period ending on the Closing Date and the denominator of which is the number of days in the entire Straddle Period and (ii) in the case of other Taxes, on an interim closing of the books as of the close of the Pre-Closing Tax Period.  The amount of Property Taxes shall be reapportioned within thirty days after the date of the receipt of the bill for the actual Property Taxes for the Straddle Period.  Seller shall be responsible for all Taxes of the Company attributable to any Pre-Closing Tax Period and, subject to Section 8.8, all Taxes of Seller for all

periods. Buyer shall be responsible for all Taxes of the Company attributable to any Post-Closing Tax Period.

**8.2    Filing of Tax Returns**.

(a)    Except as otherwise provided in this Section 8.2(a), Seller shall prepare, or cause to be prepared, all Tax Returns of the Company for periods ending on and including the Closing Date that have not been filed by the Closing Date ("Pre-Closing Tax Returns"). Seller shall prepare, or cause to be prepared, the Pre-Closing Tax Returns in a manner consistent with the past practice of Company. The Seller shall timely file all such Pre-Closing Tax Returns described in this Section 8.2(a); provided, however, if any such Pre-Closing Tax Return is filed after the Closing and Seller is not authorized to execute and file such Tax Return by applicable Law, Buyer shall execute and file (or cause to be filed) such Tax Return with the appropriate Governmental Authority, in such case, subject to Buyer's approval of such Pre-Closing Tax Return, which approval shall not be unreasonably withheld, conditioned or delayed. Seller shall pay all Taxes due and payable in respect of all such Pre-Closing Tax Returns of the Company; provided, however, that if any Pre-Closing Tax Return is due after the Closing and is to be filed (or caused to be filed) by Buyer, Seller shall pay to Buyer by wire transfer of immediately available funds to the bank account designated by Buyer an amount of cash equal to the amount of Taxes shown as due on such Pre-Closing Tax Return (determined pursuant to this Section 8.2(a)) no later than five Business Days prior to the earlier of the date such Tax Return is filed or the final due date of such Pre-Closing Tax Return.

(b)    Buyer shall prepare, or cause to be prepared, all Tax Returns for periods that begin during the Pre-Closing Tax Period and end after the Closing Date ("Straddle Tax Returns"). Buyer shall deliver or cause to be delivered a copy of each such Straddle Tax Return and any supporting work papers and schedules to Seller for their review and approval at least thirty days prior to the final due date (taking into account valid extensions), which approval shall not be unreasonably withheld, conditioned or delayed. If Seller disputes any item on any such Straddle Tax Return, Seller shall notify Buyer (by written notice within fifteen days of receipt of such draft of such Straddle Tax Return) of such disputed item (or items) and the basis for its objection. If Seller does not object by written notice within such period, the amount of Taxes shown to be due and payable on any such Straddle Tax Return shall be deemed to be accepted and agreed upon, and final and conclusive, for purposes of this Section 8.2(b). In the event that such disagreement has not been resolved within five days of Buyer's receipt of the notice of disagreement from Seller, then the disagreement will be submitted to the Reviewing Accountant for resolution in accordance with principles set forth in Section 2.4(c) (and if the Reviewing Accountant is unable to make a determination with respect to a disputed item prior to the due date for the filing of such Straddle Tax Return, such Straddle Tax Return shall be filed in accordance with Buyer's reasonable position). Seller shall pay to Buyer by wire transfer of immediately available funds to the bank account designated by Buyer an amount of cash equal to the amount of Taxes shown as due on such Straddle Tax Returns attributable to the Pre-Closing Tax Period (allocated to Seller pursuant to Section 8.1) no later than five Business Days prior to the earlier of the date such Straddle Tax Return is filed or the final due date of such Straddle Tax Return.

(c)    Buyer and Seller agree to file, or cause to be filed, all relevant Tax Returns on the basis that the purchase and sale contemplated herein shall occur for Tax purposes as of the close of business on the Effective Date, unless the relevant Tax authority will not accept a Tax Return filed on that basis.

**8.3    Refunds and Credits**.  Any credits or offsets of Taxes of the Company for any Pre-Closing Tax Period shall be for the account of Seller, provided that any credits or offsets that are conditioned on the maintenance of certain conditions by Buyer after the closing shall be for the account of Buyer except to the extent such credits are otherwise deducted from the Purchase Price or subject to a Working Capital Adjustment actually paid.  Any credits or offsets of Taxes of the Company for any Post-Closing Tax Period shall be for the account of Buyer.  Any credits or offsets of Taxes of the Company for any Straddle Period shall be equitably apportioned between Seller and Buyer.

**8.4    Transfer Taxes**.  All sales, use and transfer taxes, including any value added, stock transfer, gross receipts, stamp duty and real, personal, or intangible property transfer taxes (collectively, "Transfer Taxes"), due by reason of the consummation of the purchase of the Shares hereunder, including any interest or penalties in respect thereof, shall be borne fifty percent (50%) by Buyer and fifty percent (50%) by Seller.  Seller and Buyer shall cooperate with each other and use their commercially reasonable efforts to minimize the Transfer Taxes attributable to the transfer of the Shares.

**8.5    Cooperation on Tax Matters**.

(a)    Seller and Buyer agree to cooperate, each at its own cost and expense, and shall cause their respective Affiliates, officers, employees, agents, auditors and representatives to cooperate, and to furnish or cause to be furnished to the other, upon request, as promptly as practicable, such information (including access to books and records) and assistance relating to the Company as is reasonably necessary for the filing of any Tax Return, the preparation for any Tax audit, the prosecution or defense of any Proceeding relating to any proposed Tax adjustment for which Seller or Buyer retains liability under this Article VIII.  Buyer and Seller shall keep all such information and documents received by them confidential unless otherwise required by Law.

(b)    Buyer and Seller agree to retain or cause to be retained all books and records in their possession pertinent to the Company until the applicable period for assessment of Taxes under applicable Law (giving effect to any and all extensions or waivers) has expired, and such additional period as necessary for any administrative or judicial proceedings relating to any proposed assessment, and to abide by and cause the Company to abide by all record retention agreements entered into with any Taxing authority.  Seller and Buyer agree to give the other reasonable notice prior to transferring, discarding or destroying any such books and records relating to Tax matters and, if so requested, Seller and Buyer shall allow the requesting Party to take possession of such books and records.

(c)    Buyer and Seller shall cooperate with each other in the conduct of any audit or other proceedings for any Tax purposes and they shall each execute and deliver such

49

powers of attorney and other documents as are reasonably necessary to carry out the intent of this Agreement.

**8.6     Tax Proceedings**.  Buyer agrees to give written notice to Seller of the receipt of any written notice by the Company, Buyer or any of Buyer's Affiliates which involves the assertion of any claim, or the commencement of any proceeding, in respect of which an indemnity may be sought by Buyer pursuant to this Agreement (a "Tax Proceeding"); provided, that failure to comply with this provision shall not affect Buyer's right to indemnification hereunder.  Buyer and Seller shall cooperate with any contest or resolution of any Tax Proceeding; provided, however, that Seller shall be entitled to participate in the defense of such Tax Proceeding and to employ counsel of its choice for such purpose, the fees and expenses of which separate counsel shall be borne solely by Seller.

**8.7     Tax Actions**.  Without the prior written consent of Buyer, Seller (and, prior to the Closing, the Company, its Affiliates and their respective Representatives) shall not, to the extent it may affect, or relate to, the Company, make, change or rescind any Tax election, amend any Tax Return or take any position on any Tax Return, take any action, omit to take any action or enter into any other transaction that would have the effect of increasing the Tax liability or reducing any Tax asset of Buyer or the Company in respect of any Post-Closing Tax Period.  Seller agree that Buyer is to have no liability for any Tax resulting from any preceding actions of Seller, the Company, their Affiliates or any of their respective Representatives, and agree to indemnify and hold harmless Buyer (and, after the Closing Date, the Company) against any such Tax or reduction of any Tax asset.

**8.8     Tax Consequences of Transaction**.

(a)     The Parties acknowledge that (i) if the Code is amended is amended during calendar 2022 with such amendment being retroactive to apply to the transactions contemplated by this Agreement, such that (ii) the capital gains treatment of the proceeds of the transactions contemplated by this Agreement when received by the Seller is less favorable under the Code, as amended, than it would have been had the Closing occurred during calendar 2021, and results in an increased tax liability to Seller as compared to what the tax liability would have been for a transaction that closed in calendar 2021, (iii) and/or an additional surcharge on modified adjusted gross income is assessed, then (iv) Buyer and Seller will negotiate in good faith to determine a fair and equitable amount of the increase in tax liability incurred by Seller to be reimbursed by Buyer.

(b)     If, within thirty (30) days after Seller submits its applicable federal tax returns, Buyer and Seller are not able to arrive at an equitable agreement with respect to Seller's increased tax liability, then the Parties shall submit the matter to a partner having relevant expertise and practicing at the Reviewing Accountant, who shall prepare pro forma federal tax returns for the Seller based on a Closing in calendar 2021 and review the federal tax returns submitted for calendar 2022, and determine the applicable increase in Seller's tax liability with respect to capital gains treatment.  Buyer shall then reimburse Seller for the difference reflected in Seller's increased tax liability, as calculated by the Reviewing Accountant.

50

(c)    Any amount paid by Buyer to Seller pursuant to this Section 8.8 shall be treated by the Parties as an adjustment to the purchase price with respect to the transactions contemplated by this Agreement, for tax purposes, unless otherwise required by law, with further payment by Buyer for any further adverse tax impact.  This Section 8.8 shall only apply if Closing actually occurs.

## IX.  CONDITIONS TO CLOSING

**9.1    Conditions to Obligations of Buyer.**  The obligations of Buyer to consummate the transactions provided for by this Agreement are subject, at the discretion of Buyer, to the satisfaction at or prior to the Closing of each of the following conditions:

(a)    Each of the representations and warranties of Seller contained in this Agreement shall have been true and correct in all material respects on and as of the date hereof and shall be true and correct in all material respects on and as of the Closing Date as if originally made on and as of the Closing Date, except that (i)  those representations and warranties that are made as of a specific date shall be determined as of such date and (ii)  each of those representations and warranties in Sections 4.1, 4.4, 5.1, 5.2 and 5.6, and each of those representations and warranties that are qualified or limited as to materiality (including the word "material") or Material Adverse Effect shall be true and correct in all respects.

(b)    All of the agreements and covenants that Seller is required to perform or comply with pursuant to this Agreement at or prior to the Closing Date shall have been performed or complied with in all material respects.

(c)    Since the date of this Agreement, there shall not have occurred a Material Adverse Effect, or any events, changes, developments or effects which, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

(d)    Seller shall have executed and delivered to Buyer a certificate (the "Seller's Closing Certificate") as to compliance with the conditions set forth in Sections 9.1(a), 9.1(b) and 9.1(c).

(e)    Each of the Consents specified in Schedule 5.4 shall have been obtained in form and substance satisfactory to Buyer and shall be in full force and effect, except those required from the Bureau.  Copies of such Consents shall have been delivered to Buyer. The Parties agree that the Consents required by the Bureau can be obtained after the Closing Date.

(f)    Buyer shall have received, at its sole expense, with respect to each parcel of Real Property: (i) a marked up commitment for an ALTA 2006 owner's policy of title insurance issued by a title company reasonably acceptable to Buyer (the "Title Company") in an amount not less than the aggregate allocated purchase price, as reasonably determined by Buyer, committing the Title Company to insure Buyer or the Company, as applicable, as the fee simple owner of each parcel of Real Property with such endorsements as Buyer shall request, including but not limited to an owner's affidavit and non-imputation endorsement, (ii) a certified ALTA survey of each parcel of Real Property containing such detail as Buyer

shall require in its sole discretion, certified to Buyer, the Title Company and, if applicable, such underwriters or lending institutions as Buyer shall desire, and (iii) zoning reports, or zoning letters from local municipalities, in each case in such form and substance as reasonably acceptable to Buyer.

(g)    Buyer shall have obtained from Buyer's lenders any necessary funds required to finance the transactions contemplated by this Agreement, and any necessary consents and approvals from such lenders.

(h)    All of the deliveries required to be made by the Company and Seller shall have been made in accordance with Section 3.2.

(i)    Buyer shall have received the evidence of the discharge of all Seller Transaction Expenses, in form and substance reasonably satisfactory to Buyer, other than such Seller Transaction Expenses paid pursuant to Section 3.3.

(j)    No Proceeding shall have been instituted by any Person which seeks to prohibit, restrict or delay consummation of the transactions contemplated herein or any of the conditions material to consummation of the transactions contemplated herein.

**9.2    Conditions to Obligations of Seller.**  The obligations of Seller to consummate the transactions provided for by this Agreement are subject, in the discretion of Seller, to the satisfaction at or prior to the Closing Date of each of the following conditions:

(a)    Each of the representations and warranties of Buyer contained in this Agreement shall have been true and correct in all material respects on and as of the date hereof and shall be true and correct in all material respects on and as of the Closing Date as if originally made on and as of the Closing Date, except that (i) those representations and warranties that are made as of a specific date shall be determined as of such date and (ii) each of those representations and warranties in Section 6.2 and each of those representations and warranties that are qualified or limited as to materiality (including the word "material") or Material Adverse Effect shall be true and correct in all respects.

(b)    All of the agreements and covenants that Buyer is required to perform or comply with pursuant to this Agreement at or prior to the Closing Date shall have been performed or complied with in all material respects.

(c)    Buyer shall have executed and delivered to Seller a certificate (the "Buyer's Closing Certificate") as to compliance with the conditions set forth in Sections 9.2(a) and 9.2(b).

(d)    All of the deliveries required to be made by Buyer shall have been made in accordance with Section 3.3.

(e)    No Proceeding shall have been instituted by any Person which seeks to prohibit, restrict or delay consummation of the transactions contemplated herein or any of the conditions material to consummation of the transactions contemplated herein.

## X.  INDEMNIFICATION

**10.1    Indemnification by Seller**.  Seller shall indemnify and hold harmless Buyer, the Company, their successors and assigns, and their respective officers, directors, members, shareholders, employees, agents and Affiliates ("Buyer Indemnified Persons") from and against, and shall reimburse Buyer Indemnified Persons for, any and all losses, liabilities, claims, obligations, damages, deficiencies, actions, judgments, regulatory, legislative or judicial proceedings or investigations, assessments, levies, fines, penalties, costs, Legal Expenses or diminution in value, whether or not involving a third-party claim (collectively, "Losses"), arising out of, based upon or in any way relating to:

(a)    any misrepresentation in or breach of any representation or warranty of Seller set forth in Article IV or Article V of this Agreement or the Schedules, or in any certificate, transfer instrument, or other instrument delivered by Seller pursuant to this Agreement;

(b)    any breach or nonfulfillment of any covenant, agreement or other obligation of Seller in this Agreement or in any certificate or instrument delivered by Seller pursuant to this Agreement;

(c)    any claims by third parties to the extent caused by acts or omissions of the Company or Seller on or prior to the Closing Date, including claims for Losses which arise or arose out of Seller's operation of the Business or by virtue of Seller's ownership of the Company on or prior to the Closing Date;

(d)    any (A) Existing Indebtedness or Seller Transaction Expenses that are not paid out of the Purchase Price pursuant to the terms of this Agreement or not otherwise subject to a Working Capital Adjustment actually paid, (B) dividends or distributions or other obligations to any shareholder, member or purported shareholder or member, or bonuses paid to employees in connection with the transactions contemplated by this Agreement, or (C) any Proceedings initiated with respect to the Company prior to the Closing Date, including, but not limited to, those matters set forth on Schedule 5.23 (Proceedings);

(e)    any Seller Tax Liabilities; and

(f)    any of the liabilities in Section 5.17(f)(i).

**10.2    Indemnification by Buyer.**  Buyer shall indemnify and hold harmless Seller ("Seller Indemnified Persons") from and against, and shall reimburse Seller Indemnified Persons for, any and all Losses arising out of, based upon or in any way relating to:

(a)    any Material misrepresentation in or breach of any Material representation or warranty of Buyer set forth in this Agreement or in any certificate, transfer instrument, or other instrument delivered by Buyer pursuant to this Agreement;

(b)    any breach or nonfulfillment of any Material covenant, agreement or other obligation of Buyer in this Agreement or in any certificate or instrument delivered by Buyer pursuant to this Agreement; and

(c)    any claims by third parties to the extent caused by the acts or omissions of the Company or Buyer after the Closing Date, including claims for Losses which arise out of Buyer's operation of the Business or by virtue of Buyer's ownership of the Company after the Closing Date.

**10.3    Defense of Third-Party Claims.**  If any legal proceedings shall be instituted or any claim is asserted by any third party in respect of which any Party hereto may have an obligation to indemnify another Party, the Party asserting such right to indemnity (the "Indemnified Party") shall give the Party from whom indemnity is sought (the "Indemnifying Party") written notice thereof, but any failure to so notify the Indemnifying Party shall not relieve it from any liability that it may have to the Indemnified Party other than to the extent the Indemnifying Party is actually prejudiced thereby.  The Indemnifying Party shall have the right, at its option and expense, to participate in the defense of such proceeding or claim, but not to control the defense, negotiation or settlement thereof, which control shall at all times rest with the Indemnified Party, unless the Indemnifying Party (i) admits in writing its liability to the Indemnified Party hereunder with respect to such proceeding or claim; (ii) furnishes satisfactory evidence that the Indemnifying Party has adequate financial resources to defend against the such proceeding or claim and fulfill its obligations under this Article X, in each case no later than ten (10) Business Days after the Indemnified Party gives written notice of such proceeding or claim, and (iii) conducts such defense actively and diligently, in which case, the Indemnifying Party may assume such control at its expense through counsel reasonably satisfactory to such Indemnified Party; provided, however, that:

(a)    the Indemnified Party shall be entitled to participate in the defense of such claim and to employ counsel at its own expense to assist in the handling of such claim; provided, however, that the employment of such counsel shall be at the expense of the Indemnifying Party if the Indemnified Party determines in good faith that such participation is appropriate in light of defenses not available to the Indemnifying Party, conflicts of interest or other similar circumstances;

(b)    the Indemnifying Party shall obtain the prior written approval of the Indemnified Party before entering into any settlement of such claim or ceasing to defend against such claim (with such approval not to be unreasonably withheld);

(c)    no Indemnifying Party shall consent to the entry of any judgment or enter into any settlement that does not include as an unconditional term thereof the giving by each claimant or plaintiff to each Indemnified Party of a release from all liability in respect of such claim; and

(d)    the Indemnifying Party shall not be entitled to control (but shall be entitled to participate at its own expense in the defense of), and the Indemnified Party shall be entitled to have sole control over, the defense or settlement of (A) any claim to the extent the claim seeks an order, injunction, non-monetary or other equitable relief against the

Indemnified Party which, if successful, could materially interfere with the business, operations, assets, condition (financial or otherwise) or prospects of the Indemnified Party or (B) any claim relating to Taxes.

After written notice by the Indemnifying Party to the Indemnified Party of its election to assume control of the defense of any such action, the Indemnifying Party shall not be liable to such Indemnified Party hereunder for any Legal Expenses subsequently incurred by such Indemnified Party in connection with the defense thereof except as provided above. If the Indemnifying Party does not assume control of the defense of such claim as provided in this Section 10.3 or if the Indemnifying Party does not actively and diligently conduct the defense of such claim, the Indemnified Party shall have the right to defend such claim in such manner as it may deem appropriate at the cost and for the account and risk of the Indemnifying Party to the extent that it is finally determined or agreed that the Indemnifying Party is obligated to provide indemnification to the Indemnified Party in accordance with the terms of this Agreement. Notwithstanding any in this Agreement, there shall not be any time limitations for the Parties to bring indemnity claims or lawsuit against each other based upon a third-party claim.

**10.4    Other Claims.** A claim for indemnification between the Parties based upon any matter not involving a third-party claim shall be asserted by the Indemnified Party to the Indemnifying Party in writing, setting forth specifically the obligation with respect to which the claim is made, the facts giving rise to and the alleged basis for such claim and, if known or reasonably ascertainable, the amount of the liability asserted or which may be asserted by reason thereof, but any failure to so notify the Indemnifying Party shall not relieve it from any liability that it may have to the Indemnified Party other than to the extent the Indemnifying Party is actually prejudiced thereby. In the event the Indemnifying Party disputes its obligation to indemnify the Indemnified Party under this Section 10, the Indemnifying Party shall have thirty (30) days after receipt of notice under this Section 10.4 to give written notice of such objection, and the grounds therefor, and the Indemnified Party shall thereafter have thirty (30) days to respond in writing to the objection of the Indemnifying Party. If after such thirty (30) day period there remains a dispute as to any obligation, the Parties shall attempt in good faith for thirty (30) days to agree upon the rights of the respective Parties with respect to such indemnification obligation. If no such agreement can be reached after good faith negotiation, either Party may submit the dispute for resolution in accordance with the provisions of Section 12.1.

**10.5    Survival.** Subject to the time limitations of this Section 10.5, all representations, warranties, covenants and obligations of the Parties contained in this Agreement and in any certificate, document, writing or instrument delivered pursuant to this Agreement shall survive the Closing and the consummation of the transactions contemplated by this Agreement. The representations and warranties of each Party contained in this Agreement shall survive the Closing for a period of twelve (12) months following the Closing Date, provided, however, that (i) the representations and warranties of Seller set forth in Sections 4.1 (Authority and Enforceability), 4.4 (Ownership of Shares), 5.1 (Organization), and 5.6 (Capitalization) shall survive indefinitely, (ii) the representations and warranties of Seller set forth in Sections 5.26 (Environmental/Health Safety Matters) shall survive the Closing for a period of eighteen (18) months following the Closing Date, and (iii) the representations and warranties set forth in Section 5.17(f)(i) (Employee Plans) and Section 5.20 (Tax Returns and Taxes), shall survive until 60 days after the running of the applicable statute of limitations with respect to the taxable period to which the particular claim

55

relates (Sections 4.1, 4.4, 5.1, 5.6, 5.17(f)(i), 5.20, and 5.26 being collectively referred to as the "Fundamental Representations"). Any claim for indemnity under Sections 10.1(a) or 10.2(a) shall be asserted in writing within 90 days following the expiration of the foregoing time periods, except in any case for claims arising as a result of fraud or intentional misrepresentation, as to which the limitations of this Section 10.5 shall not apply. If notice of a claim (setting forth in reasonable detail, to the extent known, the facts, circumstances and basis of the claim) is provided by the date on which a particular claim would otherwise expire, such claim shall survive until the final resolution thereof.

**10.6    Indemnification Limitations.**

(a)    Except for Losses relating to breaches of Fundamental Representations and Losses arising as a result of fraud or intentional misrepresentation, as to which the limitations of this Section 10.6 shall not apply, (i) Buyer Indemnified Persons may not assert any claim for Losses under Sections 10.1(a) until the aggregate amount of such claims under this Agreement exceed $25,000 (the "Basket Amount"), and then Buyer Indemnified Persons may assert claims for all such Losses relating back to the first dollar; and (ii) in no event shall the aggregate liability of Seller for claims of Losses under Sections 10.1(a) exceed $2,800,000.

(b)    Except for Losses arising as a result of fraud or intentional misrepresentation, as to which the limitations of this Section 10.6 shall not apply, Seller Indemnified Persons may not assert any claim for Losses under Section 10.2(a) until the aggregate amount of such claims under this Agreement exceed Basket Amount, and then Seller Indemnified Persons may assert claims for all such Losses relating back to the first dollar.

(c)    Notwithstanding anything to the contrary in this Agreement, for purposes of the indemnification provisions in this Article X, the determination of the amount of any Losses shall, in each case, be made without giving effect to any material adverse effect qualification or any materiality or similar qualification contained in the representations, warranties, covenants or agreements herein or in the Schedules or Exhibits hereto.

(d)    No Indemnified Person shall have a right to indemnification with respect to any special, punitive or exemplary damages incurred or suffered by an Indemnified Person hereunder, and in no event shall Losses include a Person's special, punitive or exemplary damages unless such damages relate to a third party claim.

(e)    For purposes of computing the amount of Losses incurred or paid by a Person, there shall be deducted an amount equal to the amount of any insurance proceeds (other than those with respect to any self-insurance program of the Indemnified Party), indemnification payments, or contribution payments that are actually received by such Person in connection with such Losses or the circumstances giving rise thereto, after taking into account any costs and expenses incurred in collecting such insurance proceeds or other payments or increase in insurance premiums as a result of such claim.

(f)     Each Indemnified Party that becomes aware of a Loss for which it seeks indemnification under this <u>Article X</u> shall use commercially reasonable efforts in accordance with applicable Law to mitigate such Loss; provided, however, the costs and expenses incurred by the Indemnified Party in connection with taking such commercially reasonable efforts shall be deemed Losses for purposes of this <u>Article X</u>.

**10.7    Exclusive Remedy.**  The Parties hereby acknowledge and agree that from and after the Closing, subject to the right of Parties to seek specific performance and injunctive relief pursuant to <u>Section 12.11</u>, the exclusive remedy of the Parties hereto with respect to any and all claims arising in connection with the transactions contemplated under this Agreement shall be pursuant to the provisions set forth in this <u>Article X</u> and in <u>Article XII</u>.  Notwithstanding anything to the contrary contained herein, nothing in this Agreement will in any way limit the remedies an Indemnified Party may seek in instances of fraud or intentional misrepresentation.

**10.8    Limitation of Damages.**  In no event shall either Party be liable to the other for any special, incidental, punitive, statutory or consequential damages, lost profits, penalties or any multiple of actual damages, whether based on breach of contract, tort (including negligence) or otherwise, and whether or not that Party has been advised of the possibility of such damages, and the Parties hereby waive all such damages, unless any such damages are actually awarded pursuant to a third-party claim as described in this <u>Article X</u>.

# XI.  TERMINATION

**11.1    Termination.**  This Agreement may be terminated at any time prior to Closing:

(a)     by mutual consent of Buyer and Seller;

(b)     by either Buyer or Seller if there has been a material breach of any representation, warranty, covenant or agreement on the part of the other Party set forth in this Agreement that has not been cured by the breaching Party within ten days after the non-breaching Party has notified the breaching Party;

(c)     by either Buyer or Seller at any time after February 28, 2022 (the "<u>Final Termination Date</u>"), <u>provided that</u> if the Closing shall not have occurred by the Final Termination Date as the result of a breach of this Agreement, then any Party responsible for such breach may not avail itself of the right under this <u>Section 11.1</u>, and <u>provided further that</u> in any such event, the non-breaching Party(ies) shall not be deprived of any remedy hereunder or at law against the breaching Party;

(d)     by Buyer if the Closing shall not have occurred on the Closing Date by reason of the failure of any of the conditions specified in <u>Section 9.1</u>, other than <u>Section 9.1(g)</u>, and such failure has not been waived by Buyer (unless the failure results primarily from Buyer itself breaching any representation, warranty or covenant contained in this Agreement);

(e)    by Seller if the Closing shall not have occurred by the Closing Date by reason of the failure of any of the conditions specified in <u>Section 9.2</u> and such failure has not been waived by Seller (unless the failure results primarily from Seller breaching any representation, warranty or covenant contained in this Agreement); or

(f)    by either Buyer or Seller if a California court of competent jurisdiction or Governmental Authority shall have issued an order, decree or ruling or taken any other action, in each case permanently restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement and such order, decree, ruling or other action shall have become final and non-appealable.

**11.2    Effect of Termination.**  In the event of termination of this Agreement by either Buyer or Seller, as provided above, this Agreement shall forthwith terminate and there shall be no liability on the part of either Seller or Buyer or Buyer's officers or directors, except that nothing herein shall relieve any Party from liability for any breach by a Party hereto of any of its representations, warranties, covenants or agreements set forth in this Agreement; provided, however, that the obligations of the Parties set forth in <u>Section 7.6</u> (Confidentiality) and this <u>Section 11.2</u> and <u>Article XII</u> hereof shall survive such termination.

## XII.  OTHER PROVISIONS

**12.1    Dispute Resolution.**

(a)    Any dispute arising under this Agreement shall be settled by arbitration in Los Angeles, California, except as provided in <u>Section 2.4</u>.

(b)    It is the intention of the Parties that the arbitration award will be final and binding, shall not be appealable and that a judgment of any California court having jurisdiction thereof may be rendered upon the award, and enforcement may be had according to its terms.  This agreement to arbitrate shall be specifically enforceable against each of the Parties.

(c)    Except as otherwise set forth in this <u>Section 12.1</u>, Buyer and Seller agree that any claim they may have against the other arising out of or related to the transaction contemplated by this Agreement and/or the terms, interpretation and/or enforcement (including any dispute regarding the interpretation of this arbitration clause) shall be submitted to and finally resolved by binding arbitration in accordance with the California Arbitration Act (Code of Civil Procedure §1280 et seq.) ("<u>Arbitration Rules</u>") Notwithstanding the discovery provisions set forth therein, each Party shall have the right to conduct discovery as if the matter was a civil action pending in a California superior court.

(d)    When a matter has been submitted for arbitration, within (thirty) 30 days of such submission, Buyer and Seller will use their good faith best efforts to agree on a single independent arbitrator.  If Buyer and Seller are unable to agree on an independent arbitrator within such 30 day period, the independent arbitrator will be selected by petitioning a court according to the procedures of the Arbitration Rules.

(e)     The Parties hereto agree that an action to compel arbitration pursuant to this Agreement may be brought in any court of competent jurisdiction in California. Application may also be made to any such court for confirmation of any decision or award of the arbitrators, for an order of enforcement and for other remedies which may be necessary to effectuate such decision or award.  The Parties hereto hereby consent to the jurisdiction of the arbitrators and of such court and waive any objection to the jurisdiction of such arbitrator and court.

(f)     One or more of the Parties to any arbitration proceeding commenced hereunder shall be entitled as a part of the arbitration award to the costs and expenses (including reasonable attorneys' fees and interest on any award) of investigating, preparing and pursuing an arbitration claim as such costs and expenses are awarded by the arbitration panel.

(g)     The Parties hereto agree that the provisions of this Section shall not be construed to prohibit any Party from obtaining, in the proper case, specific performance or injunctive relief with respect to the enforcement of this Agreement as set forth in Section 12.11.

**12.2     Appendices, Exhibits and Schedules.**  All Recitals, Appendices, Exhibits and Schedules referred to herein are intended to be and hereby are specifically made a part of this Agreement.

**12.3     Amendment.**  This Agreement and the Appendices, Exhibits and Schedules hereto may not be amended except by an instrument in writing signed on behalf of each of the Parties hereto.

**12.4     No Waiver.**  No failure of any Party to exercise any power given it under this Agreement, or to insist upon strict compliance with any provision of this Agreement, and no custom or practice at variance with the terms of this Agreement shall constitute a waiver any such Party's right to demand strict compliance with the terms of this Agreement.

**12.5     Entire Agreement.**  This Agreement, together with the Appendices, Exhibits and Schedules hereto, constitutes the entire Agreement between the Parties pertaining to the subject matter hereof and supersedes all prior and contemporaneous agreements, understandings, negotiations and discussions, whether oral or written, of the Parties.

**12.6     Governing Law.**  This Agreement shall be governed by, construed, interpreted and the rights of the Parties determined in accordance with the laws of the State of California (regardless of the laws that might be applicable under principles of conflicts of law).

**12.7     Notices.**  All notices and other communications hereunder shall be in writing and shall be deemed given (a) on the day of service if served personally on the Party to whom notice is given, (b) on the next Business Day when sent by a nationally recognized overnight courier, or (c) on the date sent by facsimile or e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient, and properly addressed as follows:

59

If to Buyer, addressed to:

Mr. William Andrews
6160 Warren Parkway
Suite 100
Frisco, Texas 75034
E-mail: wandrews@anthempartners.com

with a copy (which will not constitute notice) to:

Dykema Gossett PLLC
39577 Woodward Avenue - Suite 300
Bloomfield Hills, Michigan 48304-2820
Attention:      Jeanne Whalen
E-mail:          jwhalen@dykema.com

If to Seller, addressed to:
William H Hawkins
9811 Amestoy Avenue
Northridge CA 91325
Email:  w.hawkins@angelenomortuaries.com
Mobile Phone:  818-257-1865
FAX:  None

with a copy (which will not constitute notice) to:

Nicholas P. Forestiere
Gurnee Mason Rushford Bonotto & Forestiere LLP
2240 Douglas Blvd., Suite 150
Roseville, California  95661
Attention:      Nicholas P. Forestiere
Facsimile:      916-797-3100
E-mail:          nicholas@gurneelaw.com

or to such other place and with such other copies as such Party may designate as to itself by written notice to the others.

**12.8    Execution of Agreement.**  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Copies (whether electronic, fax or otherwise) of this Agreement may be made and relied upon to the same extent as an original.  The exchange of copies of this Agreement and of signature pages by fax transmission or e-mail shall constitute effective execution and delivery of this Agreement as to the Parties and may be used in lieu of the original Agreement for all purposes.  Signatures of the Parties transmitted by fax or e-mail shall be deemed to be their original signatures for all purposes.

**12.9    Expenses.**    Regardless of whether the transactions contemplated hereby are consummated, each Party hereto shall pay its or their own costs and expenses, including legal, accounting, consulting and other professional fees and any broker's or finder's fees, incurred in connection with the negotiation, preparation, investigation, and performance by such Party of this Agreement and the transactions contemplated hereunder.

**12.10    Successors and Assigns; No Third Party Beneficiaries.**

(a)    No Party may assign any of its rights or delegate any of its obligations under this Agreement without the prior written consent of the other Parties, except that Buyer may assign any of its rights and delegate any of its obligations under this Agreement to any Subsidiary of Buyer and may collaterally assign its rights hereunder to any financial institution providing financing in connection with the transactions contemplated by this Agreement. Subject to the preceding sentence, this Agreement will apply to, be binding in all respects upon and inure to the benefit of the successors and permitted assigns of the Parties. Nothing expressed or referred to in this Agreement will be construed to give any Person other than the Indemnified Parties and the Parties to this Agreement any legal or equitable right, remedy or claim under or with respect to this Agreement or any provision of this Agreement, except such rights as shall inure to a successor or permitted assignee pursuant to this <u>Section 12.10</u>. This Agreement and all of its provisions and conditions are for the sole and exclusive benefit of the Parties to this Agreement and their successors and assigns.

(b)    Notwithstanding anything to the contrary, the Parties agree that nothing in this Agreement shall preclude Buyer or any of its affiliates from providing its lenders with a security interest in its rights under this Agreement in accordance with the terms of their security and collateral agreements in connection with any credit facility provided by such lenders to such Person, or preclude such lenders from foreclosing upon such security interest in accordance with the terms of such security and collateral agreements, and any such action by such lenders shall not be deemed to violate any of the assignment provisions of this <u>Section 12.10</u>.

**12.11    Enforcement by Injunction**.    The Parties hereto agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that the Parties hereto shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to specifically enforce the terms and provisions of this Agreement, in addition to any other remedy to which any Party is entitled at law or in equity, without any obligation to post a bond or other security. In the event that any action shall be brought in equity to enforce the provisions of this Agreement, no Party shall allege, and each Party hereby waives the defense, that there is an adequate remedy at law.

[Signature Page Follows]

61

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

**Anthem Holdings (USA), Inc.**

By: _____

Name:  William Andrews
Its:      President


**Seller**

**The William H Hawkins Revocable Trust**

_____
By: William H. Hawkins, Co-Trustee

_____
By: Glenn Gomez, Co-Trustee


[Signature Page to Stock Purchase Agreement]

# EXHIBIT B



As of March 29, 2022

William H. Hawkins Revocable Trust
9811 Amestoy Avenue
Northridge, CA 91325
Email: w.hawkins@angelenomortuaries.com
Attn: William H. Hawkins

cc to:

Gurnee Mason Rushford Bonotto & Forestiere LLP
2240 Douglas Blvd., Suite 150
Roseville, California 95661
Attn: Nicholas P. Forestiere
Email: nicholas@gurneelaw.com

Re:    Closing Matters

Dear Mr. Hawkins:

    This letter refers to that certain that certain Stock Purchase Agreement, dated as of February 18, 2022 (the "Purchase Agreement"), by and between Anthem Holdings (USA), Inc., a Delaware corporation ("Buyer"), and the William H. Hawkins Revocable Trust, by William Hawkins and Glenn Gomez, as Co-Trustees ("Seller").  Buyer and Seller may collectively be referred to as the "Parties" and each, individually, as a "Party."  This letter is being sent to you with respect to certain matters in connection with the Closing pursuant to the Purchase Agreement.  Terms not otherwise defined in this letter shall have the meanings given to them in the Purchase Agreement.

1.    Payment of Purchase Price and Related Matters.  Notwithstanding the provisions of the Purchase Agreement, and particularly Article II and Section 3.3 thereof:

    (a)    at the Closing, Buyer will pay a portion of the Purchase Price to Seller by issuing a Promissory Note in the original principal amount of $8,000,000 (the "Seller Note").

    (b)    there will be no Working Capital Adjustment at Closing; the Final Purchase Price will be calculated in accordance with Section 2.4.

    (c)    the Escrow Fund will be deposited with the Escrow Agent on the Maturity Date, as defined in the Seller Note, and not on the Closing Date.

    (d)    the Rollover Equity will be issued following the Maturity Date, and not the Closing Date.

2.    <u>Final Termination Date</u>

"<u>Final Termination Date</u>" as defined in the Purchase Agreement is replaced with March 31, 2022.

3.    <u>General  Provisions</u>

(a)    <u>Incorporation by Reference</u>.   This letter agreement is an integral part of the Purchase Agreement and incorporated by reference therein, and shall be interpreted in a manner that is consistent with the obligations of the Parties thereunder.

(b)    <u>Counterparts</u>. This letter agreement may be executed in any number of several counterparts (including by facsimile or other electronic transmission), shall be governed by, and construed and interpreted in accordance with, the laws of the State of Delaware, without reference to conflicts of law provisions, and shall inure to the benefit of and be binding upon Buyer, Sellers, Sellers' Representative, and their respective successors and assigns.

[Signature Page Follows]

Very truly yours,

**ANTHEM HOLDINGS (USA), INC.**

By: _____

Name:  William Andrews
Title:    President

**ACCEPTED AND AGREED**

**The William H Hawkins Revocable Trust**

_____
By: William H. Hawkins, Co-Trustee

_____
By: Glenn Gomez, Co-Trustee

*[Signature Page to Side Letter]*

Very truly yours,

**ANTHEM HOLDINGS (USA), INC.**

By: _____
Name:  William Andrews
Title:   President

**ACCEPTED AND AGREED**

**The William H Hawkins Revocable Trust**

_____
By: William H. Hawkins, Co-Trustee

_____
By: Glenn Gomez, Co-Trustee

*[Signature Page to Side Letter]*

# EXHIBIT C

# PROMISSORY NOTE

$9,000,000                                                                                           March 29, 2022

FOR VALUE RECEIVED, Anthem Holdings (USA), Inc., a Delaware corporation (the "**Maker**") hereby promises to pay to the order of William H. Hawkins Revocable Trust (the "**Noteholder**"), the principal sum of Nine Million United States Dollars ($9,000,000) (the "**Principal Amount**"), or such amount as is then outstanding, on the Maturity Date (as defined below).

1.      **Term.**  The Maker shall pay the entire unpaid Principal Amount, all unpaid interest accrued on the Principal Amount, and all other obligations arising under this Note on June 27, 2022 (the "**Maturity Date**").  All of the Maker's obligations under this Note shall survive the Maturity Date until all such obligations are paid in full.

2.      **Interest.**  The Principal Amount will bear simple interest at 12% per annum, calculated daily.  Interest will be calculated on the basis of a year of 360 days.

3.      **Payment Schedule.**

(a)      Beginning on May 1, 2022 and on the first business day of each month thereafter prior to the Maturity Date, the Maker shall make monthly interest-only payments of $90,000 until the Maturity Date.  On the Maturity Date, the Maker shall pay to the Noteholder, by wire transfer of immediately available funds, the entire unpaid Principal Amount, all remaining accrued but unpaid interest, and any other obligations arising under this Note.

(b)      The Maker may prepay all or any portion of the obligations arising under this Note at any time without penalty or premium.  All prepayments shall be applied in the following order:  first, to any unpaid fees or reimbursement obligations arising under this Note; second, to accrued but unpaid interest; and third, to unpaid Principal Amount.

4.      **Covenant Not to Encumber.**  Subject to Section 4, and to any liens of record prior to the date of this Note, unless Noteholder consents thereto in advance and in writing, Maker will not grant any further security interest in or encumber or pledge the outstanding capital stock or assets (except in connection with sales of inventory in the ordinary course of business) of Angeleno Mortuaries, Inc., a California corporation, or any portion thereof, or contract to do any of the preceding until the obligations pursuant to this Note have been fully performed.

5.      **Event of Default.**  An "**Event of Default**" shall mean receipt by Maker of Noteholder's written notice that the Note is in default as a result of the occurrence of one or more of the following events:

(a)      Maker has failed to pay when due the Principal Amount, any installment of such amount or interest thereon pursuant to this Note, or any other obligations under this Note; or

(b)      Maker shall (i) make a general assignment for the benefit of creditors, (ii) institute any proceeding seeking to adjudicate it bankrupt or insolvent, or seeking liquidation, winding up, or reorganization, under any law relating to bankruptcy, insolvency or reorganization or relief of debtors, or fail to object to any such proceeding being instituted against it, or (iii) consent to appoint a trustee, receiver, or the like with respect to its assets.

If, whenever, and as often as there shall have occurred an Event of Default, Noteholder shall be entitled to exercise its rights under this Note and the rights and remedies provided by law, including those contained in the Uniform Commercial Code in force in Delaware.

**6.      Waivers.**  The Maker hereby waives presentment, demand, protest and notice of any kind.  No failure to exercise, and no delay in exercising any rights under this Note on the part of the holder of this Note shall operate as a waiver of such rights.

**7.      Waiver of Jury Trial.  The Maker and the Noteholder irrevocably waive trial by jury in any action or proceeding with respect to this Note.**

**8.      Entire Note.**  With respect to the subject matter of this Note, this Note, together with any documents, instruments and certificates explicitly referred to herein or otherwise required by this Note, constitutes the entire agreement among the parties hereto with respect to the subject matter hereof and supersedes any and all prior discussions, negotiations, proposals, undertakings, understandings and agreements, whether written or oral, with respect thereto.

**9.      Amendment and Waivers.**  Except as specifically otherwise provided in this Note, no amendment or waiver of any provision of this Note will be valid and binding unless it is in writing and signed, in the case of an amendment, by the Maker and Noteholder or in the case of a waiver, by the party against whom the waiver is to be effective.  No waiver by any party of any breach or violation or, default under or inaccuracy in any representation, warranty or covenant hereunder, whether intentional or not, will be deemed to extend to any prior or subsequent breach, violation, default of, or inaccuracy in, any such representation, warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent such occurrence.  No delay or omission on the part of any party in exercising any right, power or remedy under this Note will operate as a waiver thereof.

**10.      Governing Law.**  This Note shall be governed and construed in accordance with the Laws of the State of Delaware (except to the extent that mandatory provisions of federal law are applicable) without reference to conflicts of law provisions.

**11.      Notices.**  All notices, requests, demands, claims and other communications required or permitted to be delivered, given or otherwise provided under this Note must be in writing and must be delivered, given or otherwise provided: (a) by hand (in which case, it will be effective upon delivery); or (b) by overnight delivery by a nationally recognized courier service (in which case, it will be effective on the Business Day after being deposited with such courier service); and (c) by email, in each case, to the address or email address listed below:

To Noteholder:

> William H. Hawkins Revocable Trust
> 9811 Amestoy Avenue
> Northridge, CA 91325
> Email: w.hawkins@angelenomortuaries.com
> Attn: William H. Hawkins
>
> with a copy (which shall not constitute notice) to:
>
> Gurnee Mason Rushford Bonotto & Forestiere LLP
> 2240 Douglas Blvd., Suite 150
> Roseville, California 95661
> Attn: Nicholas P. Forestiere
> Email: nicholas@gurneelaw.com

To Maker:

> William Andrews
> 6160 Warren Parkway – Suite 100
> Frisco, TX 75034
> Attention: wandrews@anthempartners.com
>
> with a copy (which shall not constitute notice) to:
>
> Dykema Gossett PLLC
> 39577 Woodward Avenue – Suite 300
> Bloomfield Hills, Michigan 48304-2820
> Attention: Jeanne Whalen
> Email: jwhalen@dykema.com

Each of the parties to this Note may specify a different address by giving notice in accordance with this <u>Section 11</u> to each of the other parties hereto.

**12.    Severability.**  Any term or provision of this Note that is invalid or unenforceable in any situation in any jurisdiction will not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.  In the event that any provision hereof would, under applicable law, be invalid or unenforceable in any respect, each party hereto intends that such provision will be construed by modifying or limiting it so as to be valid and enforceable to the maximum extent compatible with, and possible under, applicable law.

*        *        *

The Maker has executed this Promissory Note as of the date first-above written.

**ANTHEM HOLDINGS (USA), INC.**

By: _____

Name: William Andrews

Title:    President

# EXHIBIT D



### First American Title Insurance Company
### National Commercial Services

5445 Corporate Drive, Suite 175 • Troy, MI 48098

*Office Phone:(248)458-7200 Office Fax:(866)714-8131*

### Final Settlement Statement

**File No:** NCS-1095501-MICH
**Escrow Officer:** Patricia Cadena/pc
**Settlement Date:** 03/29/2022
**Disbursement Date:** 03/29/2022

**Property:**
2636 Sycamore Drive, Simi Valley CA
16728, 16716 & 16721 Upland Ave, Fontana, CA
38141 6th Street East, Palmdale, CA
44818 Cedar Ave, Lancaster, CA
8717 Tampa Ave., Northridge, CA
44831 Cedar Ave., Lancaster, CA

**Buyer:**
Anthem Holdings (USA), Inc.,

**Seller:**
Angeleno Mortuaries, Inc

**Lender:**
Angeleno Mortuaries, Inc.

| Buyer Charge | Buyer Credit | Description | | Seller Charge | Seller Credit |
|---|---|---|---|---|---|
| | | **Consideration** | | | |
| 28,000,000.00 | | **Total Consideration** | | | 28,000,000.00 |
| | | First Sale Price | 10,200,000.00 | | |
| | | Second Sale Price | 17,800,000.00 | | |
| | | | | | |
| | | **Deposits In Escrow** | | | |
| | 16,500,000.00 | Receipt No. 1742128194 on 03/30/2022 by Anthem GP LTD | | | |
| | | | | | |
| | | **Adjustments** | | | |
| | 1,400,000.00 | Buyer paid directly to US Bank-post closing | | 1,400,000.00 | |
| | 1,400,000.00 | Buyer purchased Stock outside closing | | 1,400,000.00 | |
| | | | | | |
| | | **Prorations** | | | |
| 6,161.24 | | 2021/2022 2nd half taxes-Sycamore Drive 03/29/22 to 06/30/22 @$11,961.99/semi | | | 6,161.24 |
| 2,553.67 | | 2021/2022 2nd half taxes-Upland 03/29/22 to 06/30/22 @$4,957.93/semi | | | 2,553.67 |
| 2,623.31 | | 2021/2022 2nd half taxes-6th Street East 03/29/22 to 06/30/22 @$5,093.12/semi | | | 2,623.31 |
| 1,464.98 | | 2021/2022 2nd half taxes-Cedar Ave 03/29/22 to 06/30/22 @$2,844.24/semi | | | 1,464.98 |
| 4,834.98 | | 2021/2022 2nd half taxes-Tampa Ave. 03/29/22 to 06/30/22 @$9,387.07/semi | | | 4,834.98 |
| 8,998.73 | | 2021/2022 2nd half taxes-Cedar 03/29/22 to 06/30/22 @$17,470.94/semi | | | 8,998.73 |
| | | | | | |

## *Final Settlement Statement*

**Settlement Date:** 03/29/2022                                    **File No:** NCS-1095501-MICH
**Officer:**                Patricia Cadena/pc

| Buyer Charge | Buyer Credit | Description | Seller Charge | Seller Credit |
|---|---|---|---|---|
|  |  | **New Loan(s)** |  |  |
|  |  | **Lender: Angeleno Mortuaries, Inc.** |  |  |
|  | 9,000,000.00 | New Loan to File | 9,000,000.00 |  |
|  |  |  |  |  |
|  |  | **Payoff Loan(s)** |  |  |
|  |  | **Lender: American Enterprise Group Inc.** |  |  |
|  |  | Mortgage Payoff-13013548-00 | 1,128,344.32 |  |
|  |  | **Lender: American Enterprise Group Inc.** |  |  |
|  |  | Mortgage Payoff-17013559-20(02) | 751,702.81 |  |
|  |  | **Lender: American Enterprise Group Inc.** |  |  |
|  |  | Mortgage Payoff-14013559-10(04) | 183,185.64 |  |
|  |  | **Lender: American Enterprise Group Inc.** |  |  |
|  |  | Mortgage Payoff-18013586-10(05) | 1,060,648.41 |  |
|  |  | **Lender: American Enterprise Group Inc.** |  |  |
|  |  | Mortgage Payoff-18013586-00(06) | 1,988,111.14 |  |
|  |  | **Lender: IncredibleBank** |  |  |
|  |  | Mortgage Payoff-8643296(03) | 845,886.13 |  |
|  |  | **Lender: Angeleno Crawford** |  |  |
|  |  | Loan Payoff | 622,310.68 |  |
|  |  | **Lender: Angeleno HOM** |  |  |
|  |  | Loan Payoff | 1,220,757.20 |  |
|  |  | **Lender: R. Dennis & Erin Persons 2017 Family Trust** |  |  |
|  |  | Payoff | 343,142.37 |  |
|  |  |  |  |  |
|  |  | **Title/Escrow Charges** |  |  |
| 600.00 |  | Closing Fee to First American Title Insurance Company National Commercial Services | 600.00 |  |
| 2,325.00 |  | Search and Exam to First American Title Insurance Company National Commercial Services |  |  |
| 1,150.00 |  | Recording Service Fee to First American Title Insurance Company National Commercial Services |  |  |
| 1,540.00 |  | Policy-Extended ALTA 2006 Owner's -01 to First American Title Insurance Company National Commercial Services |  |  |
| 3,909.00 |  | Policy-Extended ALTA 2006 Owner's -02 to First American Title Insurance Company National Commercial Services |  |  |
| 900.00 |  | Policy-Extended ALTA 2006 Lender's $150 x 5 (-01/-03/-04/-05/-06) to First American Title Insurance Company National Commercial Services |  |  |
| 2,403.00 |  | Policy-Extended ALTA 2006 Owner's -03 to First American Title Insurance Company National Commercial Services |  |  |
| 1,464.00 |  | Policy-Extended ALTA 2006 Owner's -04 to First American Title Insurance Company National Commercial Services |  |  |
| 1,302.00 |  | Policy-Extended ALTA 2006 Owner's -05 to First American Title Insurance Company National Commercial Services |  |  |
| 1,587.00 |  | Endorsement (O) -01 to First American Title Insurance Company National Commercial Services |  |  |
| 2,312.00 |  | Endorsement (O) -02 to First American Title Insurance Company National Commercial Services |  |  |
| 1,945.00 |  | Endorsement (O) -03 to First American Title Insurance Company National Commercial Services |  |  |
| 1,665.00 |  | Endorsement (O) -04 to First American Title Insurance Company National Commercial Services |  |  |

# Final Settlement Statement

**Settlement Date:** 03/29/2022                    **File No:** NCS-1095501-MICH
**Officer:**              Patricia Cadena/pc

| Buyer Charge | Buyer Credit | Description | Seller Charge | Seller Credit |
|---|---|---|---|---|
| 1,615.00 | | Endorsement (O) -05 to First American Title Insurance Company National Commercial Services | | |
| 2,170.00 | | Policy-Extended ALTA 2006 Owner's -06 to First American Title Insurance Company National Commercial Services | | |
| 1,877.00 | | Endorsement (O) -06 to First American Title Insurance Company National Commercial Services | | |
| 2,500.00 | | Estimated Recording Fees Loan Recordables to First American Title Insurance Company National Commercial Services | | |
| | | Estimated Recording Fees Releases to First American Title Insurance Company National Commercial Services | 2,000.00 | |
| | | | | |
| | | **Disbursements Paid** | | |
| | | **Miscellaneous Disbursement** | | |
| | | Consulting Fee to Johnson Consulting Group | 700,000.00 | |
| | | Legal Fees to Dykema Gossett PLLC | 95,000.00 | |
| | | **Property Tax Check** | | |
| | | 2021/2022 2nd half taxes-613-0-240-285 to County of Ventura | 11,961.99 | |
| | | 2021/2022 2nd half taxes-0191141010000 to SBC Tax Collector | 967.11 | |
| | | 2021/2022 2nd half taxes-0191141020000 to SBC Tax Collector | 3,052.47 | |
| | | 2021/2022 2nd half taxes-0191151080000 to SBC Tax Collector | 296.57 | |
| | | 2021/2022 2nd half taxes-0191151090000 to SBC Tax Collector | 641.78 | |
| | | 2021/2022 2nd half taxes-3009-011-011 to Los Angeles County Tax Collector | 373.31 | |
| | | 2021/2022 2nd half taxes-3009-011-012 to Los Angeles County Tax Collector | 4,719.81 | |
| | | 2021/2022 2nd half taxes-3134-014-008 to Los Angeles County Tax Collector | 2,844.24 | |
| | | 2021/2022 2nd half taxes-2783-027-034 to Los Angeles County Tax Collector | 9,387.07 | |
| | | 2021/2022 2nd half taxes-3134-015-021 to Los Angeles County Tax Collector | 17,470.94 | |
| | | | | |
| 242,099.09 | | **Cash ( From) (X To) Buyer** | | |
| | | **Cash (X To) ( From) Seller** | 7,233,232.92 | |
| | | | | |
| 28,300,000.00 | 28,300,000.00 | **Totals** | 28,026,636.91 | 28,026,636.91 |

*Final Settlement Statement*

**Settlement Date:**  03/29/2022                    **File No:**  NCS-1095501-MICH
**Officer:**         Patricia Cadena/pc

**BUYER(S):**

Anthem Holdings (USA), Inc., a Delaware corporation
By:_____

   Name: William Andrews

   Title: President

*Final Settlement Statement*

**Settlement Date:**  03/29/2022                                    **File No:**  NCS-1095501-MICH
**Officer:**             Patricia Cadena/pc

SELLER(S):


Angeleno Mortuaries, Inc, a California corporation


By: The William H. Hawkins Revocable Trust

By: _____

Name: William H. Hawkins

Title: Co-Trustee

By: _____

Name: Glenn Gomez

Title: Co-Trustee

## DECLARATION OF SARA WATAR

I, Sara Watar, declare as follows:

1.      I am an attorney at law duly licensed to practice before all the courts of the State of California.  I am an associate at the law firm of TroyGould PC, attorneys of record for Petitioner William H. Hawkins, as Trustee of the William H. Hawkins Revocable Trust (the "Trust").  I have personal knowledge of the facts set forth in this declaration and, if called as a witness, could and would testify competently to such facts under oath.

2.      On September 16, 2024, I conducted a business search of Respondent Anthem Holdings (USA), Inc. ("Anthem") on the California Secretary of State website.  As listed on the California Secretary of State website, Anthem is a Delaware corporation organized under the laws of Delaware with its principal place of business located at 3001 Dallas Parkway, Suite 201, Frisco, Texas 75034.

3.      On August 7, 2024, I sent a letter to Anthem on behalf of the Trust, attaching a draft demand for arbitration (the "Demand for Arbitration").  The Demand for Arbitration outlined the Trust's claims against Anthem arising under the stock purchase agreement and side letter modifying the stock purchase agreement entered into between the parties on March 29, 2022 (the "SPA").  A true and correct copy of this letter is attached hereto as **Exhibit E**.

4.      In the letter and pursuant to the SPA and Code of Civil Procedure § 1281.6, *et seq.*, I proposed to arbitrate the matter before JAMS and requested that Anthem provide us a list of recommended arbitrators.  *See* **Exhibit E**.

5.      Anthem did not respond to my August 7, 2024 letter.

6.      On August 14, 2024, I sent correspondence to Anthem, following up on the Trust's Demand for Arbitration and my request for recommended arbitrators.  In my correspondence, I notified Anthem that if I did not receive a response by August 19, 2024, regarding the Demand for Arbitration, the Trust would move to petition the Los Angeles Superior Court to appoint an arbitrator pursuant to Code of Civil Procedure § 1281.6.  A true and correct copy of my August 14, 2024, correspondence is attached hereto as **Exhibit F**.

**TroyGould PC**

04639-0002  4876-5939-6067.3

7.      On August 16, 2024, counsel for Anthem, Ashley R. Fickel of Dykema Gossett PLLC, sent me correspondence proposing mediation.  In his email, counsel for Anthem did not agree to arbitration.  A true and correct copy of Mr. Fickel's August 16, 2024, correspondence is attached hereto as **Exhibit G**.

8.      The parties did not agree to mediation.

9.      On September 3, 2024, I sent Mr. Fickel further correspondence, asking whether Anthem would arbitrate the matter before JAMS.  A true and correct copy of my September 3, 2024, correspondence is attached hereto as **Exhibit H**.

10.      On September 4, 2024, Mr. Fickel sent me correspondence refusing to use JAMS as an arbitration provider.  Mr. Fickel failed to propose an alternative arbitration provider.  A true and correct copy of Mr. Fickel's September 4, 2024, correspondence is attached hereto as **Exhibit I**.

11.      On September 4, 2024, I sent correspondence to Mr. Fickel, inquiring as to Anthem's basis for objecting to JAMS and proposing Alternative Resolution Centers as an alternative arbitration provider.  A true and correct copy of my September 4, 2024, correspondence is attached hereto as **Exhibit J**.

12.      To date, Mr. Fickel has yet to respond to my correspondence or agree to arbitration.

13.      Alternative Resolution Centers is a private disinterested association that provides arbitration and mediation services.

14.      On September 27, 2024, I obtained a list of arbitrators from a private disinterested association concerned with arbitration, namely, Alternative Resolution Centers.  A true and correct copy of my correspondence with Alternative Resolution Centers and the list of arbitrators from Alternative Resolution Centers is attached hereto as **Exhibit K**.

15.      The Trust has not at any time waived its right to arbitration.

/ / /

/ / /

/ / /

/ / /

g

04639-0002  4876-5939-6067.3

1    I declare under penalty of perjury under the laws of the State of California that the

2  foregoing is true and correct, and that this declaration is executed on September __, 2024, at Los

3  Angeles, California.

4

5  _____

6                    Sara Watar

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

04639-0002  4876-5939-6067.3

# EXHIBIT E



**TROYGOULD PC**

1801 Century Park East, 16th Floor
Los Angeles, California 90067-2367
**Tel** (310) 553-4441 | **Fax** (310) 201-4746
www.troygould.com

File No. 04639.0002

**Sara Watar** • (310) 789-1220 • swatar@troygould.com

August 7, 2024

**VIA E-MAIL AND CERTIFIED MAIL**

William Andrews
Anthem Holdings (USA), Inc.
President
3001 Dallas Parkway, Suite 210
Frisco, Texas 75035
wandrews@anthempartners.com

Andrew Clark
Anthem Holdings (USA), Inc.
Chairman & Chief Executive Officer
3001 Dallas Parkway, Suite 210
Frisco, Texas 75035
ac@trianglecapitalcorp.com

   Re: <u>Demand for Arbitration</u>

Dear Mr. Andrews and Mr. Clark:

   This law firm has been retained as counsel for the William H. Hawkins Revocable Trust (the "Trust"). As you are aware, on or around February 18, 2022, Anthem Holdings (USA), Inc. ("Anthem") and the Trust entered into a stock purchase agreement by which Anthem agreed to purchase all of the Trust's outstanding shares in Angeleno Mortuaries, Inc. (the "Purchase Agreement"). We understand that you have been in contact with Mr. William H. Hawkins regarding strategies to pay the money due to the Trust pursuant to the Promissory Note dated March 29, 2022, in the principal amount of $9 million, which was executed in connection with the Purchase Agreement.

   On May 6, 2024, our firm sent a demand letter to Mr. Andrews concerning three other outstanding past-due payments that Anthem owes the Trust pursuant to the Purchase Agreement, including the escrow fund in the amount of $1.4 million ("Escrow Fund"), the amount by which the closing working capital was greater than the target working capital of $750,000 ("Working Capital Adjustment") and reimbursement for paying Anthem's Dykema fees (the "Demand Letter"). Anthem has yet to respond to the Demand Letter.

   Pursuant to the terms of the Purchase Agreement and California Code of Civil Procedure § 1280 et seq., the Trust seeks to commence an arbitration proceeding in Los



William Andrews
Andrew Clark
August 7, 2024
Page 2

Angeles, California, for Anthem's breach of the Purchase Agreement relating to the Escrow Fund, Working Capital Adjustment and reimbursement for paying Anthem's Dykema fees.  A copy of the Trust's draft demand for arbitration is attached hereto as Exhibit A.

Section 12.1 of the Purchase Agreement provides that any dispute arising under the agreement shall be settled by arbitration in Los Angeles, California in accordance with the California Arbitration Act (Code of Civil Procedure § 1280 et seq.).  Code of Civil Procedure section 1281.6 provides, in relevant part:

> *If the arbitration agreement does not provide a method for appointing an arbitrator, the parties to the agreement who seek arbitration and against whom arbitration is sought may agree on a method of appointing an arbitrator and that method shall be followed.  In the absence of an agreed method, or if the agreed method fails or for any reason cannot be followed, or when an arbitrator appointed fails to act and his or her successor has not been appointed, the court, on petition of a party to the arbitration agreement, shall appoint the arbitrator.*

The Purchase Agreement does not provide a method for appointing an arbitrator.  Pursuant to Code of Civil Procedure section 1281.6, the Trust proposes that arbitration be administered by JAMS and that an arbitrator be selected pursuant to JAMS Comprehensive Arbitration Rules & Procedures, Rule 15.  Please let us know if you are amenable to this method and if so, provide the Trust a list of recommended arbitrators in Los Angeles, California by August 22, 2024.  If the Trust and Anthem do not reach an agreement regarding the method of appointing an arbitrator, the Trust will petition the Los Angeles Superior Court to appoint an arbitrator pursuant to Code of Civil Procedure section 1281.6.

We look forward to hearing from you and your counsel.  The Trust reserves all of its rights and remedies in connection with this matter.

Very truly yours,

Sara Watar

Encls.: (1)

# EXHIBIT A

1 | TROYGOULD PC
Russell I. Glazer (SBN 166198)
2 | Email:    rglazer@troygould.com
Sara Watar (SBN 341770)
3 | Email:    swatar@troygould.com
1801 Century Park East, 16th Floor
4 | Los Angeles, CA 90067-2367
Telephone:    (310) 553-4441
5 | Facsimile:    (310) 201-4746

6 | Attorneys for Claimants
William H. Hawkins, as Trustee of the William H. Hawkins
7 | Revocable Trust

8 |

9 | JAMS

10 |

11 | William H. Hawkins, as Trustee of the | Case No.
William H. Hawkins Revocable Trust,

12 | Claimant, | ARBITRATION DEMAND FOR:

13 | v. | 1) BREACH OF WRITTEN CONTRACT; AND

14 | Anthem Holdings (USA), Inc., a Delaware | 2) ACCOUNTING
corporation, and DOES 1-10, inclusive

15 |

16 | Respondents.

---

ARBITRATION DEMAND

**TroyGould PC**

## DEMAND FOR ARBITRATION

Claimant, William H. Hawkins ("Hawkins") as Trustee of the William H. Hawkins Revocable Trust (the "Trust" or "Claimant"), by and through his attorneys, alleges the following with personal knowledge as to his own actions, and on information and belief as to all other matters, as follows:

## INTRODUCTION

1.     Angeleno Mortuaries, Inc. ("Angeleno Mortuaries") is the culmination of William Hawkins' life's work.  Founded in 1997, Angeleno Mortuaries provides funeral and burial services in Southern California.  As its President and Secretary, Hawkins spent more than 25 years building Angeleno Mortuaries into a multimillion-dollar company.  Hawkins held his ownership of Angeleno Mortuaries in the Trust.  In or about March 2022, Hawkins caused the Trust to sell Angeleno Mortuaries to Respondent Anthem Holdings (USA), Inc. ("Anthem") in an effort to receive value for his life's work, but Anthem failed to deliver.

2.     Specifically, on or about March 29, 2022, Anthem and the Trust – which owned all of Angeleno Mortuaries' outstanding shares at that time – entered into a stock purchase agreement for the purchase and sale of the company (the "Stock Purchase Agreement").  That same day, Anthem and the Trust executed a side letter modifying the Stock Purchase Agreement (the "Side Letter").  (The Stock Purchase Agreement as modified by the Side Letter is referred to herein as the "SPA".)  Among other things, in the Side Letter, the Trust agreed to forego immediate payment of $8,000,000 of the purchase price – an amount later increased to $9,000,000 – in exchange for a promissory note in that amount, plus interest (the "Promissory Note").  The Promissory Note came due on June 27, 2022.  Anthem failed to pay the Trust any principal due under the Promissory Note, just as it has failed to honor its other obligations to the Trust.

3.     On August 17, 2022, Anthem, the Trust and the Canadian Imperial Bank of Commerce ("CIBC") entered into a subordination and postponement agreement, whereby Anthem and the Trust agreed that the Promissory Note would be deferred, postponed and subordinated to the prior repayment in full by Anthem of its debt to CIBC ("Subordination and Postponement

**TroyGould PC**

COMPLAINT

04639-0002 4875-9977-2873.3

Agreement"). As a result, the Trust does not make a claim in this arbitration for payment pursuant to the Promissory Note. Instead, the Trust brings this arbitration to seek redress for Anthem's breaches of the SPA that are not encompassed by the Promissory Note or barred by the Subordination and Postponement Agreement.

4. **First**, the SPA required Anthem to deposit an escrow fund of $1.4 million ("Escrow Fund") on June 27, 2022, to be held in a segregated escrow account ("Escrow Account") and disbursed to the Trust at the end of the escrow period on February 18, 2023 ("Escrow Period"). The Escrow Fund was only to be deducted from to pay any (1) Working Capital Adjustment[1] owed by the Trust to Anthem and/or (2) indemnification claims that might have become due to Anthem pursuant to the SPA. At the end of the Escrow Period, the Escrow Fund of $1.4 million should have been deposited to the Trust because no claims for Working Capital Adjustment or indemnification were made by Anthem. However, the Trust never received the Escrow Fund because Anthem failed to deposit it in the first instance in violation of the SPA.

5. **Second**, the SPA provides that if the Closing Working Capital was less than 750,000, Anthem and the Trust were to jointly direct the escrow agent to immediately release the full amount of that difference from the Escrow Fund to Anthem. However, if the Closing Working Capital was greater than the Target Working Capital, the SPA requires that Anthem wire transfer the full amount of that difference to the Trust.

6. The Trust is informed and believes that the Closing Working Capital was greater than the Target Working Capital of $750,000. Anthem should have wire transferred the full amount of that difference to the Trust but failed to do so in violation of the SPA.

---

[1] Pursuant to the terms of the SPA, the working capital adjustment is defined as the amount by which the closing working capital is greater than or less than the target working capital ("Working Capital Adjustment"). The SPA defines the closing working capital as the amount calculated by subtracting the current liabilities of Angeleno Mortuaries from the current assets of Angeleno Mortuaries (excluding inventory) as of the closing date (Closing Working Capital"). The SPA lists the target working capital at $750,000 ("Target Working Capital"). The closing date is defined in section 3.1 of the SPA (the "Closing Date" or "Closing").

7.    ***Third***, the SPA provides that each party shall pay its own costs and expenses, including legal fees, incurred in connection with the agreement.  Anthem retained the services of Dykema Gossett PLLC ("Dykema") to represent it during Anthem's purchase of Angeleno Mortuaries.

8.    On March 29, 2022, First American Title Insurance Company prepared a final settlement statement which listed the charges to Anthem and the Trust relating to the purchase and sale of Angeleno Mortuaries ("Final Settlement Statement").  The Final Settlement Statement erroneously listed Anthem's Dykema fees of $95,000 as charges to be paid by the Trust rather than Anthem.  As an accommodation to Anthem, the Trust paid Anthem's Dykema fees because Anthem promised to reimburse the Trust for those fees.  Anthem failed to reimburse the Trust for paying Anthem's Dykema fees in violation of the SPA.

9.    Based on the foregoing, Anthem materially breached its obligations to the Trust under the SPA.  Claimants now bring this arbitration for breach of written contract and for an accounting of Anthem's and Angeleno Mortuaries' books, records, accounting records and accounting work papers to determine the Working Capital Adjustment owed to the Trust.

## THE PARTIES

10.    William H. Hawkins is an individual residing in Northridge, California.  Hawkins is the co-trustee of the William H. Hawkins Revocable Trust.

11.    Anthem Holdings (USA), Inc., is a Delaware corporation organized under the laws of Delaware with its principal place of business located at 3001 Dallas Parkway, Suite 201, Frisco, Texas 75034.  Anthem is a privately owned operator of cemeteries, crematories and funeral homes across the United States.

## THE AGREEMENT TO ARBITRATE

12.    The Stock Purchase Agreement, which the parties to this Arbitration entered into on or about March 29, 2022, contains an arbitration clause, which provides that any dispute arising under the agreement shall be resolved by binding arbitration in accordance with the California

Arbitration Act.  The agreement further provides that the arbitration shall be conducted in Los Angeles, California.  (See Exhibit A, Stock Purchase Agreement, § 12.1.)

## GENERAL ALLEGATIONS

**A.    Creation of Angeleno Mortuaries and the Trust**

13.    In or around 1997, Hawkins founded Angeleno Mortuaries, a company devoted to providing funeral and burial services in Southern California.  Hawkins owned 100 outstanding shares of Angeleno Mortuaries, constituting all the company's outstanding shares.

14.    Hawkins served as the President and Secretary of Angeleno Mortuaries until its sale to Anthem in March 2022.

15.    On February 3, 2016, Hawkins created the William H. Hawkins Revocable Trust, naming Hawkins and his life partner, Glenn Gomez, as co-trustees of the Trust, and Hawkins' issue and Glenn Gomez as the beneficiaries of the Trust.  Hawkins subsequently transferred ownership of his shares in Angeleno Mortuaries to the Trust.

**B.    The Stock Purchase Agreement, Side Letter and Promissory Note**

16.    On or around March 29, 2022, after months of negotiations, Anthem and the Trust executed the Stock Purchase Agreement, whereby the Trust was to sell and Anthem was to buy all 100 outstanding shares of Angeleno Mortuaries.  A true and correct copy of the Stock Purchase Agreement is attached hereto as Exhibit A.  The Stock Purchase Agreement had an effective date as of February 18, 2022.

17.    Pursuant to the Stock Purchase Agreement, the estimated purchase price for the 100 outstanding shares in Angeleno Mortuaries was to be calculated as: (a) $28,000,000, plus or minus (b) the Working Capital Adjustment, minus (c) minus Existing Indebtedness[2], minus (d) Seller Transaction Expenses[3] ("Estimated Purchase Price").

---

[2]    Pursuant to the terms of the SPA, existing indebtedness is defined as the Indebtedness of Angeleno Mortuaries outstanding on the Closing Date ("Existing Indebtedness").  Indebtedness is defined in Section 1.1 of the SPA ("Indebtedness").

[3]    Section 1.1 of the SPA defines seller transaction expenses ("Seller Transaction Expenses").

18.    Also on March 29, 2022, Anthem and the Trust executed the Side Letter, modifying the Stock Purchase Agreement to provide, among other things, that Anthem would pay a substantial portion of the purchase price with a promissory note.  A true and correct copy of the Side Letter is attached hereto as Exhibit B.  As noted above, the Stock Purchase Agreement and the Side Letter are referred to collectively herein as the "SPA."

19.    The Side Letter listed the original principal amount of the Promissory Note as $8,000,000.  Anthem and the Trust later changed the original principal amount to $9,000,000, which is the principal amount reflected in the Promissory Note.  A true and correct copy of the Promissory Note is attached hereto as Exhibit C.

20.    Although the Promissory Note was executed on June 27, 2022, Anthem has yet to pay the Trust the principal amount more than two years later.

**D.    The Escrow Fund**

21.    The SPA provides that Anthem was to deposit $1.4 million into the Escrow Account by June 27, 2022.  The Escrow Fund was to be held during the Escrow Period for the purpose of paying any (1) Working Capital Adjustment owed by the Trust to Anthem and/or (2) indemnification claims that may become due to Anthem pursuant to the SPA.

22.    The escrow agent was to disburse the Escrow Fund to the Trust, less any payments for Working Capital Adjustment to Anthem and/or indemnification claims due to Anthem, upon the expiration of the Escrow Period on February 18, 2023.

23.    Anthem failed to deposit the Escrow Fund by June 27, 2022, and has yet to do so more than two years later.  Nor has Anthem paid the Escrow Fund, or any portion of it, to the Trust.

24.    Anthem made no claims for indemnification or Working Capital Adjustment by February 18, 2023 (or any time thereafter).  Accordingly, had Anthem deposited the Escrow Fund as required by the SPA, the Escrow Fund would have remained at $1.4 million, plus interest, as of February 18, 2023.

25.    Because Anthem never deposited the Escrow Fund on behalf of the Trust prior to or since June 27, 2022, the escrow agent has been unable to disburse the Escrow Fund to the Trust pursuant to the terms of the SPA.

**E.**     **The Working Capital Adjustment**

26.     The SPA provided that on or before the 60th day following the Closing Date, Anthem was to provide the Trust with a written statement setting forth Anthem's calculation of the purchase price for the 100 outstanding shares of Angeleno Mortuaries, including among other things, the Closing Working Capital.

27.     Pursuant to the terms of the SPA, if the Closing Working Capital was less than the Target Working Capital, Anthem and the Trust were to execute a joint written discretion directing the escrow agent to immediately release the full amount of that difference from the Escrow Fund to Anthem, plus interest on any unpaid amount until paid in full.

28.     The SPA also requires that if the Closing Working Capital was greater than the Target Working Capital, Anthem was to pay that difference to the Trust, plus interest on any unpaid amount until paid in full.

29.     Anthem did not provide the Trust its written statement setting forth a calculation of the purchase price or the Closing Working Capital on or before the 60th day after Closing, and has failed to do so since.

30.     On information and belief, the Closing Working Capital exceeded the Target Working Capital by approximately $300,000. Anthem has yet to transfer that difference to the Trust in violation of the SPA.

31.     The determination of the precise amount due and owing requires an accounting of Anthem's and Angeleno Mortuaries' books, records, accounting records and accounting work papers, which is information in Anthem's possession, custody and control.

32.     Once the precise amount of the Working Capital Adjustment due has been determined, Anthem is required to wire transfer that amount to the Trust.  Failure to do so will constitute a breach of the SPA.

**F.**     **Anthem's Dykema Fees**

33.     Section 12.9 of the SPA provides that each party shall pay its own costs and expenses, including legal fees, incurred in connection with the agreement.

34.     Anthem retained the legal services of Dykema in connection with its purchase of Angeleno Mortuaries.

35.     On or about March 29, 2022, a Final Settlement Statement was prepared by First American Title Insurance Company, which listed the charges to Anthem and the Trust relating to the purchase and sale of Angeleno Mortuaries.

36.     The Final Settlement Statement erroneously listed Anthem's Dykema fees of $95,000 as charges to be paid by the Trust rather than Anthem.  At Anthem's request and in the interest of time, the Trust paid Dykema's fees on Anthem's behalf and in reliance on Anthem's promise to reimburse the Trust for those fees.  Anthem failed to reimburse the Trust for paying Anthem's Dykema fees in violation of the SPA.

37.     Claimants have repeatedly reminded Anthem of its contractual obligations pursuant to the SPA, including (1) depositing the Escrow Fund into the Escrow Account, (2) paying the Working Capital Adjustment owed to the Trust, and (3) paying its own legal fees in connection with the SPA.  However, Claimants' efforts to resolve this matter informally have been unsuccessful.  Despite its agreement to do so pursuant to the SPA, Anthem has failed to deposit the Escrow Fund, pay the difference by which the Closing Working Capital is greater than the Target Working Capital, or reimburse the Trust for paying Anthem's Dykema fees.

**FIRST CAUSE OF ACTION**

**(For Breach of Written Contract)**

38.     Claimant incorporates each of the above paragraphs as if set forth fully herein.

39.     On or about March 29, 2022, the Trust and Anthem entered into the written Stock Purchase Agreement as modified by the Side Letter entered into on the same date.

40.     The Trust has performed all of its obligations under the SPA, except for those for which performance has been excused.

41.     As described above, Anthem breached the SPA by:

(a)     Failing to deposit $1.4 million into an escrow account on June 27, 2022 and failing to cause this amount to be paid to the Trust on February 18, 2023;

**TroyGould PC**

ARBITRATION DEMAND

04639-0002 4875-9977-2873.3

(b)    Failing to provide a written statement setting forth its calculation of Anthem's Closing Working Capital (as defined in the SPA) on or before 60 days after the Closing Date of the SPA, i.e., by May 28, 2022, and failing to pay the Trust the Working Capital Adjustment, as also defined in the SPA; and

(c)    Failing to reimburse the Trust $95,000 in Dykema's legal fees that the Trust paid on Anthem's behalf.

42.    As a result of the forgoing breaches, the Trust has been damaged in an amount exceeding $1,795,000 dollars, plus interest.

43.    Section 12.1(f) of the SPA provides that:

"One or more of the Parties to any arbitration proceeding commenced hereunder shall be entitled as part of the arbitration award to the costs and expenses (*including reasonable attorneys' fees and interest on any award*) of investigating, preparing and pursuing an arbitration claim as such costs and expenses are awarded by the arbitration panel."

(Exhibit A, SPA, § 12.1(f), emphasis added).

44.    As a result of Anthem's breaches of the SPA, the Trust is owed all attorneys' fees incurred by the Trust in connection with this arbitration.

## SECON CAUSE OF ACTION

### (For Accounting)

45.    Pursuant to paragraph 2.4 of the SPA, within sixty days after the closing, Anthem was obligated to provide the Trust with "a written statement setting forth a calculation of the Closing Working Capital, Existing Indebtedness, Seller Transaction Expenses, and the Purchase Price based thereon" in order to calculate the Working Capital Adjustment.

46.    Anthem failed to fulfill this obligation.

47.    The Trust is entitled to an accounting of Anthem's and Angeleno Mortuaries' books, records, accounting records and accounting work papers.

48.    Such an accounting is necessary to determine the Working Capital Adjustment.

1

2                                        **<u>PRAYER</u>**

3          WHEREFORE, Claimants pray for judgment as follows:

4          1.      For an award of damages in an amount to be determined according to proof, but

5    which is at least <u>$1,795,000;</u>

6          2.      For reasonable attorneys' fees incurred herein by the Trust;

7          3.      For interest on all sums;

8          4.      An accounting; and

9          5.      For such other and further relief in Claimants' favor as the Arbitrator deems just and

10   proper.

11

12

13   Dated:                                    TROYGOULD PC

14

15

16                                            By:  _____
                                                   Russell I. Glazer
                                                   Sara Watar
17                                            Attorneys for Claimants
                                              William H. Hawkins, individually and as the
18                                            Trustee of the William H. Hawkins Revocable Trust

19

20

21

22

23

24

25

26

27

28

**TroyGould PC**

                                             10

04639-0002 4875-9977-2873.3

# EXHIBIT F

 Outlook

---

## Re: William H. Hawkins Revocable Trust- Anthem Holdings [Demand for Arbitration]

**From** Watar, Sara <swatar@troygould.com>

**Date** Wed 8/14/2024 2:52 PM

**To** wandrews@anthempartners.com <wandrews@anthempartners.com>; ac@trianglecapitalcorp.com <ac@trianglecapitalcorp.com>

**Cc** Glazer, Russell I. <RGlazer@troygould.com>; Udoekwere, Ekong I. <EUdoekwere@troygould.com>; Cervantes, Shirley <SCervantes@troygould.com>

Mr. Andrews and Mr. Clark:

As you know, we are counsel for the William H. Hawkins Revocable Trust.  We have yet to receive your response to our August 7, 2024, letter and therefore take your silence as an indication that you will not provide us a list of recommended arbitrators.  If we do not receive a response from you by Monday August 19, 2024, we will petition the Los Angeles Superior Court to appoint an arbitrator pursuant to Code of Civil Procedure section 1281.6.

Thank you,



**Sara Watar**

Tel|Fax (310) 789-1220
swatar@troygould.com
TroyGould PC
1801 Century Park East, Suite 1600
Los Angeles, CA 90067-2367
www.troygould.com

---

**From:** Cervantes, Shirley <SCervantes@troygould.com>
**Sent:** Wednesday, August 7, 2024 11:12 AM
**To:** wandrews@anthempartners.com <wandrews@anthempartners.com>; ac@trianglecapitalcorp.com <ac@trianglecapitalcorp.com>
**Cc:** Watar, Sara <swatar@troygould.com>; Glazer, Russell I. <RGlazer@troygould.com>; Udoekwere, Ekong I. <EUdoekwere@troygould.com>
**Subject:** William H. Hawkins Revocable Trust- Anthem Holdings [Demand for Arbitration]

Good afternoon,

Please see the attached correspondence in reference to above-captioned matter.

Best,



**Shirley Cervantes**
Legal Assistant
(310) 789-1364 - Fax (310) 201-4746
scervantes@troygould.com
TroyGould PC
1801 Century Park East, Suite 1600
Los Angeles, CA 90067-2367
www.troygould.com

**Notice to Recipient**: This e-mail is meant only for the intended recipient of the transmission, and may be a communication privileged by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of the e-mail is strictly prohibited. Please notify us immediately of the error by return e-mail and delete this message from your system. Thank you in advance for your cooperation.

EXHIBIT G

 Outlook

---

## William H. Hawkins Revocable Trust- Anthem Holdings [Demand for Arbitration]

**From** Fickel, Ashley <AFickel@dykema.com>

**Date** Fri 8/16/2024 2:08 PM

**To** Watar, Sara <swatar@troygould.com>

**Cc** Glazer, Russell I. <RGlazer@troygould.com>; Udoekwere, Ekong I. <EUdoekwere@troygould.com>; Cervantes, Shirley <SCervantes@troygould.com>; Whalen, Jeanne <JWhalen@dykema.com>

Some people who received this message don't often get email from afickeL@dykema.com. Learn why this is important

Hi Sara,

As you know, our firm will be representing Anthem with respect to the above dispute. We have reviewed your correspondence and draft demand for arbitration. At this juncture, we would like to propose early mediation before proceeding with costly litigation. Could you please let us know your client's position.

Thanks,

**Ashley R. Fickel** (he/him)
Office Managing Member, Los Angeles

D 213-457-1758 · F 855-223-2781
AFickel@dykema.com · dykema.com

**BIO   VCARD   LINKEDIN**

444 South Flower Street, Suite 2200
Los Angeles, California 90071



*** Notice from Dykema Gossett PLLC: This Internet message may contain information that is privileged, confidential, and exempt from disclosure. It is intended for use only by the person to whom it is addressed. If you have received this in error, please (1) do not forward or use this information in any way; and (2) contact me immediately.

Neither this information block, the typed name of the sender, nor anything else in this message is intended to constitute an electronic signature unless a specific statement to the contrary is included in this message.

# EXHIBIT H

 Outlook

---

## Re: William H. Hawkins Revocable Trust- Anthem Holdings [Demand for Arbitration]

**From** Watar, Sara <swatar@troygould.com>

**Date** Tue 9/3/2024 4:25 PM

**To** Fickel, Ashley <AFickel@dykema.com>

**Cc** Glazer, Russell I. <RGlazer@troygould.com>; Udoekwere, Ekong I. <EUdoekwere@troygould.com>; Cervantes, Shirley <SCervantes@troygould.com>; Whalen, Jeanne <JWhalen@dykema.com>; Hamilton, Rachel E. <RHamilton@troygould.com>

Ashley,

We do not agree. We are always available to discuss resolution but are eager to push this matter forward. Please let us know if you agree to adjudicate this matter before JAMS by close of business tomorrow, September 4, 2024.  If not, we will move forward with petitioning the court to appoint an arbitrator.

Thank you,
Sara Watar



**Sara Watar**

Tel|Fax (310) 789-1220
swatar@troygould.com
TroyGould PC
1801 Century Park East, Suite 1600
Los Angeles, CA 90067-2367
www.troygould.com

---

**From:** Fickel, Ashley <AFickel@dykema.com>
**Sent:** Tuesday, September 3, 2024 1:47 PM
**To:** Watar, Sara <swatar@troygould.com>
**Cc:** Glazer, Russell I. <RGlazer@troygould.com>; Udoekwere, Ekong I. <EUdoekwere@troygould.com>; Cervantes, Shirley <SCervantes@troygould.com>; Whalen, Jeanne <JWhalen@dykema.com>; Hamilton, Rachel E. <RHamilton@troygould.com>
**Subject:** Re: William H. Hawkins Revocable Trust- Anthem Holdings [Demand for Arbitration]

# EXHIBIT I

 Outlook

---

## RE: William H. Hawkins Revocable Trust- Anthem Holdings [Demand for Arbitration]

---

**From**  Fickel, Ashley <AFickel@dykema.com>

**Date**  Wed 9/4/2024 11:51 AM

**To**  Watar, Sara <swatar@troygould.com>

**Cc**  Glazer, Russell I. <RGlazer@troygould.com>; Udoekwere, Ekong I. <EUdoekwere@troygould.com>; Cervantes, Shirley <SCervantes@troygould.com>; Whalen, Jeanne <JWhalen@dykema.com>; Hamilton, Rachel E. <RHamilton@troygould.com>

---

Hi Sara, Our client does not agree to use JAMS as an arbitration provider for this matter. If you have another proposal, please let us know. Otherwise, we remain available to discuss a productive resolution. Thanks,

**Ashley R. Fickel** (he/him)
Office Managing Member, Los Angeles

D 213-457-1758 • F 855-223-2781
AFickel@dykema.com • dykema.com

**BIO  VCARD  LINKEDIN**

444 South Flower Street, Suite 2200
Los Angeles, California 90071

# Dykema

---

**From:** Watar, Sara <swatar@troygould.com>
**Sent:** Tuesday, September 3, 2024 4:25 PM
**To:** Fickel, Ashley <AFickel@dykema.com>
**Cc:** Glazer, Russell I. <RGlazer@troygould.com>; Udoekwere, Ekong I. <EUdoekwere@troygould.com>; Cervantes, Shirley <SCervantes@troygould.com>; Whalen, Jeanne <JWhalen@dykema.com>; Hamilton, Rachel E. <RHamilton@troygould.com>
**Subject:** Re: William H. Hawkins Revocable Trust- Anthem Holdings [Demand for Arbitration]

**\*\*\* EXTERNAL\*\*\***

Ashley,

We do not agree. We are always available to discuss resolution but are eager to push this matter forward. Please let us know if you agree to adjudicate this matter before JAMS by close of business tomorrow, September 4, 2024.  If not, we will move forward with petitioning the court to appoint an arbitrator.

Thank you,
Sara Watar

# EXHIBIT J

 Outlook

---

**Re: William H. Hawkins Revocable Trust- Anthem Holdings [Demand for Arbitration]**

---

**From** Watar, Sara <swatar@troygould.com>

**Date** Wed 9/4/2024 1:51 PM

**To** Fickel, Ashley <AFickel@dykema.com>

**Cc** Glazer, Russell I. <RGlazer@troygould.com>; Udoekwere, Ekong I. <EUdoekwere@troygould.com>; Cervantes, Shirley <SCervantes@troygould.com>; Whalen, Jeanne <JWhalen@dykema.com>; Hamilton, Rachel E. <RHamilton@troygould.com>

Ashley:

Please let us know your basis for objecting to JAMS.  Alternatively, we suggest ARC.

Thank you,



**Sara Watar**

Tel|Fax (310) 789-1220
swatar@troygould.com
TroyGould PC
1801 Century Park East, Suite 1600
Los Angeles, CA 90067-2367
www.troygould.com

---

**From:** Fickel, Ashley <AFickel@dykema.com>
**Sent:** Wednesday, September 4, 2024 11:51 AM
**To:** Watar, Sara <swatar@troygould.com>
**Cc:** Glazer, Russell I. <RGlazer@troygould.com>; Udoekwere, Ekong I. <EUdoekwere@troygould.com>; Cervantes, Shirley <SCervantes@troygould.com>; Whalen, Jeanne <JWhalen@dykema.com>; Hamilton, Rachel E. <RHamilton@troygould.com>
**Subject:** RE: William H. Hawkins Revocable Trust- Anthem Holdings [Demand for Arbitration]

Hi Sara, Our client does not agree to use JAMS as an arbitration provider for this matter. If you have another proposal, please let us know. Otherwise, we remain available to discuss a productive resolution. Thanks,

EXHIBIT K

 Outlook

---

**Re: ARC Arbitration Rules**

---

**From** Nicole Bethurum <nicole@arc4adr.com>
**Date** Fri 9/27/2024 3:50 PM
**To**   Watar, Sara <swatar@troygould.com>

Marc Alexander, Esq.
John Derrick, Esq.
Hon. Andrew Kauffman, Ret.
Anthony Khoury, Esq. (retired commissioner)
Hon. John Shook, Ret.

 

**NICOLE BETHURUM-JIMENEZ**
*Chief Executive Officer*
Tel 310.284.8224 • Fax 310.284.8229
nicole@arc4adr.com
Westwood • DTLA • Ventura • Orange County
Riverside • San Francisco • San Diego

On Sep 27, 2024, at 11:37 AM, Watar, Sara <swatar@troygould.com> wrote:

Nicole:

This is a breach of contract case specifically involving breaches of a stock purchase agreement.

Thank you,

<Outlook-1pn1gr3t.png>

**Sara Watar**
Tel|Fax (310) 789-1220
swatar@troygould.com
TroyGould PC
1801 Century Park East, Suite 1600
Los Angeles, CA 90067-2367
www.troygould.com

---

**From:** Nicole Bethurum <nicole@arc4adr.com>
**Sent:** Thursday, September 26, 2024 9:52 AM
**To:** Watar, Sara <swatar@troygould.com>
**Subject:** Re: ARC Arbitration Rules

Thank you, Sara.  Please remind me what type of civil matter this is?
<ARC email signature_Nicole_12-22-22.png>

On Sep 25, 2024, at 5:30 PM, Watar, Sara <swatar@troygould.com> wrote:

Nicole,

We decided to move forward with the petition to compel arbitration and appoint a neutral arbitrator.  At your convenience, please send me a list of proposed arbitrators so that we can attach it to our client's petition.

Thank you,

<Outlook-dbecxqe4.png>

**Sara Watar**

Tel|Fax (310) 789-1220
swatar@troygould.com

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|

Russell I. Glazer #166198 Sara Watar #341770
TroyGould PC
1801 Century Park East, 16th Floor Los Angeles, CA 90067

TELEPHONE NO.: (310) 553-4441          FAX NO.:

EMAIL ADDRESS: rglazer@troygould.com; swatar@troygould.com

ATTORNEY FOR *(Name):* Petitioner William H. Hawkins, as Trustee

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF Los Angeles**
STREET ADDRESS: 111 North Hill St.
MAILING ADDRESS: 111 North Hill St.
CITY AND ZIP CODE: Los Angeles, CA 90012
BRANCH NAME: Stanley Mosk Courthouse

**Electronically FILED by
Superior Court of California,
County of Los Angeles
9/30/2024 4:50 PM
David W. Slayton,
Executive Officer/Clerk of Court,
By S. Ruiz, Deputy Clerk**

CASE NAME: William H. Hawkins, as Trustee of the William H. Hawkins Revocable Trust v. Anthem Holdings (USA)

| **CIVIL CASE COVER SHEET** | **Complex Case Designation** | CASE NUMBER: |
|---|---|---|
| ☒ Unlimited (Amount demanded exceeds $35,000) ☐ Limited (Amount demanded is $35,000 or less) | ☐ Counter  ☐ Joinder  Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | 24STCP03132  JUDGE:  DEPT.: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
☐ Auto (22)
☐ Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
☐ Asbestos (04)
☐ Product liability (24)
☐ Medical malpractice (45)
☐ Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
☐ Business tort/unfair business practice (07)
☐ Civil rights (08)
☐ Defamation (13)
☐ Fraud (16)
☐ Intellectual property (19)
☐ Professional negligence (25)
☐ Other non-PI/PD/WD tort (35)

**Employment**
☐ Wrongful termination (36)
☐ Other employment (15)

**Contract**
☐ Breach of contract/warranty (06)
☐ Rule 3.740 collections (09)
☐ Other collections (09)
☐ Insurance coverage (18)
☐ Other contract (37)

**Real Property**
☐ Eminent domain/Inverse condemnation (14)
☐ Wrongful eviction (33)
☐ Other real property (26)

**Unlawful Detainer**
☐ Commercial (31)
☐ Residential (32)
☐ Drugs (38)

**Judicial Review**
☐ Asset forfeiture (05)
☒ Petition re: arbitration award (11)
☐ Writ of mandate (02)
☐ Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400-3.403)**
☐ Antitrust/Trade regulation (03)
☐ Construction defect (10)
☐ Mass tort (40)
☐ Securities litigation (28)
☐ Environmental/Toxic tort (30)
☐ Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
☐ Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
☐ RICO (27)
☐ Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
☐ Partnership and corporate governance (21)
☐ Other petition *(not specified above)* (43)

2. This case ☐ is  ☒ is not  complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. ☐ Large number of separately represented parties
   b. ☐ Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. ☐ Substantial amount of documentary evidence
   d. ☐ Large number of witnesses
   e. ☐ Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. ☐ Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. ☒ monetary b. ☐ nonmonetary; declaratory or injunctive relief c. ☐ punitive
4. Number of causes of action *(specify):* 3
5. This case ☐ is  ☒ is not  a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*
Date: 9/30/2024

Sara Watar
_____
(TYPE OR PRINT NAME)          ►          (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| Form Adopted for Mandatory Use Judicial Council of California CM-010 [Rev. January 1, 2024] | **CIVIL CASE COVER SHEET** | Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740; Cal. Standards of Judicial Administration, std. 3.10 www.courts.ca.gov |
|---|---|---|

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the Civil Case Cover Sheet contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the Civil Case Cover Sheet to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)—Personal Injury/Property Damage/Wrongful Death
Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
Asbestos (04)
    Asbestos Property Damage
    Asbestos Personal Injury/ Wrongful Death
Product Liability *(not asbestos or toxic/environmental)* (24)
Medical Malpractice (45)
    Medical Malpractice–
        Physicians & Surgeons
    Other Professional Health Care Malpractice
Other PI/PD/WD (23)
    Premises Liability (e.g., slip and fall)
    Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
    Intentional Infliction of Emotional Distress
    Negligent Infliction of Emotional Distress
    Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business Practice (07)
Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
Defamation (e.g., slander, libel) (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
    Legal Malpractice
    Other Professional Malpractice *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
    Breach of Rental/Lease
        Contract *(not unlawful detainer or wrongful eviction)*
    Contract/Warranty Breach–Seller Plaintiff *(not fraud or negligence)*
    Negligent Breach of Contract/ Warranty
    Other Breach of Contract/Warranty
Collections (e.g., money owed, open book accounts) (09)
    Collection Case–Seller Plaintiff
    Other Promissory Note/Collections Case
Insurance Coverage *(not provisionally complex)* (18)
    Auto Subrogation
    Other Coverage
Other Contract (37)
    Contractual Fraud
    Other Contract Dispute

**Real Property**
Eminent Domain/Inverse Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
    Writ of Possession of Real Property
    Mortgage Foreclosure
    Quiet Title
    Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
    Writ–Administrative Mandamus
    Writ–Mandamus on Limited Court Case Matter
    Writ–Other Limited Court Case Review
Other Judicial Review (39)
    Review of Health Officer Order
    Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
    Abstract of Judgment (Out of County)
    Confession of Judgment *(non-domestic relations)*
    Sister State Judgment
    Administrative Agency Award *(not unpaid taxes)*
    Petition/Certification of Entry of Judgment on Unpaid Taxes
    Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified above)* (42)
    Declaratory Relief Only
    Injunctive Relief Only *(non harassment)*
    Mechanics Lien
    Other Commercial Complaint Case *(non-tort/non-complex)*
    Other Civil Complaint *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
Partnership and Corporate Governance (21)
Other Petition *(not specified above)* (43)
    Civil Harassment
    Workplace Violence
    Elder/Dependent Adult Abuse
    Election Contest
    Petition for Name Change
    Petition for Relief From Late Claim
    Other Civil Petition

| SHORT TITLE | CASE NUMBER |
|---|---|
| Hawkins, as Trustee of the William H. Hawkins Revo. Trust v. Anthem Holdings (USA) | |

## CIVIL CASE COVER SHEET ADDENDUM AND STATEMENT OF LOCATION

**(CERTIFICATE OF GROUNDS FOR ASSIGNMENT TO COURTHOUSE LOCATION)**

> **This form is required pursuant to Local Rule 2.3 in all new civil case filings in the Los Angeles Superior Court**

**Step 1:** After completing the Civil Case Cover Sheet (Judicial Council form CM-010), find the exact case type in Column A that corresponds to the case type indicated in the Civil Case Cover Sheet.

**Step 2:** In Column B, check the box for the type of action that best describes the nature of the case.

**Step 3:** In Column C, circle the number which explains the reason for the court filing location you have chosen.

| Applicable Reasons for Choosing Courthouse Location (Column C) | |
|---|---|
| 1.  Class Actions must be filed in the Stanley Mosk Courthouse, Central District. | 7.  Location where petitioner resides. |
| 2.  Permissive filing in Central District. | 8.  Location wherein defendant/respondent functions wholly. |
| 3.  Location where cause of action arose. | 9.  Location where one or more of the parties reside. |
| 4.  Location where bodily injury, death or damage occurred. | 10.  Location of Labor Commissioner Office. |
| 5.  Location where performance required, or defendant resides. | 11.  Mandatory filing location (Hub Cases – unlawful detainer, limited non-collection, limited collection). |
| 6.  Location of property or permanently garaged vehicle. | |

| | **A**<br>Civil Case Cover Sheet Case Type | **B**<br>Type of Action<br>(check only one) | **C**<br>Applicable Reasons (see Step 3 above) |
|---|---|---|---|
| **Auto Tort** | Auto (22) | ☐ 2201 Motor Vehicle - Personal Injury/Property Damage/Wrongful Death | 1, 4 |
| | Uninsured Motorist (46) | ☐ 4601 Uninsured Motorist - Personal Injury/Property Damage/Wrongful Death | 1, 4 |
| **Other Personal Injury/ Property Damage/ Wrongful Death** | Other Personal Injury/ Property Damage/ Wrongful Death (23) | ☐ 2301 Premise Liability (e.g., dangerous conditions of property, slip/trip and fall, dog attack, etc.) | 1, 4 |
| | | ☐ 2302 Intentional Bodily Injury/Property Damage/Wrongful Death (e.g., assault, battery, vandalism, etc.) | 1, 4 |
| | | ☐ 2303 Intentional Infliction of Emotional Distress | 1, 4 |
| | | ☐ 2304 Other Personal Injury/Property Damage/Wrongful Death | 1, 4 |
| | | ☐ 2305 Elder/Dependent Adult Abuse/Claims Against Skilled Nursing Facility | 1, 4 |
| | | ☐ 2306 Intentional Conduct - Sexual Abuse Case (in any form) | 1, 4 |

| SHORT TITLE | CASE NUMBER |
|---|---|
| Hawkins, as Trustee of the William H. Hawkins Revo. Trust v. Anthem Holdings (USA) | |

| | A<br>Civil Case Cover Sheet Case Type | B<br>Type of Action<br>(check only one) | C<br>Applicable Reasons (see Step 3 above) |
|---|---|---|---|
| **Other Personal Injury / Property Damage / Wrongful Death** | | ☐ 2307 Construction Accidents | 1, 4 |
| | | ☐ 2308 Landlord - Tenant Habitability (e.g., bed bugs, mold, etc.) | 1, 4 |
| | Product Liability (24) | ☐ 2401 Product Liability (not asbestos or toxic/ environmental) | 1, 4 |
| | | ☐ 2402 Product Liability - Song-Beverly Consumer Warranty Act (CA Civil Code §§1790-1795.8) (Lemon Law) | 1, 3, 5 |
| | Medical Malpractice (45) | ☐ 4501 Medical Malpractice - Physicians & Surgeons | 1, 4 |
| | | ☐ 4502 Other Professional Health Care Malpractice | 1, 4 |
| **Non – Personal Injury / Property Damage / Wrongful Death Tort** | Business Tort (07) | ☐ 0701 Other Commercial/Business Tort (not fraud or breach of contract) | 1, 2, 3 |
| | Civil Rights (08) | ☐ 0801 Civil Rights/Discrimination | 1, 2, 3 |
| | Defamation (13) | ☐ 1301 Defamation (slander/libel) | 1, 2, 3 |
| | Fraud (16) | ☐ 1601 Fraud (no contract) | 1, 2, 3 |
| | Professional Negligence (25) | ☐ 2501 Legal Malpractice | 1, 2, 3 |
| | | ☐ 2502 Other Professional Malpractice (not medical or legal) | 1, 2, 3 |
| | Other (35) | ☐ 3501 Other Non-Personal Injury/Property Damage Tort | 1, 2, 3 |
| **Employment** | Wrongful Termination (36) | ☐ 3601 Wrongful Termination | 1, 2, 3 |
| | Other Employment (15) | ☐ 1501 Other Employment Complaint Case | 1, 2, 3 |
| | | ☐ 1502 Labor Commissioner Appeals | 10 |
| **Contract** | Breach of Contract / Warranty (06) (not insurance) | ☐ 0601 Breach of Rental/Lease Contract (not unlawful detainer or wrongful eviction) | 2, 5 |
| | | ☐ 0602 Contract/Warranty Breach - Seller Plaintiff (no fraud/negligence) | 2, 5 |
| | | ☐ 0603 Negligent Breach of Contract/Warranty (no fraud) | 1, 2, 5 |
| | | ☐ 0604 Other Breach of Contract/Warranty (no fraud/ negligence) | 1, 2, 5 |
| | | ☐ 0605 Breach of Rental/Lease Contract (COVID-19 Rental Debt) | 2, 5 |
| | Collections (09) | ☐ 0901 Collections Case - Seller Plaintiff | 5, 6, 11 |
| | | ☐ 0902 Other Promissory Note/Collections Case | 5, 11 |
| | | ☐ 0903 Collections Case - Purchased Debt (charged off consumer debt purchased on or after January 1, 2014) | 5, 6, 11 |
| | | ☐ 0904 Collections Case - COVID-19 Rental Debt | 5, 11 |
| | Insurance Coverage (18) | ☐ 1801 Insurance Coverage (not complex) | 1, 2, 5, 8 |

| SHORT TITLE | CASE NUMBER |
|---|---|
| Hawkins, as Trustee of the William H. Hawkins Revo. Trust v. Anthem Holdings (USA) | |

| | A<br>Civil Case Cover Sheet Case Type | B<br>Type of Action<br>(check only one) | C<br>Applicable Reasons (see Step 3 above) |
|---|---|---|---|
| **Contract** (Continued) | Other Contract (37) | ☐ 3701 Contractual Fraud | 1, 2, 3, 5 |
| | | ☐ 3702 Tortious Interference | 1, 2, 3, 5 |
| | | ☐ 3703 Other Contract Dispute (not breach/insurance/fraud/negligence) | 1, 2, 3, 8, 9 |
| **Real Property** | Eminent Domain/ Inverse Condemnation (14) | ☐ 1401 Eminent Domain/Condemnation<br><br>Number of Parcels _____ | 2, 6 |
| | Wrongful Eviction (33) | ☐ 3301 Wrongful Eviction Case | 2, 6 |
| | Other Real Property (26) | ☐ 2601 Mortgage Foreclosure | 2, 6 |
| | | ☐ 2602 Quiet Title | 2, 6 |
| | | ☐ 2603 Other Real Property (not eminent domain, landlord/tenant, foreclosure) | 2, 6 |
| **Unlawful Detainer** | Unlawful Detainer – Commercial (31) | ☐ 3101 Unlawful Detainer - Commercial (not drugs or wrongful eviction) | 6, 11 |
| | Unlawful Detainer – Residential (32) | ☐ 3201 Unlawful Detainer - Residential (not drugs or wrongful eviction) | 6, 11 |
| | Unlawful Detainer – Post Foreclosure (34) | ☐ 3401 Unlawful Detainer - Post Foreclosure | 2, 6, 11 |
| | Unlawful Detainer – Drugs (38) | ☐ 3801 Unlawful Detainer - Drugs | 2, 6, 11 |
| **Judicial Review** | Asset Forfeiture (05) | ☐ 0501 Asset Forfeiture Case | 2, 3, 6 |
| | Petition re Arbitration (11) | ☒ 1101 Petition to Compel/Confirm/Vacate Arbitration | 2, 5 |
| | Writ of Mandate (02) | ☐ 0201 Writ - Administrative Mandamus | 2, 8 |
| | | ☐ 0202 Writ - Mandamus on Limited Court Case Matter | 2 |
| | | ☐ 0203 Writ - Other Limited Court Case Review | 2 |
| | Other Judicial Review (39) | ☐ 3901 Other Writ/Judicial Review | 2, 8 |
| | | ☐ 3902 Administrative Hearing | 2, 8 |
| | | ☐ 3903 Parking Appeal | 2, 8 |
| **Provisionally Complex Litigation** | Antitrust/Trade Regulation (03) | ☐ 0301 Antitrust/Trade Regulation | 1, 2, 8 |
| | Asbestos (04) | ☐ 0401 Asbestos Property Damage | 1, 11 |
| | | ☐ 0402 Asbestos Personal Injury/Wrongful Death | 1, 11 |

| SHORT TITLE | CASE NUMBER |
|---|---|
| Hawkins, as Trustee of the William H. Hawkins Revo. Trust v. Anthem Holdings (USA) | |

| | **A**<br>Civil Case Cover Sheet Case Type | **B**<br>Type of Action<br>(check only one) | **C**<br>Applicable Reasons (see Step 3 above) |
|---|---|---|---|
| **Provisionally Complex Litigation** (Continued) | Construction Defect (10) | ☐ 1001 Construction Defect | 1, 2, 3 |
| | Claims Involving Mass Tort (40) | ☐ 4001 Claims Involving Mass Tort | 1, 2, 8 |
| | Securities Litigation (28) | ☐ 2801 Securities Litigation Case | 1, 2, 8 |
| | Toxic Tort Environmental (30) | ☐ 3001 Toxic Tort/Environmental | 1, 2, 3, 8 |
| | Insurance Coverage Claims from Complex Case (41) | ☐ 4101 Insurance Coverage/Subrogation (complex case only) | 1, 2, 5, 8 |
| **Enforcement of Judgment** | Enforcement of Judgment (20) | ☐ 2001 Sister State Judgment | 2, 5, 11 |
| | | ☐ 2002 Abstract of Judgment | 2, 6 |
| | | ☐ 2004 Administrative Agency Award (not unpaid taxes) | 2, 8 |
| | | ☐ 2005 Petition/Certificate for Entry of Judgment Unpaid Tax | 2, 8 |
| | | ☐ 2006 Other Enforcement of Judgment Case | 2, 8, 9 |
| **Miscellaneous Civil Complaints** | RICO (27) | ☐ 2701 Racketeering (RICO) Case | 1, 2, 8 |
| | Other Complaints (not specified above) (42) | ☐ 4201 Declaratory Relief Only | 1, 2, 8 |
| | | ☐ 4202 Injunctive Relief Only (not domestic/harassment) | 2, 8 |
| | | ☐ 4203 Other Commercial Complaint Case (non-tort/noncomplex) | 1, 2, 8 |
| | | ☐ 4204 Other Civil Complaint (non-tort/non-complex) | 1, 2, 8 |
| **Miscellaneous Civil Petitions** | Partnership Corporation Governance (21) | ☐ 2101 Partnership and Corporation Governance Case | 2, 8 |
| | Other Petitions (not specified above) (43) | ☐ 4301 Civil Harassment with Damages | 2, 3, 9 |
| | | ☐ 4302 Workplace Harassment with Damages | 2, 3, 9 |
| | | ☐ 4303 Elder/Dependent Adult Abuse Case with Damages | 2, 3, 9 |
| | | ☐ 4304 Election Contest | 2 |
| | | ☐ 4305 Petition for Change of Name/Change of Gender | 2, 7 |
| | | ☐ 4306 Petition for Relief from Late Claim Law | 2, 3, 8 |
| | | ☐ 4307 Other Civil Petition | 2, 9 |

| SHORT TITLE | CASE NUMBER |
|---|---|
| Hawkins, as Trustee of the William H. Hawkins Revo. Trust v. Anthem Holdings (USA) | |

**Step 4: Statement of Reason and Address:** Check the appropriate boxes for the numbers shown under Column C for the type of action that you have selected. Enter the address, which is the basis for the filing location including zip code. (No address required for class action cases.)

| REASON: | ADDRESS: |
|---|---|
| ☐ 1. ☒ 2. ☐ 3. ☐ 4. ☐ 5. ☐ 6. ☐ 7. ☐ 8. ☐ 9. ☐ 10. ☐ 11 | 9811 Amestoy Dr. |

| CITY: | STATE: | ZIP CODE: |
|---|---|---|
| Northridge | CA | 91325 |

**Step 5: Certification of Assignment:** I certify that this case is properly filed in the _Central_____ District of the Superior Court of California, County of Los Angeles [Code of Civ. Proc., 392 et seq., and LASC Local Rule 2.3(a)(1)(E)]

Dated: _9/30/2024_____

_____
(SIGNATURE OF ATTORNEY/FILING PARTY

**PLEASE HAVE THE FOLLOWING ITEMS COMPLETED AND READY TO BE FILED IN ORDER TO PROPERLY COMMENCE YOUR NEW COURT CASE:**

1. Original Complaint or Petition.
2. If filing a Complaint, a completed Summons form for issuance by the Clerk.
3. Civil Case Cover Sheet Judicial Council form CM-010.
4. Civil Case Cover Sheet Addendum and Statement of Location form LASC CIV 109 (01/23).
5. Payment in full of the filing fee, unless there is a court order for waiver, partial or schedule payments.
6. A signed order appointing a Guardian ad Litem, Judicial Council form CIV-010, if the plaintiff or petitioner is a minor under 18 years of age will be required by Court to issue a Summons.
7. Additional copies of documents to be conformed by the Clerk. Copies of the cover sheet and this addendum must be served along with the Summons and Complaint, or other initiating pleading in the case.

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

**FOR COURT USE ONLY**
*(SOLO PARA USO DE LA CORTE)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
Anthem Holdings (USA), Inc., a Delaware corporation, and DOES 1-10, inclusive

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
William H. Hawkins, as Trustee of the William H. Hawkins Revocable Trust,

Electronically FILED by
Superior Court of California,
County of Los Angeles
9/30/2024 4:50 PM
David W. Slayton,
Executive Officer/Clerk of Court,
By S. Ruiz, Deputy Clerk

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.
*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| | |
|---|---|
| The name and address of the court is:<br>*(El nombre y dirección de la corte es):*<br>Los Angeles Superior Court Stanley Mosk Courthouse<br>111 North Hill St.<br>Los Angeles, CA 90012 | CASE NUMBER:<br>*(Número del Caso):*<br>24STCP03132 |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Russell I. Glazer/Sara Watar-1801 Century Park East, 16th Floor Los Angeles, CA 90067(310) 553-4441

| | | |
|---|---|---|
| DATE: 9/30/2024<br>*(Fecha)* | Clerk, by David W. Slayton, Executive Officer/Clerk of Court<br>*(Secretario)*  S. Ruiz | , Deputy<br>*(Adjunto)* |

*(For proof of service of this summons, use* Proof of Service of Summons *(form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario* Proof of Service of Summons, *(POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☐ on behalf of *(specify):*
   under: ☐ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)   ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
          ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

**SUMMONS**

| SUPERIOR COURT OF CALIFORNIA COUNTY OF LOS ANGELES | Reserved for Clerk's File Stamp |
|---|---|
| COURTHOUSE ADDRESS:<br>Stanley Mosk Courthouse<br>111 North Hill Street, Los Angeles, CA 90012 | **FILED**<br>Superior Court of California<br>County of Los Angeles<br>09/30/2024<br>David W. Slayton, Executive Officer / Clerk of Court<br>By: _____ S. Ruiz _____ Deputy |
| **NOTICE OF CASE ASSIGNMENT**<br><br>**UNLIMITED CIVIL CASE** | |
| **Your case is assigned for all purposes to the judicial officer indicated below.** | CASE NUMBER:<br>24STCP03132 |

### THIS FORM IS TO BE SERVED WITH THE SUMMONS AND COMPLAINT

| | ASSIGNED JUDGE | DEPT | ROOM | | | ASSIGNED JUDGE | DEPT | ROOM |
|---|---|---|---|---|---|---|---|---|
| ✔ | Daniel S. Murphy | 32 | | | | | | |

Given to the Plaintiff/Cross-Complainant/Attorney of Record

on 10/01/2024
(Date)

David W. Slayton, Executive Officer / Clerk of Court

By S. Ruiz , Deputy Clerk

LACIV 190 (Rev 6/18)
LASC Approved 05/06

**NOTICE OF CASE ASSIGNMENT – UNLIMITED CIVIL CASE**

## INSTRUCTIONS FOR HANDLING UNLIMITED CIVIL CASES

The following critical provisions of the California Rules of Court, Title 3, Division 7, as applicable in the Superior Court, are summarized for your assistance.

### APPLICATION
The Division 7 Rules were effective January 1, 2007.  They apply to all general civil cases.

### PRIORITY OVER OTHER RULES
The Division 7 Rules shall have priority over all other Local Rules to the extent the others are inconsistent.

### CHALLENGE TO ASSIGNED JUDGE
A challenge under Code of Civil Procedure Section 170.6 must be made within **15** days after notice of assignment for all purposes to a judge, or if a party has not yet appeared, within 15 days of the first appearance.

### TIME STANDARDS
Cases assigned to the Independent Calendaring Courts will be subject to processing under the following time standards:

### COMPLAINTS
All complaints shall be served within 60 days of filing and proof of service shall be filed within 90 days.

### CROSS-COMPLAINTS
Without leave of court first being obtained, no cross-complaint may be filed by any party after their answer is filed.  Cross-complaints shall be served within 30 days of the filing date and a proof of service filed within 60 days of the filing date.

### STATUS CONFERENCE
A status conference will be scheduled by the assigned Independent Calendar Judge no later than 270 days after the filing of the complaint.  Counsel must be fully prepared to discuss the following issues: alternative dispute resolution, bifurcation, settlement, trial date, and expert witnesses.

### FINAL STATUS CONFERENCE
The Court will require the parties to attend a final status conference not more than 10 days before the scheduled trial date.  All parties shall have motions in limine, bifurcation motions, statements of major evidentiary issues, dispositive motions, requested form jury instructions, special jury instructions, and special jury verdicts timely filed and served prior to the conference.  These matters may be heard and resolved at this conference.  At least five days before this conference, counsel must also have exchanged lists of exhibits and witnesses, and have submitted to the court a brief statement of the case to be read to the jury panel as required by Chapter Three of the Los Angeles Superior Court Rules.

### SANCTIONS
The court will impose appropriate sanctions for the failure or refusal to comply with Chapter Three Rules, orders made by the Court, and time standards or deadlines established by the Court or by the Chapter Three Rules.  Such sanctions may be on a party, or if appropriate, on counsel for a party.

**This is not a complete delineation of the Division 7 or Chapter Three Rules, and adherence only to the above provisions is therefore not a guarantee against the imposition of sanctions under Trial Court Delay Reduction.  Careful reading and compliance with the actual Chapter Rules is imperative.**

### Class Actions
Pursuant to Local Rule 2.3, all class actions shall be filed at the Stanley Mosk Courthouse and are randomly assigned to a complex judge at the designated complex courthouse.  If the case is found not to be a class action it will be returned to an Independent Calendar Courtroom for all purposes.

### *Provisionally Complex Cases
Cases filed as provisionally complex are initially assigned to the Supervising Judge of complex litigation for determination of complex status.  If the case is deemed to be complex within the meaning of California Rules of Court 3.400 et seq., it will be randomly assigned to a complex judge at the designated complex courthouse.  If the case is found not to be complex, it will be returned to an Independent Calendar Courtroom for all purposes.

**NOTICE OF CASE ASSIGNMENT – UNLIMITED CIVIL CASE**



# Superior Court of California, County of Los Angeles

---

## ALTERNATIVE DISPUTE RESOLUTION (ADR)
## INFORMATION PACKAGE

**THE PLAINTIFF MUST SERVE THIS ADR INFORMATION PACKAGE ON EACH PARTY WITH THE COMPLAINT.**

**CROSS-COMPLAINANTS** must serve this ADR Information Package on any new parties named to the action with the cross-complaint.

---

## What is ADR?
ADR helps people find solutions to their legal disputes without going to trial.  The main types of ADR are negotiation, mediation, arbitration, and settlement conferences.  When ADR is done by phone, videoconference or computer, it may be called Online Dispute Resolution (ODR).  These alternatives to litigation and trial are described below.

## Advantages of ADR
- **Saves Time:**  ADR is faster than going to trial.
- **Saves Money:**  Parties can save on court costs, attorney's fees, and witness fees.
- **Keeps Control** (with the parties):  Parties choose their ADR process and provider for voluntary ADR.
- **Reduces Stress/Protects Privacy:**  ADR is done outside the courtroom, in private offices, by phone or online.

## Disadvantages of ADR
- **Costs:**  If the parties do not resolve their dispute, they may have to pay for ADR, litigation, and trial.
- **No Public Trial:**  ADR does not provide a public trial or decision by a judge or jury.

## Main Types of ADR
1. **Negotiation:**  Parties often talk with each other in person, or by phone or online about resolving their case with a settlement agreement instead of a trial.  If the parties have lawyers, they will negotiate for their clients.

2. **Mediation:**  In mediation, a neutral mediator listens to each person's concerns, helps them evaluate the strengths and weaknesses of their case, and works with them to try to create a settlement agreement that is acceptable to all.  Mediators do not decide the outcome.  Parties may go to trial if they decide not to settle.

   **Mediation may be appropriate when the parties**
   - want to work out a solution but need help from a neutral person.
   - have communication problems or strong emotions that interfere with resolution.

   **Mediation may not be appropriate when the parties**
   - want a public trial and want a judge or jury to decide the outcome.
   - lack equal bargaining power or have a history of physical/emotional abuse.

## How to Arrange Mediation in Los Angeles County

Mediation for **civil cases** is voluntary and parties may select any mediator they wish.  Options include:

   a. **The Civil Mediation Vendor Resource List**
   If all parties in an active civil case agree to mediation, they may contact these organizations to request a "Resource List Mediation" for mediation at reduced cost or no cost (for selected cases).

   - **ADR Services, Inc.** Assistant Case Manager Janet Solis, janet@adrservices.com (213) 683-1600
   - **Mediation Center of Los Angeles** Program Manager info@mediationLA.org (833) 476-9145

   **These organizations cannot accept every case and they may decline cases at their discretion.** They may offer online mediation by video conference for cases they accept.  Before contacting these organizations, review important information and FAQs at www.lacourt.org/ADR.Res.List

   **NOTE:  The Civil Mediation Vendor Resource List program does not accept family law, probate, or small claims cases.**

   b. **Los Angeles County Dispute Resolution Programs.**  Los Angeles County-funded agencies provide mediation services on the day of hearings in small claims, unlawful detainer (eviction), civil harassment, and limited civil (collections and non-collection) cases. https://dcba.lacounty.gov/countywidedrp/

   **Online Dispute Resolution (ODR).**  Parties in small claims and unlawful detainer (eviction) cases should carefully review the Notice and other information they may receive about (ODR) requirements for their case.  https://my.lacourt.org/odr/

   c. Mediators and ADR and Bar organizations that provide mediation may be found on the internet.

3. **Arbitration:**  Arbitration is less formal than trial, but like trial, the parties present evidence and arguments to the person who decides the outcome.  In "binding" arbitration, the arbitrator's decision is final; there is no right to trial.  In "nonbinding" arbitration, any party can request a trial after the arbitrator's decision.  For more information about arbitration, visit https://www.courts.ca.gov/programs-adr.htm

4. **Mandatory Settlement Conferences (MSC):**  MSCs are ordered by the Court and are often held close to the trial date or on the day of trial.  The parties and their attorneys meet with a judge or settlement officer who does not make a decision but who instead assists the parties in evaluating the strengths and weaknesses of the case and in negotiating a settlement.  For information about the Court's MSC programs for civil cases, visit https://www.lacourt.org/division/civil/CI0047.aspx

Los Angeles Superior Court ADR website:  https://www.lacourt.org/division/civil/CI0109.aspx
For general information and videos about ADR, visit http://www.courts.ca.gov/programs-adr.htm

TROYGOULD PC
Russell I. Glazer (SBN 166198)
Email:   rglazer@troygould.com
Sara Watar (SBN 341770)
Email:   swatar@troygould.com
1801 Century Park East, 16th Floor
Los Angeles, CA 90067-2367
Telephone:   (310) 553-4441
Facsimile:   (310) 201-4746

Attorneys for Petitioner
William H. Hawkins, as Trustee of the
William H. Hawkins Revocable Trust

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF LOS ANGELES

| | |
|---|---|
| William H. Hawkins, as Trustee of the William H. Hawkins Revocable Trust,<br><br>Petitioner,<br><br>v.<br><br>Anthem Holdings (USA), Inc., a Delaware corporation, and DOES 1-10, inclusive,<br><br>Respondents. | Case No. 24STCP03132<br><br>WILLIAM H. HAWKINS, AS TRUSTEE OF THE WILLIAM H. HAWKINS REVOCABLE TRUST'S MOTION TO COMPEL ARBITRATION AND APPOINT NEUTRAL ARBITRATOR<br><br>[Concurrently filed with Notice of Motion; Declarations of William H. Hawkins and Sara Watar; and [Proposed Order]<br><br>Hon. Daniel S. Murphy<br><br>Date:   December 2, 2024<br>Time:   8:30 a.m.<br>Dept:   32<br>RES ID:   107461434636 |

TroyGould
PC

1    **MEMORANDUM OF POINTS AND AUTHORITIES**

2    **I.    INTRODUCTION**

3    Respondent Anthem Holdings (USA), Inc. ("Anthem") has breached its obligations to

4    Petitioner William H. Hawkins, as Trustee of the William H. Hawkins Revocable Trust (the

5    "Trust") pursuant to the stock purchase agreement and side letter entered into between the parties

6    on March 29, 2022.  Because each and every claim the Trust brings against Anthem arises under

7    the stock purchase agreement and the side letter modifying the stock purchase agreement, the

8    Trust's claims are subject to the arbitration agreement contained therein.  Despite the Trust's

9    repeated efforts to engage with Anthem in appointing a neutral arbitrator, Anthem has failed to

10   agree to arbitration or to a neutral arbitrator.  The Trust therefore respectfully requests that the

11   Court (1) grant this motion and compel Anthem to arbitrate the claims against it and (2) nominate

12   five persons from the list of arbitrators supplied by Alternative Resolution Centers, attached as

13   Exhibit K to the Declaration of Sara Watar, in accordance with California Code of Civil Procedure

14   §§ 1281.2 and 1281.6.

15   **II.    STATEMENT OF FACTS**

16       **A.    The SPA Contains an Agreement to Arbitrate**

17   On or around March 29, 2022, Anthem and the Trust executed a stock purchase agreement

18   and side letter modifying the stock purchase agreement, whereby the Trust was to sell and Anthem

19   was to buy all 100 outstanding shares of Angeleno Mortuaries, Inc. ("Angeleno Mortuaries") (the

20   stock purchase agreement and side letter modifying the stock purchase agreement are referred to

21   herein as the "SPA".)  (Declaration of William H. Hawkins ("Hawkins Decl."), ¶¶ 4-5, Exs. A-B.).

22   Pursuant to § 2.2 of the SPA, the estimated purchase price for the 100 outstanding shares in

23   Angeleno Mortuaries was to be calculated as: (a) $28,000,000, plus or minus (b) the Working

24   Capital Adjustment[1], minus (c) minus existing indebtedness, minus (d) seller transaction expenses.

25   (*Id*.)

26   _____

27   [1]    Pursuant to § 2.2(b) of the SPA, the working capital adjustment is defined as the amount by
       which the closing working capital is greater than or less than the target working capital

28   ("Working Capital Adjustment"). § 1.1 defines the closing working capital as the amount
       (Continued...)

**TroyGould PC**

2

WILLIAM H. HAWKINS, AS TRUSTEE OF THE WILLIAM H. HAWKINS REVOCABLE TRUST'S MOTION
TO COMPEL ARBITRATION AND APPOINT NEUTRAL ARBITRATOR

04639-0002  4860-9834-4172.1

Pursuant to § 12.1(a) of the SPA, the parties agreed to arbitrate "[a]ny dispute arising under [the SPA]." (*Id*.).

**B.    The Trust's Claims Arise Under the SPA**

*1.    The Escrow Fund*

Section 3.3(b) of the SPA provides that Anthem was to deposit an escrow fund of $1.4 million ("Escrow Fund") into a segregated escrow account ("Escrow Account") by June 27, 2022. (*Id*.).  The escrow agent was to disburse the Escrow Fund to the Trust upon the expiration of the escrow period on February 18, 2023 ("Escrow Period").  (*Id*.)  Anthem never deposited the Escrow Fund on behalf of the Trust prior to or since June 27, 2022.  (Hawkins Decl., ¶¶ 4-5, 11, Exs. A-B.).  Accordingly, the escrow agent has been unable to disburse the Escrow Fund pursuant to the terms of the SPA.  (*Id*.).

*2.    The Working Capital Adjustment*

Section 2.4 of the SPA provided that on or before the 60th day following the Closing Date, Anthem was to provide the Trust with a written statement setting forth Anthem's calculation of the purchase price for the 100 outstanding shares of Angeleno Mortuaries, including among other things, the Closing Working Capital.  (Hawkins Decl., ¶¶ 4-5, Exs. A-B.).  Pursuant to the terms of the SPA, if the Closing Working Capital was less than the Target Working Capital, Anthem and the Trust were to execute a joint written discretion directing the escrow agent to immediately release the full amount of that difference from the Escrow Fund to Anthem, plus interest on any unpaid amount until paid in full.  (*Id*.)  The SPA also requires that if the Closing Working Capital was greater than the Target Working Capital, Anthem was to pay that difference to the Trust, plus interest on any unpaid amount until paid in full.  (*Id*.)

Anthem did not provide the Trust its written statement setting forth a calculation of the purchase price or the Closing Working Capital on or before the 60th day after Closing, and has

---

calculated by subtracting the current liabilities of Angeleno Mortuaries from the current assets of Angeleno Mortuaries (excluding inventory) as of the closing date (Closing Working Capital").  The SPA lists the target working capital at $750,000 ("Target Working Capital").  The closing date is defined in § 3.1 of the SPA (the "Closing Date" or "Closing").  (Hawkins Decl., ¶¶ 4-5, Exs. A-B.).

**TroyGould PC**

3

WILLIAM H. HAWKINS, AS TRUSTEE OF THE WILLIAM H. HAWKINS REVOCABLE TRUST'S MOTION TO COMPEL ARBITRATION AND APPOINT NEUTRAL ARBITRATOR

04639-0002  4860-9834-4172.1

failed to do so since.  (Hawkins Decl., ¶¶ 4-5, 12, Exs. A-B.).  On information and belief, the Closing Working Capital exceeded the Target Working Capital by approximately $300,000.  (Hawkins Decl., ¶ 13.).  Anthem has yet to transfer that difference to the Trust in violation of the SPA.  (Hawkins Decl., ¶¶ 4-5, 13, Exs. A-B.).

        3.    *Anthem's Dykema Fees*

Section 12.9 of the SPA provides that each party shall pay its own costs and expenses, including legal fees, incurred in connection with the agreement.  (Hawkins Decl., ¶¶ 4-5, Exs. A-B.).  Anthem retained the legal services of Dykema Gossett PLLC ("Dykema") in connection with its purchase of Angeleno Mortuaries.  (Hawkins Decl., ¶ 14.).

On or about March 29, 2022, a final settlement statement was prepared by First American Title Insurance Company, which listed the charges to Anthem and the Trust relating to the purchase and sale of Angeleno Mortuaries ("Final Settlement Statement").  (Hawkins Decl., ¶ 15, Ex. D.).  The Final Settlement Statement erroneously listed Anthem's Dykema fees of $95,000 as charges to be paid by the Trust rather than Anthem.  (*Id*.).  At Anthem's request and in the interest of time, the Trust paid Dykema's fees on Anthem's behalf and in reliance on Anthem's promise to reimburse the Trust for those fees.  (Hawkins Decl., ¶ 16.).  Anthem failed to reimburse the Trust for paying Anthem's Dykema fees in violation of the SPA.  (Hawkins Decl., ¶¶ 4-5, 17, Exs. A-B.).

**C.**    **The Trust's Attempts to Engage Anthem in Appointing a Neutral Arbitrator Pursuant to the SPA**

Pursuant to § 12.1(c) of the SPA, Anthem and the Trust agreed that:

> [A]ny claim they may have against the other arising out of or related to the transaction contemplated by this Agreement and/or the terms, interpretation and/or enforcement (including any dispute regarding the interpretation of this arbitration clause) shall be submitted to and finally resolved by binding arbitration in accordance with the California Arbitration Act (Code of Civil Procedure § 1280 et seq.)

(Hawkins Decl., ¶¶ 4-5, Exs. A-B.)

Code of Civil Procedure § 1281.6 provides:

> If the arbitration agreement does not provide a method for appointing an arbitrator, the parties to the agreement who seek arbitration and against

**TroyGould PC**

4

WILLIAM H. HAWKINS, AS TRUSTEE OF THE WILLIAM H. HAWKINS REVOCABLE TRUST'S MOTION TO COMPEL ARBITRATION AND APPOINT NEUTRAL ARBITRATOR

04639-0002  4860-9834-4172.1

1
2
3
4

whom arbitration is sought may agree on a method of appointing an arbitrator and that method shall be followed. In the absence of an agreed method, or if the agreed method fails or for any reason cannot be followed, or when an arbitrator appointed fails to act and his or her successor has not been appointed, the court, on petition of a party to the arbitration agreement, shall appoint the arbitrator.

5
6
7
8
9
10

When a petition is made to the court to appoint a neutral arbitrator, the court shall nominate five persons from lists of persons supplied jointly by the parties to the arbitration or obtained from a governmental agency concerned with arbitration or private disinterested association concerned with arbitration. The parties to the agreement who seek arbitration and against whom arbitration is sought may within five days of receipt of notice of the nominees from the court jointly select the arbitrator whether or not the arbitrator is among the nominees. If the parties fail to select an arbitrator within the five-day period, the court shall appoint the arbitrator from the nominees.

11
12
13
14
15
16

On August 7, 2024, counsel for the Trust sent for the Trust sent a letter to Anthem attaching a draft demand for arbitration (the "Demand for Arbitration"). (Declaration of Sara Watar ("Watar Decl."), ¶ 3, Ex. E).  In the letter, and pursuant to the SPA and Code of Civil Procedure § 1281.6, *et seq.*, counsel for the Trust proposed to arbitrate the matter before JAMS and requested that Anthem provide the Trust a list of recommended arbitrators.  (Watar Decl., ¶¶ 3-4, Ex. E). Anthem did not respond.  (Watar Decl., ¶ 5.).

17
18
19
20
21

On August 14, 2024, counsel for the Trust sent correspondence to Anthem, following up on the Trust's Demand for Arbitration and its request for recommended arbitrators.  (Watar Decl., ¶ 6, Ex. F).  Counsel for the Trust notified Anthem that if she did not receive a response by August 19, 2024, regarding the Trust's Demand for Arbitration, the Trust would move to petition the Court to appoint an arbitrator pursuant to Code of Civil Procedure § 1281.6.  (*Id.*)

22
23
24

On August 16, 2024, counsel for Anthem sent correspondence to counsel for the Trust, proposing mediation.  In his email, counsel for Anthem did not agree to arbitration.  (Watar Decl., ¶ 7, Ex. G).  The parties did not agree to mediation. (Watar Decl., ¶ 8.).

25
26
27

On September 3, 2024, counsel for the Trust again asked whether Anthem would arbitrate the matter before JAMS.  (Watar Decl., ¶ 9, Ex. H).  On September 4, 2024, counsel for Anthem sent correspondence to counsel for the Trust, refusing to arbitrate before JAMS.  (Watar Decl.,

28

**TroyGould PC**

5

WILLIAM H. HAWKINS, AS TRUSTEE OF THE WILLIAM H. HAWKINS REVOCABLE TRUST'S MOTION TO COMPEL ARBITRATION AND APPOINT NEUTRAL ARBITRATOR

04639-0002  4860-9834-4172.1

¶ 10, Ex. I.).  Counsel for Anthem failed to propose an alternative arbitration provider. (*Id*.).  On September 4, 2024, counsel for the Trust sent correspondence to counsel for Anthem, inquiring as to Anthem's basis for objecting to JAMS and proposing Alternative Resolution Centers as an alternative arbitration provider.  (Watar Decl., ¶ 11, Ex. J.).  To date, Anthem's counsel has yet to respond to counsel for the Trust's correspondence regarding appointment of a neutral arbitrator and has yet to even agree to arbitrate this matter.  (Watar Decl., ¶ 12.).

On September 27, 2024, counsel for the Trust obtained a list of arbitrators from a private disinterested association concerned with arbitration, namely, Alternative Resolution Centers. (Watar Decl., ¶¶ 13-14, Ex. K.); C.C.P. § 1281.6.  Due to Anthem's failure to cooperate with the Trust regarding appointment of a neutral arbitrator, the Trust was forced to file a petition and motion to compel arbitration and appoint a neutral arbitrator, requesting that the Court compel arbitration of the Trust's claims against Anthem and nominate five arbitrators from the list of arbitrators provided by the Alterative Resolution Centers.

## III.    THE COURT SHOULD COMPEL ANTHEM TO ARBITRATE THE TRUST'S CLAIMS

Code of Civil Procedure section 1280 *et seq*. mandate**s** that courts grant motions to compel arbitration when there is a valid agreement to arbitrate.  **"**On petition of a party to an arbitration agreement alleging the existence of a written agreement to arbitrate a controversy and that a party to the agreement refuses to arbitrate that controversy, the court shall order the controversy to arbitration if it determines that an agreement to arbitrate exists . . . "  C.C.P. § 1281.2.

"California has a strong public policy in favor of arbitration and any doubts regarding the arbitrability of dispute are resolved in favor of arbitration.  This strong policy has resulted in the general rule that arbitration should be upheld unless it can be said with assurance that an arbitration clause is not susceptible to an interpretation covering the asserted dispute.  The party opposing arbitration has the burden of demonstrating that an arbitration clause cannot be interpreted to require arbitration of the dispute."  *Rice v. Downs* (2016) 248 Cal.App.4th 175, 185; *see also Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1, 9 (1992) (California "has expressed a strong

**TroyGould PC**

6

WILLIAM H. HAWKINS, AS TRUSTEE OF THE WILLIAM H. HAWKINS REVOCABLE TRUST'S MOTION TO COMPEL ARBITRATION AND APPOINT NEUTRAL ARBITRATOR

04639-0002  4860-9834-4172.1

1  public policy in favor of arbitration as a speedy and relatively inexpensive means of dispute

2  resolution.")

3        Once the party in favor of arbitration has sufficiently alleged the existence of an arbitration

4  agreement, "the burden must fall upon the party opposing arbitration to demonstrate that an

5  arbitration clause cannot be interpreted to require arbitration of the dispute." *Coast Plaza Drs.*

6  *Hosp. v. Blue Cross of California* (2000) 83 Cal.App.4th 677, 686-87.  Moreover, because of the

7  strong public policy in favor of arbitration, the scope of arbitration agreements must be liberally

8  construed: "Doubts as to whether an arbitration clause applies to a particular dispute are to be

9  resolved in favor of sending the parties to arbitration." *Cione v. Foresters Equity Servs.* (1997) 58

10 Cal.App.4th 625, 642.

11       On March 29, 2022, Anthem and the Trust entered into the SPA.  (Hawkins Decl., ¶¶ 4-5,

12 Exs. A-B.).  § 12.1(c) of the SPA contained an arbitration provision, providing that:

13           [A]ny claim they may have against the other arising out of or related to
             the transaction contemplated by this Agreement and/or the terms,
14           interpretation and/or enforcement (including any dispute regarding the
             interpretation of this arbitration clause) shall be submitted to and finally
15           resolved by binding arbitration in accordance with the California
             Arbitration Act (Code of Civil Procedure § 1280 et seq.)
16

17 (*Id*.).

18       As set forth in the Demand for Arbitration, the Trust's claims arise out of or relate to the

19 transaction contemplated by the SPA.  (Hawkins Decl., ¶¶ 4-5, Exs. A-B; Watar Decl., ¶ 3, Ex. E.).

20       *First*, the Demand for Arbitration alleges that the SPA required Anthem to deposit the

21 Escrow Fund of $1.4 million on June 27, 2022, to be held in the Escrow Account and disbursed to

22 the Trust at the end of the Escrow Period.  (Watar Decl., ¶ 3, Ex. E, Ex. A, ¶¶ 21-22).  At the end of

23 the Escrow Period, the Escrow Fund of $1.4 million should have been deposited to the Trust

24 because no claims for Working Capital Adjustment or indemnification were made by Anthem.

25 (*Id*., Ex. A, ¶ 24.).  The Demand for Arbitration alleges that the Trust never received the Escrow

26 Fund because Anthem failed to deposit it in the first instance in violation of the SPA.  (*Id*., Ex. A,

27 ¶ 25.).

28

**TroyGould PC**

7

WILLIAM H. HAWKINS, AS TRUSTEE OF THE WILLIAM H. HAWKINS REVOCABLE TRUST'S MOTION
TO COMPEL ARBITRATION AND APPOINT NEUTRAL ARBITRATOR

04639-0002  4860-9834-4172.1

**Second**, the Demand for Arbitration alleges that, per the SPA, if the Closing Working Capital was greater than the Target Working Capital, Anthem was required wire transfer the full amount of that difference to the Trust.  (*Id*., Ex. A, ¶ 28.)  The Demand for Arbitration alleges that the Closing Working Capital was greater than the Target Working Capital of $750,000 and as such, Anthem should have wire transferred the full amount of that difference to the Trust but failed to do so in violation of the SPA.  (*Id*., Ex. A, ¶ 30.)

**Third**, the Demand for Arbitration alleges that the SPA provides that each party shall pay its own costs and expenses, including legal fees, incurred in connection with the agreement.  (*Id*., Ex. A, ¶ 33.)  Although the Final Settlement Statement erroneously listed Anthem's Dykema fees of $95,000 as charges to be paid by the Trust rather than Anthem, the Trust paid Anthem's Dykema fees as an accommodation to Anthem, relying on Anthem's promise to reimburse the Trust for those fees.  (*Id*., Ex. A, ¶ 36.)  The Demand for Arbitration alleges that Anthem failed to reimburse the Trust for paying Anthem's Dykema fees in violation of the SPA.  (*Id*.).

In short, the Demand for Arbitration alleges that Anthem materially breached its obligations to the Trust in violation of the SPA.  (Watar Decl., ¶ 3, Ex. E, Ex. A.)   As a result, the Trust seeks to assert claims against Anthem for (1) breach of written contract and (2) an accounting.  (*Id*.).  These claims must be arbitrated pursuant to the arbitration agreement contained within the SPA.  (Hawkins Decl., ¶¶ 4-5, Exs. A-B.)

## IV.    THE COURT SHOULD NOMINATE A LIST OF FIVE PERSONS FROM THE LIST PROVIDED BY ARC

Section 12.1(c) of the SPA provides:

> [A]ny claim they may have against the other arising out of or related to the transaction contemplated by this Agreement and/or the terms, interpretation and/or enforcement (including any dispute regarding the interpretation of this arbitration clause) shall be submitted to and finally resolved by binding arbitration in accordance with the California Arbitration Act (Code of Civil Procedure § 1280 et seq.)

(*Id*.).  Moreover, Code of Civil Procedure § 1281.6 provides:

> If the arbitration agreement does not provide a method for appointing an arbitrator, the parties to the agreement who seek arbitration and against whom arbitration is sought may agree on a method of appointing an

WILLIAM H. HAWKINS, AS TRUSTEE OF THE WILLIAM H. HAWKINS REVOCABLE TRUST'S MOTION TO COMPEL ARBITRATION AND APPOINT NEUTRAL ARBITRATOR

04639-0002 4860-9834-4172.1

arbitrator and that method shall be followed. In the absence of an agreed method, or if the agreed method fails or for any reason cannot be followed, or when an arbitrator appointed fails to act and his or her successor has not been appointed, the court, on petition of a party to the arbitration agreement, shall appoint the arbitrator.

***When a petition is made to the court to appoint a neutral arbitrator, the court shall nominate five persons from lists of persons supplied jointly by the parties to the arbitration or obtained from a governmental agency concerned with arbitration or private disinterested association concerned with arbitration***. The parties to the agreement who seek arbitration and against whom arbitration is sought may within five days of receipt of notice of the nominees from the court jointly select the arbitrator whether or not the arbitrator is among the nominees. If the parties fail to select an arbitrator within the five-day period, the court shall appoint the arbitrator from the nominees.  (Emphasis added.)

Anthem has continuously ignored the Trust's repeated attempts to appoint an arbitrator pursuant to the SPA and Code of Civil Procedure § 1281.6.  (Watar Decl., ¶¶ 3-12, Exs. E-J.).  As a result, counsel for the Trust obtained a list of arbitrators from Alternative Resolution Centers. (Watar Decl., ¶ 14, Ex. K.).  Based in Los Angeles, Alternative Resolution Centers is a private disinterested association that provides arbitration and mediation services.  (Watar Decl., ¶ 13); C.C.P. § 1281.6.  Pursuant to the SPA and Code of Civil Procedure § 1281.6, the Court should nominate the five persons from the list of arbitrators provided by Alternative Resolution Centers and appoint an arbitrator from the nominees if the parties do not select an arbitrator within five days of the Court's order.  (Watar Decl., ¶¶ 14, Ex. K).

## V.    <u>CONCLUSION</u>

For the foregoing reasons, the Trust respectfully requests that the Court (a) order Anthem to arbitrate the Trust's claims as contained in the Demand for Arbitration, (b) nominate five persons from the list of arbitrators provided by Alternative Resolution Centers, and (c) select an arbitrator from the list if the parties do not agree on an arbitrator within five days after the parties receive notice of the nominees from the Court.

**TroyGould PC**

9

WILLIAM H. HAWKINS, AS TRUSTEE OF THE WILLIAM H. HAWKINS REVOCABLE TRUST'S MOTION TO COMPEL ARBITRATION AND APPOINT NEUTRAL ARBITRATOR

04639-0002  4860-9834-4172.1

1

TROYGOULD PC

2

3

By: _____

4

Russell I. Glazer
Sara Watar

5

Attorneys for Petitioner

William H. Hawkins as Trustee of the William H.

6

Hawkins Revocable Trust

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

TroyGould
PC

10

WILLIAM H. HAWKINS, AS TRUSTEE OF THE WILLIAM H. HAWKINS REVOCABLE TRUST'S MOTION
TO COMPEL ARBITRATION AND APPOINT NEUTRAL ARBITRATOR

04639-0002  4860-9834-4172.1

## <u>DECLARATION OF WILLIAM H. HAWKINS</u>

I, William H. Hawkins, declare as follows:

1. I am trustee of the petitioner in this proceeding, the William H. Hawkins Revocable Trust (the "Trust"). I have personal knowledge of the facts set forth in this declaration and, if called as a witness, could and would testify competently to such facts under oath.

2. I reside in Northridge, California.

3. At all relevant times, I was the co-trustee of the Trust, which was created in Los Angeles, California on or around February 3, 2016.

4. On March 29, 2022, the Trust and Anthem Holdings (USA), Inc. ("Anthem") entered into a written stock purchase agreement, whereby the Trust was to sell, and Anthem was to buy, all 100 outstanding shares of Angeleno Mortuaries, Inc. ("Stock Purchase Agreement"). A true and correct copy of the Stock Purchase Agreement is attached hereto as **Exhibit A**.

5. On March 29, 2022, the Trust and Anthem executed a side letter modifying the Stock Purchase Agreement (the "Side Letter"). A true and correct copy of the Side Letter is attached hereto as **Exhibit B**. (The Stock Purchase Agreement as modified by the Side Letter is referred to herein as the "SPA.")

6. The SPA was executed in Los Angeles, California.

7. In the Side Letter, the Trust agreed to forego immediate payment of $8,000,000 of the purchase price for the 100 outstanding shares of Angeleno Mortuaries, Inc. ("Angeleno Mortuaries") – an amount later increased to $9,000,000 – in exchange for a promissory note in that amount, plus interest (the "Promissory Note"). A true and correct copy of the Promissory Note is attached hereto as **Exhibit C**.

8. The Promissory Note came due on June 27, 2022.

9. To date, Anthem failed to pay the Trust any principal due under the Promissory Note.

10. On August 17, 2022, Anthem, the Trust and the Canadian Imperial Bank of Commerce ("CIBC") entered into a subordination and postponement agreement, whereby Anthem

**TroyGould PC**

11

WILLIAM H. HAWKINS, AS TRUSTEE OF THE WILLIAM H. HAWKINS REVOCABLE TRUST'S MOTION TO COMPEL ARBITRATION AND APPOINT NEUTRAL ARBITRATOR

04639-0002  4860-9834-4172.1

1  and the Trust agreed that the Promissory Note would be deferred, postponed and subordinated to

2  the prior repayment in full by Anthem of its debt to CIBC ("Subordination and Postponement

3  Agreement").

4         11.    Anthem never deposited the escrow fund of $1.4 million on behalf of the Trust prior

5  to or since June 27, 2022.  The escrow agent has therefore been unable to disburse the escrow fund

6  pursuant to the terms of the SPA.  *See* **Exhibits. A-B**.

7         12.    Anthem never provided the Trust its written statement setting forth a calculation of

8  the purchase price or the closing working capital on or before the 60th day after closing, and has

9  failed to do so since.  *See* **Exhibits. A-B**.

10         13.    On information and belief, the closing working capital exceeded the target working

11  capital by approximately $300,000.  Anthem has yet to transfer that difference to the Trust.

12         14.    Anthem retained the legal services of Dykema Gossett PLLC ("Dykema") in

13  connection with its purchase of Angeleno Mortuaries.

14         15.    On or about March 29, 2022, a final settlement statement was prepared by First

15  American Title Insurance Company, which listed the charges to Anthem and the Trust relating to

16  the purchase and sale of Angeleno Mortuaries ("Final Settlement Statement").  The Final

17  Settlement Statement erroneously listed Anthem's Dykema fees of $95,000 as charges to be paid

18  by the Trust rather than Anthem.  A true and correct copy of the Final Settlement Statement is

19  attached hereto as **Exhibit D**.

20         16.    At Anthem's request and in the interest of time, the Trust paid Dykema's fees on

21  Anthem's behalf and in reliance on Anthem's promise to reimburse the Trust for those fees.

22         17.    Anthem failed to reimburse the Trust for paying Anthem's Dykema fees.

23         I declare under penalty of perjury under the laws of the State of California that the

24  foregoing is true and correct, and that this declaration is executed on ___10/8/2024___ at Los

25  Angeles, California.

26

27                              DocuSigned by:

                                     _____

28                                         William H. Hawkins

**TroyGould
PC**

WILLIAM H. HAWKINS, AS TRUSTEE OF THE WILLIAM H. HAWKINS REVOCABLE TRUST'S MOTION
TO COMPEL ARBITRATION AND APPOINT NEUTRAL ARBITRATOR

04639-0002  4860-9834-4172.1

# EXHIBIT A

*Execution Version*

**STOCK PURCHASE AGREEMENT**

**BY**

**ANTHEM HOLDINGS (USA), INC.,
A DELAWARE CORPORATION**

**AND**

**THE WILLIAM H. HAWKINS REVOCABLE TRUST, BY WILLIAM H. HAWKINS
AND GLENN GOMEZ, CO-TRUSTEES**

**FEBRUARY 18, 2022**

# TABLE OF CONTENTS

Page

I. DEFINITIONS ....................................................................................................1

    **1.1**    **Definitions.**...................................................................................1
    **1.2**    **Construction.**...............................................................................11

II. PURCHASE AND SALE OF SHARES........................................................12

    **2.1**    **Purchase and Sale.**.....................................................................12
    **2.2**    **Purchase Price.**..........................................................................12
    **2.3**    **Payment of Purchase Price.**.....................................................12
    **2.4**    **Calculation of Final Purchase Price.**......................................13
    **2.5**    **Rollover.**.....................................................................................14
    **2.6**    **Excluded Assets.**........................................................................15
    **2.7**    **Permitted Liens on Company's Assets.**...................................15

III. CLOSING .....................................................................................................15

    **3.1**    **Closing Date.**..............................................................................15
    **3.2**    **Seller Deliveries at the Closing.**..............................................16
    **3.3**    **Buyer Deliveries at the Closing.**..............................................16

IV. REPRESENTATIONS AND WARRANTIES CONCERNING SELLER ...........................17

    **4.1**    **Authority and Enforceability.**.................................................17
    **4.2**    **No Conflict or Violation.**..........................................................17
    **4.3**    **Third-Party Consents and Approvals.**....................................18
    **4.4**    **Ownership of Shares.**................................................................18

V. REPRESENTATIONS AND WARRANTIES CONCERNING THE COMPANY...............18

    **5.1**    **Organization.**.............................................................................18
    **5.2**    **Qualification; Location of Business and Assets.**...................18
    **5.3**    **No Subsidiaries.**.........................................................................18
    **5.4**    **Third-Party Consents and Approvals.**....................................19
    **5.5**    **No Conflict or Violation.**..........................................................19
    **5.6**    **Capitalization.**...........................................................................19
    **5.7**    **Financial Condition and Liabilities.**.......................................19
    **5.8**    **No Undisclosed Liabilities.**.......................................................20
    **5.9**    **Absence of Certain Changes.**....................................................20
    **5.10**    **Accounts Receivable.**...............................................................22
    **5.11**    **Inventories.**...............................................................................22
    **5.12**    **Title; Business Assets.**..............................................................22
    **5.13**    **Condition of Assets.**.................................................................22
    **5.14**    **Real Property.**...........................................................................22

Stock Purchase Agreement
121265.000008 4851-0140-2367.9

Page

5.15    Leased Personal Property. ..............................................................24
5.16    Employment Matters. ....................................................................24
5.17    Employee Benefit Plans ................................................................28
5.18    Material Contracts. ........................................................................30
5.19    Suppliers. .......................................................................................31
5.20    Tax Returns and Taxes. .................................................................31
5.21    Permits. ..........................................................................................34
5.22    Intellectual Property Rights. .........................................................34
5.23    No Pending Proceedings. ...............................................................35
5.24    Compliance with Laws. .................................................................35
5.25    OSHA. ............................................................................................36
5.26    Environmental/Health Safety Matters. .........................................36
5.27    Investments. ...................................................................................37
5.28    Preneed Trusts. ..............................................................................38
5.29    Preneed Insurance. ........................................................................38
5.30    Other Insurance Coverage. ............................................................38
5.31    Warranty Claims. ...........................................................................38
5.32    Relationships with Affiliates and Related Persons. ......................38
5.33    Privacy Laws .................................................................................39
5.34    Rollover Equity .............................................................................39
5.35    Brokers and Finders. .....................................................................40
5.36    Disclosure. .....................................................................................40
5.37    No Other Seller Representation or Warranties. .............................40

VI. REPRESENTATIONS AND WARRANTIES OF BUYER .....................................40

6.1    Organization. .................................................................................40
6.2    Authority and Enforceability. .......................................................40
6.3    Third-Party Consents. ...................................................................41
6.4    No Conflict or Violation. ..............................................................41
6.5    Investment Intent. .........................................................................41
6.6    Brokers and Finders .....................................................................41
6.7    Limitation on Warranties. .............................................................41

VII. COVENANTS ...................................................................................................41

7.1    Access and Investigation. .............................................................41
7.2    Conduct of Business. .....................................................................42
7.3    Consents and Approvals. ...............................................................43
7.4    Update Schedules. .........................................................................43
7.5    Exclusivity. ....................................................................................44
7.6    Confidentiality. ..............................................................................44
7.7    Noncompetition/Nonsolicitation. ..................................................44
7.8    Termination of Pension Plans. ......................................................45
7.9    Assistance in Proceedings. ...........................................................46
7.10    Retention of and Access to Books and Records. ..........................46
7.11    Further Assurances. .......................................................................46

-ii-

Page

7.12   **Press Releases.** ...................................................................46
7.13   **Buyer Objections.** ...............................................................46
7.14   **Transfer of Excluded Assets.** ............................................47

VIII. TAX MATTERS ..........................................................................47

8.1   **Apportionment of Taxes** ......................................................47
8.2   **Filing of Tax Returns** ...........................................................48
8.3   **Refunds and Credits.** ...........................................................49
8.4   **Transfer Taxes.** .....................................................................49
8.5   **Cooperation on Tax Matters** ...............................................49
8.6   **Tax Proceedings.** .................................................................50
8.7   **Tax Actions.** .........................................................................50
8.8   **Tax Consequences of Transaction.** ......................................50

IX. CONDITIONS TO CLOSING ......................................................51

9.1   **Conditions to Obligations of Buyer.** ...................................51
9.2   **Conditions to Obligations of Seller.** ...................................52

X. INDEMNIFICATION ......................................................................53

10.1   **Indemnification by Seller.** ..................................................53
10.2   **Indemnification by Buyer.** .................................................53
10.3   **Defense of Third-Party Claims.** .........................................54
10.4   **Other Claims.** .....................................................................55
10.5   **Survival.** ..............................................................................55
10.6   **Indemnification Limitations.** .............................................56
10.7   **Exclusive Remedy.** .............................................................57
10.8   **Limitation of Damages.** .....................................................57

XI. TERMINATION .............................................................................57

11.1   **Termination.** .......................................................................57
11.2   **Effect of Termination.** ........................................................58

XII. OTHER PROVISIONS ..................................................................58

12.1   **Dispute Resolution.** ............................................................58
12.2   **Appendices, Exhibits and Schedules.** ................................59
12.3   **Amendment.** ........................................................................59
12.4   **No Waiver.** ..........................................................................59
12.5   **Entire Agreement.** ..............................................................59
12.6   **Governing Law.** ..................................................................59
12.7   **Notices.** ...............................................................................59
12.8   **Execution of Agreement.** ....................................................60
12.9   **Expenses.** .............................................................................61

Page

**12.10   Successors and Assigns; No Third Party Beneficiaries.** ....................................61

**12.11   Enforcement by Injunction**. ................................................................................61

Page

EXHIBITS

| | | |
|---|---|---|
| A | Escrow Agreement | A-1 |
| B | Consulting Agreement | B-1 |
| C | Form of Resignation and Release | C-1 |

DISCLOSURE SCHEDULES

| | |
|---|---|
| Schedule 1.1 | Preneed Trusts |
| Schedule 2.2(a) | Closing Working Capital Calculation |
| Schedule 2.3(a) | Estimated Purchase Price |
| Schedule 2.3(b) | Seller's Wire Transfer Instructions |
| Schedule 3.3(d) | Seller's Transaction Costs |
| Schedule 5.2 | Qualification; Location of Business and Assets |
| Schedule 5.4 | Third-Party Seller Consents |
| Schedule 5.8 | Company Liabilities |
| Schedule 5.9 | Absence of Certain Changes |
| Schedule 5.10 | Accounts Receivable |
| Schedule 5.14(a) | Owned Real Property and their Preliminary Title Reports |
| Schedule 5.14(b) | Leased Real Property |
| Schedule 5.15 | Leased Personal Property |
| Schedule 5.16(a) | Current Employees |
| Schedule 5.16(b) | Independent Contractors |
| Schedule 5.16(c) | Terminated Employees |
| Schedule 5.16(e) | Collective Bargaining Agreements |
| Schedule 5.17 | Employee Benefit Plans |
| Schedule 5.18 | Material Contracts |
| Schedule 5.19 | Suppliers |
| Schedule 5.20 | Tax Returns |
| Schedule 5.21 | Permits |
| Schedule 5.22 | Intellectual Property Rights |
| Schedule 5.23 | Pending Proceedings |
| Schedule 5.24 | Compliance with Laws |
| Schedule 5.25 | OSHA |
| Schedule 5.26 | Environmental Matters |
| Schedule 5.27 | Investments |
| Schedule 5.29 | Preneed Insurance |
| Schedule 5.30 | Other Insurance Coverage |
| Schedule 5.31 | Warranty Claims |
| Schedule 5.32 | Affiliates and Related Persons |
| Schedule 6.3 | Third-Party Buyer Consents |

Stock Purchase Agreement
121265.000008  4851-0140-2367.9

## STOCK PURCHASE AGREEMENT

THIS STOCK PURCHASE AGREEMENT (the "Agreement") is made as of February 18, 2022 (the "Effective Date"), by and between Anthem Holdings (USA), Inc., a Delaware corporation ("Buyer"), and the William H. Hawkins Revocable Trust, by William Hawkins and Glenn Gomez, as Co-Trustees ("Seller"). Buyer and Seller are also referred to from time to time in this Agreement individually as a "Party" and together as the "Parties."

<u>RECITALS</u>

A.      Seller owns all of the outstanding shares of capital stock (the "Shares") of Angeleno Mortuaries, Inc. a California corporation (the "Company").

B.      The Company is engaged in the business of operating funeral homes and a crematory at its facilities located in Los Angeles San Bernardino, and Ventura Counties in California (the "Business").

C.      Seller desires to sell to Buyer, and Buyer desires to purchase from Seller, all of the Shares, upon the terms and subject to the conditions of this Agreement.

<u>AGREEMENTS</u>

The Parties, intending to be legally bound, agree as follows:

## I. DEFINITIONS

**1.1      Definitions.**  For purposes of this Agreement, the following terms shall have the meanings specified or referred to in this Section 1.1:

"Affiliate" means, with respect to any specified Person, any other Person directly or indirectly controlling, controlled by or under common control with such specified Person. For the purposes of this definition, "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise. For purposes of the Employee Plans, the term "Affiliate" shall have the meaning ascribed under Code Section 414(b), (c) or (m) and ERISA Section 4001.

"Agreement" has the meaning specified in the Preamble.

"Arbitration Rules" is defined in Section 12.1(c).

"Anthem GP" has the meaning specified in Section 2.5.

"Basket Amount" has the meaning specified in Section 10.6.

"Bureau" means the California Cemetery and Funeral Bureau.

"Business" has the meaning specified in the Recitals.

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks in New York, New York are required or authorized by law to be closed.

"Buyer" has the meaning specified in the Preamble.

"Buyer Closing Certificate" has the meaning specified in Section 9.2.

"Buyer Documents" has the meaning specified in Section 6.2.

"Buyer Group" has the meaning specified in Section 7.1.

"Buyer Indemnified Persons" has the meaning specified in Section 10.1.

"CARES Act" means the Coronavirus Aid, Relief, and Economic Security Act, as in effect as of the date of this Agreement (or any amended or successor version that is substantively comparable) and any current or future regulations or official interpretations thereof.

"Cash" has the meaning specified in Section 2.5(a).

"Closing" has the meaning specified in Section 3.1.

"Closing Cash" has the meaning specified in Section 2.3(c).

"Closing Date" has the meaning specified in Section 3.1.

"Closing Financial Information" has the meaning specified in Section 2.4.

"Closing Payment" has the meaning specified in Section 2.3.

"Closing Working Capital" means the amount calculated by subtracting the current liabilities of the Company from the current assets of the Company (excluding Inventory) as of the Closing Date. The calculation of Closing Working Capital shall be prepared and presented consistent with the principles applying the same accounting methods, policies, practices, procedures and principles as were used to prepare the Pre-Closing Balance Sheet.

"COBRA" means the Consolidated Omnibus Budget Reconciliation Act.

"Code" means the Internal Revenue Code of 1986, as amended.

"Company" has the meaning specified in the Recitals.

"Company Software" means any Software (including related documentation) that is material to the Company and that is owned by or licensed to the Company other than commercially available, off-the-shelf, non-customized Software.

"Company Systems" has the meaning specified in Section 5.22.

"Consulting Agreement" has the meaning specified in Section 3.2.

2

"Consent" means any consent, approval, authorization, permission, ratification or waiver from, notice to, or registration or filing with, any Person.

"Contract" means any agreement, contract, subcontract, lease, instrument, note, option, purchase order, work order, customer order, license or sublicense or other commitment or undertaking of any nature (whether written or oral), in each case that is legally binding.

"Copyrights" means all registered and unregistered copyrights in both published works and unpublished works and all rights in mask works.

"Deferred CARES Act Taxes" means any amount payable by the Company after the Closing Date which would have been payable by the Company on or prior to the Closing Date but for the deferral of such Taxes pursuant to the CARES Act and any administrative or other guidance published with respect thereto by any Governmental Authority.

"Due Diligence" means the Buyer's representatives and advisors investigation, inspection, review and/or analysis of the Business and Company's Assets, contracts, documents, financial statements, books, records, tax returns, accounts, ledgers, insurance policies, preneed trusts, appraisals, employee files, and all other similar and related documents and information, including but not limited to those deposited in the due diligence Data Site, and those made available to Buyer and its representatives during their visits to each of Seller's Real Properties, and/or any information provided or disclosed in any Real Property Preliminary Title Reports, appraisals, Phase I or II reports, environmental reports, and any other reports regarding the Company, Business and the Company's Assets.

"Effective Date" has the meaning specified in the Preamble.

"Employee Plans" means employment related plans, including but not limited to, employment or consulting agreements, collective bargaining and supplemental agreements, pension, profit sharing, incentive, bonus, deferred compensation, retirement, stock option, stock purchase, severance, medical, hospitalization, dental, prescription, life insurance, disability, vacation, salary continuation, sick pay, welfare, fringe benefit and other employee benefit plans, contracts, programs, policies and arrangements, whether written or oral.

"Environmental Claim" means any and all administrative, regulatory or judicial actions, suits, orders, demands, claims, notices of violation, investigations or proceedings or requests for information involving any Person alleging liability arising out of or resulting from (A) alleged noncompliance with any Environmental Laws or Environmental Permits or (B) the alleged presence, migration or Release of, or exposure to, any Hazardous Substances at any location;

"Environmental Laws" means all Laws, Environmental Permits, Governmental Orders, or legally binding agreements relating to the use, management or disposal of Hazardous Substances, or to pollution, or protection of endangered species, natural resources, human health or the environment;

"Environmental Permits" means Permits which are or have been required under or are or have been issued pursuant to Environmental Laws;

"ERISA" means the Employee Retirement Income Security Act of 1974.

"Escrow Agent" has the meaning specified in Section 3.3(b).

"Escrow Agreement" has the meaning specified in Section 3.2(c).

"Escrow Fund" has the meaning specified in Section 3.3(b).

"Estimated Purchase Price" has the meaning specified in Section 2.3.

"Existing Indebtedness" means the Indebtedness of the Company outstanding on the Closing Date.

"Filed Tax Returns" has the meaning specified in Section 5.20(a).

"Final Purchase Price" has the meaning specified in Section 2.4.

"Final Termination Date" has the meaning specified in Section 11.1.

"Financial Statements" has the meaning specified in Section 5.7.

"FIRPTA" – has the meaning specified in Section 5.20.

"Fundamental Representations" has the meaning specified in Section 10.5.

"Governmental Authority" means the government of the United States, or of any state, local, county or political subdivision thereof, and any federal, state, local or county entity, agency, body or authority exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"Governmental Order" means any legally binding order, writ, judgment, injunction, decree, stipulation, award or determination of any Governmental Authority.

"Hazardous Substance" means any and all substances or wastes which have been defined or classified as hazardous, toxic or harmful pursuant to any Environmental Laws, or which are regulated pursuant to such Environmental Laws, including Medical Waste, petroleum and each of its chemical constituents and by-products, urea formaldehyde foam insulation, polychlorinated biphenyls, and asbestos in any form;

"HIPAA" means the Health Insurance Portability and Accountability Act of 1996, as amended, and the privacy and security regulations promulgated thereunder, the Health Information Technology and Clinical Health Act, enacted as part of the American Recovery and Reinvestment Act of 2009 and the regulations promulgated thereunder, and the Breach Notification Rule, codified at 45 CFR 164.400 et seq.

"Indebtedness" means (i) the principal of and/or interest accrued on (A) indebtedness for money borrowed and (B) indebtedness evidenced by notes, debentures, bonds or other similar instruments; (ii) all obligations issued or assumed as the deferred purchase price of property (but excluding accounts payable); (iii) all obligations for the reimbursement of any obligor on any letter

of credit or similar credit transaction servicing obligations of a Person or of a type described in clauses (i) and (ii) above and (iv) and (v) below; (iv) all obligations to pay rent or other amounts under any lease of real property or personal property which obligations are required to be classified and accounted for as capital leases, and the amount of such obligations shall be the capitalized amount thereof; and (v) all guarantees of obligations of the type referred to in clauses (i) through (iv) of other Persons, in each case including the aggregate amount of all pre-payment, termination or redemption charges, premiums, penalties, fees, costs, expenses, breakage costs, make-whole payments or other payments required to be paid in respect of any of the obligations of the type referred in clauses (i) through (v) on prepayment or otherwise.

"Indemnified Party" has the meaning specified in Section 10.3.

"Indemnifying Party" has the meaning specified in Section 10.3.

"Intellectual Property Rights" means all intellectual property owned or licensed (as licensor or licensee) by the Company, including (i) Marks; (ii) Patents and Invention Disclosures; (iii) Copyrights; (iv) all rights in mask works (as defined in Section 901 of the Copyright Act of 1976); (v) Software; (vi) Trade Secrets; (vii) Net Names; (viii) other applications, certificates, filings, registrations or other documents issued by, filed with, or recorded by, any private, state, government or other public or quasi-public legal authority for protection of any technology; and (ix) all rights to sue or recover and retain damages and costs and attorneys' fees for past, present and future infringement or misappropriation.

"Invention Disclosures" means invention disclosures relating to inventions conceived or reduced to practice by one or more officers, employees, independent contractors, or other parties with whom the Company may have collaborated in connection with developments on behalf of the Business.

"Inventory" means all inventories including inventory of unsold and available funeral goods, and all other materials and supplies used or consumed by the Company in its business (including inventories held at any location controlled by the Company and inventories previously purchased and in transit to such locations).

"IRCA" has the meaning specified in Section 5.16.

"Seller's Knowledge", "known to Seller" and words of similar import means, with respect to any matter in question, the actual knowledge of Seller and of each of Glenn Gomez and William Hawkins as a layperson, after making due and reasonable inquiry of such matter, which shall include due inquiry of any Person having primary responsibility for such matter. This term is not intended to connote that the persons in this term are expressing any legal opinions.

"Law" means any law, ordinance, code, statute, rule, regulation, order, judgment, injunction, award, or decree of any court, arbitrator, administrative agency, regulatory body or authority and governmental body or authority, whether federal, state, local or foreign.

"Leased Real Property" has the meaning specified in Section 5.14.

5

"<u>Legal Expenses</u>" means reasonable attorney's, accountants', investigators', and experts' fees, and expenses reasonably sustained or incurred in connection with the defense or investigation of any Losses or the enforcement of this Agreement.

"<u>Liabilities</u>" means any and all debts (secured and unsecured), liabilities, guarantees, commitments and obligations, whether fixed, contingent or absolute, asserted or unasserted, matured or unmatured, liquidated or unliquidated, accrued or not accrued, known or unknown, due or to become due, whenever or however arising (including whether arising out of any contract or any tort based on negligence or strict liability).

"<u>Lien</u>" means any pledge, lien (including without limitation any tax lien), charge, claim, encumbrance, security interest, mortgage, option, restriction on use, voting or transfer (including without limitation any buy-sell agreement or right of first refusal or offer), community property interest, forfeiture, penalty, license, equity or other right of another Person of every nature and description whatsoever.

"<u>Losses</u>" has the meaning specified in <u>Section 10.1</u>.

"<u>Marks</u>" means Company's name, all assumed fictional business names, trade names, registered and unregistered trademarks, service marks and applications.

"<u>Material Adverse Effect</u>" means any fact, event, change, development or effect that, individually or together with any one or more other facts, events, changes, developments or effects, has resulted in, or would reasonably be expected to: (a) result in a material adverse effect on the Business, assets, liabilities, operations, capitalization, results of operations or financial condition of the Company, or (b) prevent or materially delay or materially impair the ability of Seller to consummate the transactions contemplated by this Agreement.

"<u>Material Contracts</u>" has the meaning specified in <u>Section 5.18</u>.

"<u>Medical Waste</u>" means medical waste items, including, but not limited to, cultures and stocks of infectious agents, human body fluids, pathological waste, radioactive isotopes, pacemakers, and similar materials, including as defined in the applicable Laws regulating medical waste in the applicable jurisdiction.

"<u>Net Names</u>" means all rights in internet web sites and internet domain names presently used by the Company.

"<u>Notice of Disagreement</u>" has the meaning specified in <u>Section 2.4</u>.

"<u>Ordinary Course of Business</u>" means the usual and ordinary course of business consistent with past custom and practice (including with respect to quantity and frequency) of the Company.

"<u>Organizational Documents</u>" means, with respect to any Person, (i) the bylaws, (ii) certificate of incorporation or certificate of formation, (iii) limited liability company agreement, operating agreement or similar agreement, (iv) similar corporate or limited liability company documents, (v) any charter or agreement or similar document adopted or filed in connection with

the creation, formation, or organization of a Person, and (vi) any amendment to or restatement of any of the foregoing.

"OSHA" means the Occupational Safety and Health Act of 1970.

"Owned Real Property" has the meaning specified in Section 5.14.

"Party" or "Parties" has the meaning specified in the Preamble.

"Patents" means all patents, patent applications and inventions and discoveries that may be patentable.

"Payoff Letters" has the meaning specified in Section 3.3(c).

"Pension Plan" has the meaning specified in Section 7.8.

"Permits" means all permits, approvals, consents, registrations, licenses, certificates, variances or other authorizations granted by or obtained from any Governmental Authority.

"Permitted Lien" means (i) statutory Liens for Taxes not yet due and payable, (ii) statutory Liens of landlords, carriers, warehousemen, mechanics and materialmen incurred in the Ordinary Course of Business for sums not yet due, (iii) in the case of any Real Property, in addition to items (i) and (ii), zoning, building, or other restrictions, variances, covenants, rights of way, encumbrances, easements and other minor irregularities in title, none of which, individually or in the aggregate, interfere in any material respect with the present use of or occupancy of the affected Real Property by the Company, and (iv) Liens securing the Existing Indebtedness (which Liens shall be terminated on the Closing Date upon payment in full of such Existing Indebtedness).

"Permitted Purposes" means the "Allowable Uses of Covered Loans" set forth in Section 7(a)(36)(F) of the Small Business Act, as in effect on the Effective Date.

"Person" or "person" means an individual, a partnership, limited partnership, a corporation, a limited liability company, proprietorship, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, union, any other business entity, or a Governmental Authority (or any department, agency, or political subdivision thereof).

"Personal Property" means all tangible personal property and interests therein, including all machinery, equipment, tools, dies, jigs, patterns, molds, trade fixtures, furniture, furnishings, vehicles, computer hardware, drawings, designs and blue prints

"Post-Closing Tax Period" means any Tax period or portion of a period that begins after the Closing Date.

"PPACA" means the Patient Protection and Affordable Care Act of 2010, as amended by the Health Care and Education Reconciliation Act of 2010 and any subsequent amendments thereto.

"PPP Loan" means all Indebtedness of the Company pursuant to Paycheck Protection Program loan documents, including any such funds received from IncredibleBank as lender, in accordance with the CARES Act.

"Pre-Closing Balance Sheet" has the meaning specified in Section 5.7.

"Pre-Closing Tax Period" means any Tax period ending on or before the Closing Date and that portion of any Straddle Period ending on the Closing Date.

"Pre-Closing Tax Returns" has the meaning specified in Section 8.2(a).

"Preneed Agreements" means any funeral preneed Contract for undelivered funeral merchandise or services.

"Preneed Trusts" means the trusts listed on Schedule 1.1(d).

"Proceeding" means any claim, action, charge, demand, allegation, complaint, suit, litigation, arbitration, grievance, inquiry, proceeding, hearing, examination or investigation of any nature, civil, criminal, administrative, regulatory or otherwise, whether at law or in equity.

"Property Taxes" has the meaning specified in Section 8.1.

"Purchase Price" has the meaning specified in Section 2.2.

"Real Property" means any real property owned, used, leased, occupied, managed or operated by the Company, in each case together with the Company's right, title and interest in all buildings, structures, improvements, and fixtures located thereon, and all easements and other rights and interests appurtenant thereto.

"Real Property Leases" has the meaning specified in Section 5.14.

"Real Property Preliminary Title Reports" means the real property preliminary title report for each parcel of Real Property that were obtained by Buyer in connection with the transactions contemplated by this Agreement.

"Receivables" means all accounts receivable, notes receivable and other amounts receivable from third parties.

"Registered Intellectual Property" means all Intellectual Property Rights that are subject to any issuance registration, application or other filing by, to or with any Governmental Authority or authorized private registrar in any jurisdiction, including registered Trademarks, Net Names and Copyrights, issued and reissued Patents and pending applications for any of the foregoing.

"Related Person" means (i) with respect to a particular individual, each other member of such individual's family, including the individual's spouse, any other natural person who is related to the individual or the individual's spouse within the second degree, and any other natural person who resides with such individual, and (ii) with respect to a specified Person other than an individual, each shareholder, partner, member or employee of such specified Person and each

8

Person that serves as a director, officer, or manager of such specified Person (or in a similar capacity) of such specified Person.

"Release" means any actual or threatened release, spill, emission, leaking, dumping, injection, pouring, deposit, disposal, discharge, dispersal, leaching or migration into or through the environment (including ambient air, surface water, groundwater, land surface or subsurface strata) or within any building, structure, facility or fixture.

"Remedial Action" means any action required under any Environmental Laws to (x) clean up, remove, treat, or in any other way address any Hazardous Substance or other substance in the environment, (y) prevent the Release or threat of Release, or minimize the further Release of any Hazardous Substance or other substance so it does not migrate or endanger or threaten to endanger public health or welfare or the environment, or (z) perform pre-remedial studies and investigations and post-remedial monitoring and care.

"Representative" means with respect to a particular Person, any director, officer, manager, employee, agent, consultant, advisor, accountant, financial advisor, legal counsel or other representative of that Person.

"Reviewing Accountant" has the meaning specified in Section 2.4.

"Rollover Equity" has the meaning specified in Section 2.5.

"SBA" means the U.S. Small Business Administration.

"SBA Notice" means SBA Procedural Notice Control No. 5000-20057, dated effective as of October 2, 2020.

"Securities Act" means the Securities Act of 1933, as amended.

"Seller" has the meaning specified in the Preamble.

"Seller Documents" has the meaning specified in Section 4.2.

"Seller Indemnified Persons" has the meaning specified in Section 10.2.

"Seller Tax Liabilities" means all Taxes (A) imposed on or for which the Company is liable for any Pre-Closing Tax Period, (B) for which the Company is liable pursuant to Treasury Regulation Section 1.1502-6 or similar provisions of state, local or non-U.S. law, (C) of any other Person imposed on the Company as a transferee or successor, by contract, Law or otherwise, with respect to an event or transaction occurring before the Closing, (D) allocated to Seller pursuant to Section 8.1, and (E) Deferred CARES Act Taxes.

"Seller Transaction Expenses" means all out-of-pocket costs and expenses incurred by the Company on its own behalf or on behalf of any of its Affiliates or Seller prior to the Closing (whether paid or payable on, prior or after the Closing Date and whether or not then invoiced), in connection with, related to or arising from the transactions contemplated by this Agreement and the agreements and documents referenced herein, including any legal, accounting, investment

9

banking, brokerage or advisory fees and expenses and including any sale, change of control, transaction or similar bonuses or compensation payable to any employee of the Company in connection with the consummation of the transactions contemplated hereby.

"Seller's Closing Certificate" has the meaning specified in Section 9.1.

"Shares" has the meaning specified in the Recitals.

"Significant Supplier" has the meaning specified in Section 5.19.

"Software" means all computer software and subsequent versions thereof, including source code, object, executable or binary code, objects, comments, screens, user interfaces, report formats, templates, menus, buttons and icons and all files, data, materials, manuals, design notes and other items and documentation related thereto or associated therewith.

"Straddle Period" has the meaning specified in Section 8.1.

"Straddle Tax Returns" has the meaning specified in Section 8.2(b).

"Subsidiary" means, with respect to any Person, any corporation, partnership, limited liability company, joint venture or other legal entity of any kind of which such Person (either alone or through or together with one or more of its other Subsidiaries) owns, directly or indirectly, at least a majority of the outstanding capital stock (or other shares of beneficial interest) entitled to vote generally or otherwise have the power to elect a majority of the board of directors or similar governing body or the legal power to direct the business or policies of such Person.  The term Subsidiary shall include all Subsidiaries of such Subsidiary.

"Target Working Capital" means $750,000.

"Tax" or "Taxes" means any assessment of any kind or nature imposed by any Governmental Authority, any federal, state, local, or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under Code §59A), duties including customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, whether computed on a separate or consolidated, unitary or combined basis or in any other manner, including any interest, penalty, deficiency, or addition thereto, whether disputed or not and including any obligation to indemnify or otherwise assume or succeed to the liability for Taxes of any other Person.

"Tax Proceeding" has the meaning specified in Section 8.6.

"Tax Return" means any report, return, declaration, statement or other information required to be supplied to a taxing authority in connection with Taxes.

"Trade Secrets" means all know-how, trade secrets, confidential or proprietary information, customer and supplier lists, Software, technical information, manufacturing

10

processes, business practices, customer and supplier relationships, data, process technology, and plans.

"Transfer Taxes" has the meaning specified in Section 8.4.

"Treasury Regulations" means regulations promulgated under the Code.

"WARN" means the Workers Adjustment and Retraining Notification Act of 1988, as amended.

"Working Capital Adjustment" has the meaning specified in Section 2.2.

## 1.2    Construction.

(a)    Unless the context of this Agreement otherwise clearly requires, (i) references to the plural include the singular, and references to the singular include the plural, (ii) references to one gender include the other gender, (iii) references to "or" shall be construed in the inclusive sense of "and/or", (iv) the words "include", "includes" and "including" do not limit the preceding terms or words and shall be deemed to be followed by the words "without limitation", (v) the terms "hereof", "herein", "hereunder", "hereto" and similar terms in this Agreement refer to this Agreement as a whole and not to any particular provision of this Agreement, (vi) the terms "day" and "days" mean and refer to calendar day(s), (vii) the terms "year" and "years" mean and refer to calendar year(s), and (viii) where a word or phrase is defined herein, each of its other grammatical forms shall have a corresponding meaning.  When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the first day in calculating such period shall be excluded, and the last day included.  If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

(b)    Unless otherwise set forth in this Agreement, references in this Agreement to (i) any document, instrument or agreement (including this Agreement) (A) includes and incorporates all exhibits, schedules and other attachments thereto, (B) includes all documents, instruments or agreements issued or executed in replacement thereof and (C) means such document, instrument or agreement, or replacement or predecessor thereto, as amended, modified or supplemented from time to time in accordance with its terms and in effect at any given time, and (ii) a particular Law means such Law, as amended, modified, supplemented or succeeded from time to time and in effect on the date hereof.  All Article, Section, Exhibit and Schedule references herein are to Articles, Sections, Exhibits and Schedules of this Agreement, unless otherwise specified.  The headings of the several Articles and Sections herein are inserted for convenience of reference only and are not intended to be part of or to affect the meaning or interpretation of this Agreement.

(c)    Any reference in this Agreement to "made available" means a document or other item of information that was, not less than one (1) day prior to the Effective Date, provided or made available for review by Buyer and its Representatives in the electronic data site established for "Angeleno Mortuaries" by Johnson Consulting Group on behalf of the Company to which Buyer and its Representatives have been given access ("Data Site").

11

(d)    The Parties have participated jointly in the negotiation and drafting of this Agreement, and any rule of construction or interpretation otherwise requiring this Agreement to be construed or interpreted against either Party by virtue of the authorship of this Agreement shall not apply to the construction and interpretation hereof.  The Parties agree that any drafts of this Agreement prior to the final fully executed drafts shall not be used for purposes of interpreting any provision thereof, and each Party agrees that no Party or any Affiliate thereof shall make any claim, assert any defense or otherwise take any position inconsistent with the foregoing in connection with any Proceeding among any of the foregoing.

## II.  PURCHASE AND SALE OF SHARES

**2.1    Purchase and Sale.**  Upon the terms and subject to the conditions of this Agreement, at the Closing, Seller shall sell and transfer to Buyer, and Buyer shall purchase and accept from Seller, all of the outstanding Shares free and clear of all Liens.

**2.2    Purchase Price.**  Buyer shall pay Seller for purchasing the Shares from Seller an amount (the "Purchase Price") equal to:

(a)    $28,000,000;

(b)    plus or minus, as the case may be, the amount by which Closing Working Capital is greater than or less than, respectively, the Target Working Capital (the "Working Capital Adjustment").  Closing Working Capital shall be determined in accordance with the calculation shown on Schedule 2.2(a);

(c)    minus Existing Indebtedness; and

(d)    minus Seller Transaction Expenses.

**2.3    Payment of Purchase Price.**  The Purchase Price shall be paid as follows:

(a)    No later than the third Business Day immediately preceding the Closing Date, Seller shall deliver to Buyer a written closing statement certified by an appropriate executive officer of the Company (which shall be in the form attached to this Agreement as Schedule 2.3(a)), setting forth in detail Seller's good faith estimate of the Working Capital Adjustment, Existing Indebtedness and Seller Transaction Expenses as of the Closing Date and the Purchase Price based thereon calculated in accordance with Section 2.2(a) (the "Estimated Purchase Price").  If Buyer reasonably believes the Estimated Purchase Price delivered by Seller is unreasonable, Buyer and Seller shall cooperate in good faith to resolve such dispute.  If any disputed matter cannot be resolved, the Estimated Purchase Price will be calculated based upon Seller's position concerning such disputed matter without prejudice to the right of Buyer to raise such disputed matter again in accordance with the determination of the Final Purchase Price pursuant to Section 2.4.

(b)    At the Closing, Buyer shall pay to Seller a cash closing payment (the "Closing Payment") in an amount equal to (A) the Estimated Purchase Price (in accordance with Section 2.3(a)), minus (B) the amount of the Escrow Fund.  The Closing Payment

12

shall be made to Seller on the Closing Date, by wire transfer of immediately available funds to the account or accounts as specified in Schedule 2.3(b).

(c)    In connection with the transactions contemplated by this Agreement, the existing bank accounts used by the Company shall remain in place under the Company's control as of the Closing Date.  Seller shall leave an amount of cash equal to $120,000 (the "Closing Cash") in such accounts as of the Closing Date; Buyer agrees to transfer an amount equal to the Closing Cash to an account or accounts designated in writing by Seller within ten (10) Business Days following the Closing Date.  From and after the Closing, Seller shall assist the Company as reasonably necessary in ensuring that income and expenses are handled from such accounts in the Ordinary Course of Business, and in adding additional or different signatories to such accounts.

(d)    Within five (5) Business Days after the calculation of the Final Purchase Price becomes final and binding on the Parties pursuant to Section 2.4, Buyer or Seller, as the case may be, shall make the following payment:

(i)    If the Final Purchase Price is greater than the Estimated Purchase Price, Buyer shall pay to Seller, the full amount of the difference between the Final Purchase Price and the Estimated Purchase Price, by wire transfer of immediately available funds to the accounts specified in Schedule 2.3(b); or

(ii)    If the Final Purchase Price is less than the Estimated Purchase Price, then Seller shall pay to Buyer the full amount of the difference between the Final Purchase Price and the Estimated Purchase Price, by wire transfer of immediately available funds to an account specified by Buyer.

(iii)    If Buyer or Seller, as the case may be, shall fail to pay the amount due and owing in accordance with this Section 2.3(d), such unpaid amount shall bear interest at the rate of eight percent (8%) per annum from the due date of such payment until paid in full.

**2.4    Calculation of Final Purchase Price.**

(a)    On or before the sixtieth (60th) day following the Closing Date, Buyer shall deliver to Seller a written statement setting forth a calculation of the Closing Working Capital, Existing Indebtedness, Seller Transaction Expenses and the Purchase Price based thereon (collectively, the "Closing Financial Information").  The Closing Financial Information shall be consistent with Section 2.2(a) and Schedule 2.2(a).

(b)    During the thirty (30) day period following delivery of the Closing Financial Information to Seller, Seller shall be permitted to review the books, records, accounting records and accounting work papers used in the preparation of the Closing Financial Information.  The Purchase Price as calculated by Buyer shall become final, binding and conclusive upon the Parties on the thirtieth (30th) day following delivery of the Closing Financial Information, unless Seller gives written notice of his disagreement (the "Notice of Disagreement") with the calculation of the Purchase Price to Buyer prior to such date.  The Notice of Disagreement shall (i) specify in reasonable detail the nature and basis

13

of any disagreement so asserted and (ii) only include disagreements based on the Purchase Price not being calculated in accordance with Section 2.2 or mathematical or factual errors.

(c)     If Seller duly and timely delivers to Buyer the Notice of Disagreement, then the calculation of the Purchase Price shall become final, binding and conclusive upon the Parties on the earlier of (i) the date the Parties resolve in writing all differences they have with respect to the matters specified in the Notice of Disagreement or (ii) the date all disputed matters are finally resolved in writing by the Reviewing Accountant (as defined below).  If the Parties fail to resolve the issues outstanding with respect to the Notice of Disagreement and the calculation of the Purchase Price within 30 days after Buyer's receipt of the Notice of Disagreement, the Parties shall submit the issues remaining in dispute to a partner having relevant expertise and practicing at Jones & Perry Inc. in Sacramento or Napa, or, if such firm is unable or unwilling to act, a partner having relevant expertise at such other independent public accounting firm as shall be agreed upon by the Parties in writing (the "Reviewing Accountant").  Seller and Buyer shall jointly instruct the Reviewing Accountant that it (A) shall act as an expert and not as an arbitrator, (B) shall review only the matters that were properly included in the Notice of Disagreement, (C) shall make its determination based upon the terms and conditions set forth in this Section 2.4(c) and within the range of (1) the amount of Purchase Price set forth in the Closing Financial Information and (2) the amount of Purchase Price set forth in the Notice of Disagreement and (D) shall render its decision within 60 days after the referral of the dispute to the Reviewing Accountant for a decision pursuant hereto.  The determination by the Reviewing Accountant shall be final, binding and conclusive on the Parties.  The fees and expenses of the Reviewing Accountant incurred in rendering any judgment pursuant to this Section 2.4 shall be borne one-half by Seller and one-half by Buyer.  The fees and expenses of Seller and his advisors incurred in connection with their review of the Closing Financial Information and, if applicable, the Notice of Disagreement, shall be borne by Seller, and the fees and expenses of Buyer's advisors incurred in connection with its preparation of the Closing Financial Information, and, if applicable, the Notice of Disagreement, shall be borne by Buyer.  Judgment may be entered upon the determination of the Reviewing Accountant in any court in California having jurisdiction over the Party against which such determination is to be enforced.  The Purchase Price, once finally resolved and/or agreed to in accordance with this Section 2.4 shall become the "Final Purchase Price".

**2.5     Rollover.**

(a)     At the Closing, effective as of the Closing Date, Seller shall contribute $1,400,000 of the Purchase Price to Anthem GP Ltd., an indirect parent company of Buyer ("Anthem GP"), which shall be evidenced by Seller's execution and delivery to Anthem GP of a Subscription Agreement, and such other instruments of assignment, transfer and conveyance as Anthem GP may reasonably request.  In exchange for such amount, Seller shall receive approximately 180,000 Class A Preferred Shares in Anthem GP (the "Rollover Equity"), at a share price of ten Canadian dollars, based on the applicable US-Canadian exchange rate on the Closing Date, subject to the applicable provisions of Anthem GP's bylaws and other governing documents.

14

(b)    The granting of the Rollover Equity is conditioned on the recipient of the Rollover Equity entering into a Subscription Agreement with Anthem GP, and the rights of Seller as a holder of Rollover Equity will be subject to all restrictions stated in the Subscription Agreement and the applicable Anthem GP governance documents.

**2.6    Excluded Assets.**  The Parties agree that the following assets are not included in this sale transaction:

(a)    All of the Company's cash and cash equivalents deposited in any of its bank accounts, money market accounts, certificates of deposit, bonds, stock portfolio, and similar deposits and investments ("Cash") as reflected in its books and records at the Closing Date, all of which the Company shall pay to Seller at the Closing Date, subject to Section 2.3(c);

(b)    All personal items and property not owned by the Seller or Company, but located on the Real Property and/or used in the Business, none of which is material to the Business.

(c)    William Hawkins' 2020 Lincoln Continental provided by the Company;

(d)    William Hawkins' mobile phone and telephone number of 818-257-1865, provided by the Company prior to Closing; and

(e)    Glenn Gomez's mobile phone and phone numbers of 626-688-1304 and 818-798-4461, provided by the Company prior to Closing.

**2.7    Permitted Liens on Company's Assets.**  Except for the Existing Indebtedness, which will be paid in full at Closing, Buyer agrees that it is acquiring ownership of the Company whose Company's Assets are subject to any and all Permitted Liens, including without limitation all those set forth in the Real Property Preliminary Title Reports, or any other inspection or similar reports, obtained by Buyer regarding this transaction, in each case which are defined as Permitted Liens as agreed to by the Parties pursuant to this Agreement and the corresponding Disclosure Schedules.

## III.  CLOSING

**3.1    Closing Date.**  The closing of the transactions contemplated by this Agreement (the "Closing") shall take place remotely via the exchange of documents and signatures, commencing at 10:00 a.m., on the first Business Day after the satisfaction (or, to the extent permitted, waived by the Party entitled to the benefit thereof) of the conditions set forth in Article IX except those conditions relating to the delivery of documents to be delivered at Closing pursuant to the terms hereof (the day on which the Closing takes place being referred to herein as the "Closing Date"). All documents delivered and actions taken at Closing shall be deemed to have been delivered or taken simultaneously, and no such delivery or action shall be considered effective or complete unless or until all other such deliveries or actions are completed or waived in writing by the Party against whom such waiver is sought to be enforced.  For financial and accounting purposes, the Closing shall be effective as of 11:59 p.m. on the Closing Date.

**3.2     Seller Deliveries at the Closing**.  At the Closing, Seller shall deliver to Buyer:

(a)     executed assignments (or other instruments of transfer) representing all of the Shares, duly endorsed in blank and otherwise in the proper form for transfer;

(b)     executed Seller's Closing Certificate;

(c)     the Escrow Agreement, substantially in the form of that attached hereto as Exhibit A (the "Escrow Agreement"), executed by Seller;

(d)     a Consulting Agreement, substantially in the form of that attached hereto as Exhibit B (the "Consulting Agreement") executed by Seller;

(e)     resignations and releases executed by such of the directors and officers of the Company as are designated by Buyer, substantially in the form of that attached hereto as Exhibit C;

(f)     a new lease agreement for the Real Property owned by Seller and used in the Business, on terms acceptable to Buyer, executed by Seller as landlord;

(g)     duly executed termination statements or discharges by creditors terminating any and all Liens with respect to the Existing Indebtedness on the Company's Assets;

(h)     a certification from Seller pursuant to Treasury Regulation Section 1.1445-2(b), in form and substance satisfactory to Buyer, that Seller is not a foreign person within the meaning of Code Section 1445;

(i)     evidence of payment of the Transfer Taxes due and payable (if any) by Seller to the appropriate taxing authority; and

(j)     such other documents as Buyer or its counsel may reasonably request to demonstrate satisfaction of the conditions and compliance with the agreements set forth in this Agreement.

**3.3     Buyer Deliveries at the Closing.**  At the Closing, Buyer shall deliver to Seller, the Escrow Agent, and other designated Persons, as the case may be:

(a)     payment to Seller of the Closing Payment by wire transfers in immediately available funds as provided in Section 2.3(b);

(b)     deposit with U.S. Bank, National Association (the "Escrow Agent") $1,400,000 (the "Escrow Fund") into escrow to be held and distributed by the Escrow Agent for the 12 month Escrow Period (as defined in the Escrow Agreement) in accordance with the terms of the Escrow Agreement;

(c)     payment, on behalf of the Company and Seller, of the Existing Indebtedness, by wire transfers of immediately available funds pursuant to payoff and lien release letters, in form and substance satisfactory to Buyer (the "Payoff Letters"), which

16

were provided not later than five (5) Business Days prior to the Closing by the following, except to the extent the Parties agree to leave applicable arrangements in place as of the Closing Date: (i) Bank of the West, (ii) FC Marketplace, LLC, (iii) U.S. Bank Equipment Finance, (iv) IncredibleBank, (v) Antelope Valley Mortuaries, Inc., (vi) Social Construct, (vii) Los Angeles County tax authority, (viii) Great Western Insurance Company, and (ix) Ingold Chapel, Incorporated;

(d)    payment, on behalf of the Company and Seller, of the aggregate Seller Transaction Expenses, as identified on <u>Schedule 3.3(d)</u>.  The Company shall withhold from the Seller's Transaction Expenses payable to an employee of the Company all applicable federal, state and local income Tax, social security Tax, Medicare Tax, state disability Tax, unemployment Tax and other Tax required to be withheld;

(e)    executed Buyer's Closing Certificate;

(f)    to Seller a duly executed counterpart to the Escrow Agreement;

(g)    to Seller, a duly executed counterpart to the Consulting Agreement; and

(h)    evidence of payment of the Transfer Taxes due and payable (if any) by Buyer to the appropriate taxing authority;

(i)    and such other documents as Seller or their counsel may reasonably request to demonstrate satisfaction of the conditions and compliance with the agreements set forth in this Agreement.

## IV.  REPRESENTATIONS AND WARRANTIES CONCERNING SELLER

Seller represents and warrants to Buyer as of the Effective Date and as of the Closing Date, as follows:

**4.1    Authority and Enforceability.**  Seller has full power, authority and legal right and capacity to execute and deliver this Agreement and to perform his obligations hereunder and to consummate the sale of the Shares and the other transactions contemplated hereby.  The execution, delivery and performance of this Agreement, the Escrow Agreement, the Consulting Agreement, and the other agreements and documents to be executed and delivered by Seller pursuant to the provisions of this Agreement (the "<u>Seller Documents</u>") and the consummation by Seller of the transactions contemplated hereby and thereby have been duly and validly authorized by all necessary action on the part of Seller and the Company and no other proceedings on the part of Seller or the Company are necessary to authorize this Agreement or the Seller Documents or to consummate the transactions contemplated hereby.  This Agreement has been, and at the Closing the Seller Documents shall be, duly and validly executed and delivered by Seller and constitute, or shall constitute, the legal, valid and binding obligation of Seller, enforceable against Seller in accordance with their respective terms.

**4.2    No Conflict or Violation.**  Neither the execution and delivery of this Agreement or the Seller Documents by Seller nor the consummation by Seller of any of the transactions contemplated hereby do or will (with or without notice or lapse of time or both) (a) contravene,

conflict with or result in a violation of any Law or any Governmental Order to which Seller is subject (provided any and all Consents required for the transfer and issuance of the funeral establishment, crematory and any other licenses are obtained as set forth herein); (b) contravene or conflict with, result in any breach of, constitute a default under, or give to others any rights of payment, termination, amendment, modification, acceleration, suspension, revocation or cancellation of, or result in the creation of any Lien on any of the assets of Seller pursuant to, any Contract to which Seller is a party (provided any and all Consents required by those contracts are obtained as set forth herein); or (c) result in the creation of any Lien on any of the Shares.

**4.3    Third-Party Consents and Approvals.**  No Consent is required for the execution, delivery and performance of this Agreement and the Seller Documents by Seller and the consummation of the transactions contemplated hereby and thereby, except those set forth in Schedule 5.4.

**4.4    Ownership of Shares.**  Seller is the sole record and beneficial owners of, and has good and valid title to, all of the Shares, free and clear of any and all Liens.  Except for this Agreement, none of such Shares is subject to (a) any option, warrant, purchase right or other Contract that requires Seller to sell, transfer or otherwise dispose of any of such Shares or (b) any voting trust, proxy or other Contract or understanding with respect to the voting, dividend rights, preferences, sale, acquisition or other disposition of any of such Shares.  Upon delivery of such Shares to Buyer and full payment therefore as contemplated hereby, Buyer shall acquire good and valid title to all such Shares, free and clear of all Liens.

## V. REPRESENTATIONS AND WARRANTIES CONCERNING THE COMPANY

Seller represents and warrants to Buyer as of the Effective Date and as of the Closing Date, as follows:

**5.1    Organization.**  Company is a corporation incorporated, validly existing and in good standing under the laws of California.  Company has all requisite corporate power and authority to own, lease and operate its properties and assets and to carry on the Business as and where now being conducted.  The entity record books (including the stock records) of Company are correct and complete and contain accurate resolutions or other consent action adopted by the Board of Directors and shareholder of the Company since its date of formation.  Seller has made available to Buyer complete and correct copies of all the Company's record books and Operating Agreements, as currently in effect.

**5.2    Qualification; Location of Business and Assets.**  Company is duly licensed or qualified to do business only in California.  There has not been any claim by any jurisdiction to the effect that the Company is required to qualify or otherwise to be authorized to do business as a foreign corporation in any jurisdiction in which the Company has not qualified or obtained such authorization.  Set forth in Schedule 5.2 is each location where the Company (a) has a place of business, or (b) owns or leases property.

**5.3    No Subsidiaries.**  The Company owns no Subsidiaries, nor does it have any right to acquire, directly or indirectly, any capital stock of, or other equity interests in, any Person.

**5.4** **Third-Party Consents and Approvals.** Except as set forth in Schedule 5.4, no Consent is required for the consummation of the transactions contemplated by this Agreement by Seller. Seller and the Company have complied with the requirements of the SBA Notice, except as set forth in Schedule 5.4.

**5.5** **No Conflict or Violation.** Neither the execution and delivery of this Agreement nor the consummation of any of the transactions contemplated hereby do or will (with or without notice or lapse of time or both) (a) contravene, conflict with or result in a violation of any provision of the Organizational Documents of the Company; (b) contravene or conflict with or result in a violation of any Law or any Governmental Order to which the Company is subject; (c) contravene, conflict with or result in a violation of any of the terms or requirements of any Permit applicable to the Company; or (d) as of the Closing Date, contravene or conflict with, result in any breach of, constitute a default under, or give to others any rights of payment, termination, amendment, modification, acceleration, suspension, revocation or cancellation of, or result in the creation of any Lien on any of the assets of the Company pursuant to, any Material Contract to which the Company is a party.

**5.6** **Capitalization.** The Shares constitute all of the Company's outstanding equity securities. All of the Shares are duly authorized, validly issued, fully paid and nonassessable, and none of the Shares has been issued in violation of any preemptive rights or applicable Law. There are no outstanding (a) securities of the Company convertible into, or exchangeable or exercisable for, Shares, (b) options, warrants to purchase or subscribe, or other rights to acquire from the Company any Shares or other equity securities or securities convertible into or exchangeable or exercisable for Shares or other equity securities of the Company, or rights of first refusal or first offer relating to any Shares or other equity securities of the Company, or (c) bonds, debentures, notes or other Indebtedness or securities of the Company having the right to vote (or convertible into, or exchangeable for, securities having the right to vote) on any matters on which equity holders of the Company may vote. There are no voting trusts, proxies or other agreements or understanding with respect to the voting of the Shares, except as may be set forth in the Company's Bylaws.

**5.7** **Financial Condition and Liabilities.**

(a) Seller has made available to Buyer correct and complete copies of (a) trial balances of the Company as of December 31, 2019 and 2020, and year to date September 30, 2021, and internally prepared consolidated financial statements for December 31, 2019 and 2020, and year to date September 30, 2021 (collectively, the "Financial Statements"), and (b) the unaudited balance sheet of the Company as of December 31, 2021 (the "Pre-closing Balance Sheet"), and related consolidated statements of income and cash flow for the period then ended, all of which are correct and complete and in accordance with the books and records of the Company, and have been prepared in accordance with the company's historical accounting practices, consistently applied. Such balance sheets present fairly in all material respects the financial condition, assets and liabilities of the Company as of the dates indicated, and such statements of income, cash flow and members equity present fairly in all material respects the results of operations, cash flows and members equity of the Company for the periods indicated.

19

(b)    The Company properly applied for the PPP Loan in accordance with the terms of the Small Business Act and the CARES Act.  To Seller's Knowledge, the Company satisfied all of the criteria for the PPP Loan set forth in the Small Business Act (including, without limitation, Sections 7(a)(36)(D) and 7(a)(36)(G) of the Small Business Act) and the CARES Act. The Company has used all of the proceeds of the PPP Loan first for Permitted Purposes that qualify the PPP Loan for forgiveness under Section 1106 of the CARES Act, and second, for other Permitted Purposes.  At least sixty percent (60%) of the proceeds of the PPP Loan were used by the Company to fund "payroll costs" (as defined in the CARES Act) of the Company.  The PPP Loan has been forgiven in full as of the Effective Date.

**5.8    No Undisclosed Liabilities.**  Except as set forth on <u>Schedule 5.8</u>, the Company has no Liabilities, except (a) Liabilities fully reflected or reserved against on the Pre-closing Balance Sheet, (b) Liabilities for costs and expenses incurred in connection with the transactions contemplated by this Agreement, and (c) current Liabilities incurred in the Ordinary Course of Business since the date of the Pre-closing Balance Sheet.

**5.9    Absence of Certain Changes.**  Since the date of the Pre-closing Balance Sheet, except as set forth on <u>Schedule 5.9</u> or in accordance with the terms of this Agreement, the Company has conducted the Business in the Ordinary Course of Business and the Company has not:

(a)    amended any of its Organizational Documents;

(b)    made any change in its authorized stock or other securities, issued any stock or other securities of any class or become party to any subscriptions, warrants, rights, options, convertible or exchangeable securities or other agreements or commitments of any character relating to its issued and unissued equity or other securities, or granted any equity appreciation or similar rights;

(c)    declared, set aside or paid any dividend or made or agreed to make any other distribution or payment in respect of its stock or other securities, or redeemed, purchased or otherwise acquired or agreed to redeem, purchase or acquire any of its stock or other securities;

(d)    suffered any material casualty, damage, destruction or loss, or any material interruption in use, of any material assets or properties, whether or not covered by insurance, or suffered any repeated, recurring or prolonged shortage, cessation or interruption of supplies or utilities or other services required to conduct its business and operations;

(e)    made any payment of or increase in any bonuses, salaries, or other compensation to any member, manager, shareholder, director, officer, or (except in the Ordinary Course of Business and in accordance with plans existing as of the date of the Pre-Closing Balance Sheet) employee or entry into any employment, severance, or similar Contract with any member, manager, shareholder, director, officer or employee, except that, on or before the Closing Date, the Company shall pay Glenn Gomez a bonus as

described on Schedule 5.9, to compensate him for the extraordinary amount of time and work he has spent regarding this transactions that has been in additional to his usual and regular duties;

(f)    adopted, or increased the payments to or benefits under, any Employee Plan for or with any of its employees;

(g)    mortgaged, pledged or subjected any of its assets to any Lien;

(h)    accelerated, amended, terminated, or cancelled or had terminated or cancelled any Material Contract, or canceled, modified or waived any material debts or claims held by it or waived any rights material to the Business;

(i)    sold or in any way transferred or otherwise disposed of any of its material assets or properties except for sales of Inventory and other transfers and dispositions in the Ordinary Course of Business;

(j)    made or committed to make any capital expenditures or capital additions or betterments exceeding in the aggregate $10,000;

(k)    encountered any labor union organization activity, had any actual or overtly threatened employee strikes, work stoppages, slow-downs or lock outs, or had any material adverse change in its relationship with any of its employees, salesmen, distributors, or independent contractors;

(l)    changed any of the accounting principles followed by it or the methods of applying such principles or revalued any of its assets;

(m)    instituted, settled, or agreed to settle any Proceeding related to its assets or the Business;

(n)    failed to replenish its inventories or supplies in a normal and customary manner consistent with the Company's prior practices or made any purchase commitment other than in the Ordinary Course of Business;

(o)    prepaid any of its obligations or any other obligations relating to the Business;

(p)    accelerated the collection of Receivables or extended the payment of accounts payable;

(q)    except for the execution of this Agreement, entered into any transaction other than in the Ordinary Course of Business;

(r)    experienced a Material Adverse Effect or any event, change, development or effect which, individually or together with other such events, changes, developments or effects, could reasonably be expected to have a Material Adverse Effect; or

21

(s)      committed to do any of the foregoing.

**5.10    Accounts Receivable.**  The Receivables of the Company as set forth in the Pre-closing Balance Sheet or arising since the date thereof are reflected properly on the books and records of the Company; are valid and genuine; have arisen solely out of bona fide sales and deliveries of goods, performance of services and other business transactions in the Ordinary Course of Business; are not subject to valid defenses, set-offs or counterclaims; and, to Seller's Knowledge, are collectible in the Ordinary Course of Business within a reasonable period of time, except as to the VA Affairs Receivables described on <u>Schedule 5.10</u>.  Notwithstanding the preceding, Seller is not providing any guarantee of collectability of any Receivables.

**5.11    Inventories.**  All Inventory reflected on the Pre-closing Balance Sheet or acquired since the date thereof was acquired and has been maintained in the Ordinary Course of Business; is merchantable and fit for the purpose for which it was produced or manufactured; is valued at the lower of cost or market value;  is not subject to any write-down or write-off; and the quantities of all lines of Inventory are reasonable and appropriate in the present circumstances of the Business.  Except as specifically reserved on the Pre-closing Balance Sheet, none of the Inventory is obsolete, damaged, defective or slow moving to Seller's Knowledge.  To Seller's Knowledge, the Company is not under any liability or obligation with respect to the return of Inventory in the possession of wholesalers, retailers or other customers.

**5.12    Title; Business Assets.**  The Company has good and marketable title to, or a valid leasehold interest in, all of the properties and assets used by the Company, free and clear of all Liens, except Permitted Liens.  The properties and assets owned or leased by the Company constitute all the assets and properties that are used or held for use by the Company and that are reasonably necessary to conduct the Business as presently conducted, and to reasonably perform all of the Contracts of the Company.

**5.13    Condition of Assets.**  All of the buildings, structures and fixtures owned or leased by the Company are in good operating condition and repair in all material respects, subject only to ordinary wear and maintenance, and are usable in the regular and Ordinary Course of Business. All of the Personal Property owned or leased by the Company material to the business, operations or financial condition of the Company is in good operating condition and repair in all material respects, subject only to ordinary wear and maintenance, and are usable in the Ordinary Course of Business and have been maintained in accordance with normal industry practice.

**5.14    Real Property.**

(a)      <u>Schedule 5.14(a)</u> lists all Real Property owned by the Company ("<u>Owned Real Property</u>"), including a correct legal description, street address and tax parcel identification number of each property, as well as their Real Property Preliminary Title Reports obtained as part of this transaction.  Correct and complete copies of all deeds, existing title insurance policies and surveys of or pertaining to each of the Owned Real Properties have been made available to Buyer to the extent they are in the Seller's possession.  With respect to each parcel of Owned Real Property, except as set forth in <u>Schedule 5.14(a)</u>: (i) the Company has good and marketable, indefeasible, fee simple title (and holds a valid and effective policy of title insurance), free and clear of all Liens, except

Permitted Liens; (ii) the Company has not leased or otherwise granted to any Person the right to use or occupy such Owned Real Property or any portion thereof; and (iii) there are no outstanding options, rights of first offer or rights of first refusal to purchase such Owned Real Property or any portion thereof or interest therein.

(b)    Schedule 5.14(b) lists all Real Property leased, subleased or occupied by the Company ("Leased Real Property"), including the name of the landlord (or sublandlord, as applicable) under the applicable Lease, the name of the entity holding such leasehold interest, the street address and unit number of each Leased Real Property.  Correct and complete copies of all leases, subleases or occupancy agreement and all amendments, extensions, renewals, guaranties and other agreements with respect thereto (collectively, the "Real Property Leases"), and in the case of any oral Real Property Lease, a written summary of the material terms thereof, have been made available to Buyer.  With respect to each Real Property Lease (i) each such Lease is legal, valid, binding, enforceable and in full force and effect, and the Company enjoys peaceful possession of such leased property in accordance with the respective Real Property Lease, (ii) the Company nor, to Seller's Knowledge, any other party to such Lease is in breach or default under such Lease in any material respect, and no event has occurred or circumstance exists which, with the delivery of notice, the passage of time or both, would constitute such a breach or default, or permit the termination, modification or acceleration of rent under such Lease, and (iii) the Company has subleased, licensed or otherwise granted anyone the right to use or occupy such Leased Real Property or any portion thereof.  To Seller's Knowledge, all work required to be done by the Company as a tenant in accordance with the applicable Real Property Lease has been duly performed.  No party to any Real Property Lease has provided written notice to the Company of its intent to cancel or terminate such Real Property Lease, and the Company has not waived or failed to enforce any right or benefit under any Real Property Lease in a manner that would be reasonably likely to materially affect such party's rights under such Real Property Lease following the Closing.  Except as set forth in Schedule 5.14(b), the consummation of the transactions contemplated by this Agreement will not result in a breach of, or default under, or require any Consent under, any Real Property Lease.

(c)    The Owned Real Property and the Leased Real Property constitutes all of the Real Property used, held for use or intended to be used in, otherwise related to, the Business.  There is no condemnation, expropriation or other proceeding in eminent domain, pending or, to Seller's Knowledge, threatened, affecting any parcel of the Owned Real Property or the Leased Real Property or any portion thereof or interest therein.  To Seller's Knowledge, all utility services or systems for the Leased Real Property have been installed and are operational and sufficient for the operation of the Business as currently conducted thereon.  To Seller's Knowledge, the classification of each parcel of Owned Real Property and Leased Real Property under applicable zoning laws, ordinances and regulations permits the use and occupancy of such parcel and the operation of the Business as currently conducted thereon, and permits the improvements located thereon as currently constructed, used and occupied.  To Seller's Knowledge, there are sufficient parking spaces, loading docks and other facilities at such parcel to comply with such zoning laws, ordinances and regulations.  The Owned Real Property and the Leased Real Property, or any easement affecting the Owned Real Property or the Leased Real Property, does not violate any

23

building lines or set-back lines, and there are no encroachments onto the Owned Real Property or the Leased Real Property or any portion thereof.

(d)     Notwithstanding the preceding, Seller makes no representation or warranty, and expressly disclaims any warranty, whatsoever with respect to any future use or suitability of the Owned Real Property and the Leased Real Property by Buyer that changes, increases, adds and/or expands in any materially different manner or respect beyond their present use and suitability.

**5.15    Leased Personal Property.**  Schedule 5.15 contains a correct and complete list of all leases and other agreements under which the Company leases, holds or operates any Personal Property owned by any other Person.  Seller has made available to Buyer correct and complete copies of all such leases and agreements.  All of such leases and agreements are valid, binding, enforceable and in full force and effect, there is no default by the Company thereunder and no event has occurred that, with notice or lapse of time or both, would constitute a default or permit termination, modification or acceleration thereunder.  To Seller's Knowledge, there is no default by any other party under any such leases or agreements.

**5.16    Employment Matters.**

(a)     Schedule 5.16(a) lists the name, date of hire and/or appointment of the Company's currently employed employees, and their current annual salary, commissions, allowances or wage rates, along with any arrangement to increase such annual salary, commissions, allowances or wage rates, of each present manager, director, officer, and employee of the Company, together with a statement of the nature of the services rendered. Copies of the following documents, information and data, to the extent that they exist, have been made available to Buyer and are listed in Schedule 5.16(a):

(i)     (A) whether each employee is a family member of Seller, (B) whether each employee qualifies as exempt or non-exempt and Seller's basis for any such exempt classification, (C) any agreement (whether written or oral) with any employee regarding any shift rate differences or shift rate premiums, or regarding overtime payment rates in excess of what is required by applicable Law, (D) the amount of vacation time that each employee is currently entitled to (and including any amounts that have been carried over from prior years), and the amount of vacation time that each employee has taken year to date, (E) the amount of paid sick time that each employee is currently entitled to on an annual basis and how much paid sick time remains accrued and unused to date, and (F) any change in compensation since January 1, 2020, insurance benefits, and all other benefits.

(ii)     a complete and accurate list of all Contracts between the Company and any of the Company's employees, a complete and accurate copy of which have been provided to Buyer.

(iii)     a list of current Employee Handbooks and Employee Policies issued by the Company to any of the Company's employees, a complete and accurate copy of which has been provided to Buyer.

24

(iv)     a list of any Contract of which Seller has Knowledge between any of the Company's Employees and a third party applicable to the operation of the Business, a complete and accurate copy of which have been provided to Buyer.

(b)     Schedule 5.16(b) contains a complete and accurate list of all:

(i)     the names of all service providers (both individuals and business entities) who are currently and/or were retained and/or classified as independent contractors/non-employees ("ICs") and issued a Form 1099 for "Nonemployee Compensation" during any of the years between 2017 and 2021 and/or are currently retained and will be issued a Form 1099 for "Nonemployee Compensation" for 2021 (year to date), and indicating in each case (A) such IC's date of retention, (B) a description of the services provided by each such IC, (C) such IC's rate and method of compensation (meaning whether payment is or was made by project, or by the hour, the day, the week, the month or some other period of time), (D) whether such IC is or was retained on an at-will basis or is subject to contractual limitations on the Company's ability to terminate the engagement of such IC, including severance obligations in the event of certain occurrences, (E) whether such IC is or was retained on an exclusive basis, (F) whether such IC has or had a written or oral agreement providing for retention, (G) whether the applicable Company was or is not able to control or direct what such IC does, either by contract or in actual practice; and (H) whether such IC performed or performs tasks outside of the Company's usual business (i.e. is or was engaged in an independently-established trade, occupation, or business).

(ii)     the names of all service providers (both individuals and business entities) who were retained and/or classified as independent contractors/non-employees during any of the years between 2017 and 2021 and were reclassified as employees by the Company.

(iii)     a list of all independent contractor or consultant agreements between the Company and any of its contractors or consultants, a complete and accurate copy of which have been provided to Buyer.

(c)     Schedule 5.16(c) contains a list of:

(i)     the names of all employees that were terminated or resigned from the Company on or after January 1, 2017, including but not limited to the names of the former employees, if any, identified as ineligible to work in the United States by the United States Immigration and Customs Enforcement Agency ("ICE"), indicating in each case whether such former employee resigned or was terminated.

(ii)     the terms of any termination and/or severance agreement or arrangement with each former employee identified on Schedule 4.16.

(iii)     the employee numbers and positions of any and all employees who were furloughed from January 1, 2020 to the present and the dates such furloughs took place.

(iv)    the employee numbers and positions of all employees who received emergency paid sick leave under the Families First Coronavirus Response Act (FFCRA) and the dates and amounts of paid sick leave received.

(v)    the employee numbers and positions of all employees who received emergency extended family leave under the Families First Coronavirus Response Act (FFCRA) and the dates and amounts of Extended family leave received.

(d)    The Company has been in compliance for the previous four (4) years and currently is in compliance in all material respects with all applicable Laws respecting employment and employment practices, terms and conditions of employment laws and regulations (including without limitation those relating to overtime, meal periods and rest breaks), wages and hours, and the classification of employees and independent contractors, and has not engaged in any unfair labor practice.  This includes without limitation:  (i) keeping accurate time records for nonexempt employees, (ii) paying for all "on-the-clock" or other worktime of employees, paying at least minimum wage for all hours worked, not merely by averaging the amount paid over the month or year, (iii) paying any overtime at 1.5 times the normal hourly rate and 2.0 times the normal hourly rate when applicable, (iv) classifying employees properly as exempt or nonexempt, (v) classifying workers properly as employees or independent contractors, (vi) maintaining a code-compliant policy for permitting uninterrupted meal periods and rest and recovery breaks, (vii) providing paycheck stubs that comply with the nine requirements of Labor Code Section 226(a), (viii) eliminating commission-only compensation, unless sales employees are properly classified as exempt, and (ix) eliminating all piece-rate compensation (including payment by-the-mile of drivers) unless minimum wage and overtime are properly accounted for and paid.

(e)    Except as disclosed on Schedule 5.16(e):

(i)    the Company is not a party to any collective bargaining agreement or other contract or agreement with any labor organization or other representative of any of its employees nor is any such contract or agreement presently being negotiated;

(ii)    there is no unfair labor practice or discrimination charge or complaint pending or, to Seller's Knowledge, threatened against or otherwise affecting the employees of the Company;

(iii)    there is no labor strike, slowdown, work stoppage, dispute, lockout or other labor controversy in effect, or, to Seller's Knowledge, threatened against or otherwise affecting the Company, and the Company has not experienced any such labor controversy within the past five (5) years;

(iv)    no grievance is pending or, to Seller's Knowledge, threatened from any employee of the Company;

(v)    the Company is not a party to any employment agreement, independent contractor agreement or consulting agreement with any Person or entity, nor is any such contract or agreement presently being negotiated;

26

(vi)     no Proceeding by or before any Governmental Authority brought by or on behalf of any employee, prospective employee, former employee, retiree, labor organization or other representative of the employees of the Company is pending or, to Seller's Knowledge, threatened;

(vii)     the Company is not a party to or otherwise bound by, any consent decree with, or citation by, any Governmental Authority relating to employees or employment practices, wages, hours, and terms and conditions of employment with respect to its business;

(viii)     the Company has paid in full, or accrued in their financial books and records, to all employees of the Company, all wages, salaries, commissions, bonuses, benefits and other compensation due to such employees or otherwise arising under any policy, practice, agreement, plan, program, statute or other law;

(ix)     the Company is not liable for any severance pay or other payments to any employee or former employee arising from the termination of employment, and the Company will not have any liability under any benefit or severance policy, practice, agreement, plan, or program which exists or arises, or may be deemed to exist or arise, under any applicable Law or otherwise, as a result of or in connection with the transactions contemplated by this Agreement or as a result of the termination by the Company of any Persons employed by the Company on or prior to the Closing Date;

(x)     the Company has not closed any plant or facility, effectuated any layoffs of employees or implemented any early retirement or separation program within the past five (5) years, nor has the Company planned or announced any such action or program for the future;

(xi)     the Company is not subject to Federal WARN 29 USCS § 2101 or the California Plant Closing Act, Lab Code § 1400 et seq. ("WARN Acts");

(xii)     the services of all essential employees of the Company will continue to be available on the same terms and at the same locations for the continuation of the Business of the Company after consummation of the transactions contemplated hereby;

(xiii)     to Seller's Knowledge, all current employees of the Company who work in the United States are, and all former employees of the Company who worked in the United States whose employment terminated, voluntarily or involuntarily, within the three years prior to the date of this Agreement, were legally authorized to work in the United States. The Company has completed and retained the necessary employment verification paperwork under the Immigration Reform and Control Act of 1986 ("IRCA") for the employees hired prior to the date of this Agreement, and the Company has complied with anti-discrimination provisions of the IRCA. Further, at all times prior to the date of this Agreement, the Company is in material compliance with both the employment verification provisions

27

(including the paperwork and documentation requirements) and the anti-discrimination provisions of IRCA;

(xiv)    no Company employee is employed with the Company for any specified period of time or provided any benefits (other than health, life and disability insurance), profit sharing, equity incentives or other rights that are not generally made available to other employees of the Company; and

(xv)    no Company employee is on leave of absence for any reason, including but not limited to military service, because of disability or pursuant to the Family and Medical Leave Act of 1993/or the California Family Rights Act (CFRA) and the Families First Coronavirus Response Act (FFCRA).

(f)    Seller makes no representation or warranty that any Company employee currently employed will continue their employment with the Company either before or after the Closing Date.

**5.17    Employee Benefit Plans**.

(a)    Schedule 5.17 contains a correct and complete list of all Employee Plans which the Company maintains or maintained, or under which the Company has or had any obligations, with respect to any employee or former employee, officer or former officer, director or former director, manager or former manager, now or at any time during the past five (5) years.

(b)    Except as disclosed on Schedule 5.17: (i) all accrued contributions, claims and other payments required to be made by the Company to any Employee Plan through the Closing Date have been made or reserves adequate for such purposes as of the Closing Date have been set aside therefore and reflected on the Pre-Closing Balance Sheet; (ii) the Company is not in default in any material respect in performing any of its contractual obligations under any of the Employee Plans or any related trust agreement or insurance contract, and there are no outstanding or unfunded liabilities of any Employee Plan other than liabilities for benefits to be paid to participants in such Employee Plan; and (iii) all such contributions are fully deductible under the Code as employer contributions.

(c)    The only qualified retirement plan that the Company maintains or has maintained during the past five (5) years is a defined contribution profit sharing plan (with a 401(k) feature).  The Company during the past five (5) years has not maintained, established, sponsored, participated in or contributed to any qualified defined contribution money purchase pension plan, qualified defined benefit pension plan (that is subject to ERISA Title IV and Code Section 412), a "multiemployer pension plan" (as defined in ERISA §3(37)), or a "multiple employer plan" as defined under ERISA and the Code.

(d)    The Company has not ever maintained, established, sponsored, participated in, contributed to or promised to establish (i) any "employee welfare benefit plan" (as defined in ERISA Section 3(1)) that provides benefits to or on behalf of any Person following retirement or other termination of employment (other than to the extent required by Code Section 4980B), (ii) any multiemployer or multiple employer welfare

28

arrangement, fund or plan (as defined under ERISA), or (iii) any "funded welfare plan" within the meaning of Code Section 419.

(e)     The Company has not maintained or entered into any Employee Plan or other document, plan or agreement that is considered a non-qualified deferred compensation arrangement (as defined under Code Section 409(A)), or that contains any change in control provisions which would cause an increase or acceleration of benefits or vesting or contains any benefit entitlements (including severance pay, unemployment compensation, or any other type of payment) to employees or former employees of the Company or other provisions, which would cause an increase in liability of the Company or to Buyer as a result of the transactions contemplated by this Agreement or any related action thereafter.

(f)     Except as set forth in Schedule 5.17, with respect to each of the Employee Plans:

(i)     each Employee Plan has been established, maintained, funded and administered in all material respects in accordance and compliance with its governing documents, and all applicable Law, including but not limited to the provisions of ERISA, the Code, COBRA, PPACA and HIPAA, and all regulations or rules promulgated thereunder; and the Company has no unsatisfied obligations to any employees or qualified beneficiaries pursuant to COBRA, HIPAA or any state Law governing health care coverage or extension;

(ii)     all disclosures to employees and all filings and other reports relating to each such Employee Plan and required (under ERISA, the Code, other applicable Law, including federal and state securities laws, and all regulations thereunder) to have been made or filed on or before the Closing Date have been or will be duly and timely made or filed by that date;

(iii)     there is no Proceeding (other than routine claims for benefits), pending or, to Seller's Knowledge, threatened or anticipated with respect to any such Employee Plan, its related assets or trusts, or any fiduciary, administrator or sponsor of such Employee Plan, including, but not limited to, any liability or penalty under Code Sections 4975 through 4980H;

(iv)     the Company has delivered to Buyer correct and complete copies of the following: the current Employee Plan document (including a written description of all oral Employee Plans), any amendments thereto, and the related summary plan description or summary annual reports, if any; each trust or custodial agreement and each deposit administration, group annuity, insurance or other funding agreement associated with each such Employee Plan; for the last three Employee Plan years, the financial information or reports (including any FASB required reports, if applicable), relating to each such Employee Plan; all Internal Revenue Service and other governmental agency rulings relating thereto, and all applications for such rulings; and all filing and reports (including the Annual Report Form 5500 series, if applicable) filed with any governmental agency at any time during the

29

three year period ending on the Closing Date, along with all schedules and reports filed therewith; and

(v)    neither any such Employee Plan nor any other Person or entity has engaged in a "prohibited transaction" (as defined in ERISA Section 406 or Code Section 4975) with respect to such Employee Plan, for which no individual or class exemption exists.

(g)    Except as set forth in Schedule 5.17, with respect to each Employee Plan which is an "employee pension benefit plan" (as defined in ERISA Section 3(2)):

(i)    each such Employee Plan which is intended to qualify as a tax qualified retirement plan under Code Section 401(a) has received a favorable determination letter(s) from the Internal Revenue Service (copies of which have been delivered to Buyer), or is subject to an opinion letter on a pre-approved plan on which the Employee Plan can rely, as to qualification of such Employee Plan covering the period from its adoption through the Closing Date; all amendments required to maintain such qualification have been timely adopted; nothing has occurred, whether by action or failure to act, which has resulted in or could reasonably be expected to cause the loss of such qualification (whether or not eligible for review under the Internal Revenue Service's Closing Agreement Program, Voluntary Compliance Resolution program or any similar governmental agency program); and

(ii)    Any trust maintained in connection with an Employee Plan (and from its establishment) has been exempt from federal income taxation under Code Section 501 and has not, at any time, had any "unrelated business taxable income" (as defined under the Code Section 512) and, to Seller's Knowledge, nothing has occurred with respect to the operation of any such Employee Plan that could cause the loss of such qualification of exemption or the imposition of any liability, penalty or tax under Law.

**5.18    Material Contracts.**

(a)    Schedule 5.18 contains a correct and complete list of the Contracts which are material to the Company's operations, to which the Company is a party or any of its assets are currently bound or subject (collectively, the "Material Contracts"), which includes:

(i)    each Contract, if any, that involves annual payments to or from the Company in excess of $25,000, in the aggregate, except for Contracts with customers or suppliers and Contracts relating to the Leased Real Property;

(ii)    each Contract, if any, relating to Indebtedness of the Company;

(iii)    each Contract, if any, for capital expenditures in excess of $10,000;

(iv)    each Contract, if any, with independent contractors, or consultants (or similar arrangements) in excess of $10,000;

(v)    each Contract, if any, in excess of $10,000 that limits the ability of the Company (or any manager, director or officer thereof) to compete in any line of business or with any Person or in any geographic area or during any period of time, or otherwise to conduct the Business as presently conducted or planned to be conducted, or to use or disclose any information in the possession of the Company; and

(vi)    each Contract, other than the lease with Seller to be executed pursuant to this Agreement, if any, in excess of $10,000 with any shareholder or any Affiliate or Related Person of the Company;

(vii)    each material license agreement, other than for off-the-shelf, commercially available, non-customized third-party Software; and

(viii)    each Preneed Agreement for undelivered funeral merchandise or services that have not been performed as of the Closing Date.

(b)    Except as set forth on Schedule 5.18(b), each Material Contract (i) is valid and in full force and effect and constitutes a legal, valid and binding obligation of the Company, and, to Seller's Knowledge, the other parties thereto, (ii) is enforceable in accordance with its terms, and (iii) will remain valid and in full force and effect after the Closing Date as a result of the transactions contemplated hereby, without any change or modification.  Correct and complete copies of each of the Material Contracts, including all amendments and supplements as of the date hereof, have been made available to Buyer.

(c)    The Company is not (with or without the lapse of time or the giving of notice, or both) in breach of or in default under any of the Material Contracts, and to Seller's Knowledge, no other party to any of the Material Contracts is (with or without the lapse of time or the giving of notice, or both) in breach of or in default under any of the Material Contracts.  There are no Contracts granting third parties a power of attorney on behalf of the Company.

**5.19    Suppliers.**    Except as set forth in Schedule 5.19, Seller does not have any Knowledge of any intention of or indication by a "Significant Supplier" to terminate its business relationship with the Company or to limit or alter its business relationship with them in any material respect.  The term "Significant Supplier" means any of the present ten (10) largest suppliers, by dollar volume, as set for in Schedule 5.19., of the Company during the three calendar year period 2019-2021.  Schedule 5.19 contains a true and correct list of the Significant Suppliers and the dollar volume of business with each Significant Supplier during the three calendar year period 2019-2021.

**5.20    Tax Returns and Taxes.**    Except as set forth on Schedule 5.20:

(a)    the Company has made copies of the Company's filed federal and state income Tax Returns for the past (4) years ("Filed Tax Returns") available to Buyer, and

has (i) timely filed all Tax Returns which are required to be filed by the Company with respect to any Taxes, and (ii) paid all Taxes due or assessed pursuant to the Filed Tax Returns;

(b)    all such Tax Returns were correct and complete and were prepared in compliance with all applicable Laws;

(c)    all such Tax Returns properly reflect the liabilities of the Company for Taxes for the periods, properties or events covered thereby;

(d)    there are not now any extensions of time in effect with respect to the dates on which any Tax Returns of the Company were or are due to be filed;

(e)    no waiver of any statute of limitations relating to Taxes for the Company is in effect;

(f)    any deficiencies, if any, asserted as a result of any examination by a Governmental Authority of any of the Tax Returns of the Company have been paid in full or finally settled;

(g)    no claims have been asserted and no proposals or deficiencies for any Taxes of the Company are being asserted, proposed or, to Seller's Knowledge, threatened, and no audit or investigation of any Tax Returns of the Company is currently underway, pending or, to Seller's Knowledge, threatened;

(h)    the Company has not received any notice of assessment of additional Taxes or executed or filed with any Governmental Authority any agreement or waiver extending the period of assessment for any Taxes or any deficiency thereof;

(i)    no claim has ever been made by a Governmental Authority in a jurisdiction where the Company conducts the Business that it did or does not file Tax Returns that the Company is or may be subject to taxation by that jurisdiction;

(j)    there are presently no Liens for Taxes (other than Taxes not yet due and payable) upon any of the assets of the Company;

(k)    the Company has withheld and paid all Taxes required to have been withheld and paid in connection with any amounts paid or owing to any employee, independent contractor, creditor, stockholder, or other third party;

(l)    all Taxes for periods beginning four (4) years before the Closing Date, have been paid or are adequately reserved against on the books of the Company;

(m)    the Company has not been audited by the Internal Revenue Service, the California Franchise Tax Board or any other applicable Tax Governmental Authority within the past five (5) years;

(n)      the Company is presently not a party to any Tax allocation agreement, Tax indemnity agreement, Tax sharing agreement or other similar Contract;

(o)      the Company (i) has not been a member of an affiliated group within the meaning of Code Section 1504(a) (or any similar group defined under a similar provision of state, local or foreign law) and (ii) has liability for Taxes of any person (other than the Company) under Treas.  Reg. sect.  1.1502-6 (or any similar provision of state, local or foreign law), as a transferee or successor by contract or otherwise;

(p)      the Company will not be required to include or accelerate the recognition of any item in income, or exclude or defer any deduction or other tax benefit, in each case in any taxable period (or portion thereof) after Closing, as a result of any change in method of accounting, closing agreement, intercompany transaction, instalment sale, or the receipt of any prepaid amount, in each case prior to Closing;

(q)      the Company has not participated in any reportable transaction as defined in Section 6707A of the Code or Treasury Regulation Section 1.6011-4(b) and (c)(3);

(r)      no transaction contemplated by this Agreement is subject to withholding under Section 1445 of the Code (relating to "FIRPTA");

(s)      there is no Contract, plan or arrangement covering any present, former or retired employee, director, independent contractor or consultant that, individually or collectively, provides for, or provided for, nor will anything in this Agreement result in, the payment of any amount or the provision of any benefit that is or could be treated as an "excess parachute payment" pursuant to Section 280G of the Code and the regulations thereunder;

(t)      The Company has not entered into a gain recognition agreement pursuant to Treasury Regulations Section 1.367(a)-8. The Company has not transferred an intangible the transfer of which would be subject to the rules of Section 367(d) of the Code;

(u)      None of the assets of the Company:  (i) constitute Tax-exempt use property or Tax-exempt bond financed property within the meaning of Section 168 of the Code; or (ii) are subject to a lease, safe harbor lease, or other arrangement as a result of which such assets are required for federal income Tax purposes to be treated as owned by a Person other than the Company;

(v)      The Company has been for all applicable time periods prior to the Closing Date and as of the Closing Date, taxed for federal income tax purposes as an "S-Corporation" under and pursuant to Subchapter S of the Code.  Neither the Company nor any owner, officer or, to Seller's Knowledge, employee of the Company has received any notices, warning letters or other statements asserting or otherwise indicating the commencement or intention to conduct an investigation, audit, or review regarding the termination or revocation of such "S-Corporation" election or status.  No proceeding or inquiry is pending or, to Seller's Knowledge, has been or is threatened, regarding the termination or revocation of such "S-Corporation" election or status;

(w)    during the three (3) years prior to the Effective Date, the Company has not been a party to any transaction treated by the parties thereto as one to which Section 355 of the Code applied;

(x)    the Company has not engaged in any "reportable transaction" for purposes of Treasury Regulations Sections 1.6011-4(b) or Code Section 6111 or any analogous provision of state or local Law for which reporting to the Internal Revenue Service or other Governmental Authority is required (taking into account published guidance thereunder); and

(y)    each Tax election made by or with respect to the Company was timely and properly made.

**5.21    Permits.** Schedule 5.21 contains a complete and accurate list of all Permits (other than Environmental Permits) used by the Company in the operation or conduct of the Business or that relate to the Company's assets. The Permits of the Company constitute all Permits that are necessary for the lawful operation or conduct of the Business as presently conducted and are required for the lawful use, lease, occupancy and ownership of the assets of the Company. The Company is in compliance with each of the Permits, and no event, to Seller's Knowledge, has occurred which constitutes or, after notice or lapse of time or both, would constitute a breach or default under any of the Permits or would permit revocation or termination of any of the Permits. Except to the extent described on Schedule 5.21 (including with respect to the cremation license for the Company that the Seller is acquiring for Antelope Valley), the Permits are in full force and effect and should be renewable based upon paying the annual renewal filing fees and performing other legal requirements in the Ordinary Course of Business. To Seller's Knowledge, none of the Permits should be adversely affected by consummation of the transactions contemplated by this Agreement, so long as Buyer timely and completely performs all of its obligations set forth in this Agreement to obtain the applicable Consents from the applicable Government Authorities, and file all required notices and other documents with them regarding this transaction, including those required to be filed with the Bureau regarding the assignment of the Company's funeral establishment licenses and the issuance of its crematory license. Notwithstanding the foregoing, Seller provides no guarantee that the Government Authorities, including the Bureau, will issue the required licenses to Buyer to lawfully operate the Business.

**5.22    Intellectual Property Rights.**

(a)    Schedule 5.22 contains a list of all Intellectual Property Rights owned or licensed by the Company other than off-the-shelf commercially available software. The Company is the owner of all right, title and interest in and to each of the Intellectual Property Rights that are listed as owned on Schedule 5.22, free and clear of all Liens except for any Permitted Liens, and, except as indicated on Schedule 5.22, has the right to use without payment to a third party all of the Intellectual Property Rights listed as licensed on Schedule 5.22. Except as indicated on Schedule 5.22, the Company has no, nor does it pay or receive any royalties on, any licenses and other agreements relating to the Intellectual Property Rights. To Seller's Knowledge, there is no material conflicting use, infringement or misappropriation of any such Intellectual Property Rights within the United States. Except as set forth on Schedule 5.22, to Seller's Knowledge, (i) no products made, sold or

distributed by the Company or service provided by the Company violate any license or infringes any intellectual property rights of any third party, and (ii) there are no pending claims or demands by

(b)     Any Net Names have been registered in the name of the Company.  No Net Name, if any, has been or is now involved in any dispute, opposition, invalidation or cancellation Proceeding and, to Seller's Knowledge, no such action is threatened with respect to any Net Name.

(c)     To Seller's Knowledge, except for commonly available off-the-shelf computer and workstation software programs, no Person (other than the Company) holds, manages or controls the Company Software or other software used in the operation of the Business of the Company in any manner without the Company's right and ability to maintain unhindered and continuous useful operation of such software.  To Seller's Knowledge, the Company has taken commercially reasonable steps and implemented commercially reasonable procedures, each consistent with industry practices and standards to ensure that the Company Software and internal computer systems (consisting of hardware, software, databases or embedded control systems, collectively with the Company Software, the "Company Systems") are free from all disabling codes or instructions, and all malware, viruses or other intentionally created (by any Person) undocumented contaminants.  The Company Systems have in place disaster recovery plans, procedures and facilities and have taken commercially reasonable steps consistent with industry practices and standards to safeguard the Company.

(d)

(e)     The Company has taken commercially reasonable efforts consistent with industry practices and standards to safeguard the security, confidentiality and integrity of the Company Systems, transactions and data, and protect against unauthorized access to the Company Systems or data.  To Seller's Knowledge, the Company has not suffered a security breach with respect to any of the Company Systems or data.  To Seller's Knowledge, there has been no unauthorized or illegal use of or access to the Company Systems or to any data.  The Company has not notified, or been required to notify, any Person of any information security breach involving user or customer data.

**5.23    No Pending Proceedings.**  Except as set forth in <u>Schedule 5.23</u>, there is no Proceeding pending or, to Seller's Knowledge, threatened against or affecting the Company or any of their respective properties or assets, at law or in equity, nor does Seller know of any reasonably likely basis for any such Proceeding.  There are presently no outstanding Governmental Orders of any Governmental Authority or any arbitrator against or affecting the Company or any of its properties or assets.  None of the pending or threatened Proceedings listed in <u>Schedule 5.23</u>, individually or in the aggregate, will or could reasonably be expected to have a Material Adverse Effect.

**5.24    Compliance with Laws.**

(a)     Except as set forth in Schedule 5.24, the current Business of the Company has been conducted in compliance in all material respects with all applicable Laws. No notice, citation, summons or order has been assessed and no investigation or review is pending or, to Seller's Knowledge, threatened by any Governmental Authority with respect to any alleged violation by the Company of any Law. To Seller's Knowledge, no event has occurred or circumstance exists that (with or without notice or lapse of time), could reasonably be expected to constitute or result in a violation by the Company of, or a failure on the part of the Company to comply with, any Law in any material respect.

(b)     The Company has at all times operated in reasonable compliance with applicable executive orders, quarantines, or similar guidelines from any governmental or administrative body with authority with respect to mitigation of the spread of COVID-19, including those requiring modifications of the operation of the workplace in response to the COVID-19 pandemic. The Company has not experienced any material number of employees testing positive for COVID-19 to the extent that its employees have provided such information to the Company.

**5.25     OSHA.** The facilities of the Company are maintained and operated in compliance with OSHA and any similar state statute and the rules and regulations promulgated thereunder in all material respects. Except as set forth in Schedule 5.25, the Company has not been subject to an investigation by the U. S. Department of Labor, litigation over compliance with such rules and regulations or any fine, penalty or citation relating to or arising out of a violation or alleged violation of OSHA and any similar state statute and such rules and regulations.

**5.26     Environmental/Health Safety Matters.** Except as set forth in Schedule 5.26:

(a)     The Company (including its assets, operations and Business) is not now, nor has previously been, in violation of or noncompliant with any applicable and required Environmental Laws or Environmental Permits.

(b)     To the extent required by Law, the Company currently holds and at all times has held all Environmental Permits that are or have been required for the operation of the Business of the Company as currently and formerly conducted. Schedule 5.26 contains (i) a description of all Environmental Permits currently held by the Company in connection with the operation of its Business, properties and assets, and identifies the, nature, duration and renewal dates of and the issuing governmental entity with respect to each Environmental Permit, and (ii) a complete list of all solid waste and hazardous waste disposal, treatment, and storage facilities which are presently or were used by the Company at any time in the operation of its Business for disposal of solid waste and Hazardous Materials. Each current Environmental Permit is valid and in good standing, and the Company has not been advised by any Governmental Authority of any actual or potential change in the status or terms and conditions of any Environmental Permit. To Seller's Knowledge, all applications for renewal, extension, reissuance or modification of Environmental Permits, or related submissions to any Governmental Authority, have been made in a complete and timely manner and the Company has no reason to believe that such application(s) will be denied, in whole or in part.

(c)    The generation, usage, Release, transportation, treatment, storage or disposal of any Hazardous Substance that may have been used in the operation of the Business have been (i) in compliance with Environmental Laws, and (ii) in a manner that would not give rise to any Environmental Claim or to any other liability or obligations under Environmental Laws.; no underground storage tanks, surface impoundments, landfills, asbestos containing materials or polychlorinated biphenyls are located at, on or under any property currently or formerly owned, leased or used by the Company.

(d)    To Seller's Knowledge, there has been no Release of any Hazardous Substance at, on or under any property or facility currently or formerly owned, operated or leased by the Company, or at any adjacent or off-site location, that has formed or could reasonably be expected to form the basis of any Environmental Claim against the Company or any obligation to perform Remedial Action by the Company.

(e)    To seller's Knowledge, there are no Environmental Claims pending or, to Seller's Knowledge, threatened against the Company.  The Company has not retained or assumed, either contractually or by operation of law, any liabilities or obligations that have formed or could reasonably be expected to form the basis of any Environmental Claim against the Company or any obligation to perform Remedial Action by the Company.

(f)    The Company has delivered to Buyer true and complete copies and results of any environmental reports, studies, analyses, tests or monitoring possessed or initiated by the Company, if any, pertaining to any Hazardous Substance in, on or under any property currently or formerly owned, leased or used by the Company in the operation of the Business, or concerning compliance by the Company or the Business with Environmental Laws.

**5.27    Investments.**

(a)    All funds received by the Company in connection with Preneed Agreements have been deposited on a timely basis in appropriate accounts and administered and reported in all material respects (i) in accordance with the terms of agreements with the purchasers and (ii) as required by applicable Law. On an aggregate basis, to Seller's Knowledge, the principal and interest earnings of the accounts, trusts or other deposits held pursuant to Preneed Agreements are equal to or greater than the cost of performing such Preneed Agreements.

(b)    The Company, and any preneed funeral trust or similar entity established by the Company, have good and marketable title to all securities and other investments (collectively, the "<u>Investments</u>") owned by the Company and any such trust or similar entity established by the Company.

(c)    As of the date of this Agreement, (i) none of the Investments is in default in any material respect, (ii) all Investments held in any trust or similar entity are in compliance with industry regulatory standards in all material respects and are owned and administered in accordance with standards such that the Investments, collectively, are prudent taking into account the needs of the Investments' beneficiaries, the need to preserve the corpus of

37

such trust or similar entity and the amount and regularity of income produced by the Investments, and (iii) Schedule 5.27 sets forth a list, by category, of the amount of each type of Investment owned by the Company.

**5.28    Preneed Trusts.**  Schedule 1.1 is a correct and complete list of all Preneed Trusts maintained by the Company.  Each Preneed Trust is duly established and validly existing under the Laws of the state of its creation and has the requisite power and authority to hold the property held in such trust, and to carry on the affairs of such trust as now being conducted.  To Seller's Knowledge, the trustee of each Preneed Trust has administered each such Trust in compliance with all applicable Laws.  Seller has made available to Buyer correct and complete copies of all documents governing each Preneed Trust.

**5.29    Preneed Insurance.**  To Seller's Knowledge, since January 1, 2017, the Company has exclusively used the insurance companies set forth in Schedule 5.29 to provide insurance products sold in connection with Preneed Agreements The Company owns no insurance subsidiaries or captive insurance company.

**5.30    Other Insurance Coverage.**  To Seller's Knowledge, the Company presently maintains, and has at all times prior to the date hereof maintained, liability, casualty, property loss and other insurance coverages upon its properties and with respect to the conduct of its Business in such amounts, of such kinds and with such insurance carriers as are generally deemed appropriate and sufficient for companies of a similar size engaged in similar types of business and operations.  Schedule 5.30 sets forth a complete and correct list of all current insurance policies maintained by the Company and indicating for each policy the insurance company, type of coverage, annual premium and whether the terms of such policy provide for retrospective premium adjustments.  Schedule 5.30 also sets forth all claims made under any such policy in the past five (5) years.  Each of such policies are valid, outstanding and enforceable and there is no default with respect to any provision contained in any such policy, nor has there been any failure to give any notice or present any claim under any such policy in a timely fashion or in the manner or detail required by the policy. The Company has paid all premiums due, and, to Seller's Knowledge, has otherwise performed all of its obligations, under each policy of insurance to which it is a party or that provides coverage to the Company.  No written notice of cancellation or non-renewal with respect to, or disallowance of any claim under, any such policy has been received by the Company. The Company has not been refused any insurance, nor has its coverage been limited by any insurance carrier to which it has applied for insurance or with which it has carried insurance during the last five (5) years.

**5.31    Warranty Claims**.  To Seller's Knowledge, except as set forth in Schedule 5.31, (a) the Company has made no oral or written warranties with respect to the quality or absence of defects of its products or services which are in force as of the date of this Agreement, and (b) there are no liabilities of or claims against the Company and no liabilities or claims are threatened against the Company, with respect to any product liability or product warranty (or similar claim) of the Company that relates to any product manufactured, shipped or sold or any service provided by the Company.

**5.32    Relationships with Affiliates and Related Persons.**  To Seller's Knowledge, neither the Company, nor Seller nor any Affiliate or Related Person of any of them has, or during

the past three years, has had, any interest in any property (whether real, personal or mixed and whether tangible or intangible) used in or pertaining to the Business, except for the Seller's lease to the Company of one of the Leased Real Properties.  To Seller's Knowledge, except as set forth in <u>Schedule 5.32</u>, the Company nor Seller nor any Affiliate or Related Person of any of them is a party to any Contract with, or has any claim or right against, the Company.

**5.33    Privacy Laws.**  The Company has complied in all material respects with all applicable Laws relating to privacy, data protection, and the collection and use of personal information.  To Seller's Knowledge, the Company has complied with any internal privacy policies and guidelines relating to privacy, data protection, and the collection and use of personal information.  To Seller's Knowledge, the Company takes reasonable measures to ensure that such information is protected against unauthorized access, use, modification, or other misuse.   To Seller's Knowledge, the Company has not experienced any incident in which personal information or other sensitive data was or may have been stolen or improperly accessed, and the Company is not aware of any facts suggesting the likelihood of the foregoing, including, any breach of security or receipt of any notices or complaints from any Person regarding personal information or other data.  True copies of the Company's privacy policies and guidelines, if any, have been made available to Buyer.

**5.34    Rollover Equity.**

(a)    Seller acknowledges that Seller is acquiring the Rollover Equity for investment for Seller's own account and not with a view to, or intention of, a sale in connection with, any distribution of any part thereof.  Seller acknowledges that the Rollover Units may not be sold, transferred, offered for sale, assigned, pledged, hypothecated or otherwise disposed of unless (i) such transfer, sale, assignment, pledge, hypothecation or other disposition is pursuant to the terms of an effective registration statement under the Securities Act, and the Rollover Equity is registered under any applicable state or foreign securities Laws or (ii) the Rollover Equity is sold pursuant to an exemption from registration under the Securities Act and any applicable state or foreign (including Canadian) securities Laws.  Seller acknowledges that the Rollover Equity and the issuance or transfer thereof have not been registered under the Securities Act or the securities Laws of any state or jurisdiction.

(b)    Seller is an "accredited investor" as defined in Canada's National Instrument 45-106 – Prospectus Exemptions.  Seller acknowledges that it is informed as to the risks of acquiring and ownership of the Rollover Equity.  Seller is an informed and sophisticated investor, and has engaged advisors, experienced in transactions of the type of the transactions contemplated by this Agreement and any documentation related to the Rollover Equity ("<u>Rollover Documentation</u>").  Seller has been given the opportunity to ask questions of and receive answers from Buyer and Anthem GP concerning the Rollover Equity, the Rollover Documentation and related matters.  Seller further represents that it has been furnished with, and has evaluated, all information it deems necessary, desirable and appropriate to evaluate the merits and risks of the acquisition of the Rollover Equity and the Rollover Documentation and has received such legal, financial, and other advice as deemed by it to be necessary, desirable and appropriate to enable it to make an informed and intelligent decision with respect to the execution, delivery and performance of this

39

Agreement, the Rollover Documentation and the other agreements and documents to be executed and delivered by it in connection herewith and therewith. In evaluating the suitability of the transactions contemplated by this Agreement and the Rollover Documentation, Seller has not relied upon any other representations, whether oral or written provided by or made on behalf of Buyer or any of its Affiliates, and is not relying on any implied representations or warranties as to the prospects or the likelihood of success of the business of Buyer or any of its Affiliates contained in any information whether oral or written provided by or on behalf of Buyer or any of its Affiliates.

**5.35    Brokers and Finders.** Neither Seller nor the Company has employed any broker or finder or incurred any liability for any financial advisory fees, brokerage fees, commissions or finders' fees, and no broker or finder has acted directly or indirectly for Seller or the Company in connection with this Agreement or the transactions contemplated herein, except for Johnson Consulting Group, whose fees shall be paid by Seller and are included among the Transaction Expenses.

**5.36    Disclosure.** No representation or warranty of Seller contained in this Agreement, and no statement contained in any certificate or Schedule furnished to Buyer pursuant hereto, contains any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements contained herein or therein, in light of the circumstances under which such statements are made, not misleading.

**5.37    No Other Seller Representation or Warranties.** Except as expressly set forth in Articles IV and V, Seller and the Company have not made any other representations or warranties whatsoever (implied, express or otherwise) to the Buyer.

## VI. REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Seller as of the Effective Date and as of the Closing Date, as follows:

**6.1    Organization.** Buyer is a corporation duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation. Buyer has all requisite corporate or other entity power and authority to own, lease and operate its properties and assets and to carry out its business as and where now being conducted.

**6.2    Authority and Enforceability.** Buyer has full corporate or other entity power and authority to execute and deliver this Agreement and to perform its obligations hereunder and to consummate the transactions contemplated hereby. The execution, delivery and performance of this Agreement, the Escrow Agreement, the Consulting Agreement and all other agreements and documents to be executed and delivered by Buyer pursuant to the provisions of this Agreement (the "Buyer Documents") and the consummation by Buyer of the transactions contemplated hereby and thereby have been duly authorized by all necessary corporate or other entity action on the part of Buyer and no other proceedings on the part of Buyer are necessary to authorize this Agreement or the Buyer Documents or to consummate the transactions contemplated hereby. This Agreement has been, and at the Closing the Buyer Documents shall be, duly and validly executed and delivered

by Buyer and constitute, or shall constitute, the legal, valid and binding obligation of Buyer enforceable against Buyer in accordance with their respective terms.

**6.3    Third-Party Consents.**  Except as set forth in <u>Schedule 6.3</u>, no Consent is required for the execution, delivery and performance of this Agreement and the Buyer Documents by Buyer and the consummation of the transactions contemplated hereby and thereby.

**6.4    No Conflict or Violation.**  Neither the execution and delivery of this Agreement or the Buyer Documents by Buyer nor the consummation by Buyer of any of the transactions contemplated hereby do or will (with or without notice or lapse of time or both) (a) contravene, conflict with or result in a violation of any provision of the Organizational Documents of Buyer; (b) contravene, conflict with or result in a violation of any Law or any Governmental Order to which Buyer is subject; or (c) contravene or conflict with, result in any breach of, constitute a default under, any Contract to which Buyer is a party.

**6.5    Investment Intent.**  Buyer is acquiring the Shares for its own account for investment and not with a view to their distribution within the meaning of Section 2(11) of the Securities Act.  Buyer understands that the Shares have not been registered under the Securities Act or any state securities laws and are being transferred to Buyer, in part, in reliance on the foregoing representation.

**6.6    Brokers and Finders.**  Buyer has not employed any broker or finder or incurred any liability for any financial advisory fees, brokerage fees, commissions or finders' fees, and no broker or finder has acted directly or indirectly for Buyer in connection with this Agreement or the transactions contemplated herein.

**6.7    Limitation on Warranties.**  Buyer hereby acknowledges and agrees that, except as expressly set forth in Articles IV and V or as and to the extent set forth in the Disclosure Schedules, Seller makes no, and Buyer is not relying upon any, representation or warranty, express or implied, with respect to the Company or the Shares.  Buyer acknowledges and agrees that in entering into this Agreement, it has relied and will rely on such representations and warranties and its own investigation and analysis pursuant to Buyer's Due Diligence.  With respect to any Company assets not otherwise addressed pursuant to Section 7.13 below, Buyer has not identified, including through its Due Diligence, any material unacceptable conditions in Company assets, except for any such conditions as are identified to Seller at least three (3) Business Days prior to Closing.

## VII.  COVENANTS

**7.1    Access and Investigation.**  Between the date of this Agreement and the Closing Date, and upon reasonable notice, Seller will, and shall cause the Company and its Representatives to (a) afford Buyer and its Representatives and prospective lenders and their Representatives (collectively, "<u>Buyer Group</u>") full and free access, during regular business hours, to the Company's personnel, properties (including subsurface testing), Contracts, Permits, books and records and other documents and data, such rights of access to be exercised in a manner that does not unreasonably interfere with the operations of the Company; (b) furnish Buyer Group with copies of all such Contracts, Permits, books and records and other existing documents and data as

Buyer may reasonably request; (c) furnish Buyer Group with such additional financial, operating and other relevant data and information as Buyer may reasonably request; (d) reasonable access to the Significant Suppliers of the Company in a manner as shall be mutually agreeable between Buyer and Seller, and (e) otherwise cooperate and assist, to the extent reasonably requested by Buyer, with Buyer's investigation of the properties, assets and financial condition related to the Company.  In addition, Buyer shall have the right to have the Real Property and Personal Property inspected by Buyer Group, at Buyer's expense, for purposes of determining the physical condition and legal characteristics of the Real Property and Personal Property, including subsurface or other destructive testing.  Buyer Group shall have access to the Real Estate and facilities thereon for the purpose of conducting appropriate environmental tests, inspections or investigations, including without limitation, Phase I and II environmental investigations or other intrusive testing or sampling of soil and groundwater, all at Buyer's expense.

     7.2    **Conduct of Business.**

     (a)    Except as otherwise contemplated by this Agreement, during the period from the date of this Agreement and continuing until the Closing Date, Seller will, and shall cause the Company to, operate the Business in the Ordinary Course of Business and to use all commercially reasonable efforts to:

     (i)    preserve the Business intact and conserve the goodwill related thereto;

     (ii)    preserve intact the present business organization of the Company, keep available the services of officers, employees and agents; and

     (iii)    preserve present relationships with suppliers, customers, lenders and others having business dealings with them.

     (b)    In connection with the foregoing, and without limiting the generality of the this Section 7.2, Seller will and shall cause the Company to:

     (i)    maintain supplies and other materials included in the Inventories at levels that are in the Ordinary Course of Business;

     (ii)    maintain its assets (including buildings, offices, properties and equipment) in the Ordinary Course of Business in good operating order and condition, reasonable wear and tear excepted;

     (iii)    continue to extend customers credit, collect Receivables and pay accounts payable and similar obligations and otherwise handle short-term assets and liabilities in the Ordinary Course of Business;

     (iv)    maintain in full force and effect and in the same amounts policies of insurance comparable in amount and scope of coverage to that now maintained by or on behalf of the Company;

(v)     continue to maintain its books and records in accordance with its historical practices;

(vi)     continue its cash management practices in the Ordinary Course of Business;

(vii)     confer with Buyer prior to implementing operational decisions of a material nature; and

(viii)     otherwise report periodically to Buyer concerning the status of its Business, operations and finances.

(c)     Without the prior written consent of Buyer, and without limiting the generality of any other provision of this Agreement, Seller will not, and shall cause the Company not to, take any affirmative action, or fail to take any reasonable action within its control, as a result of which any of the changes or events listed in <u>Section 5.9</u> would be likely to occur.

**7.3     Consents and Approvals.**  Each of the Parties shall cooperate with each other, and use their respective commercially reasonable efforts to take, or cause to be taken, all action, and to do, or cause to be done, all things necessary under applicable Laws to consummate the transactions contemplated by this Agreement as promptly as practicable after the date hereof, including obtaining all Consents of Governmental Authorities and other third parties necessary to consummate the transactions contemplated by this Agreement.

(a)     Without limiting the forgoing, the Buyer shall, at its sole expense, secure any and all Consents of Governmental Authorities necessary to consummate the transactions contemplated by this Agreement, including but not limited to those required by the Bureau, that must be timely completed in order that the Buyer and Company may properly and legally operate the Business from and after the Closing Date.  This includes, but is not limited to Buyer complying with all conditions imposed by the Bureau for such approvals, filing all applications for assignment of funeral establishment and issuance of crematory licenses, filing all Notifications of change of the Company's ownership, officers, managing funeral director, and preneed trustees, filing related Certification Affidavits, and any providing any other documents and taking any other actions as may be required for such approval by the Bureau.  Seller shall provide such information and assistance as is reasonably requested for Buyer to complete the requirements of the Bureau.

(b)     The Parties hereby acknowledge and agree that the risk of delay and/or unanticipated additional terms or conditions being imposed by the Governmental Authorities entities, including the Bureau, and other third parties necessary to consummate the transactions and obtain their consent and approvals as contemplated by this Agreement is beyond the control of the Parties.

**7.4     Update Schedules.**  Seller shall promptly disclose to Buyer any information contained in its representations and warranties or the Schedules which, because of an event occurring after the date hereof, is incomplete or is no longer correct as of all times after the date hereof until the Closing Date.  Such disclosures shall be deemed to modify, amend or supplement

the representations and warranties of Seller and the Schedules hereto for the purpose of <u>Articles IV and V</u> hereof if they are provided to Buyer at least three (3) Business days prior to the Closing Date and Buyer has consented thereto in writing.  If Buyer has any objections to the updated Schedules, Buyer will provide such objections writing prior to the Closing Date.

**7.5     Exclusivity.**  Seller grants to Buyer the exclusive right to acquire the Shares until the Final Termination Date.  Seller will not, and shall cause the Company not to, directly or indirectly (a) solicit, initiate or encourage the submission of any proposal or offer from any Person relating to the acquisition of the Shares or any other equity or voting securities, or any substantial portion of the assets of, the Company (including any acquisition structured as a merger, consolidation or share exchange) or (b) participate in any discussions or negotiations regarding, furnishing any information with respect to, assist or participate in, or facilitate in any other manner any effort or attempt by any Person to do or seek any of the foregoing.

**7.6     Confidentiality.**

(a)     Unless and until the Closing has been consummated, Buyer will hold, and shall cause its Representatives to hold, in confidence any confidential data or information made available to Buyer in connection with this Agreement with respect to the Company and its Business using the same standard of care to protect such confidential data or information as is used to protect Buyer's confidential information.  If the transactions contemplated by this Agreement are not consummated, Buyer shall return or cause to be returned to Seller all written materials and all copies thereof that were supplied to Buyer by Seller or the Company that contain any such confidential data or information, provided that Buyer may retain one copy of such confidential data and information in secure storage for use in any dispute related to this Agreement.

(b)     From and after the Closing Date, Seller shall hold, and shall cause their respective Representatives to hold, in confidence all confidential data or information with respect to the Company and the Business and all terms and conditions of this Agreement using the same standard of care to protect such confidential data or information or terms and conditions as it used to protect such confidential information prior to the Closing Date.

**7.7     Noncompetition/Nonsolicitation**.

(a)     The Parties acknowledge that Seller has owned and operated the Company in the state of California and has developed the goodwill of the Company.  To induce Buyer to purchase the Shares, and as consideration for Seller transferring all of his equity interests in the Business along with all good will attendant thereto to the Buyer, Seller agrees that for a period lasting until the third (3rd) anniversary of the Closing Date (the "**Restricted Period**") within the limits of Los Angeles County, San Bernardino County, or Ventura County, California (the "**Restricted Territory**"), Seller shall not, directly or indirectly, alone or for the account of any other Person:

(i)     either as employee, employer, consultant, agent, principal, partner, trustee, advisor, officer, director, manager, shareholder, member or in any other individual or representative capacity, own, manage, control, advise, support,

44

finance, operate, engage or participate in the ownership, management, operation or control of or be connected in any manner with any business, partnership, joint venture, corporation, trust or other organization or entity which is or may be in competition with the funeral home, mortuary, crematory, cemetery, burial or pre-need marketing business of the Company or Buyer; notwithstanding the above, Seller may own up to one percent (1%) of the stock of any publicly traded corporation, provided that no public acknowledgement of such stock ownership is made by any Person in any way which could reasonably constitute an endorsement of such publicly-traded company by Seller;

(ii)    interfere with, solicit, disrupt or attempt to disrupt any past, present or prospective relationship, contractual or otherwise, between Company or Buyer and any former, existing or prospective customer, client, supplier, employee or agent or request or advise any such Person to withdraw, curtail or cancel their business with Company or Buyer or induce or attempt to induce any such Person to breach their agreements with Company or Buyer; or

(iii)    divulge, transmit or otherwise disclose or cause to be disclosed, or use personally, any Confidential Information, other than as may be required by Law or legal process.

(b)    Seller agrees that the terms and conditions of the restrictive covenants in this Section 7.7 are reasonable and necessary for the protection of the Company and Buyer and to prevent damage or loss to Company or Buyer as a result of actions taken by Seller. Seller further agrees that the consideration provided to Seller in this Agreement is sufficient to compensate Seller fully and adequately for agreeing to the restrictions contained in this Section 7.7. It is agreed by the Parties that if any portion of the restrictive covenants set forth above is held to be unreasonable, arbitrary or against public policy, then each such covenant shall be considered divisible both as to time and geographical area, with each month of a specified period being deemed a separate period of time and each city being deemed a separate geographical area, it being the intention of the Parties that a lesser period of time or geographical area shall be enforced so long as the same is not unreasonable, arbitrary or against public policy.

**7.8    Termination of Pension Plans**. At least one day before Closing, Seller shall cause the Company to cease any sponsorship of, participation in, obligation to contribute to and otherwise terminate the Company's existing 401(k) plan and any other Company-sponsored pension plan (as defined in ERISA Section 3(2)) (collectively referred to as the "Pension Plan"). Seller shall cause to be taken all further actions as may be necessary to implement Pension Plan termination and/or discontinuance of sponsorship or contribution by the Company of the Pension Plan in a manner that complies with all applicable Law, including, but not limited to, timely adoption (at least one day before Closing) of resolutions of the Company's governing bodies approving plan termination and of a plan termination amendment; preparation, submission and dissemination of annual reports (form 5500); timely provision of any required notices to participants, trustees and administrators; and processing the final distribution of plan assets and final wind-up of the Plan.

7.9     **Assistance in Proceedings**.  In the event and for so long as any Party is actively contesting or defending against any Proceeding brought by a third party in connection with any action, activity, circumstance, condition, conduct, event, fact, failure to act, incident, occurrence, plan, practice, situation, status or transaction involving the Business, the other Party shall reasonably cooperate with the contesting or defending Party and its Representatives in the contest or defense, make available its personnel and provide any testimony and access to its books and records as may be reasonably requested in connection with the contest or defense, at the sole cost and expense of the contesting or defending Party (unless such contesting or defending Party is entitled to indemnification therefor under Article X, in which case, the costs and expense shall be borne by the Parties in accordance with Article X).

7.10     **Retention of and Access to Books and Records.**  After the Closing Date, Buyer shall retain for a period consistent with Buyer's record-retention policies and practices the books and records of the Company, but in no event less than seven (7) years after the Closing Date. Buyer shall provide Seller and its Representatives reasonable access thereto, during normal business hours and on at least three days' prior written notice, to enable them to prepare financial statements or tax returns or deal with tax audits.

7.11     **Further Assurances.**  Seller, after the Closing, without further consideration, shall execute, acknowledge, and deliver any further deeds, assignments, conveyances, and other assurances, documents, and instruments of transfer, reasonably requested by Buyer, and shall take any other action consistent with the terms of this Agreement that may reasonably be requested by Buyer for the purpose of assigning, transferring and delivering the Shares to Buyer or to better enable Buyer to complete, perform or discharge any of the liabilities or obligations assumed by Buyer.  Each of the Parties hereto will, without further consideration unless otherwise agreed, cooperate with the other and execute and deliver to the other Parties hereto such other instruments and documents and take such other actions as may be reasonably requested from time to time by any other Party hereto as necessary to carry out, evidence and confirm the intended purposes of this Agreement.

7.12     **Press Releases.**  Except as required by applicable Law, no Party to this Agreement shall give notice to third parties or otherwise make any public statement or releases concerning this Agreement or the transactions contemplated hereby except for such written information as shall have been approved in writing as to form and content by the other Parties, which approval shall not be unreasonably withheld.

7.13     **Buyer Objections.**

(a)     Buyer shall notify Seller in writing of all title objections uncovered pursuant to Buyer's Due Diligence no less than five (5) business days prior to Closing.  No later than five (5) business days after receipt of the Buyer's title objections, Seller shall notify Buyer either that (i) Seller will correct such title objections or cause the Title Company to insure over any such title objections (in which case Seller shall state with specificity as to how such correction will be accomplished), or (ii) Seller will not correct such title objections.  If Seller elects to correct such title objections, then Seller will do so in a manner reasonably satisfactory to Buyer at or prior to Closing.  Notwithstanding anything contained herein to the contrary, Seller shall be obligated to satisfy all Mandatory Removal

Liens by no later than the Closing Date. As used herein, the term "Mandatory Removal Liens" means: (i) amounts secured by liens, deeds to secure debt, security deeds, deeds of trust, mortgages, security agreements, security interests, UCC financing statements or other similar liens which can be discharged by a sum certain of money, (ii) real estate taxes and assessments that are due and payable (subject to proration adjustments as provided herein), (iii) liens against the Real Property whether voluntarily or involuntarily created by the acts or omissions of Seller, or any other party acting by or through Seller which can be discharged by a sum certain of money, and (iv) any mechanics liens affecting all or any portion of the Real Property.

(b)     If Seller elects not to correct any title objections with respect to the Real Property, then Buyer may, (i) as its sole and exclusive remedy (except to the extent that the title objection is a result of a default by Seller hereunder), terminate this Agreement no later than 5:00 p.m. Eastern time on the date which is five (5) business days after receipt of Seller's election not to correct any title objections (other than Mandatory Removal Liens), (ii) purchase the Real Property and consummate the transaction without any reduction in the Purchase Price, except that in the event of any failure by Seller to cure any Mandatory Removal Liens on or prior to the Closing Date, Buyer may proceed to Closing with title to the Real Property as it then exists, with the right to deduct from the Purchase Price a sum equal to the aggregate amount necessary to cure or remove (by endorsement or otherwise, in form and substance reasonably acceptable to Buyer) the Mandatory Removal Liens that Seller has failed to cure and remove, or (iii) agree with Seller to proceed to Closing, but for any exceptions set forth in the Title Policy as of Closing other than Permitted Encumbrances or other title objections outstanding as of Closing, including Post-Closing Exceptions, if any, Seller shall correct such matters withing thirty (30) days post-Closing.

**7.14     Transfer of Excluded Assets.**  Immediately upon Closing Date, the Company shall transfer title and possession to all of the Excluded Assets, including but not limited to its Cash, to Seller, subject to Section 2.3(c).  The Parties shall cooperate with each other regarding the transfer of the Cash from the Company's accounts to Seller to mitigate any disruption to the Company and its Business operations.

## VIII.   TAX MATTERS

**8.1     Apportionment of Taxes**.  Any Taxes of the Company for a taxable period beginning on or before and ending after the Closing Date ("Straddle Period") shall be apportioned between the Pre-Closing Tax Period and Post-Closing Tax Period based, (i) in the case of property Taxes and similar ad valorem obligations ("Property Taxes"), the amount of such Property Taxes for the entire Straddle Period multiplied by a fraction, the numerator of which is the number of days in the portion of the Straddle Period ending on the Closing Date and the denominator of which is the number of days in the entire Straddle Period and (ii) in the case of other Taxes, on an interim closing of the books as of the close of the Pre-Closing Tax Period.  The amount of Property Taxes shall be reapportioned within thirty days after the date of the receipt of the bill for the actual Property Taxes for the Straddle Period.  Seller shall be responsible for all Taxes of the Company attributable to any Pre-Closing Tax Period and, subject to Section 8.8, all Taxes of Seller for all

periods.  Buyer shall be responsible for all Taxes of the Company attributable to any Post-Closing Tax Period.

**8.2**    **Filing of Tax Returns**.

(a)    Except as otherwise provided in this <u>Section 8.2(a)</u>, Seller shall prepare, or cause to be prepared, all Tax Returns of the Company for periods ending on and including the Closing Date that have not been filed by the Closing Date ("<u>Pre-Closing Tax Returns</u>").  Seller shall prepare, or cause to be prepared, the Pre-Closing Tax Returns in a manner consistent with the past practice of Company.  The Seller shall timely file all such Pre-Closing Tax Returns described in this <u>Section 8.2(a)</u>; <u>provided</u>, <u>however</u>, if any such Pre-Closing Tax Return is filed after the Closing and Seller is not authorized to execute and file such Tax Return by applicable Law, Buyer shall execute and file (or cause to be filed) such Tax Return with the appropriate Governmental Authority, in such case, subject to Buyer's approval of such Pre-Closing Tax Return, which approval shall not be unreasonably withheld, conditioned or delayed.  Seller shall pay all Taxes due and payable in respect of all such Pre-Closing Tax Returns of the Company; <u>provided</u>, <u>however</u>, that if any Pre-Closing Tax Return is due after the Closing and is to be filed (or caused to be filed) by Buyer, Seller shall pay to Buyer by wire transfer of immediately available funds to the bank account designated by Buyer an amount of cash equal to the amount of Taxes shown as due on such Pre-Closing Tax Return (determined pursuant to this <u>Section 8.2(a)</u>) no later than five Business Days prior to the earlier of the date such Tax Return is filed or the final due date of such Pre-Closing Tax Return.

(b)    Buyer shall prepare, or cause to be prepared, all Tax Returns for periods that begin during the Pre-Closing Tax Period and end after the Closing Date ("<u>Straddle Tax Returns</u>").  Buyer shall deliver or cause to be delivered a copy of each such Straddle Tax Return and any supporting work papers and schedules to Seller for their review and approval at least thirty days prior to the final due date (taking into account valid extensions), which approval shall not be unreasonably withheld, conditioned or delayed.  If Seller disputes any item on any such Straddle Tax Return, Seller shall notify Buyer (by written notice within fifteen days of receipt of such draft of such Straddle Tax Return) of such disputed item (or items) and the basis for its objection.  If Seller does not object by written notice within such period, the amount of Taxes shown to be due and payable on any such Straddle Tax Return shall be deemed to be accepted and agreed upon, and final and conclusive, for purposes of this <u>Section 8.2(b)</u>.  In the event that such disagreement has not been resolved within five days of Buyer's receipt of the notice of disagreement from Seller, then the disagreement will be submitted to the Reviewing Accountant for resolution in accordance with principles set forth in <u>Section 2.4(c)</u> (and if the Reviewing Accountant is unable to make a determination with respect to a disputed item prior to the due date for the filing of such Straddle Tax Return, such Straddle Tax Return shall be filed in accordance with Buyer's reasonable position).  Seller shall pay to Buyer by wire transfer of immediately available funds to the bank account designated by Buyer an amount of cash equal to the amount of Taxes shown as due on such Straddle Tax Returns attributable to the Pre-Closing Tax Period (allocated to Seller pursuant to <u>Section 8.1</u>) no later than five Business Days prior to the earlier of the date such Straddle Tax Return is filed or the final due date of such Straddle Tax Return.

48

(c)    Buyer and Seller agree to file, or cause to be filed, all relevant Tax Returns on the basis that the purchase and sale contemplated herein shall occur for Tax purposes as of the close of business on the Effective Date, unless the relevant Tax authority will not accept a Tax Return filed on that basis.

**8.3**    **Refunds and Credits**.  Any credits or offsets of Taxes of the Company for any Pre-Closing Tax Period shall be for the account of Seller, provided that any credits or offsets that are conditioned on the maintenance of certain conditions by Buyer after the closing shall be for the account of Buyer except to the extent such credits are otherwise deducted from the Purchase Price or subject to a Working Capital Adjustment actually paid.  Any credits or offsets of Taxes of the Company for any Post-Closing Tax Period shall be for the account of Buyer.  Any credits or offsets of Taxes of the Company for any Straddle Period shall be equitably apportioned between Seller and Buyer.

**8.4**    **Transfer Taxes**.  All sales, use and transfer taxes, including any value added, stock transfer, gross receipts, stamp duty and real, personal, or intangible property transfer taxes (collectively, "Transfer Taxes"), due by reason of the consummation of the purchase of the Shares hereunder, including any interest or penalties in respect thereof, shall be borne fifty percent (50%) by Buyer and fifty percent (50%) by Seller.  Seller and Buyer shall cooperate with each other and use their commercially reasonable efforts to minimize the Transfer Taxes attributable to the transfer of the Shares.

**8.5**    **Cooperation on Tax Matters**.

(a)    Seller and Buyer agree to cooperate, each at its own cost and expense, and shall cause their respective Affiliates, officers, employees, agents, auditors and representatives to cooperate, and to furnish or cause to be furnished to the other, upon request, as promptly as practicable, such information (including access to books and records) and assistance relating to the Company as is reasonably necessary for the filing of any Tax Return, the preparation for any Tax audit, the prosecution or defense of any Proceeding relating to any proposed Tax adjustment for which Seller or Buyer retains liability under this Article VIII.  Buyer and Seller shall keep all such information and documents received by them confidential unless otherwise required by Law.

(b)    Buyer and Seller agree to retain or cause to be retained all books and records in their possession pertinent to the Company until the applicable period for assessment of Taxes under applicable Law (giving effect to any and all extensions or waivers) has expired, and such additional period as necessary for any administrative or judicial proceedings relating to any proposed assessment, and to abide by and cause the Company to abide by all record retention agreements entered into with any Taxing authority.  Seller and Buyer agree to give the other reasonable notice prior to transferring, discarding or destroying any such books and records relating to Tax matters and, if so requested, Seller and Buyer shall allow the requesting Party to take possession of such books and records.

(c)    Buyer and Seller shall cooperate with each other in the conduct of any audit or other proceedings for any Tax purposes and they shall each execute and deliver such

powers of attorney and other documents as are reasonably necessary to carry out the intent of this Agreement.

**8.6    Tax Proceedings**.  Buyer agrees to give written notice to Seller of the receipt of any written notice by the Company, Buyer or any of Buyer's Affiliates which involves the assertion of any claim, or the commencement of any proceeding, in respect of which an indemnity may be sought by Buyer pursuant to this Agreement (a "Tax Proceeding"); provided, that failure to comply with this provision shall not affect Buyer's right to indemnification hereunder.  Buyer and Seller shall cooperate with any contest or resolution of any Tax Proceeding; provided, however, that Seller shall be entitled to participate in the defense of such Tax Proceeding and to employ counsel of its choice for such purpose, the fees and expenses of which separate counsel shall be borne solely by Seller.

**8.7    Tax Actions**.  Without the prior written consent of Buyer, Seller (and, prior to the Closing, the Company, its Affiliates and their respective Representatives) shall not, to the extent it may affect, or relate to, the Company, make, change or rescind any Tax election, amend any Tax Return or take any position on any Tax Return, take any action, omit to take any action or enter into any other transaction that would have the effect of increasing the Tax liability or reducing any Tax asset of Buyer or the Company in respect of any Post-Closing Tax Period.  Seller agree that Buyer is to have no liability for any Tax resulting from any preceding actions of Seller, the Company, their Affiliates or any of their respective Representatives, and agree to indemnify and hold harmless Buyer (and, after the Closing Date, the Company) against any such Tax or reduction of any Tax asset.

**8.8    Tax Consequences of Transaction**.

(a)    The Parties acknowledge that (i) if the Code is amended is amended during calendar 2022 with such amendment being retroactive to apply to the transactions contemplated by this Agreement, such that (ii) the capital gains treatment of the proceeds of the transactions contemplated by this Agreement when received by the Seller is less favorable under the Code, as amended, than it would have been had the Closing occurred during calendar 2021, and results in an increased tax liability to Seller as compared to what the tax liability would have been for a transaction that closed in calendar 2021, (iii) and/or an additional surcharge on modified adjusted gross income is assessed, then (iv) Buyer and Seller will negotiate in good faith to determine a fair and equitable amount of the increase in tax liability incurred by Seller to be reimbursed by Buyer.

(b)    If, within thirty (30) days after Seller submits its applicable federal tax returns, Buyer and Seller are not able to arrive at an equitable agreement with respect to Seller's increased tax liability, then the Parties shall submit the matter to a partner having relevant expertise and practicing at the Reviewing Accountant, who shall prepare pro forma federal tax returns for the Seller based on a Closing in calendar 2021 and review the federal tax returns submitted for calendar 2022, and determine the applicable increase in Seller's tax liability with respect to capital gains treatment.  Buyer shall then reimburse Seller for the difference reflected in Seller's increased tax liability, as calculated by the Reviewing Accountant.

50

(c)    Any amount paid by Buyer to Seller pursuant to this Section 8.8 shall be treated by the Parties as an adjustment to the purchase price with respect to the transactions contemplated by this Agreement, for tax purposes, unless otherwise required by law, with further payment by Buyer for any further adverse tax impact.  This Section 8.8 shall only apply if Closing actually occurs.

## IX.  CONDITIONS TO CLOSING

**9.1    Conditions to Obligations of Buyer.**  The obligations of Buyer to consummate the transactions provided for by this Agreement are subject, at the discretion of Buyer, to the satisfaction at or prior to the Closing of each of the following conditions:

(a)    Each of the representations and warranties of Seller contained in this Agreement shall have been true and correct in all material respects on and as of the date hereof and shall be true and correct in all material respects on and as of the Closing Date as if originally made on and as of the Closing Date, except that (i)  those representations and warranties that are made as of a specific date shall be determined as of such date and (ii)  each of those representations and warranties in Sections 4.1, 4.4, 5.1, 5.2 and 5.6, and each of those representations and warranties that are qualified or limited as to materiality (including the word "material") or Material Adverse Effect shall be true and correct in all respects.

(b)    All of the agreements and covenants that Seller is required to perform or comply with pursuant to this Agreement at or prior to the Closing Date shall have been performed or complied with in all material respects.

(c)    Since the date of this Agreement, there shall not have occurred a Material Adverse Effect, or any events, changes, developments or effects which, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

(d)    Seller shall have executed and delivered to Buyer a certificate (the "Seller's Closing Certificate") as to compliance with the conditions set forth in Sections 9.1(a), 9.1(b) and 9.1(c).

(e)    Each of the Consents specified in Schedule 5.4 shall have been obtained in form and substance satisfactory to Buyer and shall be in full force and effect, except those required from the Bureau.  Copies of such Consents shall have been delivered to Buyer. The Parties agree that the Consents required by the Bureau can be obtained after the Closing Date.

(f)    Buyer shall have received, at its sole expense, with respect to each parcel of Real Property: (i) a marked up commitment for an ALTA 2006 owner's policy of title insurance issued by a title company reasonably acceptable to Buyer (the "Title Company") in an amount not less than the aggregate allocated purchase price, as reasonably determined by Buyer, committing the Title Company to insure Buyer or the Company, as applicable, as the fee simple owner of each parcel of Real Property with such endorsements as Buyer shall request, including but not limited to an owner's affidavit and non-imputation endorsement, (ii) a certified ALTA survey of each parcel of Real Property containing such detail as Buyer

51

shall require in its sole discretion, certified to Buyer, the Title Company and, if applicable, such underwriters or lending institutions as Buyer shall desire, and (iii) zoning reports, or zoning letters from local municipalities, in each case in such form and substance as reasonably acceptable to Buyer.

(g)     Buyer shall have obtained from Buyer's lenders any necessary funds required to finance the transactions contemplated by this Agreement, and any necessary consents and approvals from such lenders.

(h)     All of the deliveries required to be made by the Company and Seller shall have been made in accordance with Section 3.2.

(i)     Buyer shall have received the evidence of the discharge of all Seller Transaction Expenses, in form and substance reasonably satisfactory to Buyer, other than such Seller Transaction Expenses paid pursuant to Section 3.3.

(j)     No Proceeding shall have been instituted by any Person which seeks to prohibit, restrict or delay consummation of the transactions contemplated herein or any of the conditions material to consummation of the transactions contemplated herein.

**9.2     Conditions to Obligations of Seller.** The obligations of Seller to consummate the transactions provided for by this Agreement are subject, in the discretion of Seller, to the satisfaction at or prior to the Closing Date of each of the following conditions:

(a)     Each of the representations and warranties of Buyer contained in this Agreement shall have been true and correct in all material respects on and as of the date hereof and shall be true and correct in all material respects on and as of the Closing Date as if originally made on and as of the Closing Date, except that (i) those representations and warranties that are made as of a specific date shall be determined as of such date and (ii) each of those representations and warranties in Section 6.2 and each of those representations and warranties that are qualified or limited as to materiality (including the word "material") or Material Adverse Effect shall be true and correct in all respects.

(b)     All of the agreements and covenants that Buyer is required to perform or comply with pursuant to this Agreement at or prior to the Closing Date shall have been performed or complied with in all material respects.

(c)     Buyer shall have executed and delivered to Seller a certificate (the "Buyer's Closing Certificate") as to compliance with the conditions set forth in Sections 9.2(a) and 9.2(b).

(d)     All of the deliveries required to be made by Buyer shall have been made in accordance with Section 3.3.

(e)     No Proceeding shall have been instituted by any Person which seeks to prohibit, restrict or delay consummation of the transactions contemplated herein or any of the conditions material to consummation of the transactions contemplated herein.

## X.  INDEMNIFICATION

**10.1    Indemnification by Seller**.  Seller shall indemnify and hold harmless Buyer, the Company, their successors and assigns, and their respective officers, directors, members, shareholders, employees, agents and Affiliates ("Buyer Indemnified Persons") from and against, and shall reimburse Buyer Indemnified Persons for, any and all losses, liabilities, claims, obligations, damages, deficiencies, actions, judgments, regulatory, legislative or judicial proceedings or investigations, assessments, levies, fines, penalties, costs, Legal Expenses or diminution in value, whether or not involving a third-party claim (collectively, "Losses"), arising out of, based upon or in any way relating to:

(a)    any misrepresentation in or breach of any representation or warranty of Seller set forth in Article IV or Article V of this Agreement or the Schedules, or in any certificate, transfer instrument, or other instrument delivered by Seller pursuant to this Agreement;

(b)    any breach or nonfulfillment of any covenant, agreement or other obligation of Seller in this Agreement or in any certificate or instrument delivered by Seller pursuant to this Agreement;

(c)    any claims by third parties to the extent caused by acts or omissions of the Company or Seller on or prior to the Closing Date, including claims for Losses which arise or arose out of Seller's operation of the Business or by virtue of Seller's ownership of the Company on or prior to the Closing Date;

(d)    any (A) Existing Indebtedness or Seller Transaction Expenses that are not paid out of the Purchase Price pursuant to the terms of this Agreement or not otherwise subject to a Working Capital Adjustment actually paid, (B) dividends or distributions or other obligations to any shareholder, member or purported shareholder or member, or bonuses paid to employees in connection with the transactions contemplated by this Agreement, or (C) any Proceedings initiated with respect to the Company prior to the Closing Date, including, but not limited to, those matters set forth on Schedule 5.23 (Proceedings);

(e)    any Seller Tax Liabilities; and

(f)    any of the liabilities in Section 5.17(f)(i).

**10.2    Indemnification by Buyer.**  Buyer shall indemnify and hold harmless Seller ("Seller Indemnified Persons") from and against, and shall reimburse Seller Indemnified Persons for, any and all Losses arising out of, based upon or in any way relating to:

(a)    any Material misrepresentation in or breach of any Material representation or warranty of Buyer set forth in this Agreement or in any certificate, transfer instrument, or other instrument delivered by Buyer pursuant to this Agreement;

(b)    any breach or nonfulfillment of any Material covenant, agreement or other obligation of Buyer in this Agreement or in any certificate or instrument delivered by Buyer pursuant to this Agreement; and

(c)    any claims by third parties to the extent caused by the acts or omissions of the Company or Buyer after the Closing Date, including claims for Losses which arise out of Buyer's operation of the Business or by virtue of Buyer's ownership of the Company after the Closing Date.

**10.3    Defense of Third-Party Claims.**  If any legal proceedings shall be instituted or any claim is asserted by any third party in respect of which any Party hereto may have an obligation to indemnify another Party, the Party asserting such right to indemnity (the "Indemnified Party") shall give the Party from whom indemnity is sought (the "Indemnifying Party") written notice thereof, but any failure to so notify the Indemnifying Party shall not relieve it from any liability that it may have to the Indemnified Party other than to the extent the Indemnifying Party is actually prejudiced thereby.  The Indemnifying Party shall have the right, at its option and expense, to participate in the defense of such proceeding or claim, but not to control the defense, negotiation or settlement thereof, which control shall at all times rest with the Indemnified Party, unless the Indemnifying Party (i) admits in writing its liability to the Indemnified Party hereunder with respect to such proceeding or claim; (ii) furnishes satisfactory evidence that the Indemnifying Party has adequate financial resources to defend against the such proceeding or claim and fulfill its obligations under this Article X, in each case no later than ten (10) Business Days after the Indemnified Party gives written notice of such proceeding or claim, and (iii) conducts such defense actively and diligently, in which case, the Indemnifying Party may assume such control at its expense through counsel reasonably satisfactory to such Indemnified Party; provided, however, that:

(a)    the Indemnified Party shall be entitled to participate in the defense of such claim and to employ counsel at its own expense to assist in the handling of such claim; provided, however, that the employment of such counsel shall be at the expense of the Indemnifying Party if the Indemnified Party determines in good faith that such participation is appropriate in light of defenses not available to the Indemnifying Party, conflicts of interest or other similar circumstances;

(b)    the Indemnifying Party shall obtain the prior written approval of the Indemnified Party before entering into any settlement of such claim or ceasing to defend against such claim (with such approval not to be unreasonably withheld);

(c)    no Indemnifying Party shall consent to the entry of any judgment or enter into any settlement that does not include as an unconditional term thereof the giving by each claimant or plaintiff to each Indemnified Party of a release from all liability in respect of such claim; and

(d)    the Indemnifying Party shall not be entitled to control (but shall be entitled to participate at its own expense in the defense of), and the Indemnified Party shall be entitled to have sole control over, the defense or settlement of (A) any claim to the extent the claim seeks an order, injunction, non-monetary or other equitable relief against the

Indemnified Party which, if successful, could materially interfere with the business, operations, assets, condition (financial or otherwise) or prospects of the Indemnified Party or (B) any claim relating to Taxes.

After written notice by the Indemnifying Party to the Indemnified Party of its election to assume control of the defense of any such action, the Indemnifying Party shall not be liable to such Indemnified Party hereunder for any Legal Expenses subsequently incurred by such Indemnified Party in connection with the defense thereof except as provided above.  If the Indemnifying Party does not assume control of the defense of such claim as provided in this Section 10.3 or if the Indemnifying Party does not actively and diligently conduct the defense of such claim, the Indemnified Party shall have the right to defend such claim in such manner as it may deem appropriate at the cost and for the account and risk of the Indemnifying Party to the extent that it is finally determined or agreed that the Indemnifying Party is obligated to provide indemnification to the Indemnified Party in accordance with the terms of this Agreement.  Notwithstanding any in this Agreement, there shall not be any time limitations for the Parties to bring indemnity claims or lawsuit against each other based upon a third-party claim.

**10.4    Other Claims.**  A claim for indemnification between the Parties based upon any matter not involving a third-party claim shall be asserted by the Indemnified Party to the Indemnifying Party in writing, setting forth specifically the obligation with respect to which the claim is made, the facts giving rise to and the alleged basis for such claim and, if known or reasonably ascertainable, the amount of the liability asserted or which may be asserted by reason thereof, but any failure to so notify the Indemnifying Party shall not relieve it from any liability that it may have to the Indemnified Party other than to the extent the Indemnifying Party is actually prejudiced thereby.  In the event the Indemnifying Party disputes its obligation to indemnify the Indemnified Party under this Section 10, the Indemnifying Party shall have thirty (30) days after receipt of notice under this Section 10.4 to give written notice of such objection, and the grounds therefor, and the Indemnified Party shall thereafter have thirty (30) days to respond in writing to the objection of the Indemnifying Party.  If after such thirty (30) day period there remains a dispute as to any obligation, the Parties shall attempt in good faith for thirty (30) days to agree upon the rights of the respective Parties with respect to such indemnification obligation.  If no such agreement can be reached after good faith negotiation, either Party may submit the dispute for resolution in accordance with the provisions of Section 12.1.

**10.5    Survival.**  Subject to the time limitations of this Section 10.5, all representations, warranties, covenants and obligations of the Parties contained in this Agreement and in any certificate, document, writing or instrument delivered pursuant to this Agreement shall survive the Closing and the consummation of the transactions contemplated by this Agreement.  The representations and warranties of each Party contained in this Agreement shall survive the Closing for a period of twelve (12) months following the Closing Date, provided, however, that (i) the representations and warranties of Seller set forth in Sections 4.1 (Authority and Enforceability), 4.4 (Ownership of Shares), 5.1 (Organization), and 5.6 (Capitalization) shall survive indefinitely, (ii) the representations and warranties of Seller set forth in Sections 5.26 (Environmental/Health Safety Matters) shall survive the Closing for a period of eighteen (18) months following the Closing Date, and (iii) the representations and warranties set forth in Section 5.17(f)(i) (Employee Plans) and Section 5.20 (Tax Returns and Taxes), shall survive until 60 days after the running of the applicable statute of limitations with respect to the taxable period to which the particular claim

relates (Sections <u>4.1</u>, <u>4.4</u>, <u>5.1</u>, <u>5.6</u>, <u>5.17(f)(i)</u>, <u>5.20</u>, and <u>5.26</u> being collectively referred to as the "<u>Fundamental Representations</u>"). Any claim for indemnity under <u>Sections 10.1(a)</u> or <u>10.2(a)</u> shall be asserted in writing within 90 days following the expiration of the foregoing time periods, except in any case for claims arising as a result of fraud or intentional misrepresentation, as to which the limitations of this <u>Section 10.5</u> shall not apply. If notice of a claim (setting forth in reasonable detail, to the extent known, the facts, circumstances and basis of the claim) is provided by the date on which a particular claim would otherwise expire, such claim shall survive until the final resolution thereof.

**10.6    Indemnification Limitations.**

(a)    Except for Losses relating to breaches of Fundamental Representations and Losses arising as a result of fraud or intentional misrepresentation, as to which the limitations of this <u>Section 10.6</u> shall not apply, (i) Buyer Indemnified Persons may not assert any claim for Losses under <u>Sections 10.1(a)</u> until the aggregate amount of such claims under this Agreement exceed $25,000 (the "<u>Basket Amount</u>"), and then Buyer Indemnified Persons may assert claims for all such Losses relating back to the first dollar; and (ii) in no event shall the aggregate liability of Seller for claims of Losses under <u>Sections 10.1(a)</u> exceed $2,800,000.

(b)    Except for Losses arising as a result of fraud or intentional misrepresentation, as to which the limitations of this <u>Section 10.6</u> shall not apply, Seller Indemnified Persons may not assert any claim for Losses under <u>Section 10.2(a)</u> until the aggregate amount of such claims under this Agreement exceed Basket Amount, and then Seller Indemnified Persons may assert claims for all such Losses relating back to the first dollar.

(c)    Notwithstanding anything to the contrary in this Agreement, for purposes of the indemnification provisions in this <u>Article X</u>, the determination of the amount of any Losses shall, in each case, be made without giving effect to any material adverse effect qualification or any materiality or similar qualification contained in the representations, warranties, covenants or agreements herein or in the Schedules or Exhibits hereto.

(d)    No Indemnified Person shall have a right to indemnification with respect to any special, punitive or exemplary damages incurred or suffered by an Indemnified Person hereunder, and in no event shall Losses include a Person's special, punitive or exemplary damages unless such damages relate to a third party claim.

(e)    For purposes of computing the amount of Losses incurred or paid by a Person, there shall be deducted an amount equal to the amount of any insurance proceeds (other than those with respect to any self-insurance program of the Indemnified Party), indemnification payments, or contribution payments that are actually received by such Person in connection with such Losses or the circumstances giving rise thereto, after taking into account any costs and expenses incurred in collecting such insurance proceeds or other payments or increase in insurance premiums as a result of such claim.

(f)     Each Indemnified Party that becomes aware of a Loss for which it seeks indemnification under this <u>Article X</u> shall use commercially reasonable efforts in accordance with applicable Law to mitigate such Loss; provided, however, the costs and expenses incurred by the Indemnified Party in connection with taking such commercially reasonable efforts shall be deemed Losses for purposes of this <u>Article X</u>.

**10.7    Exclusive Remedy.**  The Parties hereby acknowledge and agree that from and after the Closing, subject to the right of Parties to seek specific performance and injunctive relief pursuant to <u>Section 12.11</u>, the exclusive remedy of the Parties hereto with respect to any and all claims arising in connection with the transactions contemplated under this Agreement shall be pursuant to the provisions set forth in this <u>Article X</u> and in <u>Article XII</u>.  Notwithstanding anything to the contrary contained herein, nothing in this Agreement will in any way limit the remedies an Indemnified Party may seek in instances of fraud or intentional misrepresentation.

**10.8    Limitation of Damages.**  In no event shall either Party be liable to the other for any special, incidental, punitive, statutory or consequential damages, lost profits, penalties or any multiple of actual damages, whether based on breach of contract, tort (including negligence) or otherwise, and whether or not that Party has been advised of the possibility of such damages, and the Parties hereby waive all such damages, unless any such damages are actually awarded pursuant to a third-party claim as described in this <u>Article X</u>.

# XI. TERMINATION

**11.1    Termination.**  This Agreement may be terminated at any time prior to Closing:

(a)     by mutual consent of Buyer and Seller;

(b)     by either Buyer or Seller if there has been a material breach of any representation, warranty, covenant or agreement on the part of the other Party set forth in this Agreement that has not been cured by the breaching Party within ten days after the non-breaching Party has notified the breaching Party;

(c)     by either Buyer or Seller at any time after February 28, 2022 (the "<u>Final Termination Date</u>"), <u>provided that</u> if the Closing shall not have occurred by the Final Termination Date as the result of a breach of this Agreement, then any Party responsible for such breach may not avail itself of the right under this <u>Section 11.1</u>, and <u>provided further that</u> in any such event, the non-breaching Party(ies) shall not be deprived of any remedy hereunder or at law against the breaching Party;

(d)     by Buyer if the Closing shall not have occurred on the Closing Date by reason of the failure of any of the conditions specified in <u>Section 9.1</u>, other than <u>Section 9.1(g)</u>, and such failure has not been waived by Buyer (unless the failure results primarily from Buyer itself breaching any representation, warranty or covenant contained in this Agreement);

(e)     by Seller if the Closing shall not have occurred by the Closing Date by reason of the failure of any of the conditions specified in Section 9.2 and such failure has not been waived by Seller (unless the failure results primarily from Seller breaching any representation, warranty or covenant contained in this Agreement); or

(f)     by either Buyer or Seller if a California court of competent jurisdiction or Governmental Authority shall have issued an order, decree or ruling or taken any other action, in each case permanently restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement and such order, decree, ruling or other action shall have become final and non-appealable.

**11.2    Effect of Termination.**  In the event of termination of this Agreement by either Buyer or Seller, as provided above, this Agreement shall forthwith terminate and there shall be no liability on the part of either Seller or Buyer or Buyer's officers or directors, except that nothing herein shall relieve any Party from liability for any breach by a Party hereto of any of its representations, warranties, covenants or agreements set forth in this Agreement; provided, however, that the obligations of the Parties set forth in Section 7.6 (Confidentiality) and this Section 11.2 and Article XII hereof shall survive such termination.

## XII.  OTHER PROVISIONS

**12.1    Dispute Resolution.**

(a)     Any dispute arising under this Agreement shall be settled by arbitration in Los Angeles, California, except as provided in Section 2.4.

(b)     It is the intention of the Parties that the arbitration award will be final and binding, shall not be appealable and that a judgment of any California court having jurisdiction thereof may be rendered upon the award, and enforcement may be had according to its terms.  This agreement to arbitrate shall be specifically enforceable against each of the Parties.

(c)     Except as otherwise set forth in this Section 12.1, Buyer and Seller agree that any claim they may have against the other arising out of or related to the transaction contemplated by this Agreement and/or the terms, interpretation and/or enforcement (including any dispute regarding the interpretation of this arbitration clause) shall be submitted to and finally resolved by binding arbitration in accordance with the California Arbitration Act (Code of Civil Procedure §1280 et seq.) ("Arbitration Rules") Notwithstanding the discovery provisions set forth therein, each Party shall have the right to conduct discovery as if the matter was a civil action pending in a California superior court.

(d)     When a matter has been submitted for arbitration, within (thirty) 30 days of such submission, Buyer and Seller will use their good faith best efforts to agree on a single independent arbitrator.  If Buyer and Seller are unable to agree on an independent arbitrator within such 30 day period, the independent arbitrator will be selected by petitioning a court according to the procedures of the Arbitration Rules.

58

(e)    The Parties hereto agree that an action to compel arbitration pursuant to this Agreement may be brought in any court of competent jurisdiction in California. Application may also be made to any such court for confirmation of any decision or award of the arbitrators, for an order of enforcement and for other remedies which may be necessary to effectuate such decision or award. The Parties hereto hereby consent to the jurisdiction of the arbitrators and of such court and waive any objection to the jurisdiction of such arbitrator and court.

(f)    One or more of the Parties to any arbitration proceeding commenced hereunder shall be entitled as a part of the arbitration award to the costs and expenses (including reasonable attorneys' fees and interest on any award) of investigating, preparing and pursuing an arbitration claim as such costs and expenses are awarded by the arbitration panel.

(g)    The Parties hereto agree that the provisions of this Section shall not be construed to prohibit any Party from obtaining, in the proper case, specific performance or injunctive relief with respect to the enforcement of this Agreement as set forth in Section 12.11.

**12.2    Appendices, Exhibits and Schedules.**  All Recitals, Appendices, Exhibits and Schedules referred to herein are intended to be and hereby are specifically made a part of this Agreement.

**12.3    Amendment.**  This Agreement and the Appendices, Exhibits and Schedules hereto may not be amended except by an instrument in writing signed on behalf of each of the Parties hereto.

**12.4    No Waiver.**  No failure of any Party to exercise any power given it under this Agreement, or to insist upon strict compliance with any provision of this Agreement, and no custom or practice at variance with the terms of this Agreement shall constitute a waiver any such Party's right to demand strict compliance with the terms of this Agreement.

**12.5    Entire Agreement.**  This Agreement, together with the Appendices, Exhibits and Schedules hereto, constitutes the entire Agreement between the Parties pertaining to the subject matter hereof and supersedes all prior and contemporaneous agreements, understandings, negotiations and discussions, whether oral or written, of the Parties.

**12.6    Governing Law.**  This Agreement shall be governed by, construed, interpreted and the rights of the Parties determined in accordance with the laws of the State of California (regardless of the laws that might be applicable under principles of conflicts of law).

**12.7    Notices.**  All notices and other communications hereunder shall be in writing and shall be deemed given (a) on the day of service if served personally on the Party to whom notice is given, (b) on the next Business Day when sent by a nationally recognized overnight courier, or (c) on the date sent by facsimile or e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient, and properly addressed as follows:

If to Buyer, addressed to:

Mr. William Andrews
6160 Warren Parkway
Suite 100
Frisco, Texas 75034
E-mail: wandrews@anthempartners.com

with a copy (which will not constitute notice) to:

Dykema Gossett PLLC
39577 Woodward Avenue - Suite 300
Bloomfield Hills, Michigan 48304-2820
Attention:    Jeanne Whalen
E-mail:        jwhalen@dykema.com

If to Seller, addressed to:
William H Hawkins
9811 Amestoy Avenue
Northridge CA 91325
Email:  w.hawkins@angelenomortuaries.com
Mobile Phone:  818-257-1865
FAX:  None

with a copy (which will not constitute notice) to:

Nicholas P. Forestiere
Gurnee Mason Rushford Bonotto & Forestiere LLP
2240 Douglas Blvd., Suite 150
Roseville, California  95661
Attention:    Nicholas P. Forestiere
Facsimile:    916-797-3100
E-mail:        nicholas@gurneelaw.com

or to such other place and with such other copies as such Party may designate as to itself by written notice to the others.

**12.8    Execution of Agreement.**  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Copies (whether electronic, fax or otherwise) of this Agreement may be made and relied upon to the same extent as an original.  The exchange of copies of this Agreement and of signature pages by fax transmission or e-mail shall constitute effective execution and delivery of this Agreement as to the Parties and may be used in lieu of the original Agreement for all purposes.  Signatures of the Parties transmitted by fax or e-mail shall be deemed to be their original signatures for all purposes.

60

**12.9   Expenses.**   Regardless of whether the transactions contemplated hereby are consummated, each Party hereto shall pay its or their own costs and expenses, including legal, accounting, consulting and other professional fees and any broker's or finder's fees, incurred in connection with the negotiation, preparation, investigation, and performance by such Party of this Agreement and the transactions contemplated hereunder.

**12.10   Successors and Assigns; No Third Party Beneficiaries.**

(a)      No Party may assign any of its rights or delegate any of its obligations under this Agreement without the prior written consent of the other Parties, except that Buyer may assign any of its rights and delegate any of its obligations under this Agreement to any Subsidiary of Buyer and may collaterally assign its rights hereunder to any financial institution providing financing in connection with the transactions contemplated by this Agreement. Subject to the preceding sentence, this Agreement will apply to, be binding in all respects upon and inure to the benefit of the successors and permitted assigns of the Parties. Nothing expressed or referred to in this Agreement will be construed to give any Person other than the Indemnified Parties and the Parties to this Agreement any legal or equitable right, remedy or claim under or with respect to this Agreement or any provision of this Agreement, except such rights as shall inure to a successor or permitted assignee pursuant to this Section 12.10. This Agreement and all of its provisions and conditions are for the sole and exclusive benefit of the Parties to this Agreement and their successors and assigns.

(b)      Notwithstanding anything to the contrary, the Parties agree that nothing in this Agreement shall preclude Buyer or any of its affiliates from providing its lenders with a security interest in its rights under this Agreement in accordance with the terms of their security and collateral agreements in connection with any credit facility provided by such lenders to such Person, or preclude such lenders from foreclosing upon such security interest in accordance with the terms of such security and collateral agreements, and any such action by such lenders shall not be deemed to violate any of the assignment provisions of this Section 12.10.

**12.11   Enforcement by Injunction**.   The Parties hereto agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that the Parties hereto shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to specifically enforce the terms and provisions of this Agreement, in addition to any other remedy to which any Party is entitled at law or in equity, without any obligation to post a bond or other security. In the event that any action shall be brought in equity to enforce the provisions of this Agreement, no Party shall allege, and each Party hereby waives the defense, that there is an adequate remedy at law.

[Signature Page Follows]

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

**Anthem Holdings (USA), Inc.**

By: _____

Name: William Andrews
Its:      President


**Seller**

**The William H Hawkins Revocable Trust**

_____
By: William H. Hawkins, Co-Trustee

_____
By: Glenn Gomez, Co-Trustee

[Signature Page to Stock Purchase Agreement]

# EXHIBIT B

# Anthem

— P A R T N E R S —

WHERE LEGACY LIVES.

As of March 29, 2022

William H. Hawkins Revocable Trust
9811 Amestoy Avenue
Northridge, CA 91325
Email: w.hawkins@angelenomortuaries.com
Attn: William H. Hawkins

cc to:

Gurnee Mason Rushford Bonotto & Forestiere LLP
2240 Douglas Blvd., Suite 150
Roseville, California 95661
Attn: Nicholas P. Forestiere
Email: nicholas@gurneelaw.com

Re:     Closing Matters

Dear Mr. Hawkins:

This letter refers to that certain that certain Stock Purchase Agreement, dated as of February 18, 2022 (the "Purchase Agreement"), by and between Anthem Holdings (USA), Inc., a Delaware corporation ("Buyer"), and the William H. Hawkins Revocable Trust, by William Hawkins and Glenn Gomez, as Co-Trustees ("Seller").  Buyer and Seller may collectively be referred to as the "Parties" and each, individually, as a "Party."  This letter is being sent to you with respect to certain matters in connection with the Closing pursuant to the Purchase Agreement.  Terms not otherwise defined in this letter shall have the meanings given to them in the Purchase Agreement.

1.    Payment of Purchase Price and Related Matters.  Notwithstanding the provisions of the Purchase Agreement, and particularly Article II and Section 3.3 thereof:

(a)    at the Closing, Buyer will pay a portion of the Purchase Price to Seller by issuing a Promissory Note in the original principal amount of $8,000,000 (the "Seller Note").

(b)    there will be no Working Capital Adjustment at Closing; the Final Purchase Price will be calculated in accordance with Section 2.4.

(c)    the Escrow Fund will be deposited with the Escrow Agent on the Maturity Date, as defined in the Seller Note, and not on the Closing Date.

(d)    the Rollover Equity will be issued following the Maturity Date, and not the Closing Date.

1

2.      <u>Final Termination Date</u>

"<u>Final Termination Date</u>" as defined in the Purchase Agreement is replaced with March 31, 2022.

3.      <u>General  Provisions</u>

(a)     <u>Incorporation by Reference</u>.  This letter agreement is an integral part of the Purchase Agreement and incorporated by reference therein, and shall be interpreted in a manner that is consistent with the obligations of the Parties thereunder.

(b)     <u>Counterparts</u>. This letter agreement may be executed in any number of several counterparts (including by facsimile or other electronic transmission), shall be governed by, and construed and interpreted in accordance with, the laws of the State of Delaware, without reference to conflicts of law provisions, and shall inure to the benefit of and be binding upon Buyer, Sellers, Sellers' Representative, and their respective successors and assigns.

[Signature Page Follows]

Very truly yours,

**ANTHEM HOLDINGS (USA), INC.**

By: _____

Name:  William Andrews
Title:    President


**ACCEPTED AND AGREED**

**The William H Hawkins Revocable Trust**

_____
By: William H. Hawkins, Co-Trustee


_____
By: Glenn Gomez, Co-Trustee


[*Signature Page to Side Letter*]

Very truly yours,

**ANTHEM HOLDINGS (USA), INC.**

By: _____
Name:  William Andrews
Title:   President

**ACCEPTED AND AGREED**

**The William H Hawkins Revocable Trust**

By: William H. Hawkins, Co-Trustee

By: Glenn Gomez, Co-Trustee

*[**Signature Page to Side Letter**]*

EXHIBIT C

**PROMISSORY NOTE**

$9,000,000                                                                                    March 29, 2022

FOR VALUE RECEIVED, Anthem Holdings (USA), Inc., a Delaware corporation (the "**Maker**") hereby promises to pay to the order of William H. Hawkins Revocable Trust (the "**Noteholder**"), the principal sum of Nine Million United States Dollars ($9,000,000) (the "**Principal Amount**"), or such amount as is then outstanding, on the Maturity Date (as defined below).

1.      **Term.**  The Maker shall pay the entire unpaid Principal Amount, all unpaid interest accrued on the Principal Amount, and all other obligations arising under this Note on June 27, 2022 (the "**Maturity Date**").  All of the Maker's obligations under this Note shall survive the Maturity Date until all such obligations are paid in full.

2.      **Interest.**  The Principal Amount will bear simple interest at 12% per annum, calculated daily.  Interest will be calculated on the basis of a year of 360 days.

3.      **Payment Schedule.**

(a)      Beginning on May 1, 2022 and on the first business day of each month thereafter prior to the Maturity Date, the Maker shall make monthly interest-only payments of $90,000 until the Maturity Date.  On the Maturity Date, the Maker shall pay to the Noteholder, by wire transfer of immediately available funds, the entire unpaid Principal Amount, all remaining accrued but unpaid interest, and any other obligations arising under this Note.

(b)      The Maker may prepay all or any portion of the obligations arising under this Note at any time without penalty or premium.  All prepayments shall be applied in the following order:  first, to any unpaid fees or reimbursement obligations arising under this Note; second, to accrued but unpaid interest; and third, to unpaid Principal Amount.

4.      **Covenant Not to Encumber.**  Subject to Section 4, and to any liens of record prior to the date of this Note, unless Noteholder consents thereto in advance and in writing, Maker will not grant any further security interest in or encumber or pledge the outstanding capital stock or assets (except in connection with sales of inventory in the ordinary course of business) of Angeleno Mortuaries, Inc., a California corporation, or any portion thereof, or contract to do any of the preceding until the obligations pursuant to this Note have been fully performed.

5.      **Event of Default.**  An "**Event of Default**" shall mean receipt by Maker of Noteholder's written notice that the Note is in default as a result of the occurrence of one or more of the following events:

(a)      Maker has failed to pay when due the Principal Amount, any installment of such amount or interest thereon pursuant to this Note, or any other obligations under this Note; or

121265.000008 4871-4906-0631.5

(b)      Maker shall (i) make a general assignment for the benefit of creditors, (ii) institute any proceeding seeking to adjudicate it bankrupt or insolvent, or seeking liquidation, winding up, or reorganization, under any law relating to bankruptcy, insolvency or reorganization or relief of debtors, or fail to object to any such proceeding being instituted against it, or (iii) consent to appoint a trustee, receiver, or the like with respect to its assets.

If, whenever, and as often as there shall have occurred an Event of Default, Noteholder shall be entitled to exercise its rights under this Note and the rights and remedies provided by law, including those contained in the Uniform Commercial Code in force in Delaware.

**6.      Waivers.**  The Maker hereby waives presentment, demand, protest and notice of any kind.  No failure to exercise, and no delay in exercising any rights under this Note on the part of the holder of this Note shall operate as a waiver of such rights.

**7.      Waiver of Jury Trial.  The Maker and the Noteholder irrevocably waive trial by jury in any action or proceeding with respect to this Note.**

**8.      Entire Note.**  With respect to the subject matter of this Note, this Note, together with any documents, instruments and certificates explicitly referred to herein or otherwise required by this Note, constitutes the entire agreement among the parties hereto with respect to the subject matter hereof and supersedes any and all prior discussions, negotiations, proposals, undertakings, understandings and agreements, whether written or oral, with respect thereto.

**9.      Amendment and Waivers.**  Except as specifically otherwise provided in this Note, no amendment or waiver of any provision of this Note will be valid and binding unless it is in writing and signed, in the case of an amendment, by the Maker and Noteholder or in the case of a waiver, by the party against whom the waiver is to be effective.  No waiver by any party of any breach or violation or, default under or inaccuracy in any representation, warranty or covenant hereunder, whether intentional or not, will be deemed to extend to any prior or subsequent breach, violation, default of, or inaccuracy in, any such representation, warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent such occurrence.  No delay or omission on the part of any party in exercising any right, power or remedy under this Note will operate as a waiver thereof.

**10.      Governing Law.**  This Note shall be governed and construed in accordance with the Laws of the State of Delaware (except to the extent that mandatory provisions of federal law are applicable) without reference to conflicts of law provisions.

**11.      Notices.**  All notices, requests, demands, claims and other communications required or permitted to be delivered, given or otherwise provided under this Note must be in writing and must be delivered, given or otherwise provided: (a) by hand (in which case, it will be effective upon delivery); or (b) by overnight delivery by a nationally recognized courier service (in which case, it will be effective on the Business Day after being deposited with such courier service); and (c) by email, in each case, to the address or email address listed below:

To Noteholder:

        William H. Hawkins Revocable Trust
        9811 Amestoy Avenue
        Northridge, CA 91325
        Email: w.hawkins@angelenomortuaries.com
        Attn: William H. Hawkins

        with a copy (which shall not constitute notice) to:

        Gurnee Mason Rushford Bonotto & Forestiere LLP
        2240 Douglas Blvd., Suite 150
        Roseville, California 95661
        Attn: Nicholas P. Forestiere
        Email: nicholas@gurneelaw.com

To Maker:

        William Andrews
        6160 Warren Parkway – Suite 100
        Frisco, TX 75034
        Attention: wandrews@anthempartners.com

        with a copy (which shall not constitute notice) to:

        Dykema Gossett PLLC
        39577 Woodward Avenue – Suite 300
        Bloomfield Hills, Michigan 48304-2820
        Attention: Jeanne Whalen
        Email: jwhalen@dykema.com

Each of the parties to this Note may specify a different address by giving notice in accordance with this <u>Section 11</u> to each of the other parties hereto.

    **12.**    **Severability.**  Any term or provision of this Note that is invalid or unenforceable in any situation in any jurisdiction will not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.  In the event that any provision hereof would, under applicable law, be invalid or unenforceable in any respect, each party hereto intends that such provision will be construed by modifying or limiting it so as to be valid and enforceable to the maximum extent compatible with, and possible under, applicable law.

*    *    *

3

The Maker has executed this Promissory Note as of the date first-above written.

ANTHEM HOLDINGS (USA), INC.

By: _____

Name: William Andrews

Title:    President

# EXHIBIT D

DocuSign Envelope ID: 14F9BB7A-A1F74A96-839F-91973BF8DDE9



### First American Title Insurance Company
### National Commercial Services
5445 Corporate Drive, Suite 175 • Troy, MI 48098

*Office Phone:*(248)458-7200 *Office Fax:*(866)714-8131

### Final Settlement Statement

| | |
|---|---|
| **File No:** | NCS-1095501-MICH |
| **Escrow Officer:** | Patricia Cadena/pc |
| **Settlement Date:** | 03/29/2022 |
| **Disbursement Date:** | 03/29/2022 |

**Property:**
2636 Sycamore Drive, Simi Valley CA
16728, 16716 & 16721 Upland Ave, Fontana, CA
38141 6th Street East, Palmdale, CA
44818 Cedar Ave, Lancaster, CA
8717 Tampa Ave., Northridge, CA
44831 Cedar Ave., Lancaster, CA

**Buyer:**
Anthem Holdings (USA), Inc.,

**Seller:**
Angeleno Mortuaries, Inc

**Lender:**
Angeleno Mortuaries, Inc.

| Buyer Charge | Buyer Credit | Description | | Seller Charge | Seller Credit |
|---|---|---|---|---|---|
| | | **Consideration** | | | |
| 28,000,000.00 | | **Total Consideration** | | | 28,000,000.00 |
| | | First Sale Price | 10,200,000.00 | | |
| | | Second Sale Price | 17,800,000.00 | | |
| | | | | | |
| | | **Deposits In Escrow** | | | |
| | 16,500,000.00 | Receipt No. 1742128194 on 03/30/2022 by Anthem GP LTD | | | |
| | | | | | |
| | | **Adjustments** | | | |
| | 1,400,000.00 | Buyer paid directly to US Bank-post closing | | 1,400,000.00 | |
| | 1,400,000.00 | Buyer purchased Stock outside closing | | 1,400,000.00 | |
| | | | | | |
| | | **Prorations** | | | |
| 6,161.24 | | 2021/2022 2nd half taxes-Sycamore Drive 03/29/22 to 06/30/22 @$11,961.99/semi | | | 6,161.24 |
| 2,553.67 | | 2021/2022 2nd half taxes-Upland 03/29/22 to 06/30/22 @$4,957.93/semi | | | 2,553.67 |
| 2,623.31 | | 2021/2022 2nd half taxes-6th Street East 03/29/22 to 06/30/22 @$5,093.12/semi | | | 2,623.31 |
| 1,464.98 | | 2021/2022 2nd half taxes-Cedar Ave 03/29/22 to 06/30/22 @$2,844.24/semi | | | 1,464.98 |
| 4,834.98 | | 2021/2022 2nd half taxes-Tampa Ave. 03/29/22 to 06/30/22 @$9,387.07/semi | | | 4,834.98 |
| 8,998.73 | | 2021/2022 2nd half taxes-Cedar 03/29/22 to 06/30/22 @$17,470.94/semi | | | 8,998.73 |
| | | | | | |

## Final Settlement Statement

**Settlement Date:** 03/29/2022                                    **File No:** NCS-1095501-MICH
**Officer:**                Patricia Cadena/pc

| Buyer Charge | Buyer Credit | Description | Seller Charge | Seller Credit |
|---|---|---|---|---|
| | | **New Loan(s)** | | |
| | | **Lender: Angeleno Mortuaries, Inc.** | | |
| | 9,000,000.00 | New Loan to File | 9,000,000.00 | |
| | | | | |
| | | **Payoff Loan(s)** | | |
| | | **Lender: American Enterprise Group Inc.** | | |
| | | Mortgage Payoff-13013548-00 | 1,128,344.32 | |
| | | **Lender: American Enterprise Group Inc.** | | |
| | | Mortgage Payoff-17013559-20(02) | 751,702.81 | |
| | | **Lender: American Enterprise Group Inc.** | | |
| | | Mortgage Payoff-14013559-10(04) | 183,185.64 | |
| | | **Lender: American Enterprise Group Inc.** | | |
| | | Mortgage Payoff-18013586-10(05) | 1,060,648.41 | |
| | | **Lender: American Enterprise Group Inc.** | | |
| | | Mortgage Payoff-18013586-00(06) | 1,988,111.14 | |
| | | **Lender: IncredibleBank** | | |
| | | Mortgage Payoff-8643296(03) | 845,886.13 | |
| | | **Lender: Angeleno Crawford** | | |
| | | Loan Payoff | 622,310.68 | |
| | | **Lender: Angeleno HOM** | | |
| | | Loan Payoff | 1,220,757.20 | |
| | | **Lender: R. Dennis & Erin Persons 2017 Family Trust** | | |
| | | Payoff | 343,142.37 | |
| | | | | |
| | | **Title/Escrow Charges** | | |
| 600.00 | | Closing Fee to First American Title Insurance Company National Commercial Services | 600.00 | |
| 2,325.00 | | Search and Exam to First American Title Insurance Company National Commercial Services | | |
| 1,150.00 | | Recording Service Fee to First American Title Insurance Company National Commercial Services | | |
| 1,540.00 | | Policy-Extended ALTA 2006 Owner's -01 to First American Title Insurance Company National Commercial Services | | |
| 3,909.00 | | Policy-Extended ALTA 2006 Owner's -02 to First American Title Insurance Company National Commercial Services | | |
| 900.00 | | Policy-Extended ALTA 2006 Lender's $150 x 5 (-01/-03/-04/-05/-06) to First American Title Insurance Company National Commercial Services | | |
| 2,403.00 | | Policy-Extended ALTA 2006 Owner's -03 to First American Title Insurance Company National Commercial Services | | |
| 1,464.00 | | Policy-Extended ALTA 2006 Owner's -04 to First American Title Insurance Company National Commercial Services | | |
| 1,302.00 | | Policy-Extended ALTA 2006 Owner's -05 to First American Title Insurance Company National Commercial Services | | |
| 1,587.00 | | Endorsement (O) -01 to First American Title Insurance Company National Commercial Services | | |
| 2,312.00 | | Endorsement (O) -02 to First American Title Insurance Company National Commercial Services | | |
| 1,945.00 | | Endorsement (O) -03 to First American Title Insurance Company National Commercial Services | | |
| 1,665.00 | | Endorsement (O) -04 to First American Title Insurance Company National Commercial Services | | |

## *Final Settlement Statement*

**Settlement Date:** 03/29/2022                    **File No:** NCS-1095501-MICH
**Officer:**        Patricia Cadena/pc

| Buyer Charge | Buyer Credit | Description | Seller Charge | Seller Credit |
|---|---|---|---|---|
| 1,615.00 | | Endorsement (O) -05 to First American Title Insurance Company National Commercial Services | | |
| 2,170.00 | | Policy-Extended ALTA 2006 Owner's -06 to First American Title Insurance Company National Commercial Services | | |
| 1,877.00 | | Endorsement (O) -06 to First American Title Insurance Company National Commercial Services | | |
| 2,500.00 | | Estimated Recording Fees Loan Recordables to First American Title Insurance Company National Commercial Services | | |
| | | Estimated Recording Fees Releases to First American Title Insurance Company National Commercial Services | 2,000.00 | |
| | | | | |
| | | **Disbursements Paid** | | |
| | | **Miscellaneous Disbursement** | | |
| | | Consulting Fee to Johnson Consulting Group | 700,000.00 | |
| | | Legal Fees to Dykema Gossett PLLC | 95,000.00 | |
| | | **Property Tax Check** | | |
| | | 2021/2022 2nd half taxes-613-0-240-285 to County of Ventura | 11,961.99 | |
| | | 2021/2022 2nd half taxes-0191141010000 to SBC Tax Collector | 967.11 | |
| | | 2021/2022 2nd half taxes-0191141020000 to SBC Tax Collector | 3,052.47 | |
| | | 2021/2022 2nd half taxes-0191151080000 to SBC Tax Collector | 296.57 | |
| | | 2021/2022 2nd half taxes-0191151090000 to SBC Tax Collector | 641.78 | |
| | | 2021/2022 2nd half taxes-3009-011-011 to Los Angeles County Tax Collector | 373.31 | |
| | | 2021/2022 2nd half taxes-3009-011-012 to Los Angeles County Tax Collector | 4,719.81 | |
| | | 2021/2022 2nd half taxes-3134-014-008 to Los Angeles County Tax Collector | 2,844.24 | |
| | | 2021/2022 2nd half taxes-2783-027-034 to Los Angeles County Tax Collector | 9,387.07 | |
| | | 2021/2022 2nd half taxes-3134-015-021 to Los Angeles County Tax Collector | 17,470.94 | |
| | | | | |
| 242,099.09 | | **Cash ( From) (X To) Buyer** | | |
| | | **Cash (X To) ( From) Seller** | 7,233,232.92 | |
| | | | | |
| 28,300,000.00 | 28,300,000.00 | **Totals** | 28,026,636.91 | 28,026,636.91 |

*Final Settlement Statement*

**Settlement Date:**  03/29/2022                                    **File No:**   NCS-1095501-MICH
**Officer:**          Patricia Cadena/pc


**BUYER(S):**


Anthem Holdings (USA), Inc., a Delaware corporation
By: _____

   Name: William Andrews

   Title: President

*Final Settlement Statement*

**Settlement Date:**    03/29/2022                    **File No:**    NCS-1095501-MICH
**Officer:**              Patricia Cadena/pc

SELLER(S):


Angeleno Mortuaries, Inc, a California corporation


By: The William H. Hawkins Revocable Trust

By: _____
Name: William H. Hawkins
Title: Co-Trustee

By: _____
Name: Glenn Gomez

Title: Co-Trustee

**DECLARATION OF SARA WATAR**

I, Sara Watar, declare as follows:

1.      I am an attorney at law duly licensed to practice before all the courts of the State of California.  I am an associate at the law firm of TroyGould PC, attorneys of record for Petitioner William H. Hawkins, as Trustee of the William H. Hawkins Revocable Trust (the "Trust").  I have personal knowledge of the facts set forth in this declaration and, if called as a witness, could and would testify competently to such facts under oath.

2.      On September 16, 2024, I conducted a business search of Respondent Anthem Holdings (USA), Inc. ("Anthem") on the California Secretary of State website.  As listed on the California Secretary of State website, Anthem is a Delaware corporation organized under the laws of Delaware with its principal place of business located at 3001 Dallas Parkway, Suite 201, Frisco, Texas 75034.

3.      On August 7, 2024, I sent a letter to Anthem on behalf of the Trust, attaching a draft demand for arbitration (the "Demand for Arbitration").  The Demand for Arbitration outlined the Trust's claims against Anthem arising under the stock purchase agreement and side letter modifying the stock purchase agreement entered into between the parties on March 29, 2022 (the "SPA").  A true and correct copy of this letter is attached hereto as **Exhibit E**.

4.      In the letter and pursuant to the SPA and Code of Civil Procedure § 1281.6, *et seq.*, I proposed to arbitrate the matter before JAMS and requested that Anthem provide us a list of recommended arbitrators.  *See* **Exhibit E**.

5.      Anthem did not respond to my August 7, 2024 letter.

6.      On August 14, 2024, I sent correspondence to Anthem, following up on the Trust's Demand for Arbitration and my request for recommended arbitrators.  In my correspondence, I notified Anthem that if I did not receive a response by August 19, 2024, regarding the Demand for Arbitration, the Trust would move to petition the Los Angeles Superior Court to appoint an arbitrator pursuant to Code of Civil Procedure § 1281.6.  A true and correct copy of my August 14, 2024, correspondence is attached hereto as **Exhibit F**.

**TroyGould PC**

13

WILLIAM H. HAWKINS, AS TRUSTEE OF THE WILLIAM H. HAWKINS REVOCABLE TRUST'S MOTION TO COMPEL ARBITRATION AND APPOINT NEUTRAL ARBITRATOR

04639-0002  4860-9834-4172.1

7.    On August 16, 2024, counsel for Anthem, Ashley R. Fickel of Dykema Gossett PLLC, sent me correspondence proposing mediation.  In his email, counsel for Anthem did not agree to arbitration.  A true and correct copy of Mr. Fickel's August 16, 2024, correspondence is attached hereto as **Exhibit G**.

8.    The parties did not agree to mediation.

9.    On September 3, 2024, I sent Mr. Fickel further correspondence, asking whether Anthem would arbitrate the matter before JAMS.  A true and correct copy of my September 3, 2024, correspondence is attached hereto as **Exhibit H**.

10.    On September 4, 2024, Mr. Fickel sent me correspondence refusing to use JAMS as an arbitration provider.  Mr. Fickel failed to propose an alternative arbitration provider.  A true and correct copy of Mr. Fickel's September 4, 2024, correspondence is attached hereto as **Exhibit I**.

11.    On September 4, 2024, I sent correspondence to Mr. Fickel, inquiring as to Anthem's basis for objecting to JAMS and proposing Alternative Resolution Centers as an alternative arbitration provider.  A true and correct copy of my September 4, 2024, correspondence is attached hereto as **Exhibit J**.

12.    To date, Mr. Fickel has yet to respond to my correspondence or agree to arbitration.

13.    Alternative Resolution Centers is a private disinterested association that provides arbitration and mediation services.

14.    On September 27, 2024, I obtained a list of arbitrators from a private disinterested association concerned with arbitration, namely, Alternative Resolution Centers.  A true and correct copy of my correspondence with Alternative Resolution Centers and the list of arbitrators from Alternative Resolution Centers is attached hereto as **Exhibit K**.

15.    The Trust has not at any time waived its right to arbitration.

/ / /

/ / /

/ / /

/ / /

**TroyGould PC**

14

WILLIAM H. HAWKINS, AS TRUSTEE OF THE WILLIAM H. HAWKINS REVOCABLE TRUST'S MOTION TO COMPEL ARBITRATION AND APPOINT NEUTRAL ARBITRATOR

04639-0002  4860-9834-4172.1

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that this declaration is executed on October 9, 2024, at Los Angeles, California.

_____
Sara Watar

TroyGould PC

WILLIAM H. HAWKINS, AS TRUSTEE OF THE WILLIAM H. HAWKINS REVOCABLE TRUST'S MOTION TO COMPEL ARBITRATION AND APPOINT NEUTRAL ARBITRATOR

04639-0002  4860-9834-4172.1

# EXHIBIT E



**TROYGOULD PC**

1801 Century Park East, 16th Floor
Los Angeles, California 90067-2367
**Tel** (310) 553-4441 | **Fax** (310) 201-4746
www.troygould.com

File No. 04639.0002

**Sara Watar** • (310) 789-1220 • swatar@troygould.com

August 7, 2024

**VIA E-MAIL AND CERTIFIED MAIL**

William Andrews
Anthem Holdings (USA), Inc.
President
3001 Dallas Parkway, Suite 210
Frisco, Texas 75035
wandrews@anthempartners.com

Andrew Clark
Anthem Holdings (USA), Inc.
Chairman & Chief Executive Officer
3001 Dallas Parkway, Suite 210
Frisco, Texas 75035
ac@trianglecapitalcorp.com

   Re: <u>Demand for Arbitration</u>

Dear Mr. Andrews and Mr. Clark:

  This law firm has been retained as counsel for the William H. Hawkins Revocable Trust (the "Trust"). As you are aware, on or around February 18, 2022, Anthem Holdings (USA), Inc. ("Anthem") and the Trust entered into a stock purchase agreement by which Anthem agreed to purchase all of the Trust's outstanding shares in Angeleno Mortuaries, Inc. (the "Purchase Agreement"). We understand that you have been in contact with Mr. William H. Hawkins regarding strategies to pay the money due to the Trust pursuant to the Promissory Note dated March 29, 2022, in the principal amount of $9 million, which was executed in connection with the Purchase Agreement.

  On May 6, 2024, our firm sent a demand letter to Mr. Andrews concerning three other outstanding past-due payments that Anthem owes the Trust pursuant to the Purchase Agreement, including the escrow fund in the amount of $1.4 million ("Escrow Fund"), the amount by which the closing working capital was greater than the target working capital of $750,000 ("Working Capital Adjustment") and reimbursement for paying Anthem's Dykema fees (the "Demand Letter"). Anthem has yet to respond to the Demand Letter.

  Pursuant to the terms of the Purchase Agreement and California Code of Civil Procedure § 1280 et seq., the Trust seeks to commence an arbitration proceeding in Los

**TG | TroyGould**
ATTORNEYS

William Andrews
Andrew Clark
August 7, 2024
Page 2

Angeles, California, for Anthem's breach of the Purchase Agreement relating to the Escrow Fund, Working Capital Adjustment and reimbursement for paying Anthem's Dykema fees.  A copy of the Trust's draft demand for arbitration is attached hereto as Exhibit A.

Section 12.1 of the Purchase Agreement provides that any dispute arising under the agreement shall be settled by arbitration in Los Angeles, California in accordance with the California Arbitration Act (Code of Civil Procedure § 1280 et seq.).  Code of Civil Procedure section 1281.6 provides, in relevant part:

> *If the arbitration agreement does not provide a method for appointing an arbitrator, the parties to the agreement who seek arbitration and against whom arbitration is sought may agree on a method of appointing an arbitrator and that method shall be followed.  In the absence of an agreed method, or if the agreed method fails or for any reason cannot be followed, or when an arbitrator appointed fails to act and his or her successor has not been appointed, the court, on petition of a party to the arbitration agreement, shall appoint the arbitrator.*

The Purchase Agreement does not provide a method for appointing an arbitrator.  Pursuant to Code of Civil Procedure section 1281.6, the Trust proposes that arbitration be administered by JAMS and that an arbitrator be selected pursuant to JAMS Comprehensive Arbitration Rules & Procedures, Rule 15.  Please let us know if you are amenable to this method and if so, provide the Trust a list of recommended arbitrators in Los Angeles, California by August 22, 2024.  If the Trust and Anthem do not reach an agreement regarding the method of appointing an arbitrator, the Trust will petition the Los Angeles Superior Court to appoint an arbitrator pursuant to Code of Civil Procedure section 1281.6.

We look forward to hearing from you and your counsel.  The Trust reserves all of its rights and remedies in connection with this matter.

Very truly yours,

Sara Watar

Encls.: (1)

**EXHIBIT A**

1   TROYGOULD PC
    Russell I. Glazer (SBN 166198)
2   Email:   rglazer@troygould.com
    Sara Watar (SBN 341770)
3   Email:   swatar@troygould.com
    1801 Century Park East, 16th Floor
4   Los Angeles, CA 90067-2367
    Telephone:    (310) 553-4441
5   Facsimile:    (310) 201-4746

6   Attorneys for Claimants
    William H. Hawkins, as Trustee of the William H. Hawkins
7   Revocable Trust

8

9                                    JAMS

10

    | William H. Hawkins, as Trustee of the William H. Hawkins Revocable Trust, | Case No. |
    |---|---|
    | Claimant, | ARBITRATION DEMAND FOR: |
    | v. | 1)  BREACH OF WRITTEN CONTRACT; AND |
    | Anthem Holdings (USA), Inc., a Delaware corporation, and DOES 1-10, inclusive | 2)  ACCOUNTING |
    | Respondents. | |

# DEMAND FOR ARBITRATION

Claimant, William H. Hawkins ("Hawkins") as Trustee of the William H. Hawkins Revocable Trust (the "Trust" or "Claimant"), by and through his attorneys, alleges the following with personal knowledge as to his own actions, and on information and belief as to all other matters, as follows:

# INTRODUCTION

1.      Angeleno Mortuaries, Inc. ("Angeleno Mortuaries") is the culmination of William Hawkins' life's work.  Founded in 1997, Angeleno Mortuaries provides funeral and burial services in Southern California.  As its President and Secretary, Hawkins spent more than 25 years building Angeleno Mortuaries into a multimillion-dollar company.  Hawkins held his ownership of Angeleno Mortuaries in the Trust.  In or about March 2022, Hawkins caused the Trust to sell Angeleno Mortuaries to Respondent Anthem Holdings (USA), Inc. ("Anthem") in an effort to receive value for his life's work, but Anthem failed to deliver.

2.      Specifically, on or about March 29, 2022, Anthem and the Trust – which owned all of Angeleno Mortuaries' outstanding shares at that time – entered into a stock purchase agreement for the purchase and sale of the company (the "Stock Purchase Agreement").  That same day, Anthem and the Trust executed a side letter modifying the Stock Purchase Agreement (the "Side Letter").  (The Stock Purchase Agreement as modified by the Side Letter is referred to herein as the "SPA".)  Among other things, in the Side Letter, the Trust agreed to forego immediate payment of $8,000,000 of the purchase price – an amount later increased to $9,000,000 – in exchange for a promissory note in that amount, plus interest (the "Promissory Note").  The Promissory Note came due on June 27, 2022.  Anthem failed to pay the Trust any principal due under the Promissory Note, just as it has failed to honor its other obligations to the Trust.

3.      On August 17, 2022, Anthem, the Trust and the Canadian Imperial Bank of Commerce ("CIBC") entered into a subordination and postponement agreement, whereby Anthem and the Trust agreed that the Promissory Note would be deferred, postponed and subordinated to the prior repayment in full by Anthem of its debt to CIBC ("Subordination and Postponement

COMPLAINT

TroyGould PC

04639-0002 4875-9977-2873.3

Agreement"). As a result, the Trust does not make a claim in this arbitration for payment pursuant to the Promissory Note. Instead, the Trust brings this arbitration to seek redress for Anthem's breaches of the SPA that are not encompassed by the Promissory Note or barred by the Subordination and Postponement Agreement.

4.    **First**, the SPA required Anthem to deposit an escrow fund of $1.4 million ("Escrow Fund") on June 27, 2022, to be held in a segregated escrow account ("Escrow Account") and disbursed to the Trust at the end of the escrow period on February 18, 2023 ("Escrow Period"). The Escrow Fund was only to be deducted from to pay any (1) Working Capital Adjustment[1] owed by the Trust to Anthem and/or (2) indemnification claims that might have become due to Anthem pursuant to the SPA. At the end of the Escrow Period, the Escrow Fund of $1.4 million should have been deposited to the Trust because no claims for Working Capital Adjustment or indemnification were made by Anthem. However, the Trust never received the Escrow Fund because Anthem failed to deposit it in the first instance in violation of the SPA.

5.    **Second**, the SPA provides that if the Closing Working Capital was less than 750,000, Anthem and the Trust were to jointly direct the escrow agent to immediately release the full amount of that difference from the Escrow Fund to Anthem. However, if the Closing Working Capital was greater than the Target Working Capital, the SPA requires that Anthem wire transfer the full amount of that difference to the Trust.

6.    The Trust is informed and believes that the Closing Working Capital was greater than the Target Working Capital of $750,000. Anthem should have wire transferred the full amount of that difference to the Trust but failed to do so in violation of the SPA.

---

[1]    Pursuant to the terms of the SPA, the working capital adjustment is defined as the amount by which the closing working capital is greater than or less than the target working capital ("Working Capital Adjustment"). The SPA defines the closing working capital as the amount calculated by subtracting the current liabilities of Angeleno Mortuaries from the current assets of Angeleno Mortuaries (excluding inventory) as of the closing date (Closing Working Capital"). The SPA lists the target working capital at $750,000 ("Target Working Capital"). The closing date is defined in section 3.1 of the SPA (the "Closing Date" or "Closing").

7.    ***Third***, the SPA provides that each party shall pay its own costs and expenses, including legal fees, incurred in connection with the agreement.  Anthem retained the services of Dykema Gossett PLLC ("Dykema") to represent it during Anthem's purchase of Angeleno Mortuaries.

8.    On March 29, 2022, First American Title Insurance Company prepared a final settlement statement which listed the charges to Anthem and the Trust relating to the purchase and sale of Angeleno Mortuaries ("Final Settlement Statement").  The Final Settlement Statement erroneously listed Anthem's Dykema fees of $95,000 as charges to be paid by the Trust rather than Anthem.  As an accommodation to Anthem, the Trust paid Anthem's Dykema fees because Anthem promised to reimburse the Trust for those fees.  Anthem failed to reimburse the Trust for paying Anthem's Dykema fees in violation of the SPA.

9.    Based on the foregoing, Anthem materially breached its obligations to the Trust under the SPA.  Claimants now bring this arbitration for breach of written contract and for an accounting of Anthem's and Angeleno Mortuaries' books, records, accounting records and accounting work papers to determine the Working Capital Adjustment owed to the Trust.

## THE PARTIES

10.    William H. Hawkins is an individual residing in Northridge, California.  Hawkins is the co-trustee of the William H. Hawkins Revocable Trust.

11.    Anthem Holdings (USA), Inc., is a Delaware corporation organized under the laws of Delaware with its principal place of business located at 3001 Dallas Parkway, Suite 201, Frisco, Texas 75034.  Anthem is a privately owned operator of cemeteries, crematories and funeral homes across the United States.

## THE AGREEMENT TO ARBITRATE

12.    The Stock Purchase Agreement, which the parties to this Arbitration entered into on or about March 29, 2022, contains an arbitration clause, which provides that any dispute arising under the agreement shall be resolved by binding arbitration in accordance with the California

Arbitration Act.  The agreement further provides that the arbitration shall be conducted in Los Angeles, California.  (See Exhibit A, Stock Purchase Agreement, § 12.1).

## GENERAL ALLEGATIONS

### A.    Creation of Angeleno Mortuaries and the Trust

13.    In or around 1997, Hawkins founded Angeleno Mortuaries, a company devoted to providing funeral and burial services in Southern California.  Hawkins owned 100 outstanding shares of Angeleno Mortuaries, constituting all the company's outstanding shares.

14.    Hawkins served as the President and Secretary of Angeleno Mortuaries until its sale to Anthem in March 2022.

15.    On February 3, 2016, Hawkins created the William H. Hawkins Revocable Trust, naming Hawkins and his life partner, Glenn Gomez, as co-trustees of the Trust, and Hawkins' issue and Glenn Gomez as the beneficiaries of the Trust.  Hawkins subsequently transferred ownership of his shares in Angeleno Mortuaries to the Trust.

### B.    The Stock Purchase Agreement, Side Letter and Promissory Note

16.    On or around March 29, 2022, after months of negotiations, Anthem and the Trust executed the Stock Purchase Agreement, whereby the Trust was to sell and Anthem was to buy all 100 outstanding shares of Angeleno Mortuaries.  A true and correct copy of the Stock Purchase Agreement is attached hereto as Exhibit A.  The Stock Purchase Agreement had an effective date as of February 18, 2022.

17.    Pursuant to the Stock Purchase Agreement, the estimated purchase price for the 100 outstanding shares in Angeleno Mortuaries was to be calculated as: (a) $28,000,000, plus or minus (b) the Working Capital Adjustment, minus (c) minus Existing Indebtedness[2], minus (d) Seller Transaction Expenses[3] ("Estimated Purchase Price").

---

[2]    Pursuant to the terms of the SPA, existing indebtedness is defined as the Indebtedness of Angeleno Mortuaries outstanding on the Closing Date ("Existing Indebtedness").  Indebtedness is defined in Section 1.1 of the SPA ("Indebtedness").

[3]    Section 1.1 of the SPA defines seller transaction expenses ("Seller Transaction Expenses").

18.     Also on March 29, 2022, Anthem and the Trust executed the Side Letter, modifying the Stock Purchase Agreement to provide, among other things, that Anthem would pay a substantial portion of the purchase price with a promissory note.  A true and correct copy of the Side Letter is attached hereto as Exhibit B.  As noted above, the Stock Purchase Agreement and the Side Letter are referred to collectively herein as the "SPA."

19.     The Side Letter listed the original principal amount of the Promissory Note as $8,000,000.  Anthem and the Trust later changed the original principal amount to $9,000,000, which is the principal amount reflected in the Promissory Note.  A true and correct copy of the Promissory Note is attached hereto as Exhibit C.

20.     Although the Promissory Note was executed on June 27, 2022, Anthem has yet to pay the Trust the principal amount more than two years later.

**D.     The Escrow Fund**

21.     The SPA provides that Anthem was to deposit $1.4 million into the Escrow Account by June 27, 2022.  The Escrow Fund was to be held during the Escrow Period for the purpose of paying any (1) Working Capital Adjustment owed by the Trust to Anthem and/or (2) indemnification claims that may become due to Anthem pursuant to the SPA.

22.     The escrow agent was to disburse the Escrow Fund to the Trust, less any payments for Working Capital Adjustment to Anthem and/or indemnification claims due to Anthem, upon the expiration of the Escrow Period on February 18, 2023.

23.     Anthem failed to deposit the Escrow Fund by June 27, 2022, and has yet to do so more than two years later.  Nor has Anthem paid the Escrow Fund, or any portion of it, to the Trust.

24.     Anthem made no claims for indemnification or Working Capital Adjustment by February 18, 2023 (or any time thereafter).  Accordingly, had Anthem deposited the Escrow Fund as required by the SPA, the Escrow Fund would have remained at $1.4 million, plus interest, as of February 18, 2023.

25.      Because Anthem never deposited the Escrow Fund on behalf of the Trust prior to or since June 27, 2022, the escrow agent has been unable to disburse the Escrow Fund to the Trust pursuant to the terms of the SPA.

**TroyGould**
**PC**

ARBITRATION DEMAND

04639-0002  4875-9977-2873.3

**E.    The Working Capital Adjustment**

26.    The SPA provided that on or before the 60th day following the Closing Date, Anthem was to provide the Trust with a written statement setting forth Anthem's calculation of the purchase price for the 100 outstanding shares of Angeleno Mortuaries, including among other things, the Closing Working Capital.

27.    Pursuant to the terms of the SPA, if the Closing Working Capital was less than the Target Working Capital, Anthem and the Trust were to execute a joint written discretion directing the escrow agent to immediately release the full amount of that difference from the Escrow Fund to Anthem, plus interest on any unpaid amount until paid in full.

28.    The SPA also requires that if the Closing Working Capital was greater than the Target Working Capital, Anthem was to pay that difference to the Trust, plus interest on any unpaid amount until paid in full.

29.    Anthem did not provide the Trust its written statement setting forth a calculation of the purchase price or the Closing Working Capital on or before the 60th day after Closing, and has failed to do so since.

30.    On information and belief, the Closing Working Capital exceeded the Target Working Capital by approximately $300,000. Anthem has yet to transfer that difference to the Trust in violation of the SPA.

31.    The determination of the precise amount due and owing requires an accounting of Anthem's and Angeleno Mortuaries' books, records, accounting records and accounting work papers, which is information in Anthem's possession, custody and control.

32.    Once the precise amount of the Working Capital Adjustment due has been determined, Anthem is required to wire transfer that amount to the Trust.  Failure to do so will constitute a breach of the SPA.

**F.    Anthem's Dykema Fees**

33.    Section 12.9 of the SPA provides that each party shall pay its own costs and expenses, including legal fees, incurred in connection with the agreement.

34.    Anthem retained the legal services of Dykema in connection with its purchase of Angeleno Mortuaries.

35.    On or about March 29, 2022, a Final Settlement Statement was prepared by First American Title Insurance Company, which listed the charges to Anthem and the Trust relating to the purchase and sale of Angeleno Mortuaries.

36.    The Final Settlement Statement erroneously listed Anthem's Dykema fees of $95,000 as charges to be paid by the Trust rather than Anthem.  At Anthem's request and in the interest of time, the Trust paid Dykema's fees on Anthem's behalf and in reliance on Anthem's promise to reimburse the Trust for those fees.  Anthem failed to reimburse the Trust for paying Anthem's Dykema fees in violation of the SPA.

37.    Claimants have repeatedly reminded Anthem of its contractual obligations pursuant to the SPA, including (1) depositing the Escrow Fund into the Escrow Account, (2) paying the Working Capital Adjustment owed to the Trust, and (3) paying its own legal fees in connection with the SPA.  However, Claimants' efforts to resolve this matter informally have been unsuccessful.  Despite its agreement to do so pursuant to the SPA, Anthem has failed to deposit the Escrow Fund, pay the difference by which the Closing Working Capital is greater than the Target Working Capital, or reimburse the Trust for paying Anthem's Dykema fees.

## **FIRST CAUSE OF ACTION**

### **(For Breach of Written Contract)**

38.    Claimant incorporates each of the above paragraphs as if set forth fully herein.

39.    On or about March 29, 2022, the Trust and Anthem entered into the written Stock Purchase Agreement as modified by the Side Letter entered into on the same date.

40.    The Trust has performed all of its obligations under the SPA, except for those for which performance has been excused.

41.    As described above, Anthem breached the SPA by:

(a)    Failing to deposit $1.4 million into an escrow account on June 27, 2022 and failing to cause this amount to be paid to the Trust on February 18, 2023;

04639-0002  4875-9977-2873.3

(b)     Failing to provide a written statement setting forth its calculation of Anthem's Closing Working Capital (as defined in the SPA) on or before 60 days after the Closing Date of the SPA, i.e., by May 28, 2022, and failing to pay the Trust the Working Capital Adjustment, as also defined in the SPA; and

(c)     Failing to reimburse the Trust $95,000 in Dykema's legal fees that the Trust paid on Anthem's behalf.

42.     As a result of the forgoing breaches, the Trust has been damaged in an amount exceeding $1,795,000 dollars, plus interest.

43.     Section 12.1(f) of the SPA provides that:

"One or more of the Parties to any arbitration proceeding commenced hereunder shall be entitled as part of the arbitration award to the costs and expenses (***including reasonable attorneys' fees and interest on any award***) of investigating, preparing and pursuing an arbitration claim as such costs and expenses are awarded by the arbitration panel."

(Exhibit A, SPA, § 12.1(f), emphasis added).

44.     As a result of Anthem's breaches of the SPA, the Trust is owed all attorneys' fees incurred by the Trust in connection with this arbitration.

## **SECON CAUSE OF ACTION**

### **(For Accounting)**

45.     Pursuant to paragraph 2.4 of the SPA, within sixty days after the closing, Anthem was obligated to provide the Trust with "a written statement setting forth a calculation of the Closing Working Capital, Existing Indebtedness, Seller Transaction Expenses, and the Purchase Price based thereon" in order to calculate the Working Capital Adjustment.

46.     Anthem failed to fulfill this obligation.

47.     The Trust is entitled to an accounting of Anthem's and Angeleno Mortuaries' books, records, accounting records and accounting work papers.

48.     Such an accounting is necessary to determine the Working Capital Adjustment.

**TroyGould PC**

ARBITRATION DEMAND

04639-0002 4875-9977-2873.3

**PRAYER**

WHEREFORE, Claimants pray for judgment as follows:

1.    For an award of damages in an amount to be determined according to proof, but which is at least $1,795,000;

2.    For reasonable attorneys' fees incurred herein by the Trust;

3.    For interest on all sums;

4.    An accounting; and

5.    For such other and further relief in Claimants' favor as the Arbitrator deems just and proper.

Dated:                                              TROYGOULD PC


By: _____
         Russell I. Glazer
         Sara Watar
      Attorneys for Claimants
      William H. Hawkins, individually and as the
      Trustee of the William H. Hawkins Revocable Trust

04639-0002 4875-9977-2873.3

EXHIBIT F

 Outlook

---

**Re: William H. Hawkins Revocable Trust- Anthem Holdings [Demand for Arbitration]**

---

**From** Watar, Sara <swatar@troygould.com>

**Date** Wed 8/14/2024 2:52 PM

**To** wandrews@anthempartners.com <wandrews@anthempartners.com>; ac@trianglecapitalcorp.com <ac@trianglecapitalcorp.com>

**Cc** Glazer, Russell I. <RGlazer@troygould.com>; Udoekwere, Ekong I. <EUdoekwere@troygould.com>; Cervantes, Shirley <SCervantes@troygould.com>

Mr. Andrews and Mr. Clark:

As you know, we are counsel for the William H. Hawkins Revocable Trust.  We have yet to receive your response to our August 7, 2024, letter and therefore take your silence as an indication that you will not provide us a list of recommended arbitrators.  If we do not receive a response from you by Monday August 19, 2024, we will petition the Los Angeles Superior Court to appoint an arbitrator pursuant to Code of Civil Procedure section 1281.6.

Thank you,



**Sara Watar**

Tel|Fax (310) 789-1220
swatar@troygould.com
TroyGould PC
1801 Century Park East, Suite 1600
Los Angeles, CA 90067-2367
www.troygould.com

---

**From:** Cervantes, Shirley <SCervantes@troygould.com>
**Sent:** Wednesday, August 7, 2024 11:12 AM
**To:** wandrews@anthempartners.com <wandrews@anthempartners.com>; ac@trianglecapitalcorp.com <ac@trianglecapitalcorp.com>
**Cc:** Watar, Sara <swatar@troygould.com>; Glazer, Russell I. <RGlazer@troygould.com>; Udoekwere, Ekong I. <EUdoekwere@troygould.com>
**Subject:** William H. Hawkins Revocable Trust- Anthem Holdings [Demand for Arbitration]

Good afternoon,

Please see the attached correspondence in reference to above-captioned matter.

Best,



**Shirley Cervantes**
Legal Assistant
(310) 789-1364 - Fax (310) 201-4746
scervantes@troygould.com
TroyGould PC
1801 Century Park East, Suite 1600
Los Angeles, CA 90067-2367
www.troygould.com

**Notice to Recipient**: This e-mail is meant only for the intended recipient of the transmission, and may be a communication privileged by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of the e-mail is strictly prohibited. Please notify us immediately of the error by return e-mail and delete this message from your system. Thank you in advance for your cooperation.

# EXHIBIT G

 Outlook

---

**William H. Hawkins Revocable Trust- Anthem Holdings [Demand for Arbitration]**

---

**From**  Fickel, Ashley <AFickel@dykema.com>

**Date**  Fri 8/16/2024 2:08 PM

**To**  Watar, Sara <swatar@troygould.com>

**Cc**  Glazer, Russell I. <RGlazer@troygould.com>; Udoekwere, Ekong I. <EUdoekwere@troygould.com>; Cervantes, Shirley <SCervantes@troygould.com>; Whalen, Jeanne <JWhalen@dykema.com>

Some people who received this message don't often get email from afickel@dykema.com. Learn why this is important

Hi Sara,

As you know, our firm will be representing Anthem with respect to the above dispute. We have reviewed your correspondence and draft demand for arbitration. At this juncture, we would like to propose early mediation before proceeding with costly litigation. Could you please let us know your client's position.

Thanks,

**Ashley R. Fickel** (he/him)
Office Managing Member, Los Angeles

D 213-457-1758 ▪ F 855-223-2781
AFickel@dykema.com ▪ dykema.com

**BIO   VCARD   LINKEDIN**

444 South Flower Street, Suite 2200
Los Angeles, California 90071



*** Notice from Dykema Gossett PLLC: This Internet message may contain information that is privileged, confidential, and exempt from disclosure. It is intended for use only by the person to whom it is addressed. If you have received this in error, please (1) do not forward or use this information in any way; and (2) contact me immediately.

Neither this information block, the typed name of the sender, nor anything else in this message is intended to constitute an electronic signature unless a specific statement to the contrary is included in this message.

EXHIBIT H

 Outlook

---

## Re: William H. Hawkins Revocable Trust- Anthem Holdings [Demand for Arbitration]

**From** Watar, Sara <swatar@troygould.com>

**Date** Tue 9/3/2024 4:25 PM

**To** Fickel, Ashley <AFickel@dykema.com>

**Cc** Glazer, Russell I. <RGlazer@troygould.com>; Udoekwere, Ekong I. <EUdoekwere@troygould.com>; Cervantes, Shirley <SCervantes@troygould.com>; Whalen, Jeanne <JWhalen@dykema.com>; Hamilton, Rachel E. <RHamilton@troygould.com>

Ashley,

We do not agree. We are always available to discuss resolution but are eager to push this matter forward. Please let us know if you agree to adjudicate this matter before JAMS by close of business tomorrow, September 4, 2024.  If not, we will move forward with petitioning the court to appoint an arbitrator.

Thank you,
Sara Watar



**Sara Watar**

Tel|Fax (310) 789-1220
swatar@troygould.com
TroyGould PC
1801 Century Park East, Suite 1600
Los Angeles, CA 90067-2367
www.troygould.com

---

**From:** Fickel, Ashley <AFickel@dykema.com>
**Sent:** Tuesday, September 3, 2024 1:47 PM
**To:** Watar, Sara <swatar@troygould.com>
**Cc:** Glazer, Russell I. <RGlazer@troygould.com>; Udoekwere, Ekong I. <EUdoekwere@troygould.com>; Cervantes, Shirley <SCervantes@troygould.com>; Whalen, Jeanne <JWhalen@dykema.com>; Hamilton, Rachel E. <RHamilton@troygould.com>
**Subject:** Re: William H. Hawkins Revocable Trust- Anthem Holdings [Demand for Arbitration]

# EXHIBIT I

 Outlook

---

## RE: William H. Hawkins Revocable Trust- Anthem Holdings [Demand for Arbitration]

---

**From** Fickel, Ashley <AFickel@dykema.com>

**Date** Wed 9/4/2024 11:51 AM

**To** Watar, Sara <swatar@troygould.com>

**Cc** Glazer, Russell I. <RGlazer@troygould.com>; Udoekwere, Ekong I. <EUdoekwere@troygould.com>; Cervantes, Shirley <SCervantes@troygould.com>; Whalen, Jeanne <JWhalen@dykema.com>; Hamilton, Rachel E. <RHamilton@troygould.com>

Hi Sara, Our client does not agree to use JAMS as an arbitration provider for this matter. If you have another proposal, please let us know. Otherwise, we remain available to discuss a productive resolution. Thanks,

**Ashley R. Fickel** (he/him)
Office Managing Member, Los Angeles

D 213-457-1758 • F 855-223-2781
AFickel@dykema.com • dykema.com

**BIO   VCARD   LINKEDIN**

444 South Flower Street, Suite 2200
Los Angeles, California 90071

## Dykema

---

**From:** Watar, Sara <swatar@troygould.com>
**Sent:** Tuesday, September 3, 2024 4:25 PM
**To:** Fickel, Ashley <AFickel@dykema.com>
**Cc:** Glazer, Russell I. <RGlazer@troygould.com>; Udoekwere, Ekong I. <EUdoekwere@troygould.com>; Cervantes, Shirley <SCervantes@troygould.com>; Whalen, Jeanne <JWhalen@dykema.com>; Hamilton, Rachel E. <RHamilton@troygould.com>
**Subject:** Re: William H. Hawkins Revocable Trust- Anthem Holdings [Demand for Arbitration]

**\*\*\* EXTERNAL\*\*\***

Ashley,

We do not agree. We are always available to discuss resolution but are eager to push this matter forward. Please let us know if you agree to adjudicate this matter before JAMS by close of business tomorrow, September 4, 2024.  If not, we will move forward with petitioning the court to appoint an arbitrator.

Thank you,
Sara Watar

EXHIBIT J

 Outlook

---

**Re: William H. Hawkins Revocable Trust- Anthem Holdings [Demand for Arbitration]**

---

| | |
|---|---|
| **From** | Watar, Sara <swatar@troygould.com> |
| **Date** | Wed 9/4/2024 1:51 PM |
| **To** | Fickel, Ashley <AFickel@dykema.com> |
| **Cc** | Glazer, Russell I. <RGlazer@troygould.com>; Udoekwere, Ekong I. <EUdoekwere@troygould.com>; Cervantes, Shirley <SCervantes@troygould.com>; Whalen, Jeanne <JWhalen@dykema.com>; Hamilton, Rachel E. <RHamilton@troygould.com> |

Ashley:

Please let us know your basis for objecting to JAMS.  Alternatively, we suggest ARC.

Thank you,



**Sara Watar**

Tel|Fax (310) 789-1220
swatar@troygould.com
TroyGould PC
1801 Century Park East, Suite 1600
Los Angeles, CA 90067-2367
www.troygould.com

---

**From:** Fickel, Ashley <AFickel@dykema.com>
**Sent:** Wednesday, September 4, 2024 11:51 AM
**To:** Watar, Sara <swatar@troygould.com>
**Cc:** Glazer, Russell I. <RGlazer@troygould.com>; Udoekwere, Ekong I. <EUdoekwere@troygould.com>; Cervantes, Shirley <SCervantes@troygould.com>; Whalen, Jeanne <JWhalen@dykema.com>; Hamilton, Rachel E. <RHamilton@troygould.com>
**Subject:** RE: William H. Hawkins Revocable Trust- Anthem Holdings [Demand for Arbitration]

Hi Sara, Our client does not agree to use JAMS as an arbitration provider for this matter. If you have another proposal, please let us know. Otherwise, we remain available to discuss a productive resolution. Thanks,

# EXHIBIT K

 Outlook

---

**Re: ARC Arbitration Rules**

---

**From** Nicole Bethurum <nicole@arc4adr.com>
**Date** Fri 9/27/2024 3:50 PM
**To**    Watar, Sara <swatar@troygould.com>

Marc Alexander, Esq.
John Derrick, Esq.
Hon. Andrew Kauffman, Ret.
Anthony Khoury, Esq. (retired commissioner)
Hon. John Shook, Ret.

    **NICOLE BETHURUM-JIMENEZ**
*Chief Executive Officer*
Tel 310.284.8224 • Fax 310.284.8229
nicole@arc4adr.com
Westwood • DTLA • Ventura • Orange County
Riverside • San Francisco • San Diego

www.arc4adr.com

On Sep 27, 2024, at 11:37 AM, Watar, Sara <swatar@troygould.com> wrote:

Nicole:

This is a breach of contract case specifically involving breaches of a stock purchase agreement.

Thank you,

<Outlook-1pn1gr3t.png>

**Sara Watar**
Tel|Fax (310) 789-1220
swatar@troygould.com
TroyGould PC
1801 Century Park East, Suite 1600
Los Angeles, CA 90067-2367
www.troygould.com

---

**From:** Nicole Bethurum <nicole@arc4adr.com>
**Sent:** Thursday, September 26, 2024 9:52 AM
**To:** Watar, Sara <swatar@troygould.com>
**Subject:** Re: ARC Arbitration Rules

Thank you, Sara.  Please remind me what type of civil matter this is?
<ARC email signature_Nicole_12-22-22.png>

On Sep 25, 2024, at 5:30 PM, Watar, Sara <swatar@troygould.com> wrote:

Nicole,

We decided to move forward with the petition to compel arbitration and appoint a neutral arbitrator.  At your convenience, please send me a list of proposed arbitrators so that we can attach it to our client's petition.

Thank you,

<Outlook-dbecxqe4.png>

**Sara Watar**

Tel|Fax (310) 789-1220
swatar@troygould.com

1    TROYGOULD PC
     Russell I. Glazer (SBN 166198)
2    Email:   rglazer@troygould.com
     Sara Watar (SBN 341770)
3    Email:   swatar@troygould.com
     1801 Century Park East, 16th Floor
4    Los Angeles, CA 90067-2367
     Telephone:    (310) 553-4441
5    Facsimile:    (310) 201-4746

6    Attorneys for Plaintiff
     William H. Hawkins, as Trustee of the
7    William H. Hawkins Revocable Trust,

8            SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                 COUNTY OF LOS ANGELES

10

| | |
|---|---|
| 11   William H. Hawkins, as Trustee of the William H. Hawkins Revocable Trust, | Case No. 24STCP03132 |
| 12            Petitioner, | NOTICE OF MOTION TO COMPEL ARBITRATION AND APPOINT NEUTRAL ARBITRATOR |
| 13      v. | |
| 14   Anthem Holdings (USA), Inc., a Delaware corporation, and DOES 1-10, inclusive, | [Concurrently filed with Memorandum of Points and Authorities; Declarations of William H. Hawkins and Sara Watar; and [Proposed Order] |
| 16          Respondents. | Hon. Daniel S. Murphy |
| 17 | Date:    December 2, 2024 Time:   8:30 a.m. |
| 18 | Dept:   32 RES ID:  107461434636 |

19

20

21

22

23

24

25

26

27

28

NOTICE OF HEARING ON MOTION TO COMPEL ARBITRATION AND APPOINT NEUTRAL ARBITRATOR

04639-0002 4868-5666-1228.1

TO THE COURT, ALL PARTIES, AND THEIR COUNSEL OF RECORD: PLEASE TAKE NOTICE that on December 2, 2024, at 8:30 a.m., or as soon thereafter as the matter may be heard, in Department 32 of the above-captioned Court, located at the Stanley Mosk Courthouse, 111 N. Hill Street, Los Angeles, CA 90012, the Honorable Daniel S. Murphy presiding, petitioner William H. Hawkins, as Trustee of the William H. Hawkins Revocable Trust, will and hereby does move the Court for an order (1) compelling respondent Anthem Holdings (USA), Inc., ("Anthem"), to arbitrate the dispute existing between them in accordance with the arbitration provision set forth in their agreement, (2) nominate five persons from the list of arbitrators provided by Alternative Resolution Centers and attached as Exhibit K to the Declaration of Sara Watar and, (3) pursuant to Code of Civil Procedure § 1281.6, select an arbitrator from the list if the parties do not agree on an arbitrator within five days after the parties receive notice of the nominees from the Court.

TROYGOULD PC


By: _____
        Russell I. Glazer
        Sara Watar
Attorneys for Petitioner
William H. Hawkins, as Trustee of the William H. Hawkins Revocable Trust

TroyGould
PC

NOTICE OF HEARING ON MOTION TO COMPEL ARBITRATION AND APPOINT NEUTRAL ARBITRATOR

04639-0002  4868-5666-1228.1

Journal Technologies Court Portal

# Make a Reservation

### WILLIAM H. HAWKINS vs ANTHEM HOLDINGS (USA), INC.

Case Number: 24STCP03132    Case Type: Civil Unlimited    Category: Petition to Compel/Confirm/Vacate Arbitration
Date Filed: 2024-09-30  Location: Stanley Mosk Courthouse - Department 32

## Reservation

| | |
|---|---|
| Case Name:<br>WILLIAM H. HAWKINS vs ANTHEM HOLDINGS (USA), INC. | Case Number:<br>24STCP03132 |
| Type:<br>Motion to Compel Arbitration | Status:<br>RESERVED |
| Filing Party:<br>William H. Hawkins (Petitioner) | Location:<br>Stanley Mosk Courthouse - Department 32 |
| Date/Time:<br>12/02/2024 8:30 AM | Number of Motions:<br>1 |
| Reservation ID:<br>107461434636 | Confirmation Code:<br>CR-XZIATJY95DJPYGVUQ |

## Fees

| Description | Fee | Qty | Amount |
|---|---|---|---|
| Motion to Compel Arbitration | 0.00 | 1 | 0.00 |
| TOTAL | | | **$0.00** |

## Payment

| | |
|---|---|
| Amount:<br>$0.00 | Type:<br>NOFEE |
| Account Number:<br>n/a | Authorization:<br>n/a |
| Payment Date:<br>n/a | |

🖶 Print Receipt      ✚ Reserve Another Hearing

1

2

3

4

5

6

7

8    SUPERIOR COURT OF THE STATE OF CALIFORNIA

9    COUNTY OF LOS ANGELES

10

11    William H. Hawkins, as Trustee of the
      William H. Hawkins Revocable Trust,

12                                          Case No. 24STCP03132

               Petitioner,                  [PROPOSED] ORDER GRANTING MOTION
13                                          TO COMPEL ARBITRATION AND APPOINT
                                            NEUTRAL ARBITRATOR
14         v.
                                            [Concurrently filed with Notice of Motion;
15    Anthem Holdings (USA), Inc., a Delaware   Memorandum of Points and Authorities; and
      corporation, and DOES 1-10, inclusive,   Declarations of William H. Hawkins and Sara
16                                          Watar]
               Respondents.
17                                          Hon. Daniel S. Murphy

18                                          Date:    December 2, 2024
                                            Time:    8:30 a.m.
19                                          Dept:    32

20

21

22

23

24

25

26

27

28

**TroyGould
PC**

[PROPOSED] ORDER GRANTING MOTION TO COMPEL ARBITRATION AND APPOINT NEUTRAL
ARBITRATOR

04639-0002  4871-6160-0492.1

The Court having considered petitioner William H. Hawkins, as Trustee of the William H. Hawkins Revocable Trust's motion to compel arbitration and appoint a neutral arbitrator, and having heard argument from all counsel, it is hereby ORDERED that:

1. The motion to compel arbitration is GRANTED;

2. This Court nominates the list of arbitrators supplied by Alternative Resolution Centers and attached as Exhibit K to the Declaration of Sara Watar; and

3. Should the parties fail to agree on an arbitrator within five days after notice of this Order, this Court shall appoint an arbitrator from the list of the arbitrators supplied by Alternative Resolution Centers, attached as Exhibit K to the Declaration of Sara Watar.

IT IS SO ORDERED.

DATED: October 9, 2024

_____
THE HONORABLE DANIEL S. MURPHY

**TroyGould PC**

04639-0002  4871-6160-0492.1